# EXHIBIT 1

Case 3:17-cv-01124-MMA-WVG   Document 93-6   Filed 06/11/19   PageID.1140   Page 2 of 271

**Non-Confidential**
Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF CALIFORNIA

 3                         -    -    -

 4   LA JOLLA SPA MD INC.,            :

 5        Plaintiff,                  : Civil Action No.

 6             vs.                    : 3:17-CV-01124-MMA-WVG

 7   AVIDAS PHARMACEUTICALS, LLC,  :

 8   a limited liability company;  :

 9   and DOES 1 through 10           :

10   inclusive,                      :

11        Defendants.                :

12                         -    -    -

13                 ***NON-CONFIDENTIAL***

14              Videotaped deposition of

15              MARGARET GARDNER - 30(b)(6)

16              Philadelphia, Pennsylvania

17                Friday, May 3, 2019

18                    10:15 a.m.

19
     BEFORE:
20

21   Gail L. Inghram Verbano:

22        Registered Diplomate Reporter,

23        Certified Realtime Reporter,

24        Certified Shorthand Reporter-CA (No. 8635)

25   JOB NO. 10055415
```

1

2

3

4                    ***NON-CONFIDENTIAL***

5

6                    Videotaped deposition of MARGARET

7    GARDNER - 30(b)(6) , held at the offices of HOGAN

8    LOVELLS, LLP, 1735 Market Street, 23rd Floor,

9    Philadelphia, Pennsylvania 19103, on Friday, May

10   3, 2019, beginning at approximately 10:15 a.m., the

11   proceedings being recorded stenographically by Gail

12   Inghram Verbano, Registered Diplomate Reporter,

13   Certified Realtime Reporter, Certified Shorthand

14   Reporter-CA (No. 8635), and transcribed under her

15   direction.

16

17

18

19

20

21

22

23

24

25

```
 1          A P P E A R A N C E S

 2

 3    On behalf of PLAINTIFF:

 4         JAMES T. RYAN, P.C., ESQ.

 5         jr@jamestryan.com

 6         1110 Glenville Drive #307

 7         Los Angeles, California 90035

 8

 9

10    On behalf of Defendants:

11         JULIE CHOVANES, ESQ.

12         jchovanes@chovanes.com

13         25 Springfield Avenue

14         Philadelphia, Pennsylvania 19118

15

16    ALSO PRESENT:

17         DENNIS MULLIN, Legal Videographer

18         DIANNE YORK, via telephone

19

20

21

22

23

24

25
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1              C O N T E N T S

 2   EXAMINATION OF:                           PAGE

 3   MARGARET GARDNER

 4          By Mr. Ryan                          9

 5

 6

 7              E X H I B I T S

 8

 9   EXHIBIT                              IDENTIFIED

10   Exhibit 50   Notice of Deposition         17

11   Exhibit 51   Know-How and Trademark License   36
                  and Purchase Agreement
12
     Exhibit 52   Sales and distribution agreement   38
13
     Exhibit 53   Modification Know-How and       43
14                Trademark License and Purchase
                  Agreement
15
     Exhibit 54   Manufacturing and Technical    62
16                Services Agreement, Bates-stamped
                  A_1138 to 1166
17
     Exhibit 55   Letter from Ms. Gardner to Ms.  97
18                York dated 6-10-14, Bates-stamped
                  P-153 to 156
19
     Exhibit 56   Inventory and License Agreement  100
20
     Exhibit 57   Photograph of Vitaphenol       156
21                Anti-Aging toner package

22   Exhibit 58   Photographs of Vitaphenol      159
                  Anti-Aging toner package, Bates
23                P-545 to 546

24   Exhibit 59   Photographs of Vitaphenol Ultra  163
                  Gentle Daily Cleanser package
25
```

```
 1   EXHIBIT                                          IDENTIFIED

 2   Exhibit 60  Packet of documents Bates-stamped   173
                 A-1044 to 1066
 3
     Exhibit 61  Packet of documents Bates-stamped   191
 4               A-1003 to 1042

 5   Exhibit 62  Letter from Ms. Gardner to Ms.      218
                 York dated 5-8-14, with
 6               attachment, Bates-stamped P-151
                 and 152
 7
     Exhibit 63  La Jolla Spa sales summary,         225
 8               Bates-stamped A-1001

 9   Exhibit 64  IFS Inventory Summary,              236
                 Bates-stamped A-1051
10   PREVIOUSLY MARKED EXHIBITS REFERENCED:          PAGE

11                  Exhibit 33                         61

12                  Exhibit 5                          240

13                  Exhibit 24                         251

14                  Exhibit 8                          253

15                  Exhibit 7                          254

16

17   DOCUMENTS REQUESTED:

18          PAGE  LINE

19           137     5

20

21   PAGES MARKED AS CONFIDENTIAL:

22        PAGE to PAGE

23           139   146

24           256   258

25
```

1    QUESTIONS INSTRUCTED NOT TO ANSWER:

2              PAGE   LINE

3              14     14

4              14     19

5              15      6

6              18      9

7              19      2

8              25     20

9              28      3

10             29      2

11             29      7

12             29     11

13             29     16

14             30      5

15             31      3

16             33     10

17             37     17

18             39     25

19             40     22

20             41     23

21             42      7

22             44     15

23             45     10

24             50      6

25             51     14

**Non-Confidential**

**Margaret Gardner - 30(b)(6)**          **La Jolla Spa MD vs. Avidas Pharmaceuticals**

```
 1   QUESTIONS INSTRUCTED NOT TO ANSWER:

 2             PAGE   LINE

 3              52     13

 4              53     13

 5              53     24

 6              68     18

 7              70      9

 8              72     12

 9              73      8

10              75     22

11              76      3

12              78     11

13              79      6

14              84     19

15              93     12

16             109     12

17             117     17

18             118     10

19             245      7

20             265     13

21             271     14

22

23

24

25
```

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1              Philadelphia, Pennsylvania

2            Friday, May 3, 2019; 10:15 a.m.

3                   -    -    -

4              THE VIDEOGRAPHER:  We're now on the

5    record.  Today's date is May 3rd, 2019, and the

6    time is 10:18 a.m.

7              This video deposition of Margaret

8    Gardner, being taken in the matter of La Jolla Spa

9    MD, v. Avidas Pharmaceuticals, pending in the US

10   District Court, Southern District of California,

11   Case No. 3:17-cv-01124-MMA.

12              We are at 1735 Market Street,

13   Philadelphia, PA.  My name is Dennis Mullin of

14   Aptus Court Reporting.

15              Will counsel please identify

16   yourselves and whom you represent.

17              MR. RYAN:  James Ryan for plaintiff.

18              MS. CHOVANES:  Julie Chovanes,

19   C-H-O-V as in Victor, A-N-E-S for defense.

20              THE VIDEOGRAPHER:  Our court

21   reporter today is Gail Verbano, and she may now

22   swear in the witness.

23                   -    -    -

24              MARGARET GARDNER, having first been

25   duly sworn according to law, was examined and

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1   testified as follows:

 2                       -    -    -

 3                  EXAMINATION

 4   BY MR. RYAN:

 5        **Q.    Could you please state and spell your**

 6   **name.**

 7        A.    Yes, my name is Margaret Gardner.

 8   M-A-R-G-A-R-E-T, Gardner, G-A-R-D-N-E-R.

 9        **Q.    Do you sometimes go by Margaret**

10   **Gardner-Hunt?**

11        A.    Uh-huh, sometimes.

12        **Q.    Is there a distinction as to when you use**

13   **Gardner-Hunt versus Gardner?**

14        A.    Not really.  My husband prefers that I

15   use it more often but --

16        **Q.    Sure.**

17                  MS. CHOVANES:  Please -- I thought

18   you were going to open this by giving me an

19   opportunity to put my objection on the record.

20                  Do you want to state who is present

21   in the room?

22                  MR. RYAN:  Ms. York is present on

23   the phone for this deposition.

24                  MS. CHOVANES:  And my objection to

25   her presence is that we have been given no notice

Non-Confidential

Margaret Gardner - 30(b)(6)        La Jolla Spa MD vs. Avidas Pharmaceuticals

1   of this, nor do we have any idea to what extent she

2   is involved here.  I think it's unfair, and there's

3   no reason not to have given us notice.

4                   MR. RYAN:  Okay.

5                   MS. CHOVANES:  So note my objection,

6   please.  And please don't interrupt me.

7                   MR. RYAN:  Okay.

8   BY MR. RYAN:

9        Q.   So today the court reporter is taking

10  down everything that we say, so it's important that

11  we not speak over each other.

12                   I will wait until you finish your

13  answer before I ask the next question, and I

14  request that you wait until I finish my question

15  before you answer.  That way we have a transcript

16  where we don't have two people talking over each

17  other.

18                   Do you understand that?

19                   MS. CHOVANES:  Objection to that

20  preamble.  No need to lecture my client.

21  BY MR. RYAN:

22       Q.   Okay.  Have you ever had your deposition

23  taken before?

24       A.   Yes, I have.

25       Q.   Okay.  Approximately how many occasions?

```
 1        A.   I think once.

 2        Q.   Okay.  In the deposition that you had

 3   previously, was it -- did it have anything to do

 4   with Avidas Pharmaceuticals?

 5              MS. CHOVANES:  Objection;

 6   irrelevant.

 7              You may answer.

 8              THE WITNESS:  Oh, I can answer?

 9              No, it did not.

10   BY MR. RYAN:

11        Q.   It's important today that you understand

12   the questions that I ask.  So if I ask a question

13   that you don't understand, please let me know, and

14   I'll try to clarify it for you.

15              Is that okay?

16        A.   Yes.

17              MS. CHOVANES:  Objection to the

18   lecture.

19   BY MR. RYAN:

20        Q.   Are you an employee of Avidas

21   Pharmaceuticals?

22        A.   I am the founder.

23              MS. CHOVANES:  Objection;

24   irrelevant.

25              Why don't you identify why the
```

 1   witness is here first.  Okay?  She's here pursuant

 2   to the 30(b)(6) notice that you issued.  I think

 3   it's usually presentable to the witness at this

 4   point.  Whether or not she's an employee or not is

 5   irrelevant; right?

 6   BY MR. RYAN:

 7        **Q.   Are you an employee of Avidas**

 8   **Pharmaceuticals?**

 9             MS. CHOVANES:  Are you going to

10   respond to what I said?

11             MR. RYAN:  No, you made your

12   objection.

13             THE WITNESS:  I'm the founder of the

14   company.

15             MS. CHOVANES:  Okay.  I would like

16   to know why we're here then, if you're not going to

17   produce a 30(b)(6) notice.  Are you going to

18   acknowledge we're here pursuant to that?

19             MR. RYAN:  We are here pursuant to a

20   30(b)(6) notice.

21             MS. CHOVANES:  And what are the

22   categories of that notice?  Do you want to present

23   them?  Because as I pointed out to the Court, it's

24   very difficult, given the history of this case and

25   your repeated items -- your repeated arguments that

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1  you keep identifying, it's very difficult for us to

2  have this deposition when you should have done this

3  a long time ago.

4              You have been carefully proscribed

5  by the Court to certain areas of relevance.  I

6  would suggest we start with those and, therefore,

7  you get that 30(b)(6) notice out, because you're

8  not going to be able to go anywhere beyond that.

9              Do you understand?

10             MR. RYAN:  I've listened to your

11  objection.  I feel like I'm allowed to ask

12  questions.

13             MS. CHOVANES:  Okay.  Well, you're

14  not going to be.  Anything beyond the scope of what

15  the Court has ordered is the scope.  And we

16  reiterated at our last conference.  We're not going

17  to get into -- and don't interrupt me please.  Let

18  me finish.

19             Anything the Court specifically

20  noted at the last conference that the Court's order

21  was in place and the witness is not to answer

22  anything beyond those orders.  So we're going to

23  have a continuing objection to anything beyond

24  those and she's not going to answer.

25             You can either identify those

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1  categorically or waste everyone's time by going

 2  through those individually.  But right now let's

 3  stick to the 30(b)(6) notice.  Okay?  Otherwise,

 4  you're not going to be getting answers.

 5               MR. RYAN:  Okay.  Well, here's what

 6  I'm going to do.  I'm going to ask questions, and

 7  you can make objections.  And if you want to

 8  instruct the witness not to answer, you have that

 9  right.

10               MS. CHOVANES:  Okay.  Note that

11  you've refused my offer to speed this up.

12               Go ahead.

13  BY MR. RYAN:

14      **Q.   Are you an officer of Avidas**

15  **Pharmaceuticals?**

16               MS. CHOVANES:  Objection; don't

17  answer that question.

18  BY MR. RYAN:

19      **Q.   Are you a member of Avidas**

20  **Pharmaceuticals?**

21               MS. CHOVANES:  Objection; don't

22  answer the question.

23               Bring the 30(b)(6) notice out and

24  you'll see exactly why she's appearing.  I don't

25  know why you aren't, because you're wasting our

1  time.  Where is the 30(b)(6) notice?  That's why

2  we're appearing.  If you don't bring it out, we're

3  going to leave, because that's the only reason

4  we're appearing here.

5  BY MR. RYAN:

6      **Q.   Are you a managing member of Avidas?**

7          MS. CHOVANES:  Objection; don't

8  answer the question.

9          Where is the 30(b)(6) notice?

10  That's why we're here.  This is pure harassment.

11          MR. RYAN:  Would you like to call

12  the Court and try to get some clarification?

13          MS. CHOVANES:  Sure.  Let's get your

14  notice out, let's call the Court.

15          MR. RYAN:  Okay.

16          THE VIDEOGRAPHER:  Do you want to go

17  off the video?

18          MR. RYAN:  No, stay on.

19          Dianne, I'll call you back.

20          MS. CHOVANES:  Is she going to stay

21  on for the Court?

22          MR. RYAN:  No.

23          (Whereupon, Mr. Ryan places a

24  telephone call.)

25          MR. RYAN:  It may be too early.

1    MS. CHOVANES:  You're right.  That's

2    why I actually suggested so we actually do this

3    efficiently -- no, go on the record.  We should be

4    on the record.

5    TELEPHONE RECORDING:  Judge Gallo's

6    chambers is not available.  Record your message at

7    the tone.

8    MR. RYAN:  So chambers is not

9    available, so we'll have to call them at a later

10   point in time.

11   MS. CHOVANES:  Okay.  Well, we're

12   not going to proceed final until we see our

13   30(b)(6) notice because I am not going to proceed

14   without the -- I am not going to proceed without

15   the confines that the Court noted are necessary

16   with regard to this deposition and your discovery.

17   MR. RYAN:  Well, the Court didn't

18   make any specific findings in terms of what

19   questions should be asked.

20   MS. CHOVANES:  Right; the Court held

21   you should be within the scope of the order that

22   the Court had issued.

23   MR. RYAN:  The Court -- the Court

24   didn't hold anything.

25   MS. CHOVANES:  Okay.  Well, we

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1   disagree -- we disagree on that.  That was the last

 2   transcript before the Court, the Court noted

 3   specifically.

 4              Do you really think that a Court

 5   will allow you to go beyond orders that were

 6   already issued?

 7              MR. RYAN:  I'm going to mark as

 8   Exhibit 50 --

 9              MS. CHOVANES:  There we go.

10              MR. RYAN:  -- the deposition notice.

11   Handing it to the witness.

12          (Exhibit 50, Notice of Deposition,

13       was marked for identification.)

14   BY MR. RYAN:

15   **Q.   So Exhibit 50 is the amended notice of**

16   **deposition of Avidas Pharmaceuticals for today.**

17   **There are several categories in the notice.**

18              MS. CHOVANES:  Do you have a

19   question?

20              (Whereupon, Mr. Ryan places a

21   telephone call.)

22              MS. CHOVANES:  Note the interruption

23   while Mr. Ryan dials his client, apparently, to

24   which we are objecting -- whose presence to which

25   we are objecting, over the telephone.  But if it's

```
 1   okay for people to attend by telephone, we'll take

 2   note of that.

 3                   MS.YORK:  Good morning.  This is

 4   Dianne.

 5                   MR. RYAN:  Hi.  Please put it on

 6   mute, Dianne.

 7                   MS. YORK:  Okay.

 8   BY MR. RYAN:

 9       Q.   When was Avidas Pharmaceuticals formed?

10                   MS. CHOVANES:  Objection; don't

11   answer that question.

12   BY MR. RYAN:

13       Q.   What does Avidas Pharmaceuticals do as a

14   business?

15                   MS. CHOVANES:  You can answer that

16   because it's in the present tense, to the extent

17   it's relevant.  But I'm not sure it's relevant, but

18   you can answer.

19                   THE WITNESS:  We develop and produce

20   skin care products.

21   BY MR. RYAN:

22       Q.   How long has Avidas done that?

23                   MS. CHOVANES:  Objection to the term

24   "long."

25                   THE WITNESS:  We began in -- I
```

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1   believe 2008.

2   BY MR. RYAN:

3        **Q.   Did Avidas Pharmaceuticals exist prior to**

4   **2008?**

5                    MS. CHOVANES:   Objection;

6   irrelevant.

7                    We're not going to go there.   Please

8   get to the Court -- what the Court proscribed the

9   boundaries of the deposition.   Thank you.

10                   MR. RYAN:   When you say "we're not

11  going to go there," you mean the witness is

12  instructed not to answer the question?

13                   MS. CHOVANES:   What?

14                   MR. RYAN:   You said "we're not going

15  to go there."   Are you instructing the witness not

16  to answer the question?

17                   MS. CHOVANES:   Yes.   Anything beyond

18  the scope of the Court's orders, the witness will

19  not answer.

20                   MR. RYAN:   Which Court orders are

21  you referring to?

22                   MS. CHOVANES:   If you want to go off

23  the record, we can discuss this.   But I'm not

24  prepared to go through an argument with you right

25  now, sir.   You're here to take a deposition.   We

 1   noted at the last conference before the judge that

 2   the scope was going to be within the scope of the

 3   Court orders.

 4              Now, there are many Court orders

 5   that are in this, but right now we're looking at

 6   the time Court order.  Are you familiar with any

 7   Court order with regard to time?  Are you familiar

 8   with that, Mr. Ryan?

 9              MR. RYAN:  The Court order says when

10   the deposition has to be completed with two-hour

11   intervals and half-hour breaks.

12              MS. CHOVANES:  Right.  There's that,

13   and what about time with regard to discovery?

14   Remember how you wanted discovery before May of

15   2014 and the judge said you couldn't get that?

16              MR. RYAN:  That was in connection

17   with the interrogatories.

18              MS. CHOVANES:  That's in connection

19   with everything.  And we're not going to go there.

20              MR. RYAN:  That's not true.

21              MS. CHOVANES:  Okay.  Well --

22              MR. RYAN:  The Court clarified its

23   order and said it didn't apply to anything other

24   than the discovery at issue.

25              MS. CHOVANES:  Why don't you tell me

1   where the Court did that.  Because the last -- the

2   last conference the Court specifically said that

3   we're going to subscribe to the protective orders.

4               So give me your cite for that.  And

5   we're going to go off the record for a minute.

6               MR. RYAN:  We're not going off the

7   record.

8               On March 7th, 2019, Judge Gallo

9   issued an order, which is Document 73.  And it

10  states [reading]:  This order clarifies the

11  February 8th, 2019, order, Docket No. 60, on

12  discovery disputes in which the Court discussed a

13  May 8th, 2014, cutoff of various responses.  To

14  the extent that this Court's finding in Paragraph 4

15  of that orders -- that the scope of discovery was

16  limited to the time period after May 8th, 2014 --

17  could be read as broadly limiting all discovery in

18  this case, the Court now clarifies that Paragraph 4

19  applied only to the disputed discovery items before

20  the Court that day -- namely RP No. 78811 through

21  16 and S Rog 16.

22              So that's the order that I'm

23  referring to where the Court did not limit

24  discovery.

25              MS. CHOVANES:  In our latest

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1   conference the Court said that we're going to limit

2   discovery past that date, is my recollection.

3                Do you have that transcript?

4                MR. RYAN:  I don't, but I don't have

5   any order that says that.  Can you point to me the

6   order where the Court --

7                MS. CHOVANES:  No, there's no order.

8   It was in the transcript.

9                MR. RYAN:  Well, if there's no

10   order, then I'm not under an order prohibiting me

11   from questions.

12                MS. CHOVANES:  Well, we're not going

13   to let you ask the questions until we hear from the

14   Court, because I don't think that you should be

15   allowed to.  It doesn't make sense.  So I would

16   just proceed according to everything aside from

17   that area in order to speed this up, and then we

18   can deal with the Court in one big clump; and then,

19   if necessary, we could go through what we're

20   talking about.

21                But let's just try to move this

22   ahead and for everyone's courtesy and to be --

23   let's just not waste time and let's go to the stuff

24   that we do agree is coverable.

25                MR. RYAN:  Well, I'm going to ask

1   questions and, like I said, you're free to object

2   and instruct the witness if you'd like.

3                   MS. CHOVANES:   Okay.   All right.

4   That's fine.   Pending the Court -- just so it's

5   clear -- and I'm going to ask the court reporter to

6   read this back to the Court when we do have our

7   conference so I want to mark this -- it's our

8   position that such material is irrelevant, and has

9   no basis, in fact.   And the Court, in our last

10  conference, which we don't have the transcript of,

11  made it clear that that date was a hard date and

12  that we're not going to get into stuff before that.

13                  To the extent we will speed things

14  up now, Mr. Ryan isn't proposing to do anything but

15  ask a long list of questions.   My proposal is, we

16  deal with the stuff that the witness can testify

17  to, that we all agree to, and then leave the other

18  material out until we do talk to the Court.

19                  MR. RYAN:   Well, I'm trying to

20  develop foundational information, and this witness

21  has already testified that she's the founder of the

22  defendant in this case.   So I'm trying to get some

23  information --

24                  MS. CHOVANES:   What -- there's

25  nothing on here, on your 30(b)(6) notice, that says

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1    "foundational information."

2              So you're beyond the scope of the

3    30(b)(6) notice too.  So that makes no sense,

4    foundational information.  You're just making that

5    up, sir.

6              Let's proceed to what's on the

7    30(b)(6) notice, which is why we're here.

8              MR. RYAN:  I'm going to continue to

9    ask questions.

10             MS. CHOVANES:  Objection to the

11   extent it's beyond the scope of the notice.  Note

12   my continuing objection.

13             MR. RYAN:  Your continuing objection

14   is noted.

15   BY MR. RYAN:

16        **Q.   So I was asking about Avidas**

17   **Pharmaceuticals and whether it developed and**

18   **produced skin care products prior to 2008; and I**

19   **believe your testimony was that it started in 2008**

20   **doing that; is that correct?**

21        A.   So in 2008 the company was operational.

22   Prior to 2008, in 2007, it was just the entity

23   being formed.

24        **Q.   Since 2008, what skin care products has**

25   **Avidas developed and produced?**

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    MS. CHOVANES:  Objection to the term
 2      "developed and produced."  I don't know what that
 3      means, and I'm an intellectual property lawyer.  So
 4      let's clarify what you mean by "developed and
 5      produced."
 6                    MR. RYAN:  I'm using the words that
 7      the witness used, so in that context, that's my
 8      question.
 9                    MS. CHOVANES:  Okay.  Do you
10      understand that?
11                    THE WITNESS:  Yes.
12                    MS. CHOVANES:  Okay.  It's your
13      definition.  Proceed.
14                    THE WITNESS:  So we've developed a
15      delivery technology.  It's a platform that's used
16      to deliver topical and transdermal products.
17      BY MR. RYAN:
18          Q.   What do you mean by "delivery
19      technology . . . platform"?
20                    MS. CHOVANES:  Objection; beyond the
21      scope.
22                    Don't answer that question.  Please
23      go ahead.
24      BY MR. RYAN:
25          Q.   So my original question was what products
```

1    did you -- what skin care products have you

2    developed and produced since 2008.

3                    Did you give me the -- if there are

4    brand names?

5                    MS. CHOVANES:  Objection -- excuse

6    me.  Objection to the question.

7                    Could you just ask a single

8    question?  Because that was two in a row and they

9    were sort of jammed together.

10   BY MR. RYAN:

11       Q.   What are the brand names of the products

12   that Avidas has developed and produced since 2008?

13       A.   We have --

14                   MS. CHOVANES:  To the best of your

15   recollection.

16                   MR. RYAN:  Ms. Chovanes, please

17   don't provide speaking objections for the witness.

18                   MS. CHOVANES:  That's an objection.

19   I'm allowed to object.  Are you objecting to the

20   fact that I'm objecting?

21                   MR. RYAN:  Yes, because --

22                   MS. CHOVANES:  I'm allowed to

23   object.  It's not a speaking objection to say that

24   your assumption may be incorrect.

25                   MR. RYAN:  That wasn't what you

1   said.  You said to the witness --

2               MS. CHOVANES:  Your assumption -- of

3   course that's what I said.  Your assumption was --

4   we're not going to read back.  Just please go on.

5               MR. RYAN:  Please don't make

6   speaking objections.

7               MS. CHOVANES:  Please ask questions

8   that aren't objectionable; I won't be making

9   speaking objections, which I'm not doing anyway.

10  BY MR. RYAN:

11       **Q.   Question is:  What are the brand names of**

12  **the products that Avidas has developed and produced**

13  **since 2008?**

14       A.   Avidas -- to the best of my memory,

15  Avidas has a product that's called Pro D3.  We have

16  some products that are called Pellesana skin care

17  products.  And there's a product -- I think it's

18  called Forteman.

19               That's really all I can think of

20  right now.

21          (Clarification by reporter.)

22               THE WITNESS:  Forteman.

23  BY MR. RYAN:

24       **Q.   How do you spell that?**

25       A.   F-O-R-T-E-M-A-N.

1      Q.   How do you spell Pellesana?

2      A.   P-E-L-L-E-S-A-N-A.

3      Q.   You mentioned something called Pro D3.

4  How do you --

5           MS. CHOVANES:   Objection.   Don't

6  answer that question.

7           Come on.   This is irrelevant; it's

8  without -- outside the scope of your notice

9  30(b)(6), and it's outside of scope of anything

10  with regard to this case.   Don't waste our time.

11           Don't answer the question.   Move

12  ahead.

13           MR. RYAN:   I'm asking the witness

14  how to spell Pro D3.

15           MS. CHOVANES:   Right.   It's

16  relevant.

17           MR. RYAN:   It's important for the

18  transcript.

19           MS. CHOVANES:   We'll get it at a

20  break, don't you worry about it.   Keep going.   You

21  don't have to get spellings.   We're very good at

22  getting reporters spellings at breaks.

23  BY MR. RYAN:

24      Q.   Did Avidas ever develop and produce a

25  skin care product called Vitaphenol?

1       A.   No, we did not develop and produce it.

2       **Q.   Are there any current employees of Avidas**

3    **Pharmaceuticals?**

4                MS. CHOVANES:  Objection.  Don't

5    answer that question.  Beyond the scope.

6    BY MR. RYAN:

7       **Q.   Where has Avidas been located since 2008?**

8                MS. CHOVANES:  Objection.  Don't

9    answer that question.  Beyond the scope.

10   BY MR. RYAN:

11      **Q.   Are there members of Avidas**

12   **Pharmaceuticals, LLC?**

13                MS. CHOVANES:  Objection.  Don't

14   answer that.  Beyond the scope.

15   BY MR. RYAN:

16      **Q.   Is Dan McCall a member of Avidas**

17   **Pharmaceuticals, LLC?**

18                MS. CHOVANES:  You can just assume I

19   have a continuing objection to answering any of

20   these questions, so I'm not going to say it every

21   time.

22                Why don't you ask your whole list

23   and then we'll go ahead and object to them all.

24                MR. RYAN:  So are you instructing

25   the witness not to answer the last question?

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1              MS. CHOVANES:  Yes; it's beyond the
 2   scope and it's irrelevant, not in the 30(b)(6)
 3   notice, and you're wasting our time.
 4   BY MR. RYAN:
 5       Q.   Is Michael Warne, W-A-R-N-E a member of
 6   Avidas Pharmaceuticals, LLC?
 7              MS. CHOVANES:  Same objection; same
 8   instruction.
 9   BY MR. RYAN:
10       Q.   Has Avidas Pharmaceuticals ever had any
11   involvement with a product called Vitaphenol?
12              MS. CHOVANES:  You can answer that.
13              THE WITNESS:  Yes.
14              MS. CHOVANES:  To the extent you
15   understand what "involvement" means.
16              THE WITNESS:  We licensed Vitaphenol
17   and sold Vitaphenol.
18   BY MR. RYAN:
19       Q.   Who did Avidas Pharmaceuticals license
20   Vitaphenol from?
21       A.   Vitaphenol was licensed from La Jolla Spa
22   MD.
23              MS. CHOVANES:  To the extent the
24   witness can testify with regard to that, let the
25   record reflect that's a layman's understanding of
```

1   the term "license."

2   BY MR. RYAN:

3        Q.   Has Avidas Pharmaceuticals ever licensed

4   and sold any products that it did not develop and

5   produce?

6                    MS. CHOVANES:  Objection; don't

7   answer that question.  It's irrelevant, beyond the

8   scope.

9   BY MR. RYAN:

10       Q.   When did Avidas Pharmaceuticals license

11  Vitaphenol?

12       A.   I believe it was in 2008.

13       Q.   And you mentioned that Avidas

14  Pharmaceuticals was -- began operations in around

15  2008.

16            At the time that Avidas

17  Pharmaceuticals began operations, was Vitaphenol

18  the first product that it sold?

19                    MS. CHOVANES:  Can you read that

20  question back, please.

21            (Record read.)

22                    MS. CHOVANES:  Objection.  That

23  question is in two parts, and I object to your

24  saying that the witness mentioned anything.

25                    No need for a preamble.  Let's just

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1  ask a nice clean question.  Please restate the

 2  question.

 3  BY MR. RYAN:

 4      **Q.   At the time Avidas Pharmaceuticals was**

 5  **formed, was Vitaphenol the first product that it**

 6  **sold?**

 7              MS. CHOVANES:  You can answer that.

 8              THE WITNESS:  I honestly don't

 9  remember.

10              MR. RYAN:  Again, Ms. Chovanes,

11  you're making speaking objections.

12              MS. CHOVANES:  No, I'm not.

13              MR. RYAN:  You just told the witness

14  "to the extent that you can remember."  That's

15  suggesting an answer.

16              MS. CHOVANES:  No, it's not.

17  BY MR. RYAN:

18      **Q.   Did Avidas enter into a -- any agreements**

19  **with La Jolla Spa in connection with the Vitaphenol**

20  **products?**

21              MS. CHOVANES:  Objection to the

22  extent the term "agreement" has a legal meaning

23  that you're trying to force on the client.  We

24  object to its use.

25              To the extent you can answer that,

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1   that objection aside, please do so.

 2                   THE WITNESS:  Yes.

 3   BY MR. RYAN:

 4        Q.   How many agreements?

 5                   MS. CHOVANES:  Objection.  Same

 6   objection.

 7                   THE WITNESS:  I believe there were

 8   three agreements.

 9   BY MR. RYAN:

10        Q.   Can you generally describe what those

11   agreements were.

12                   MS. CHOVANES:  Objection.  No don't

13   answer that question.  That's a ridiculous

14   question.  What do you mean by "generally

15   describe."  That's dangerous.  I'm not going to let

16   her answer that.

17                   Rephrase.  There are titles right

18   here so why don't you just ask her that.  Why are

19   you wasting our time?

20                   MR. RYAN:  I'm not wasting your

21   time.

22                   MS. CHOVANES:  They're right in the

23   30(b)(6) notice.  In fact, since there's no

24   question outstanding -- is there?  Or my objection

25   to it, asking to rephrase.  No, no question

1    outstanding?

2                    I'm going to ask the witness to

3    reread the 30(b)(6).  And counsel do the courtesy

4    of rereading the 30(b)(6) with the witness so as

5    not to try to trick her.

6                    MR. RYAN:  I don't need to read it.

7    I wrote it.

8                    MS. CHOVANES:  You need to read it,

9    because you're trying to trick the witness, which I

10   object to.

11                   So why don't you read it carefully

12   and show her what agreements you're talking about.

13                   MR. RYAN:  I'm not trying to trick

14   the witness.

15                   MS. CHOVANES:  Then why are you

16   asking her questions without any foundation --

17   tenure to this 30(b)(6) notice?  It just makes no

18   sense.

19                   MR. RYAN:  I'm sorry it doesn't make

20   sense to you.

21                   MS. CHOVANES:  Right --

22                   MR. RYAN:  I'm allowed to ask

23   questions.

24                   MS. CHOVANES:  Right, you are,

25   questions that make sense and are relevant and

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1   aren't wasting our time.  And this is a garbage

 2   case, and we've known that since the beginning, and

 3   you're just wasting our time more.

 4             Now ask questions that she can

 5   answer with regard to the 30(b)(6).  Whether or not

 6   she remembers the agreements independently of a

 7   30(b)(6) is meaningless and a waste of our time.

 8   BY MR. RYAN:

 9        Q.   You mentioned that Avidas entered into

10   three agreements with La Jolla Spa regarding the

11   Vitaphenol products; correct?

12        A.   Correct.

13        Q.   Is one of those agreements called the

14   sales and distribution agreement?

15        A.   Yes.

16        Q.   Is another one of those agreements called

17   the know-how agreement?

18        A.   Yes.

19        Q.   What's the third agreement called?

20        A.   It was a modification.  I don't remember

21   if it was a modification to the know-how or a

22   modification to the sales and distribution, but it

23   was a modification.

24             MS. CHOVANES:  Do you want

25   anything -- do you need a break?

1          Okay, we're going to go off the

2   record, and we're going to stop taping the

3   witness --

4               MR. RYAN:   Okay.   We can go off the

5   record.

6               MS. CHOVANES:   -- and we're going to

7   give her a second to recover.

8               THE VIDEOGRAPHER:   Time is

9   10:45 a.m.   We're going off the video record.

10          (Discussion off the record.)

11              THE VIDEOGRAPHER:   Time is

12   10:46 a.m.   We're back on the video record.

13              MR. RYAN:   We can mark as Exhibit 51

14   a document called "Know-How and Trademark License

15   and Purchase Agreement."

16          (Exhibit 51, the Know-How and

17      Trademark License and Purchase

18      Agreement, was marked for

19      identification.)

20   BY MR. RYAN:

21      **Q.   If you turn to Page 8 of Exhibit 51 there**

22   **are some signatures.   Is that your signature under**

23   **"Avidas Pharmaceuticals LLC?"**

24      A.   Yes, it is.

25      **Q.   Did you sign this know-how agreement?**

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    MS. CHOVANES:  Wait a minute.  Wait

 2     a minute.  Take a minute and look through this.

 3     And this is a copy, first of all.

 4                    THE WITNESS:  This looks like a copy

 5     of the agreement I signed.

 6     BY MR. RYAN:

 7          Q.   So Exhibit 51 is one of the agreements

 8     that Avidas Pharmaceuticals entered into with

 9     La Jolla Spa MD; is that correct?

10                    MS. CHOVANES:  Objection.  Don't ask

11     questions so they lead, please.

12                    You may answer.

13                    THE WITNESS:  Yes, this looks like

14     one of the -- this looks like the know-how

15     agreement.

16     BY MR. RYAN:

17          Q.   And generally speaking -- and I know

18     you're not a lawyer.  Generally speaking, what is

19     your understanding as to what the know-how

20     agreement provides?

21                    MS. CHOVANES:  Objection.  I'm not

22     going to let you answer that question.

23                    If you want to point her to specific

24     areas and ask her questions about facts, but that

25     comes too close to opinion testimony so we're not
```

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1   going to answer.

 2   BY MR. RYAN:

 3        **Q.   The second agreement you mentioned was**

 4   **that Avidas entered into a sales and distribution**

 5   **agreement with La Jolla Spa; is that correct?**

 6        A.   Yes.

 7              MS. CHOVANES:  Excuse me.  I didn't

 8   hear what you said at the end.

 9              MR. RYAN:  I said "is that correct?"

10              We'll mark as Exhibit 52 a copy of a

11   sales and distribution agreement.

12         (Exhibit 52, Sales and distribution

13      agreement, was marked for

14      identification.)

15   BY MR. RYAN:

16        **Q.   Please take a look at this and let me**

17   **know if your signature appears on Page 7 of Exhibit**

18   **52.**

19              MS. CHOVANES:  Objection to the form

20   of the question.

21              I'll notice there's highlighting on

22   Page 3 of my copy.  That apparently was copied --

23   that is, it's not original highlighting.  Is that

24   on the original document, Mr. Ryan?

25              MR. RYAN:  It's on my version.

**Page 38**

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1  BY MR. RYAN:

 2       Q.   My question is:  Does your signature

 3  appear on Page 7 of the sales and distribution

 4  agreement, which is marked as Exhibit 52?

 5       A.   Yes, that is my signature on the copy.

 6       Q.   You signed as the president on behalf of

 7  Avidas Pharmaceuticals; is that correct?

 8                 MS. CHOVANES:  Objection; the

 9  document speaks for itself.

10  BY MR. RYAN:

11       Q.   Is that --

12       A.   Yes.

13       Q.   Were you the president of Avidas

14  Pharmaceuticals --

15                 MS. CHOVANES:  Objection.

16  BY MR. RYAN:

17       Q.   -- on September 29th of 2018?

18                 MS. CHOVANES:  Objection.  Margie --

19                 THE COURT REPORTER:  Your answer?

20                 MS. CHOVANES:  Her answer was "yes."

21                 THE COURT REPORTER:  Your answer?

22                 THE WITNESS:  Yes, my answer was

23  "yes."

24  BY MR. RYAN:

25       Q.   Do you have a general understanding as to

Non-Confidential

Margaret Gardner - 30(b)(6)        La Jolla Spa MD vs. Avidas Pharmaceuticals

1   how the sales and distribution agreement that we

2   see in Exhibit 52 differs from the know-how

3   agreement that we see in Exhibit 51?

4                MS. CHOVANES:  Objection.  I'm going

5   to instruct the witness not to answer.

6                MR. RYAN:  On what grounds?

7                MS. CHOVANES:  Your "general

8   understanding" is an undefined term and may call

9   for legal opinion as well as the witness's

10  opinion -- excuse me.  Let me answer.

11               If you would like to point her to

12  specific areas pointing out, for example, the

13  titles are different, maybe that would be a way of

14  proceeding; but "general understanding" is too

15  ambiguous and you're not asking for anything but

16  opinion.

17               MR. RYAN:  Well, first of all, I'm

18  not asking for a legal opinion, so that we're

19  clear.  I'm just asking for the lay witness's

20  opinion.  She did sign both of these agreements.

21  BY MR. RYAN:

22      Q.   And so my question is:  Do you have a

23  general understanding as to whether there's a

24  difference between the sales and distribution

25  agreement and the know-how agreement?

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1          MS. CHOVANES:  Objection.  Don't

2     answer that.  As I said, the term is undefined.

3     We've been arguing about this for months.  I don't

4     know how the witness could have a general

5     understanding.  No.

6     BY MR. RYAN:

7          **Q.   Why did Avidas Pharmaceuticals enter into**

8     **two different agreements for the Vitaphenol**

9     **products?**

10          MS. CHOVANES:  Objection; assumes a

11    fact.

12    BY MR. RYAN:

13         **Q.   You can answer.**

14          MS. CHOVANES:  You may answer to the

15    extent you can.

16          THE WITNESS:  This was based on the

17    advice of our attorneys.

18          MS. CHOVANES:  Okay, that's enough.

19    I don't want you to go further than that.

20          Objection to the extent it calls for

21    attorney-client privilege.

22    BY MR. RYAN:

23         **Q.   In your mind, is there any distinction**

24    **between the sales and distribution agreement and**

25    **the know-how agreement?**

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1          MS. CHOVANES:  Objection; don't

 2   answer that.  It's irrelevant.  In her mind has

 3   nothing to do with this case.  She's a corporate

 4   representative.

 5          Don't answer.

 6   BY MR. RYAN:

 7      Q.   Why did Avidas Pharmaceuticals enter into

 8   two separate agreements with La Jolla Spa, those

 9   being the sales and distribution agreement and the

10   know-how agreement?

11          MS. CHOVANES:  I'm going to say that

12   was asked and answered unless you can tell me why

13   it's different.  But I think it's asked and

14   answered and it's subject to attorney-client

15   privilege.  She already said it's because what the

16   lawyers said.

17          MR. RYAN:  Are you instructing her

18   not to answer?

19          MS. CHOVANES:  Yeah.  Calls for

20   attorney-client privileged information and was

21   asked and answered as well.

22   BY MR. RYAN:

23      Q.   Can you tell me, without telling me

24   anything that you learned from an attorney, why

25   Avidas Pharmaceuticals entered into two different

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1   agreements with La Jolla Spa regarding the

2   Vitaphenol products?

3        A.   It was based on the advice of our

4   attorneys.

5             MR. RYAN:   Next I'm going to mark as

6   Exhibit 53 a document entitled "Modification

7   Know-How and Trademark License and Purchase

8   Agreement."

9            (Exhibit 53, Modification Know-How

10       and Trademark License and Purchase

11       Agreement, was marked for

12       identification.)

13  BY MR. RYAN:

14       Q.   Does your signature appear on Page 2 of

15  Exhibit 53?

16       A.   Yes, that appears to be my signature.

17       Q.   So other than Exhibit 51, the know-how

18  agreement, Exhibit 52, the sales and distribution

19  agreement, and Exhibit 53, the modification to the

20  know-how agreement, did Avidas Pharmaceuticals

21  enter into any other agreements with La Jolla Spa

22  relating to the Vitaphenol products?

23       A.   Not that I -- not that I recall.

24       Q.   If you look at Exhibit 52, the sales and

25  distribution agreement, on Page 8 there is Exhibit

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1   I, which is the product list and price schedule --

 2   do you see that?

 3        A.   Yes, I do.

 4        Q.   The product list and price schedule lists

 5   inventory units of different Vitaphenol products --

 6               MS. CHOVANES:  Objection to the

 7   characterization; document speaks for itself.

 8               MR. RYAN:  I haven't finished my

 9   question yet.

10               MS. CHOVANES:  I thought you did

11   because of your lengthy pause.

12   BY MR. RYAN:

13        Q.   Exhibit 1 reflects a number of units of

14   inventory of Vitaphenol products.

15               Did Avidas confirm that it received

16   each of those units of inventory that is stated on

17   Exhibit 52 of Exhibit 1?

18               MS. CHOVANES:  Objection to the

19   question.  It's not understandable.  It also

20   misstates the document itself.

21               So I'm not going to let you answer

22   the question because it's not an accurate

23   reflection of what's in the document.

24               You can't make up stuff about the

25   documents and ask the witness to testify.  Go from

 1    the document itself.

 2                    MR. RYAN:  I'm not making up

 3    anything about the document.

 4                    MS. CHOVANES:  Then why don't you

 5    ask the question predicated on the document?

 6    BY MR. RYAN:

 7        Q.   Well, the document lists a number of

 8    units of Vitaphenol products; true?

 9        A.   Yes.

10        Q.   Did Avidas receive the number of units of

11    Vitaphenol products that are stated on Exhibit 1 to

12    Exhibit 52?

13                    MS. CHOVANES:  What timeline are you

14    talking about?

15                    MR. RYAN:  At any point in time.

16                    MS. CHOVANES:  Objection.  Why is it

17    relevant?  This is dated '08 and we're talking

18    about '14 and beyond.  Objection.

19                    Don't answer that question.

20                    Please move ahead.

21    BY MR. RYAN:

22        Q.   Did Avidas Pharmaceuticals ever receive

23    any Vitaphenol products from La Jolla Spa?

24                    MS. CHOVANES:  Objection.

25                    You can answer that with regard to

Non-Confidential

Margaret Gardner - 30(b)(6)                      La Jolla Spa MD vs. Avidas Pharmaceuticals

1    anything after May of 2014.

2              THE WITNESS:  No, it did not.

3    BY MR. RYAN:

4        **Q.   It did not receive any products after May**

5    **of 2014?**

6        A.   Correct.

7        **Q.   Did Avidas receive any Vitaphenol**

8    **products from La Jolla Spa prior to May of 2014?**

9              MS. CHOVANES:  Objection.  That gets

10   into materials that we're not allowed to get into.

11   And I don't know why you want to ask and answer

12   stuff that's been proven in this case already.

13             MR. RYAN:  I don't understand your

14   objection and I disagree with it.

15             MS. CHOVANES:  Okay.  You disagree

16   with it, but she's not going to answer anything

17   before May of 2014.  It's not on -- it's beyond the

18   scope and it's not within the judge's order.

19             MR. RYAN:  Well, it's not beyond the

20   scope because the 30(b)(6) notice doesn't have any

21   specific dates in it.

22             MS. CHOVANES:  Where does it have

23   your statement about inventory?

24             MR. RYAN:  I'm asking questions

25   about the sales and distribution agreement.

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    MS. CHOVANES:  Right.  Where is --
 2    no, you're asking about something that was
 3    received.  That has nothing to do with this except
 4    it's listed in the agreement.  You're not asking
 5    about the agreement, sir.
 6                    MR. RYAN:  I am.  It's --
 7                    MS. CHOVANES:  No, you're asking
 8    about inventory, which is totally different and not
 9    on your list.
10                    MR. RYAN:  It's No. 8 on my list.
11                    MS. CHOVANES:  Inventory of
12    products, not whether they were received from --
13    whatever.  So your question, again, is not on this,
14    according to your own example.
15                    MR. RYAN:  Well, just so we're
16    clear, a 30(b)(6) notice does not require me to
17    list every question that I'm going to ask of a
18    witness.
19                    Do you agree with that?
20                    MS. CHOVANES:  I'm not going to talk
21    about 30(b)(6) depositions generally.  I'm talking
22    about this one, and the scope is proscribed --
23    there's that word again -- by the 30(b)(6) as well
24    the judge's order.  We've been going over this
25    again and again.
```

1          Please answer your questions -- ask

2     your questions within that scope.  Why are you

3     surprised?  You keep re-attacking it.  It's a

4     statement, and we made it.

5          MR. RYAN:  Because you keep

6     preventing me from asking questions.

7          MS. CHOVANES:  Right.  That's

8     exactly right.  Yes, you're right.

9          MR. RYAN:  Right.  So you're

10    preventing me from asking questions about inventory

11    at Avidas; is that true?

12          MS. CHOVANES:  Beyond the scope of

13    the judge's order.  Okay.  Stop it.  Go ask

14    questions.  We're not going to -- you've already

15    wasted five minutes making meaningless arguments.

16          Ask questions that are acceptable.

17    Go.  Otherwise, we're going to leave because you're

18    wasting our time.

19          MR. RYAN:  I've already read you the

20    judge's order clarifying his prior order.  He said

21    that his prior order is only limited to the

22    interrogatories.

23          Now, you had an opportunity to make

24    a protective order motion, which you said you were

25    going to go at one of the conferences, and you

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1    didn't do that.  So if you had any objections to

2    the scope of discovery, you could have raised them

3    with the Court at the time, but you didn't.

4                    MS. CHOVANES:  The Court -- that's

5    because right after I said that, the Court said, Of

6    course that's limited by our orders.  That's what's

7    in the transcript.

8                    I'm not going to argue anymore.  Do

9    you want to take her deposition with the allowable

10   questions after 2014, which are, by the way, on

11   your 30(b)(6).  There are plenty of them.  Go.

12   BY MR. RYAN:

13       Q.   Did Avidas Pharmaceuticals receive

14   inventory from La Jolla Spa prior to 2014?

15       A.   We did receive inventory.

16       Q.   What year?

17                    MS. CHOVANES:  Excuse me.  What was

18   the question?

19                    MR. RYAN:  What year?

20                    MS. CHOVANES:  What year for what?

21   BY MR. RYAN:

22       Q.   What year did Avidas Pharmaceuticals

23   receive inventory from La Jolla Spa?

24       A.   I believe it was in 2008.

25       Q.   Did Avidas receive approximately 17,000

Non-Confidential

Margaret Gardner - 30(b)(6)                La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1    of Vitaphenol products from La Jolla Spa in 2008?

 2        A.   I'm not sure.  I'm not sure if it was

 3    17,000.

 4                   MS. CHOVANES:  Why is this relevant?

 5    BY MR. RYAN:

 6        Q.   Why are you not sure?

 7                   MS. CHOVANES:  No, I'm asking a

 8    question.  Don't ignore me.  Why is this relevant?

 9                   MR. RYAN:  I don't need to engage

10    with you about relevance.  You can make --

11                   MS. CHOVANES:  You certainly do.

12    I'm going to object and instruct the witness not to

13    answer.

14                   It's irrelevant what Avidas received

15    from -- whatever.  It's not within the scope, it's

16    not within the case, and you're wasting time.

17                   Please proceed.  The witness is not

18    going to answer.

19                   MR. RYAN:  Well, it is within the

20    scope and within the case.

21                   MS. CHOVANES:  No, it's not.  We're

22    not going to argue about it.  It's not.  If you

23    want to go off the record and go through it, but

24    I've given you my objection four times.  Why is

25    this a surprise and why are you wasting time
```

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   arguing?
 2              MR. RYAN:  It's a surprise how
 3   you're trying to impede this deposition.  I'm just
 4   trying to --
 5              (Simultaneous cross-talk.)
 6              (Clarification by reporter.)
 7              MS. CHOVANES:  I told you since day
 8   one, and the Court certainly knew it too in every
 9   one of our hearings.
10              Now, why don't you go ahead and ask.
11   I'm asking you to stick with your scope, and I'm
12   tired of arguing.  Please proceed ahead.
13   BY MR. RYAN:
14       Q.   Did Avidas Pharmaceuticals purchase the
15   entire inventory that La Jolla Spa had in 2008?
16              MS. CHOVANES:  Objection.  Don't
17   answer that question.
18              And also with regard to "the
19   entire," we have no idea of what -- knowing what
20   was there anyway, so it's objectionable on that
21   grounds too.  But it's generally objectionable
22   because it ignores the scope of this deposition.
23   BY MR. RYAN:
24       Q.   Did Avidas Pharmaceuticals purchase all
25   of the inventory that's listed on Exhibit 1 in the
```

1    sales and distribution agreement?

2        A.   No, we did not.

3        Q.   Of the inventory that's listed on

4    Exhibit 1 of the sales and distribution agreement,

5    what inventory did Avidas not purchase?

6        A.   The number of units that we received and

7    that we purchased was less than what is on

8    Exhibit 1.

9        Q.   How much less?

10       A.   I don't remember the exact number.

11       Q.   Can you give me an estimate?

12       A.   No.

13       Q.   Do you have any documents that reflect

14   how much inventory Avidas received in 2008 from La

15   Jolla Spa?

16            MS. CHOVANES:  Objection.  Don't

17   answer that question.

18            You're getting into materials that

19   even by your own admission are foreclosed.

20            MR. RYAN:  I didn't make any

21   admissions.

22   BY MR. RYAN:

23       Q.   So as you sit here today, you can't tell

24   me how many number of units less than what's stated

25   on Exhibit 1 to the sales and distribution

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1  agreement that Avidas Pharmaceuticals received; is

2  that true?

3              MS. CHOVANES:  Objection; asked and

4  answered.  Don't argue with the witness.

5              You can answer to the extent you

6  can.

7              THE WITNESS:  No, I do not recall.

8  I do know there was a difference.  I remember that

9  there was a difference.  And there was some back

10  and forth between Avidas and La Jolla, but I do not

11  recall how much the difference was.

12  BY MR. RYAN:

13      Q.   Do you know whether the inventory was

14  greater than or less than what is stated in

15  Exhibit 1 to the sales and distribution agreement

16  that Avidas received?

17              MS. CHOVANES:  Objection --

18  objection.  Asked and answered, and we're not going

19  into this area because it's irrelevant.  Let's move

20  ahead, please.

21              Don't answer that question.

22              Beyond the scope.

23  BY MR. RYAN:

24      Q.   Did Avidas pay La Jolla Spa for

25  Vitaphenol inventory in 2008?

1          MS. CHOVANES:  Objection.

2          Don't answer that question.

3          Beyond the scope.  It's irrelevant.

4    Keep moving.

5          MR. RYAN:  It appears to now be

6    8 a.m. on the West Coast.  I'm going to attempt to

7    call Judge Gallo's chambers so that we can get some

8    clarity as to how this deposition is going to

9    proceed.  We're going to stay on the record for

10   this.

11          (Whereupon, Mr. Ryan places a

12   telephone call.)

13          COURT CLERK:  Judge Gallo's

14   chambers.

15          MR. RYAN:  Good morning,

16   Mr. Fuladian.  This is Jim Ryan in the La Jolla Spa

17   matter.  We are on the record in the deposition of

18   Margaret Gardner-Hunt, and we are having some

19   significant issues regarding the deposition

20   questions and the scope of the questions.  Is it

21   possible that Judge Gallo can get on the call?

22          COURT CLERK:  He's not in chambers

23   yet.  Why don't you give me your phone number and I

24   can call back -- he has an 8:15 -- perhaps.

25          MR. RYAN:  Okay.  I don't know the

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1 | number to the conference room that we're in but I
 2 | can give you my cell number.  It's (310)990-2889.
 3 |                 COURT CLERK:  And, generally
 4 | speaking, what -- what's the nature of the issues?
 5 |                 MR. RYAN:  We have a lot of
 6 | instructions not to answer on the basis of
 7 | relevance.  We've been going for about an hour now
 8 | and the witness has been instructed not to answer a
 9 | number of questions.  I do have -- we do have a
10 | reporter here.
11 |                 Is it possible to email a rough of
12 | this transcript --
13 |                 MS. CHOVANES:  I just want to
14 | clarify that the objections have not been on
15 | grounds of relevance, but rather have -- this is
16 | Julie Chovanes for the defendant -- but rather have
17 | been because counsel has insisted on both going
18 | beyond the scope of the notice as well as ignoring
19 | the judge's prior protective orders.  That's why
20 | we're making these objections.  Counsel sought to
21 | minimize it by characterizing it as relevance, and
22 | they're not.
23 |                 We can certainly go on to other
24 | areas that have -- that are relevant and the Court
25 | is allowing the witness to testify while we're

 1   waiting for the Court.  Would you suggest we do

 2   that?

 3                 COURT CLERK:  Yes, since the judge

 4   is not available right now, go ahead and go on to

 5   other things that are not going to cause issues,

 6   and then circle back.  And we can perhaps schedule

 7   something with Judge Gallo this morning later.

 8                 MS. CHOVANES:  Great, thank you.

 9                 COURT CLERK:  I have your number.

10   I'll confirm with him and call you back.

11                 MR. RYAN:  Okay.  We definitely need

12   to try to get on a call as soon as possible.  Thank

13   you.

14                 COURT CLERK:  All right.  Thank you.

15                 (Whereupon, Mr. Ryan places a

16   telephone call.)

17                 MS. CHOVANES:  Let's go.

18                 Note again counsel is taking more

19   time to call the nonexistent person, Ms. York

20   Goldman.

21                 MS. YORK:  Good morning.  This is

22   Dianne.

23                 MR. RYAN:  Hi, Dianne.  We're back

24   on the record.  Please put it on mute.

25                 MS. YORK:  Thank you.

```
 1    BY MR. RYAN:

 2         Q.   Did Avidas Pharmaceuticals manufacture

 3    any new Vitaphenol products after it received

 4    inventory from La Jolla Spa?

 5         A.   I'm sorry.  Could you repeat that

 6    question for me.

 7         Q.   Did Avidas Pharmaceuticals manufacture

 8    any new Vitaphenol products after it received

 9    inventory from La Jolla Spa?

10         A.   No.  Avidas does not manufacture

11    products.

12         Q.   Did Avidas engage any third parties to

13    manufacture new Vitaphenol products after it

14    received inventory from La Jolla Spa?

15         A.   Yes.

16         Q.   Which companies manufactured products for

17    Avidas?

18         A.   Only one company.

19         Q.   What's the name?

20         A.   The company was Harmony.

21         Q.   Is it also called Harmony Labs?

22         A.   Maybe.

23         Q.   Which Vitaphenol products did Avidas

24    engage Harmony to manufacture?

25         A.   I believe Harmony manufactured all of the
```

**Page 57**

Margaret Gardner - 30(b)(6)            La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   products except the CRS.

 2        Q.   Did Avidas have Harmony manufacture new

 3   Vitaphenol daily cleansers?

 4                  MS. CHOVANES:  Objection;

 5   irrelevant.

 6   BY MR. RYAN:

 7        Q.   You can answer.

 8        A.   Yes.

 9        Q.   Did Avidas have Harmony manufacture new

10   Vitaphenol anti-aging toner?

11        A.   Yes.

12                  MS. CHOVANES:  You know what?  While

13   there's no question, I'm going to ask you to speed

14   this up and say:  Are there any products on that

15   list that they did not manufacture?

16                  Can we do it quicker?

17                  MR. RYAN:  No.

18                  MS. CHOVANES:  Why not, Counsel?

19                  MR. RYAN:  But I think it's

20   important that we go through each one.

21                  MS. CHOVANES:  Yeah, I know you

22   think it's important to waste our time, but we're

23   trying to get out of here and with concern -- out

24   of courtesy for everyone's time.

25   BY MR. RYAN:
```

**Page 58**

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1      Q.    Did Avidas engage Harmony to manufacture

2    new Vitaphenol anti-aging serum?

3      A.    Yes, to the best of my knowledge, we did.

4      Q.    Did Avidas engage Harmony Labs to

5    manufacture new Vitaphenol sheer moisturizer?

6      A.    Yes.

7      Q.    Did Avidas engage Harmony Labs to

8    manufacture new fortified moisturizer?

9      A.    Yes, I believe so.

10      Q.    Did Avidas engage Harmony Labs to

11    manufacture new Vitaphenol daily defense cream?

12      A.    I believe so.

13      Q.    You mentioned that Avidas did not engage

14    Harmony Labs to manufacture Vitaphenol with CRS; is

15    that correct?

16      A.    Correct.

17      Q.    Did Avidas engage anyone to manufacture

18    Vitaphenol with CRS?

19      A.    Yes.

20      Q.    What company was that?

21      A.    I believe their name was Topix.

22      Q.    When did Avidas engage Topix to

23    manufacture new Vitaphenol with CRS?

24      A.    When?  I don't remember if the contract

25    was 2008 or 2009.  It was one of those two years.

**Non-Confidential**

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1      Q.    Did Topix actually manufacture Vitaphenol

2    with CRS for Avidas?

3      A.    Yes.

4      Q.    Do you know approximately how many units

5    Topix manufactured?

6                    MS. CHOVANES:   Objection;

7    irrelevant.

8                    THE WITNESS:   I'm sorry, no --

9                    MS. CHOVANES:   I'm going to

10   foreclose this area.

11                   THE WITNESS:   It's too long ago for

12   me.

13                   MS. CHOVANES:   Margie, I have to get

14   my objection in.

15                   I'm going to foreclose this area

16   because it's, again, irrelevant.   You're asking for

17   a time frame that's before the Court's order.

18                   Why is this relevant anyway?   Could

19   you answer me?

20                   MR. RYAN:   I don't need to go over

21   relevance again.   Are you instructing the witness

22   not to answer?

23                   MS. CHOVANES:   I'm going to

24   foreclose this area if you're asking questions that

25   are irrelevant.   Yes, you're wasting our time.

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    MR. RYAN:  When you say "foreclose
 2    this area," what is the area that you're
 3    foreclosing?
 4                    MS. CHOVANES:  Why don't you ask the
 5    question and we'll find out.  Why don't you ask for
 6    stuff after 2014, like the Court suggested, stuff
 7    that there's no argument about.  Why don't you do
 8    that?
 9    BY MR. RYAN:
10        Q.   I'm handing you a document that was
11    previously marked as Exhibit 33 --
12                    MS. CHOVANES:  Previously marked
13    where?
14                    MR. RYAN:  At a deposition of Topix?
15                    MS. CHOVANES:  What deposition?
16                    MR. RYAN:  Of Topix Pharmaceuticals.
17                    MS. CHOVANES:  Where is the exhibit
18    marker from Topix?  Where is the original?  Because
19    otherwise, it's your reference, and I don't believe
20    you.
21                    MR. RYAN:  I'm representing that it
22    was previously marked as Exhibit 33.
23                    MS. CHOVANES:  Okay.  We're subject
24    to the objection that this is an unmarked exhibit,
25    we're not going to -- we're going to take this
```

```
 1   whole area under advisement.

 2               What do you want to ask about this?

 3   Why don't you let me know that.  And if you want to

 4   go off the record and tell me why you want to ask

 5   about an unmarked exhibit that we've never seen

 6   before, that would be good.

 7               MR. RYAN:  I'm not sure why you can

 8   say you've never seen this before because this

 9   document was produced by Avidas and it's Bates

10   number A_1138 --

11               MS. CHOVANES:  There's no exhibit

12   sticker on this, sir.  There's no exhibit sticker.

13   We've never seen this before, and you just

14   represented it as an exhibit.  You can't do that.

15               Where is the one with the exhibit

16   sticker?  Would you answer that?

17               MR. RYAN:  Here's what I'll do.  I'm

18   going to mark this as Exhibit 54, as a new exhibit.

19               MS. CHOVANES:  There you go.  That's

20   exactly what you should do.  Thank you.

21          (Exhibit 54, Manufacturing and

22      Technical Services Agreement,

23      Bates-stamped A_1138 to 1166, was marked

24      for identification.)

25   BY MR. RYAN:
```

1    Q.   So I'm handing you Exhibit 54, which is a

2    document that was produced by Avidas in this case.

3    It's Bates number A_1138 through 1166.

4              Have you seen this document before?

5              MS. CHOVANES:  Okay.  Hold on.

6    There's a lot of pages here.  So I'm going to ask

7    you, Counsel, to identify what pages you said this

8    is, because you rushed through the Bates numbering.

9    How did you identify this?

10              MR. RYAN:  A_1138 through 1166.

11              MS. CHOVANES:  Is there a question?

12              (Whereupon, Mr. Ryan receives a

13    telephone call.)

14              MR. RYAN:  Yes, this is James Ryan.

15    We're in the deposition.

16              COURT CLERK:  Hi Mr. Ryan.  Judge

17    Gallo can talk to you folks at 9:30.  So if you

18    want to call back in at 9:30, he will pick up the

19    matter.

20              MR. RYAN:  We will do that.  Thank

21    you, very much.

22              COURT CLERK:  All righty.  Bye-bye.

23              MS. CHOVANES:  Did you get that?

24    Let the record reflect that was the chambers

25    calling in.

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1              MR. RYAN:  The court reporter is

 2   taking down everything that's being said today.

 3              MS. CHOVANES:  Right.  I want to

 4   make sure she knew who it was.

 5              Is there a question?

 6   BY MR. RYAN:

 7       Q.   Have you seen Exhibit 54 before?

 8       A.   Yes, I have.

 9       Q.   Is this the agreement that Avidas

10   Pharmaceuticals entered into with Topix that you

11   mentioned earlier in your testimony?

12       A.   It appears to be, yes.

13       Q.   There's a signature on Page 28 under

14   "Avidas Pharmaceuticals."  It's says "Dan C.

15   McCall, Chief Operating Officer."

16              Who is that?

17       A.   He was the chief operating officer of

18   Avidas.

19       Q.   Is Mr. McCall still the chief operating

20   officer of Avidas?

21       A.   No, he's not.

22       Q.   Does Mr. McCall have any involvement with

23   Avidas at this time?

24       A.   Yes.

25       Q.   Is he --
```

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1               MS. CHOVANES:  Objection;

 2    irrelevant.

 3    BY MR. RYAN:

 4        Q.   Is he -- what is his role with Avidas at

 5    the present time?

 6        A.   He is an LLC member.

 7        Q.   If you turn to Page 29 of Exhibit 54,

 8    there's a Schedule A.

 9               Do you see that?

10        A.   Yes, I do.

11        Q.   It references batch quantities of CRS

12    with Vitaphenol.

13               Do you know whether Avidas ever

14    ordered any units of Vitaphenol with CRS pursuant

15    to Exhibit 54?

16               MS. CHOVANES:  Objection; asked and

17    answered.  I don't know what "pursuant" -- do you

18    want to restate the question?  It's a little

19    confusing.  Or do you want to have the reporter

20    read it back, please, because it was a little

21    confusing.

22    BY MR. RYAN:

23        Q.   Do you understand the question?

24        A.   If you wouldn't mind just repeating it

25    for me.
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1        Q.    Sure.

2              Do you know whether Avidas ever

3    ordered any units of Vitaphenol with CRS pursuant

4    to the contract we see here as Exhibit 54?

5        A.    Avidas ordered units of CRS from Topix.

6        Q.    Okay.  And did Avidas pay Topix the

7    amounts -- any amounts for those products?

8        A.    Topix was paid for the products they

9    produced for Avidas.

10       Q.    So Schedule A to Exhibit 54, which is on

11   Page 29, lists a minimum batch quantity of 3,300

12   units.

13             Do you know whether Avidas

14   Pharmaceuticals ever ordered more than 3,300 units

15   of CRS from Topix?

16       A.    I'm sorry.  I don't remember the details

17   in terms of the number of units that were ordered

18   from Topix.

19       Q.    Does Avidas have any records that would

20   show how many products it ordered from Topix?

21             MS. CHOVANES:  Objection;

22   irrelevant.  You're talking about 2008?

23             MR. RYAN:  I'm talking about at any

24   point in time.

25             MS. CHOVANES:  Okay.

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1   BY MR. RYAN:

2        Q.    Does Avidas have any records that would

3   reflect how many products it ordered from Topix?

4        A.    I honestly don't recall.  I submitted

5   everything that we had.  I don't know.

6        Q.    Does Avidas have any records relating to

7   Vitaphenol?

8        A.    All the records that Avidas had were

9   submitted to counsel.

10        Q.    Where were those records located before

11   they were submitted to counsel?

12        A.    Some old files and old emails.

13        Q.    When you say "old files," are you

14   referring to like hard paper files?

15        A.    Correct.

16        Q.    And where were those files physically

17   maintained?

18        A.    In -- in my office.

19        Q.    Where is your office located?

20        A.    We have -- I have two locations.  One

21   location is in Doylestown, and the other location

22   is my home office.

23        Q.    So the Vitaphenol paper files that you

24   located, were they in your home office or in the

25   Doylestown office?

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1              MS. CHOVANES:   Objection;

 2    irrelevant.

 3              THE WITNESS:   They were in my home

 4    office.

 5    BY MR. RYAN:

 6         **Q.   At any point in time, has Avidas**

 7    **destroyed any records that it had previously**

 8    **relating to Vitaphenol products?**

 9         A.   I can't answer that.  I don't know.

10         **Q.   Other than you, Ms. Gardner, who else**

11    **would have maintained records relating to the**

12    **Vitaphenol products?**

13         A.   Several members of the team.

14         **Q.   What are their names?**

15              MS. CHOVANES:   Objection.  Why is

16    this relevant?

17    BY MR. RYAN:

18         **Q.   Could you tell me their names?**

19              MS. CHOVANES:   No.  No.  I want to

20    know why the documents are relevant, because we're

21    going far before May of 2014.  Why don't you start

22    with that date.  She's not going to answer that

23    question otherwise, because you're trying to extend

24    discovery for your garbage case.  So, no, we're not

25    going -- we're not going to go there.

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1              MR. RYAN:  You're instructing the
 2   witness not to answer?
 3              MS. CHOVANES:  Yeah, I am, because
 4   you haven't established any kind of relevance and
 5   you've harassed us already.  So names are very
 6   protected unless you establish relevance, which you
 7   haven't.
 8              MR. RYAN:  Well, I don't think I'm
 9   required to establish relevance in a deposition.
10              MS. CHOVANES:  I know, you keep
11   saying, so don't do it.  So go ahead.
12              Note my objection.
13   BY MR. RYAN:
14       Q.  You mentioned that there were several
15   employees who maintained files --
16              MS. CHOVANES:  Objection;
17   mischaracterization of her -- now, don't start
18   mischaracterizing her testimony just because you're
19   upset.
20              MR. RYAN:  I'm not upset.
21              MS. CHOVANES:  Well, then state her
22   testimony accurately if you're going to restate,
23   which is objectionable anyway.  Just ask a
24   question.
25   BY MR. RYAN:
```

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1      Q.   Your testimony was that there were

2    several members of the team that maintained records

3    relating to the Vitaphenol products; correct?

4                    MS. CHOVANES:  Objection; asked and

5    answered.

6                    You can answer.

7                    THE WITNESS:  Correct.

8    BY MR. RYAN:

9      Q.   How many members of the team?

10                   MS. CHOVANES:  Objection;

11   irrelevant.

12                   THE WITNESS:  Can I answer?  No?

13                   MR. RYAN:  Are you instructing the

14   witness not to answer?

15                   MS. CHOVANES:  Yes.  Yes.  I want to

16   get to the areas the Court said we should get to,

17   not to areas that are irrelevant and before May of

18   2014.

19                   MR. RYAN:  I don't believe the Court

20   said we should get to any particular areas.

21                   MS. CHOVANES:  The Court said the

22   nonobjectionable areas, but go ahead, waste your

23   time.

24   BY MR. RYAN:

25     Q.   The members of the team that maintained

Non-Confidential

Margaret Gardner - 30(b)(6)    La Jolla Spa MD vs. Avidas Pharmaceuticals

 1   **Vitaphenol records, do they work out of the**

 2   **Doylestown office?**

 3        MS. CHOVANES:  Do you want to give a

 4   time frame, Counsel?  Because you just switched

 5   time frames and it's confusing.  Are you asking for

 6   present people, or are you asking for people in

 7   2008, or are you asking for people after May 2014?

 8        If you clear up the confusion, it

 9   may help proceed.  So why don't you give us a time

10   frame?

11   BY MR. RYAN:

12     **Q.   Are there any current employees of Avidas**

13   **that previously maintained files relating to**

14   **Vitaphenol?**

15        MS. CHOVANES:  Thank you.

16        THE WITNESS:  No, there are not.

17   BY MR. RYAN:

18     **Q.   When was the last employee employed who**

19   **maintained files relating to Vitaphenol?**

20     A.   I really don't remember the specific

21   date.  I'm thinking maybe there was still someone

22   in 2013, but I really don't remember the date.  It

23   was a number of years ago.

24     **Q.   The records that were maintained by the**

25   **employees of Avidas, do those records still exist**

1  to this day?

2       A.   Not that I'm aware of.

3       **Q.   Did you conduct any sort of search to**

4  **determine whether those records still exist?**

5       A.   Yes, I did.

6       **Q.   What did you do to search?**

7       A.   I reached out to the individuals to see

8  if they had still any files.

9       **Q.   Which individuals?**

10      A.   I reached out specifically to Dan McCall

11 and Michael Warne.

12      **Q.   Where does -- is Dan McCall still -- you**

13 **said Dan McCall is still involved with Avidas;**

14 **correct?**

15            MS. CHOVANES:   Objection.   Don't

16 answer that question.

17            Do you want to rephrase?

18            MR. RYAN:   What was the objection?

19            MS. CHOVANES:   The question restated

20 her testimony inaccurately.   I'm not going to have

21 her answer that.   Do you want to restate it so you

22 don't refer to her prior testimony?

23 BY MR. RYAN:

24      **Q.   Is Dan McCall still involved with Avidas?**

25      A.   Yes.

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1        Q.   What does Dan McCall do for Avidas at the
 2   present time?
 3        A.   He's a member of the LLC.
 4        Q.   Where does he live?  Which state?
 5        A.   I really don't remember.
 6             MS. CHOVANES:  Why is it relevant?
 7   BY MR. RYAN:
 8        Q.   Does he live in Pennsylvania?
 9             MS. CHOVANES:  Objection.  Don't
10   answer that question.
11             Move ahead to relevant information,
12   please.  She said she doesn't know.
13             THE WITNESS:  I don't remember.
14   He's changed addresses a few times, so I don't know
15   where he is currently.
16   BY MR. RYAN:
17        Q.   Where was he previously?
18        A.   I think South Carolina.
19        Q.   When was the last time you spoke to Dan
20   McCall?
21        A.   Not for several years.
22        Q.   Was the last time you spoke to Dan McCall
23   when you asked him whether he had any Vitaphenol
24   records?
25        A.   I don't believe so.
```

1    **Q.    You think you've spoken to him since**

2    **then?**

3         A.   Yes, I believe so.

4         **Q.    What year did you ask Dan McCall whether**

5    **he has any records relating to Vitaphenol?**

6         A.   I believe it might have been -- it may

7    have been 2012.

8         **Q.    Why did you ask Dan McCall whether he had**

9    **any records relating to Vitaphenol in 2012?**

10        A.   I had a subpoena from Travelers

11   insurance.  Avidas was subpoenaed by Travelers.

12        **Q.    At the time you asked Dan McCall for any**

13   **Vitaphenol records in 2012, did he have any records**

14   **at that time?**

15             MS. CHOVANES:  Objection.  Again,

16   this is all irrelevant since it's before May of

17   2014.

18             You can answer, but that's the last

19   question, because this is just wasting everyone's

20   time.  When the witness said 2012 to someone else

21   is irrelevant.

22             Go ahead, you can answer.

23             THE WITNESS:  I'm sorry.  Can you

24   ask me again.

25   BY MR. RYAN:

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

1      Q.    When you asked Dan McCall in 2012 whether

2   he had any Vitaphenol records, did he have any?

3      A.    He told me he did not.

4      Q.    You mentioned Michael Warne as another

5   person that you asked whether he had any Vitaphenol

6   records; is that true?

7      A.    Yes.

8      Q.    When did you ask Michael Warne?

9      A.    I believe it was about the same time

10   frame, in 2012.  It was related to the Travelers

11   subpoena.

12      Q.    When was the last time you spoke to

13   Michael Warne?

14      A.    Maybe six months ago.

15      Q.    Where does Michael Warne live?

16      A.    He lives in South Africa.

17      Q.    Is Michael Warne a member of Avidas?

18      A.    Yes.

19            MS. CHOVANES:   Objection;

20   irrelevant.

21   BY MR. RYAN:

22      Q.    Other than you, Michael Warne and Dan

23   McCall, are there any other members of Avidas?

24            MS. CHOVANES:   Objection.  Don't

25   answer that question.

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1                    Irrelevant.  Purely for harassment

 2   purposes.

 3   BY MR. RYAN:

 4        Q.   Are there any other members of the team

 5   of Avidas that you asked for Vitaphenol records

 6   from, other than Dan McCall and Michael Warne?

 7                    MS. CHOVANES:  Objection.  I don't

 8   know what team of Avidas you're talking about, and

 9   I'm not going to let her answer that question in

10   light of that ambiguity.

11                    So if you want to rephrase it,

12   please go ahead.

13   BY MR. RYAN:

14        Q.   Are there any other persons involved with

15   Avidas that you've asked for Vitaphenol records

16   from other than Dan McCall and Michael Warne?

17                    MS. CHOVANES:  Objection.  I'm

18   going -- I don't know what you mean by "involved

19   with Avidas" or when, the time frame.

20                    It's the same objection as before.

21   Can we clarify time frames, what "involve" means?

22   BY MR. RYAN:

23        Q.   Well, the time frame would be any time

24   from 2012 to the present.  And "involved" could be

25   as a member, as an employee, anyone who assists

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   Avidas.
 2                   MS. CHOVANES:  So what's the
 3   question?
 4   BY MR. RYAN:
 5       Q.   Are there any other persons involved with
 6   Avidas that you've asked for Vitaphenol records
 7   from other than Dan McCall and Michael Warne?
 8       A.   Not that I recall.
 9       Q.   When you were searching for records to
10   produce in connection with this lawsuit, where did
11   you search?
12                   MS. CHOVANES:  Objection, asked and
13   answered.
14                   THE WITNESS:  I searched my files.
15   BY MR. RYAN:
16       Q.   Did you only search your files located at
17   your home office or did you search files at the
18   Doylestown office?
19                   MS. CHOVANES:  Objection; asked and
20   answered.
21                   THE WITNESS:  There are no files in
22   the Doylestown office.
23   BY MR. RYAN:
24       Q.   There are no files relating to Vitaphenol
25   in the Doylestown office?
```

```
 1        A.   There were no files --

 2                  MS. CHOVANES:  Excuse me.

 3                  THE WITNESS:  -- in the Doylestown

 4   office.

 5   BY MR. RYAN:

 6        Q.   Of any kind?

 7                  MS. CHOVANES:  Don't argue with the

 8   witness.

 9                  THE WITNESS:  Correct.

10   BY MR. RYAN:

11        Q.   Okay.  All of Avidas' files are

12   maintained in your home office; is that true?

13                  MS. CHOVANES:  Objection; irrelevant

14   as to where Avidas' files are.

15                  Don't answer that question.

16                  If you want to talk about this case,

17   let's go for it.  But don't answer that question in

18   light of your client's demonstrated harassing

19   behavior.

20   BY MR. RYAN:

21        Q.   At any point in time, were there records

22   relating to Vitaphenol at any location other than

23   your home office?

24                  MS. CHOVANES:  Objection;

25   irrelevant.
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   BY MR. RYAN:
 2        Q.   You can answer.
 3        A.   Yes.
 4        Q.   Where were those records located?
 5        A.   In the Doylestown office.
 6        Q.   Did the Vitaphenol records that were
 7   maintained in the Doylestown office, were they
 8   transferred to your home office at some point?
 9             MS. CHOVANES:  Objection; inference.
10   I'm not going to let her answer that question
11   because it's leading and it implies facts that
12   aren't in evidence.
13             Just ask her simple questions.  It's
14   not that complicated.
15             MR. RYAN:  It's a simple question.
16             MS. CHOVANES:  No, it's not.
17   BY MR. RYAN:
18        Q.   Well, you mentioned that at some point in
19   time there were Vitaphenol records at the
20   Doylestown office; correct?
21             MS. CHOVANES:  Objection; asked and
22   answered.
23   BY MR. RYAN:
24        Q.   You can answer it.
25        A.   Correct.
```

1      Q.   Were those Vitaphenol records at the

2   Doylestown office transferred to your home office

3   at some point in time?

4      A.   I believe so.

5      Q.   Were all of the Vitaphenol records that

6   were contained at the Doylestown office transferred

7   to your home office?

8      A.   I don't know.

9      Q.   Do you know when the records were

10  transferred to your home office?

11     A.   I do not recall the date.

12     Q.   Do you know if it was before or after

13  2014?

14     A.   I don't remember.

15             MS. CHOVANES:  All right.  Let's

16  take a break here.  It's 11:30 and the Court --

17  we're off -- and the Court said they'll call at

18  when?

19             MR. RYAN:  We're not off the record.

20             MS. CHOVANES:  Okay.  Well, let's

21  stay on.  I want to talk about taking a break.

22             It's 11:30, and the Court said

23  they'll call in at 12:30 our time; right?

24             MR. RYAN:  Yes.

25             MS. CHOVANES:  Okay.  So what do you

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1    want to do about a break?

 2                   MR. RYAN:  Well, I think we need to

 3    go for our allotted two hours, and then we'll take

 4    a break.

 5                   MS. CHOVANES:  There's no allotted

 6    two hours.

 7                   MR. RYAN:  That's what the Court

 8    said, is we should take --

 9                   MS. CHOVANES:  No, the Court didn't

10    say anything about timing.  The witness -- the

11    witness is doing the best she can.  And we moved

12    this precisely for your convenience.  Don't start

13    doing that game.  You've wasted plenty of time.

14                   MR. RYAN:  Do you need to take a

15    break?

16                   MS. CHOVANES:  No, don't talk to my

17    witness, ever.  Don't you ever talk to my witness.

18    Do you understand how threatening that is?

19                   MR. RYAN:  Why are you standing up?

20                   MS. CHOVANES:  And how

21    unprofessional that is?

22                   MR. RYAN:  Why are you standing up?

23                   MS. CHOVANES:  Because you're a male

24    exercising male privilege and talking to my witness

25    in a situation where she's already nervous.  And

 1   you're talking to her directly?  That's, first of

 2   all, a violation of the ethical rules, as you know.

 3                    MR. RYAN:  Why are you standing up?

 4                    MS. CHOVANES:  We're going to take a

 5   break.

 6                    Come on, Margie, let's take a break.

 7                    MR. RYAN:  You're leaning over the

 8   table.

 9                    MS. CHOVANES:  Yes, because of your

10   threatening nature --

11                    THE VIDEOGRAPHER:  I'm sorry.  You

12   have the microphone on.

13                    MS. CHOVANES:  Because you

14   threatened my witness just now.  Don't you ever

15   talk to her directly.

16                    MR. RYAN:  I did not threaten the

17   witness.

18                    MS. CHOVANES:  Okay.

19                    THE VIDEOGRAPHER:  The clip is still

20   on it.

21                    THE WITNESS:  I'm sorry.  I hope I

22   didn't break it.

23                    THE VIDEOGRAPHER:  You can just

24   leave it there.

25                    Off the video?

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1          MR. RYAN:  Not yet.

2          THE WITNESS:  Excuse me.

3          (Whereupon, Ms. Chovanes and

4  Ms. Gardner leave the deposition room.)

5          MR. RYAN:  Now we're off the record.

6          THE VIDEOGRAPHER:  Time is 11:37

7  a.m.  We're going off the video record.

8      (Recess.)

9          THE VIDEOGRAPHER:  Time is now

10  11:43.  We're back on the video record.

11  BY MR. RYAN:

12      Q.   With respect to the Vitaphenol products

13  that Avidas engaged Harmony Labs to manufacture,

14  can you give me an estimate as to how many products

15  Harmony Labs manufactured for Avidas?

16      A.   No, I don't know what number that would

17  be.

18      Q.   Are there any records that would reflect

19  the number of units of products that Harmony Labs

20  manufactured for Avidas?

21      A.   I don't believe so.

22      Q.   Why don't you believe so?

23      A.   Because we worked with Harmony in 2008

24  and 2009, and our retention policy is usually three

25  years.

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1       Q.   Do you know whether any records relating

2    to Vitaphenol were destroyed in connection with

3    Avidas' three-year retention policy?

4       A.   I really do not know.

5       Q.   Are there any records that would reflect

6    documents that are destroyed in connection with

7    Avidas' retention policy?

8       A.   No, not that I'm aware of.

9       Q.   Do you know whether there are any

10   Vitaphenol records that were destroyed pursuant to

11   Avidas' destruction -- I'm sorry -- retention

12   policy?

13      A.   I'm sorry.  Can you repeat that question.

14      Q.   Sure.

15           Do you know if there are any

16   Vitaphenol records that were destroyed pursuant to

17   Avidas' retention policy?

18      A.   Not specifically that I'm aware of.

19      Q.   Do you know whether all of the records

20   that Avidas maintained relating to Vitaphenol

21   products were retained?

22           MS. CHOVANES:  Objection.  Don't

23   answer that question.

24           MR. RYAN:  On what grounds?

25           MS. CHOVANES:  It makes no sense;

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   and I'm not going to get into these areas without a

 2   specific question making sense.

 3   BY MR. RYAN:

 4       Q.   Has Avidas ever destroyed any records

 5   relating to Vitaphenol products?

 6                 MS. CHOVANES:  Objection;

 7   irrelevant.

 8                 THE WITNESS:  I -- I do not know if

 9   records were destroyed or not destroyed.  I'm aware

10   of my records and the records in the current files.

11   BY MR. RYAN:

12       Q.   You mentioned that some of the records

13   that Avidas still has are emails that you

14   maintained; is that correct?

15                 MS. CHOVANES:  Objection;

16   mischaracterization of her testimony.

17                 You can answer.

18                 THE WITNESS:  That's correct:

19   Emails.

20   BY MR. RYAN:

21       Q.   Did you search for your emails in

22   connection with discovery in this case?

23                 MS. CHOVANES:  Objection; asked and

24   answered.

25                 You're wasting time now, sir.  Move
```

```
 1   ahead, please.

 2   BY MR. RYAN:

 3        Q.    Please answer the question.

 4        A.    Can you repeat the question.

 5        Q.    Did you search for your emails in

 6   connection with discovery in this case?

 7        A.    Yes, I did.

 8        Q.    What did you do to search your emails?

 9             MS. CHOVANES:  Objection; asked and

10   answered.

11             And I'm going to interpose a

12   cautioning exercise here:  To the extent counsel

13   gave advice with regard to your search, I want you

14   to exclude from your answer.  Are you able to do

15   that and just talk about what factually you did?

16   Because I don't want any advice of counsel coming

17   into your search or what you looked for or

18   anything.

19             Do you understand?  Yeah?

20             THE WITNESS:  I'm not sure.

21             MS. CHOVANES:  Okay.  Can you ask

22   the question again or read it back, please, and

23   let's see if we can get you an answer.  I just want

24   to make sure we don't get into privileged areas.

25   BY MR. RYAN:
```

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1       Q.    What did you do to search your emails in

2    connection with discovery in this case?

3       A.    I looked through my files.

4       Q.    How did you look?

5       A.    I have organized files.

6       Q.    How are they organized?

7       A.    They're organized by subject matter.

8       Q.    How many files do you have that are

9    related to the Vitaphenol products?

10      A.    I don't know the number of files.

11      Q.    When you say you have files, are you

12   referring to email files?

13              MS. CHOVANES:   Objection; asked and

14   answered.

15   BY MR. RYAN:

16      Q.    Are you referring to paper files?

17      A.    I had both and have both.

18      Q.    So just focusing on the emails, do you

19   have emails relating to Vitaphenol foldered

20   somewhere electronically?

21      A.    Yes, that's correct.

22      Q.    Do you have a specific folder that's set

23   up for Vitaphenol in your emails?

24      A.    Yes, that's correct.

25      Q.    Did you search that folder when you were

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1   looking for documents in connection with discovery

2   in this case?

3        A.   Yes.

4        Q.   Can you tell me approximately how many

5   emails were in your folder relating to Vitaphenol

6   when you searched?

7        A.   No, I can't tell you the number.

8        Q.   Can you tell me whether it was more than

9   50?

10       A.   I think so, but I don't know the number.

11       Q.   Can you tell me how far back the emails

12  were dated, from the emails that you searched for

13  in connection with discovery in this case?

14       A.   They were dated from 2008 and on through

15  various years.

16       Q.   So you've maintained emails dating as far

17  back as 2008; is that correct?

18                 MS. CHOVANES:   Objection to the use

19  of the word for word "maintained."

20                 THE WITNESS:   My file folder for

21  Vitaphenol contained emails that were dated in

22  2008.

23  BY MR. RYAN:

24       Q.   Do you believe that your file folder that

25  contains emails relating to Vitaphenol contains all

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   of the emails that were sent or received relating

 2   to Vitaphenol from 2008 to the present?

 3               MS. CHOVANES:  Objection to the

 4   question; it's irrelevant, the use of the word

 5   "believe."

 6               Do you want to rephrase the

 7   question, please?  I mean, you're obviously hunting

 8   to pin her down for destroying documents, and I

 9   think it's unfair.  So ask a good question.

10   BY MR. RYAN:

11       Q.   Does your file folder that contains

12   emails relating to Vitaphenol contain all of the

13   emails that were sent or received relating to

14   Vitaphenol from 2008 to the present?

15               MS. CHOVANES:  Objection; asked and

16   answered already.

17               To the extent you can answer, you

18   can go ahead.

19               THE WITNESS:  I believe the company

20   files have what I believe to be the majority of the

21   important documents related to Vitaphenol.

22   BY MR. RYAN:

23       Q.   Would that be true with respect to the

24   emails as well?

25       A.   I believe so.
```

1      Q.   The electronic file folder that you

2  maintained relating to Vitaphenol, does that file

3  folder only contain emails that you received, or

4  does it also contain emails that you sent?

5           MS. CHOVANES:   Objection; asked and

6  answered.

7  BY MR. RYAN:

8      Q.   You can answer.

9      A.   The -- the files that I have that are

10 electronic contain both emails received as well as

11 sent.

12     Q.   Has Avidas ever, in connection with its

13 document retention policy, ever deleted any emails

14 relating to Vitaphenol?

15     A.   Not that I'm aware of.

16     Q.   The paper files that you maintain in your

17 home office relating to Vitaphenol, approximately

18 how much space does that take up?  Is it -- is it a

19 box? more than a box? less than a box?

20     A.   I think it's enough for a box.  Not a big

21 box:  A small box (indicating.)

22     Q.   And generally speaking, what type of --

23           MS. CHOVANES:  What size box did you

24 refer to?  I'm really curious about that, actually.

25 Do you want to identify the size of the box?

```
 1   12-by-12?

 2                    THE WITNESS:  I'm not good at this.

 3   So an 8-1/2-by-11 sort of size.  Box sort of this

 4   kind of size (indicating).

 5                    MS. CHOVANES:  Pointing to the

 6   8-1/2-by-11 exhibit.

 7                    THE WITNESS:  Yeah.

 8                    MS. CHOVANES:  Right?

 9   BY MR. RYAN:

10        Q.   Meaning the bottom of the box is

11   approximately --

12        A.   Yes.

13        Q.   -- the size of a piece of paper?

14        A.   Yeah.

15        Q.   And how high is the box?

16        A.   It's not very high.  Like a file folder

17   high (indicating.)

18        Q.   Approximately six inches?

19        A.   I don't know.  The size is, I guess about

20   this high.  Is that about six inches (indicating)?

21                    MR. RYAN:  Okay.  Approximately 6 to

22   8 inches Counsel, would you agree?

23                    MS. CHOVANES:  No, I wouldn't agree

24   at all.  Let's keep going here.  She's

25   characterized what it is, and I disagree with your
```

 1  characterization.  Get a ruler if you want an exact

 2  measurement, but I think it's irrelevant.

 3                      MR. RYAN:  I think you were the one

 4  that asked for the size of the box.

 5                      MS. CHOVANES:  Yeah, and I don't

 6  like the way you asked the questions after that.

 7  So, yeah, I don't agree with that measurement.

 8  BY MR. RYAN:

 9       **Q.   The box that you just described of**

10  **Vitaphenol records, does that box contain all of**

11  **the records that Avidas maintained from 2008 to the**

12  **present?**

13                      MS. CHOVANES:  Objection; asked and

14  answered.

15  BY MR. RYAN:

16       **Q.   You can answer.**

17       A.   It contains the only files that I have.

18       **Q.   Did Avidas ever manufacture any new**

19  **cartons for the Vitaphenol products after it**

20  **received La Jolla Spa's inventory?**

21       A.   Yes, we did.

22       **Q.   For which Vitaphenol products?**

23       A.   I believe it was -- my memory is not good

24  on this.

25                      I can't remember if it was all of

1    them or six of them.  If there was one that we

2    didn't do, I cannot remember.

3        Q.   Who manufactured the new cartons for the

4    Vitaphenol products after Avidas acquired them?

5        A.   Harmony.

6        Q.   Would Harmony have created new cartons

7    for the Vitaphenol is CRS?

8        A.   No.

9        Q.   If new cartons were created, that would

10   have been by Topix; is that true?

11       A.   That's correct.

12       Q.   Did Avidas, when it had Harmony

13   manufacture new cartons for the Vitaphenol

14   products, were those new cartons only manufactured

15   in connection with the manufacturing of new

16   Vitaphenol products?

17              MS. CHOVANES:  Objection.  No, I'm

18   not going to let you answer that because it's

19   complicated and legalese.

20              Can you please restate the question.

21   BY MR. RYAN:

22       Q.   When Harmony manufactured new cartons for

23   the Vitaphenol products, did Avidas place existing

24   Vitaphenol products in those new cartons?

25       A.   I think there were some.  I think there

 1   were some existing bottles that went into new

 2   cartons.

 3        Q.   Do you know which products that happened

 4   with?

 5        A.   No, I'm sorry I don't.

 6        Q.   When Harmony Labs manufactured new

 7   cartons for the Vitaphenol products, did the

 8   packaging change from the packaging that the

 9   Vitaphenol products were in when La Jolla Spa

10   transferred its inventory to Avidas?

11        A.   Yes.

12        Q.   How did it change?

13        A.   Some of the -- some of the wording and

14   also some of the logos that were on the original La

15   Jolla Spa packaging were modified or removed.

16        Q.   Which logos were removed?

17        A.   I believe the logo that was removed was

18   La Jolla Spa MD.

19        Q.   You mentioned that some of the wording

20   was changed.  What wording was changed?

21        A.   There were some descriptors on the side

22   of the box that our regulatory people wanted to

23   improve upon.  I don't remember specifically what

24   exactly the wording was that got modified.

25                 And we changed -- there was an

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1    indication on the old box that needed to be changed

2    to "manufactured for Avidas" or -- I think that's

3    what it said, "manufactured for Avidas."

4        Q.    When Harmony manufactured new Vitaphenol

5    products for Avidas, where was that inventory of

6    products sent?

7        A.    The products were sent to a fulfillment

8    center.  We had a fulfillment center for

9    distribution.

10       Q.    Do you recall the name of that

11   fulfillment center?

12       A.    I believe it was IFS.

13       Q.    Do you know where that fulfillment center

14   was located?

15       A.    Not in Pennsylvania.  I don't remember.

16       Q.    Just focusing on the time before Avidas

17   had Harmony manufacture new product, with respect

18   to the inventory of Vitaphenol products that Avidas

19   acquired from La Jolla Spa in 2008, did it place a

20   sticker over the cartons with Avidas' contact

21   information?

22       A.    I'm sorry.  Can you -- I missed the last

23   part of what you said.

24       Q.    Yeah.

25            Did Avidas place stickers on the

1   existing cartons that were transferred from La

2   Jolla Spa to Avidas?

3        A.   Yes, we did.

4        Q.   What did those stickers say?  Or what

5   information did the stickers have on them?

6        A.   I believe the stickers said "manufactured

7   for Avidas."  I believe that's what they said.

8        Q.   Do you know who manufactured the stickers

9   that were placed on the cartons?

10       A.   No, I don't remember.

11       Q.   Do you know who physically affixed the

12  stickers to the cartons?

13       A.   No, I don't remember.

14       Q.   Do you believe that IFS would have been

15  the company that would have affixed the stickers?

16            MS. CHOVANES:  Objection;

17  irrelevant, her belief.

18            THE WITNESS:  I don't remember.

19  BY MR. RYAN:

20       Q.   Did Avidas ever acquire any trademarks

21  for any company -- countries outside of the United

22  States relating to the Vitaphenol products?

23            MS. CHOVANES:  Sorry, could you

24  repeat that question.  Your voice dropped.  I

25  didn't hear the end.

Non-Confidential

Margaret Gardner - 30(b)(6)                La Jolla Spa MD vs. Avidas Pharmaceuticals

 1  BY MR. RYAN:

 2       **Q.   Did Avidas ever acquire any trademarks**

 3  **for any countries outside of the United States**

 4  **acquired for the Vitaphenol products?**

 5                 MS. CHOVANES:  "Acquired any

 6  trademarks."  I'm going to object as a trademark

 7  lawyer.  You don't necessarily acquire trademarks.

 8  I think you're thinking of licensing trademarks.

 9  BY MR. RYAN:

10       **Q.   Did Avidas ever register any trademarks**

11  **for Vitaphenol products outside the United States?**

12       A.   I don't remember which country.  There

13  was one registration that I recall, and I don't

14  remember which country.  It was in the license

15  agreement.

16       **Q.   When you say "the license agreement," are**

17  **you referring to the know-how agreement, exhibit**

18  **51?**

19       A.   If you could give me a moment.  I don't

20  remember.

21       **Q.   I'm going to withdraw that question and**

22  **I'm going to ask a different one.**

23                 (Exhibit 55, Letter from

24            Ms. Gardner to Ms. York dated 6-10-14,

25            Bates-stamped P-153 to 156, was marked

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1          for identification.)

 2   BY MS. CHOVANES:

 3       Q.   I'm going to mark as Exhibit 55 a letter

 4   dated June 10th, 2014.  This is a letter

 5   addressed to Ms. York.  I believe it's signed by

 6   you; is that correct?

 7       A.   Yes, that's my signature.

 8       Q.   Do you recall sending this letter to

 9   Ms. York.

10       A.   Yes, now I do.  Thank you.

11       Q.   Okay.  Attached behind there is a

12   June 9th letter, 2014, from a legal assistant to

13   Keith R. Lange relating to Vitaphenol trademarks.

14            Do you recall receiving this letter

15   from Keith Lange's assistant?

16       A.   Looking at it now, yes, I do.

17       Q.   So this letter references trademarks that

18   are registered in Japan, China and Hong Kong.

19            Does that refresh your recollection

20   that there were three trademarks that Avidas

21   registered outside the United States?

22       A.   This seemed correct, yes.

23       Q.   Did Avidas ever sell any Vitaphenol

24   products outside the United States?

25       A.   No, we did not.
```

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1    **Q.    At no point in time?**

2    A.    Not that I'm aware of.

3    **Q.    Why did Avidas acquire trademarks for**

4    **countries outside of the United States?**

5              MS. CHOVANES:   Objection.

6              If a lawyer's advice is involved,

7    please don't answer with regard to that.

8              THE WITNESS:   Can you repeat the

9    question.

10   BY MR. RYAN:

11   **Q.    Sure.**

12            **Why did Avidas acquire trademarks**

13   **for countries outside the United States related to**

14   **the Vitaphenol products?**

15   A.    I believe these were done at the time of

16   the know-how agreement.  So I believe they were in

17   place when we took the worldwide license.

18   **Q.    So even though Avidas acquired trademarks**

19   **outside the United States, Avidas never actually**

20   **ever sold any Vitaphenol products outside the**

21   **United States; is that true?**

22   A.    We did not sell to --

23            MS. CHOVANES:   Objection; asked and

24   answered.

25            Then you can answer.  Okay?  You

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

1   have to let me get it in.  Go ahead.

2                    THE WITNESS:  We did not sell

3   product here in Japan or Hong Kong or the China

4   market.

5   BY MR. RYAN:

6       Q.   Do you have any information as to whether

7   any Vitaphenol products were sold by companies in

8   Hong Kong?

9       A.   Not to the best of my knowledge.

10                   MR. RYAN:  I've marked as Exhibit 56

11  a document called "Inventory and License

12  Agreement."

13              (Exhibit 56, Inventory and License

14      Agreement, was marked for

15      identification.)

16  BY MR. RYAN:

17      Q.   Do you recognize Exhibit 56?

18      A.   (Witness reviews document.)

19                   Yes, I do.

20      Q.   Is that your signature on Page 16 of

21  Exhibit 56 under "Avidas Pharmaceuticals"?

22      A.   Yes, it appears to be my signature.

23      Q.   And there are several initials on most of

24  the pages in the lower right-hand corner that

25  appears to be M. G.

Margaret Gardner - 30(b)(6)        La Jolla Spa MD vs. Avidas Pharmaceuticals

1           Are those your initials?

2      A.   Yes.

3      Q.   This document is also signed on behalf of

4  SciDerma Medical by someone named Douglas S. Neal.

5  Do you know who that is?

6                MS. CHOVANES:  Objection to the

7  characterization.

8                THE WITNESS:  I do know Doug Neal.

9  BY MR. RYAN:

10     Q.   Who is Doug Neal?

11                Page 16.

12     A.   Right.  He is -- he was the CEO for

13  SciDerma.

14     Q.   So does Exhibit 56 reflect the agreement

15  between Avidas Pharmaceuticals and SciDerma related

16  to the Vitaphenol products?

17                MS. CHOVANES:  Sorry, could you

18  ask -- I didn't hear you.  You taper off at the

19  end.  Can you restate that question, please.

20  BY MR. RYAN:

21     Q.   Does Exhibit 56 reflect the agreement

22  between Avidas Pharmaceuticals and SciDerma related

23  to the Vitaphenol products?

24     A.   Yes.

25     Q.   Were there any other agreements between

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   Avidas and SciDerma other than this inventory and

 2   license agreement we see in Exhibit 56?

 3        A.   Yes, there was.

 4        Q.   How many agreements?

 5        A.   Yes.

 6        Q.   What was that agreement?

 7        A.   A letter of intent.

 8                  MS. CHOVANES:  I'm going to object

 9   to the extent that the witness characterized it as

10   an agreement.  A letter of intent legally may or

11   may not be an agreement.

12   BY MR. RYAN:

13        Q.   The letter of agreement that you're

14   referring to, did that --

15                  MS. CHOVANES:  Letter of intent.

16   BY MR. RYAN:

17        Q.   Sorry.  The letter of intent that you

18   referred to, did that precede the inventory and

19   license agreement?

20        A.   Yes, it did.

21        Q.   Does Exhibit 56, the inventory and

22   license agreement, reflect the final agreement

23   between Avidas Pharmaceuticals and SciDerma LLC

24   related to the Vitaphenol products?

25        A.   Yes, it does.
```

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

1      Q.   Avidas entered into this agreement in

2    August of 2010; is that correct?

3      A.   Yes.

4              MS. CHOVANES:  Document speaks for

5    itself.  Objection.

6    BY MR. RYAN:

7      Q.   In connection with this agreement, Avidas

8    sold its inventory of Vitaphenol products to

9    SciDerma; is that correct?

10             MS. CHOVANES:  I'm going to object,

11   because we had an issue with regard to the word

12   "sold."  And that's a leading question, and it is

13   unfair.  So I'm going to ask you to restate in

14   light of the dispute we already had with regard to

15   legal conclusions.

16             Can you do that?  Can you ask just

17   open-ended questions -- was inventory

18   transferred? -- and then maybe we can get into it

19   that way.

20             MR. RYAN:  Well, I don't think I'm

21   required to only ask open-ended questions.

22             MS. CHOVANES:  Well, I understand.

23   You can ask them how you -- but my objection is

24   with regard to the word "sold," which as you recall

25   we already went through on an extensive go-around

Margaret Gardner - 30(b)(6)　　　　La Jolla Spa MD vs. Avidas Pharmaceuticals

1   already with regard to paper discovery.

2   　　　　　　　I mean, I would just ask the

3   witness -- you're pulling teeth.  Why don't you

4   just ask her what happened as a result of the

5   agreement and see what happens.  Maybe you'll get

6   the statement you want.

7   　　　　　　　MR. RYAN:  Let's start there.

8   BY MR. RYAN:

9   　　Q.   **What happened as a result of Avidas and**

10  **SciDerma entering into the inventory and license**

11  **agreement?**

12  　　A.   I'm not sure I understand "what

13  happened."

14  　　Q.   **Did Avidas sell its inventory of**

15  **Vitaphenol products to SciDerma?**

16  　　A.   Avidas sublicensed its Vitaphenol rights

17  to SciDerma.

18  　　Q.   **Did Avidas sell any --**

19  　　　　　　　MS. CHOVANES:  Objection; asked and

20  answered.  Don't -- don't belabor the witness.  She

21  clearly rejected your use of the word "sell" so

22  please don't argue with that.

23  　　　　　　　MR. RYAN:  I didn't finish my

24  question.

25  　　　　　　　MS. CHOVANES:  Well, you started

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   using "sell" again.

 2   BY MR. RYAN:

 3       Q.   So I'm asking:  Did Avidas sell any

 4   Vitaphenol inventory to SciDerma?

 5               MS. CHOVANES:  Objection; asked and

 6   answered.

 7   BY MR. RYAN:

 8       Q.   You can answer.

 9       A.   This -- the agreement was a sublicense of

10   all the product rights to SciDerma.

11               MS. CHOVANES:  The agreement speaks

12   for itself, and that's my ongoing objection with

13   regard to these questions.

14   BY MR. RYAN:

15       Q.   Please turn to Page 7 of Exhibit 56.  And

16   focusing your attention on Paragraph 6C, do you see

17   where it starts "IFS product inventory"?

18       A.   Uh-huh.

19       Q.   It says, Sublicensee agrees to pay

20   $316,501 for the product inventory located at IFS."

21               Did SciDerma pay Avidas $316,501 in

22   connection with this agreement?

23       A.   Yes.

24       Q.   Was the inventory of Vitaphenol products

25   that were located at IFS transferred to SciDerma
```

Margaret Gardner - 30(b)(6)        La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1    after this agreement?

 2         A.   Ask me that question again, please.

 3         Q.   Was the inventory of Vitaphenol products

 4    that Avidas maintained at IFS, was that transferred

 5    to SciDerma after this agreement?

 6         A.   Yes, it was.

 7         Q.   When did SciDerma pay the $316,501 to

 8    Avidas?

 9         A.   There were payments over time.  I don't

10    know specifically the dates, but they were -- they

11    made multiple payments over time.

12         Q.   Can you give me an estimate about how

13    much time elapsed between the first payment and the

14    last payment?

15         A.   No, I'm sorry, I don't remember.

16         Q.   Would it have been more than one year?

17         A.   No, I don't think so.

18         Q.   If you look at Paragraph 6A also on

19    Page 7, it refers to a license fee.  It says that

20    the "Sublicensee agrees to pay a payment of

21    $100,000."

22                   Did SciDerma pay Avidas a license

23    fee of $100,000?

24         A.   Yes, they did.

25         Q.   And it looks like the license fee was
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1    broken up into two payments of $50,000; is that

2    correct?

3         A.   I believe so, yes.

4         Q.   Paragraph 6D relates to the Harmony

5    product inventory.  It says that, "Sublicensee

6    agrees to pay $86,014.04 for the product inventory

7    located at Harmony."

8              Did SciDerma pay Avidas that amount?

9         A.   No.

10        Q.   Is there some reason why SciDerma did not

11   pay that amount?

12        A.   I believe they were still making payments

13   when we terminated and they hadn't completed their

14   payments.

15        Q.   Who was SciDerma making payments to?

16        A.   Making payments to Avidas to pay Harmony.

17        Q.   The payments that SciDerma was making to

18   Avidas to pay Harmony, were those payments separate

19   from the payments for the product inventory and the

20   license fee?

21             MS. CHOVANES:  Objection; that

22   assumes facts not in evidence.

23             Do you want to break the question

24   down?  I don't know what payments you are talking

25   about.

Page 107

Non-Confidential

Margaret Gardner - 30(b)(6)              La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   BY MR. RYAN:
 2        Q.   So you mentioned that SciDerma was making
 3   payments in connection with the Harmony inventory;
 4   is that correct?
 5        A.   This specific inventory.
 6        Q.   Meaning the Harmony product inventory?
 7        A.   Correct.
 8             MS. CHOVANES:  Reflect the witness
 9   pointing to Paragraph 6D of Exhibit 56.
10   BY MR. RYAN:
11        Q.   As SciDerma made payments for the Harmony
12   inventory, was that Harmony inventory then
13   transferred to SciDerma?
14        A.   The inventory was transferred on the
15   signing, actually, of the agreement; and how they
16   paid for it was just a matter of payment terms.  So
17   they were transferred all of the inventory,
18   including anything that was at Harmony as part of
19   the sublicense agreement.
20             THE VIDEOGRAPHER:  Pardon me,
21   Counsel.  About five minutes until I have to change
22   tape.
23             MR. RYAN:  Okay.
24   BY MR. RYAN:
25        Q.   How much did SciDerma still owe for the
```

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

1   Harmony product inventory at the time SciDerma

2   terminated the agreement?

3       A.   I don't recall the specific amount.

4   Maybe -- maybe 75 percent was paid.

5               MS. CHOVANES:  Objection to the form

6   of the question.

7   BY MR. RYAN:

8       Q.   Has Avidas ever tried to collect the

9   remaining amount owed by SciDerma in connection

10  with the Harmony product inventory?

11      A.   We had some discussion.

12      Q.   Has it done anything affirmatively to try

13  to collect that money?

14              MS. CHOVANES:  Objection to the

15  question.  Don't answer.

16              I don't like the prejudicial nature

17  of the word "anything" and what was the other

18  part -- anyway, rephrase the question, if you

19  would.

20  BY MR. RYAN:

21      Q.   Does SciDerma still owe Avidas some money

22  in connection with the Harmony product inventory

23  that was transferred to it?

24              MS. CHOVANES:  To the extent

25  SciDerma is a company, that's an interesting

Page 109

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1   question.  I don't know if they're still in

 2   business.

 3                  So why don't you ask within the

 4   scope of if the client knows they're -- if the

 5   witness even knows they're a company.

 6                  MR. RYAN:  Well, I just want to know

 7   whether Avidas believes that SciDerma still owes

 8   money in connection with the Harmony product.

 9                  MS. CHOVANES:  Avidas' belief is not

10   relevant to this case, and she's not going to

11   testify with regard to a legal matter.

12   BY MR. RYAN:

13       **Q.   Does SciDerma still owe money in**

14   **connection with the Harmony product inventory, to**

15   **Avidas?**

16       A.   The SciDerma debt was written off.

17       **Q.   If you turn to Page 22 of Exhibit 56, at**

18   **the top it says Exhibit VI, Roman numerals.**

19       A.   Uh-huh.

20       **Q.   Was this the product inventory that was**

21   **located at Harmony Labs that was transferred to**

22   **SciDerma?**

23                  MS. CHOVANES:  You're asking all

24   these items?

25                  MR. RYAN:  Yes.

Margaret Gardner - 30(b)(6)        La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                  MS. CHOVANES:  Okay.  Let's take a
 2    break then after she answers that question, since
 3    the Court is going to call in and I'd like to hit
 4    the restroom beforehand.
 5                  So you could answer the question.
 6                  THE WITNESS:  Yes, this is the
 7    detail of the inventory items.
 8                  MR. RYAN:  Okay.  We'll go off the
 9    record.
10                  MS. CHOVANES:  All right.
11                  THE VIDEOGRAPHER:  Time is
12    12:23 p.m.  We're going off the video record.
13           (Recess.)
14                  THE VIDEOGRAPHER:  Time is now
15    12:34 p.m.  We're back on the video record.
16    BY MR. RYAN:
17       Q.   Look back at Exhibit 56, the inventory
18    and license agreement with SciDerma.  It says, in
19    Paragraph 1M, that the "Territory" means the United
20    States of America, including Puerto Rico, Guam and
21    any other territories or protectorates of the
22    United States and Canada.
23                  Was SciDerma only allowed to sell in
24    those territories?
25                  MS. CHOVANES:  Objection with regard
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1    to her interpretation of the scope of license.

2              You can answer.

3              THE WITNESS:  This is the territory

4    that SciDerma was interested in.

5    BY MR. RYAN:

6        Q.   Do you know if SciDerma ever sold outside

7    of that defined territory?

8        A.   Not that I'm aware of.

9        Q.   If you turn to Page 20 of Exhibit 56,

10   there's Exhibit Roman numeral IV, relating to the

11   product inventory located at IFS.

12             Do you see that?

13       A.   Yes, I do.

14       Q.   Were these product units transferred to

15   SciDerma in connection with this agreement?

16       A.   Yes, that's what this document is.

17       Q.   Okay.  So Avidas transferred 22,215 units

18   of Vitaphenol product to SciDerma; is that correct?

19             MS. CHOVANES:  Objection; asked and

20   answered, document speaks for itself.

21             THE WITNESS:  Yes.

22   BY MR. RYAN:

23       Q.   In the last column on Exhibit Roman

24   numeral IV it lists inventory values for various

25   products.

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1              Do you know who placed the value on
 2   those inventory items?
 3              MS. CHOVANES:  Objection; assumes a
 4   fact not in evidence.
 5              THE WITNESS:  Can you ask me?
 6   BY MR. RYAN:
 7       Q.   With respect to the inventory values that
 8   we see on Exhibit Roman numeral IV, do you know who
 9   came up with those values for the inventory?
10              MS. CHOVANES:  Objection to the
11   question.  I don't know what "come up with" means,"
12   and I'd ask you to clarify and be precise with
13   regard to your question.
14   BY MR. RYAN:
15       Q.   With respect to the inventory values that
16   we see on Exhibit Roman numeral IV, do you know who
17   determined the values that are stated for the
18   inventory?
19       A.   The individual?  It was done by the
20   finance people.
21       Q.   The finance people where?
22       A.   For Avidas.
23       Q.   So someone working for Avidas determined
24   the values to be assigned for the Vitaphenol
25   inventory that we see here in Exhibit 56; is that
```

Margaret Gardner - 30(b)(6)               La Jolla Spa MD vs. Avidas Pharmaceuticals

1   true?

2        A.   We had a cost of goods.  It was a matter

3   of just multiplying the units by the cost of goods.

4        **Q.   So is it true that someone working for**

5   **Avidas determined the values to be assigned for the**

6   **Vitaphenol inventory that we see in Exhibit 56?**

7              MS. CHOVANES:  Objection; asked and

8   answered.

9              THE WITNESS:  They did the

10  calculation; correct.

11  BY MR. RYAN:

12       **Q.   "They" meaning someone from Avidas did?**

13       A.   Correct.

14       **Q.   Do you know how the cost of goods was**

15  **determined for each of the Vitaphenol items?**

16             MS. CHOVANES:  Objection.  I just

17  want to know what you mean by "each."  Are you

18  talking about a specific single product or the

19  entire groups that are identified here?  Would you,

20  please, clarify.

21  BY MR. RYAN:

22       **Q.   I'm talking about each type of product.**

23  **So, for example, the CRS with Vitaphenol, do you**

24  **know how the cost of goods was determined for that**

25  **product?**

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

1        A.    There was a unit cost of goods for every

2    one of the products.

3        Q.    My question is do you know how that unit

4    cost was determined?

5        A.    I don't know the specific calculation, if

6    that's what you're asking.

7        Q.    Do you know anything generally as to how

8    the unit cost of goods was determined for the

9    Vitaphenol products?

10       A.    Do I know?

11       Q.    You said you don't know the specific

12   calculation, and I'm asking more broadly.

13             Do you know generally how the unit

14   cost of goods was determined for the Vitaphenol

15   products?

16       A.    In general terms, it would have been the

17   actual cost of the product from the manufacturer

18   and include the cost of distribution and include

19   the cost of fulfillment, and there was probably as

20   well an administrative cost that made up the cost

21   per unit of the goods.

22       Q.    If you turn to Page 19 of Exhibit 56 --

23   it's Exhibit Roman numeral III -- there are some

24   net selling prices and professional selling prices

25   relating to each of the different types of

Non-Confidential

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

1   Vitaphenol products.

2       A.   Yes.

3       Q.   SciDerma was required to sell the

4   Vitaphenol products for the prices stated in this

5   Exhibit III; correct?

6                 MS. CHOVANES:  Objection.  Can we

7   have more context than that?

8                 MR. RYAN:  No.

9                 MS. CHOVANES:  Well, this

10  Exhibit III is referred to in the contract, so I

11  object to you being unfair and not giving her the

12  reference in the actual document itself.  You're

13  asking this out of context so I object.

14                You can answer if you can answer.

15                THE WITNESS:  I need you to ask

16  again, please.

17  BY MR. RYAN:

18      Q.   Was SciDerma required to sell the

19  Vitaphenol products for the prices stated in this

20  Exhibit III to the inventory and license agreement?

21                MS. CHOVANES:  Objection to the word

22  "required."

23                You can answer.

24                THE WITNESS:  You'll see the notes

25  that are on here that says that the net selling

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1  prices shall not be less than 75 percent of the

2  prices above, and that the note regarding the

3  professional selling price is the gross selling

4  price.

5  BY MR. RYAN:

6     **Q.   So whatever this contract says, SciDerma**

7  **was required to follow?**

8                MS. CHOVANES:  Objection.

9  BY MR. RYAN:

10     **Q.   Is that true?**

11                MS. CHOVANES:  Objection.  Objection

12  as to form.  Note again the unfairness of handing

13  the witness a document with some 25 -- 22

14  single-spaced pages and asking her questions on the

15  whole thing.  I object to this question.

16  BY MR. RYAN:

17     **Q.   Was SciDerma required to follow this**

18  **inventory and license agreement?**

19                MS. CHOVANES:  Objection; that

20  implies a legal duty.  She can't answer that.

21  That's an opinion, "required to follow."

22                Do you want to rephrase it?

23                MR. RYAN:  No, I don't.

24                MS. CHOVANES:  Well, don't answer

25  that question.  "Required to follow" is not a legal

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1   question -- I mean, it's asking for your opinion,

2   and that's not what we're here for.

3              Again, you're belaboring the

4   witness, you have so many "belief" questions.

5   BY MR. RYAN:

6       **Q.   Did Avidas ever tell SciDerma that it did**

7   **not need to follow the terms in the inventory and**

8   **license agreement?**

9       A.   No, it did not.

10      **Q.   Did Avidas expect that SciDerma would**

11  **follow the terms in the inventory and license**

12  **agreement?**

13             MS. CHOVANES:  Objection; it's

14  irrelevant what Avidas expected, and this whole

15  area is irrelevant.

16             If you want to tell me why it's

17  relevant, I'm happy to talk to you about it, but

18  right now I'm going to instruct not to answer to

19  try to move this along, because there's no reason

20  to answer.

21             MR. RYAN:  Well, it's really not

22  moving things along.  It's actually delaying

23  things.

24             MS. CHOVANES:  Well, what's the

25  relevance of your question?  Transaction happened

1  in 2010.  Give me an offer of proof and maybe we

2  can forestall the Court.

3              MR. RYAN:  I'm not required to give

4  you an offer.

5              MS. CHOVANES:  I know that, but

6  maybe we can forestall the Court because you're

7  asking about stuff that's in 2010 and makes no

8  sense.

9              I'm sure you have some elements in

10  mind and you're just holding it back to extend this

11  and torture me and the Court.  So what's your --

12  what's your --

13              MR. RYAN:  If you've reviewed the

14  third amended complaint --

15              MS. CHOVANES:  Okay.  Well, tell me.

16              MR. RYAN:  If you've read the third

17  amended complaint, you would know why this document

18  was --

19              MS. CHOVANES:  Okay.  Well, tell me.

20  Don't hide it.  Tell me.

21              MR. RYAN:  I don't need to educate

22  you about the case.

23              MS. CHOVANES:  Oh, my goodness.

24  Okay.  Well, if you're not going to talk about why

25  it's relevant and you're not going to explain what

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   you have in mind --

 2              COURT CLERK:  Counsel, this is Judge

 3   Gallo's chambers.  Judge Gallo is available now.

 4              MR. RYAN:  Thank you.

 5              COURT CLERK:  Okay.  I'm going to

 6   transfer you.

 7              JUDGE GALLO:  Counsel, good

 8   morning -- good afternoon where you are.  Bill

 9   Gallo.  We are on the record.  This is La Jolla Spa

10   versus Avidas 17-cv-1124.  Counsel state your

11   appearance for the record, plaintiff begin.

12              MR. RYAN:  James Ryan for plaintiff.

13              MS. CHOVANES:  Julie Chovanes for

14   defendant.

15              JUDGE GALLO:  All right.  What's the

16   issue?

17              MR. RYAN:  Just so Your Honor is

18   aware, is it okay -- we have a court reporter here

19   who is also taking down everything.  Is that

20   acceptable?

21              JUDGE GALLO:  That's fine with me.

22              MR. RYAN:  Okay.  So we started this

23   deposition around 10 o'clock this morning, and

24   we've had a number of questions that were -- the

25   witness was instructed not to answer on relevance
```

Non-Confidential

1   grounds.  And we really can't go through them

2   individually because it, frankly, would take too

3   much time.

4            But generally speaking, I'm having

5   difficulty asking questions about this case, and

6   Ms. Chovanes keeps stating that Your Honor limited

7   discovery in this case to the period after 2014 for

8   all purposes.  And as, Your Honor, is aware, I

9   filed an ex parte application asking for

10   clarification of that order, and Your Honor

11   clarified that the order was just limited to the

12   discovery at issue.

13            In addition, since that time,

14   plaintiff has filed a third amended complaint that

15   was accepted by Judge Anello, so there are some

16   additional issues that are the subject of this

17   deposition.

18            And I'm concerned because I flew all

19   the way to Philadelphia to try to make

20   Ms. Gardner's deposition and I'm being stimied with

21   trying to ask questions, and I don't want to have

22   to do this again and file a motion to compel, but I

23   don't know what else to do at this point.

24            JUDGE GALLO:  Ms. Chovanes?

25            MS. CHOVANES:  Your Honor, these

```
 1   aren't objections with regard to relevance at all,

 2   and he's put the joker in the deck by saying that.

 3                  There are enough to go through, and

 4   that's really the only fair way to do this.  He's

 5   asked numerous questions about the witness' belief,

 6   about activities that happened in 2008 and 2010

 7   that are no relevance.

 8                  He won't discuss relevance, ever.

 9   In fact, he just literally -- before Your Honor got

10   on the phone, literally refused to and just

11   referred me generally to the amended complaint,

12   which is certainly not trying to get this thing

13   done.

14                  We want this thing done.  As we have

15   said since day one, it's harassment.  His client is

16   on the phone in California and attending this

17   deposition, but she chose not to be here.  So we do

18   have cross-continent people participating.

19                  And he has asked every single

20   question with regard to these old dates that simply

21   aren't relevant.  He just wants to extend this.

22                  Most importantly, the Court will

23   doubtless recall, in our last conference, I made

24   the point he doesn't have the time to fill seven

25   hours of any deposition because there's not that
```

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1    much here to ask.  And Your Honor said, Well, he

2    will stay within the protective orders, within

3    those have been ordered.  And that's with regard to

4    May 2014, not stuff that happened years ago that

5    has no relevance and, in fact, has been foreclosed

6    by order, as the Court acknowledged.

7                     JUDGE GALLO:  All right.  Thank you.

8                     Here's what I'm going to order you

9    to do, both sides.

10                    One is, I'm going to ask both sides

11   to try to cooperatively get through this

12   deposition.  The more objections that there are,

13   the more interruptions that there are, such as

14   this, the longer it is going to take.  And if

15   there's an interest on both sides to be as

16   efficient as possible, then I would think that that

17   would be your priority, as opposed to the sniping

18   that seems to, once again, have surfaced.

19                    Two:  My strong recommendation is,

20   if Mr. Ryan asks a question and, Ms. Chovanes, you

21   believe that the question is objectionable on

22   whatever grounds other than privilege, that you

23   state your objection succinctly, whether it be

24   relevance or some other objection; that you not

25   instruct your client not to answer, that your

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1    client respond to the question.  Your objection

2    will be preserved.  And if, in fact, the question

3    is irrelevant, then the answer will not be admitted

4    later if there is a trial.  Judge Anello will have

5    the opportunity to rule on the objection and

6    determine then if it's relevant or not relevant.

7                    If, however -- and moreover, it's

8    not appropriate to instruct the witness not to

9    answer a question that might be objectionable

10   unless it is based upon privilege, in which case,

11   it is appropriate to instruct such a witness to not

12   answer the question, but to state the objection and

13   allow the witness to answer because there's a --

14   there's an out.  The out is that Judge Anello will

15   make a determination if the objection is valid or

16   not.

17                    And instructing the witness not to

18   answer, if you continue to do that, you do so at

19   your peril, because if there's -- if there's a

20   problem at the end, when this is concluded,

21   whenever that happens, and Mr. Ryan, who is taking

22   the deposition, believes that he was stimied and

23   files a motion, then that motion will come to me, I

24   will want the transcript of the deposition; and I

25   will look at each question for which there was an

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

1    objection and for which there was an instruction

2    not to answer and make a decision whether the

3    instruction not to answer was appropriate.  And as

4    I've already indicated, in most cases, other than

5    for privilege, instructing a witness not to answer

6    a question over an objection is inappropriate.

7                    And if it appears that these

8    instructions not to answer are inappropriate, then

9    I will order a follow-on deposition to occur at

10   some length of time -- whatever I believe to be

11   appropriate -- at the full cost and expense of the

12   defendant.

13                   So unless there are privilege

14   objections, the witness should not be instructed

15   not to answer the question but should answer the

16   question.

17                   MS. CHOVANES:  Your Honor, may I

18   clarify --

19                   JUDGE GALLO:  Is that clear?

20                   MS. CHOVANES:  -- may I clarify

21   that?

22                   JUDGE GALLO:  Yes.

23                   MS. CHOVANES:  The rule actually

24   says that you can instruct a witness not to answer

25   if it's in violation of prior orders of the Court.

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1    And just so it's clear with the Court, that's

2    precisely what I'm applying here, Rule 30.

3                    And I don't -- excuse me -- I don't

4    mean any disrespect to the Court or to Counsel.  If

5    Your Honor's instructions are to try to get through

6    this deposition, they are well-taken and we will

7    try to do that as soon as we can.

8                    JUDGE GALLO:  I would appreciate

9    that, and I think your client would appreciate that

10   as well, because I think this is unnecessarily

11   prolonging this.

12                   But let's not forget:  This is --

13   this is a little bit of a moving target here, and

14   what you believe is compliance with prior orders of

15   the Court and what Mr. Ryan believes is prior

16   orders of the Court.  And right now I'm not going

17   to go back through those prior orders, because

18   there was a clarification -- Judge Anello even got

19   involved in that and asked myself to clarify, if we

20   all recollect the record correctly.

21                   And so if you instruct a witness not

22   to answer questions based upon prior orders of the

23   Court, you do so at your peril, believing that your

24   interpretation of those prior orders of the Court

25   will coincide with my interpretation of those prior

Non-Confidential

1    orders of the Court.

2                  I would not say that this is a

3    black-and-white, clear-cut issue when it comes to

4    the scope of discovery.  I've had limited

5    discovery, because of the history of this case, and

6    I've attempted to do that, and I would encourage

7    the parties to bear that in mind.

8                  And unless we are -- unless I was

9    there -- and I'm not -- ruling on every single

10   objection -- and I'm not -- the parties should

11   allow some leeway here and try to get through this

12   deposition and avoid any future disputes and calls

13   to the Court.  Because my -- my admonition to you

14   will be almost identical to the one I've given you

15   now and that is:  State the objection, instruct the

16   witness to answer the question to the best of her

17   ability unless it's a privilege objection.

18                  And if you're going to rely upon

19   this "it violates the prior rule of the Court,"

20   then you better darn well be sure you are correct,

21   because I may not agree with you and then you'll be

22   doing this all over again, or at least parts of it

23   all over again, at the expense of the defendant.

24                  All right, Counsel?  Any other

25   questions?

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1           MR. RYAN:  No.  Thank you, Your

2  Honor.

3           MS. CHOVANES:  Thank you, sir.

4           JUDGE GALLO:  Thank you.  All right.

5  You have a good day.

6           MS. CHOVANES:  All right.  You too.

7  Bye.

8           MR. RYAN:  Okay.  So I need to break

9  for lunch now.

10           MS. CHOVANES:  Let's keep going.

11           MR. RYAN:  Go off the record.

12           THE VIDEOGRAPHER:  Time is 12:55

13  p.m. --

14           MS. CHOVANES:  Hold on, hold on.

15  We're not going off the record.

16           What are your plans for the rest of

17  the day that you want to break for lunch

18  arbitrarily?

19           MR. RYAN:  My plans are I need to

20  eat lunch.

21           MS. CHOVANES:  And what time after

22  lunch?  What time do you think you're finishing up

23  here?

24           MR. RYAN:  I don't know.  I have

25  food that's available, and I'm going to eat it, and

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1   then we can start back up in maybe 20 minutes or

2   so?

3                   MS. CHOVANES:  Okay.  I have 12:52,

4   so let's start up at 10 after 1:00.

5                   MR. RYAN:  Okay.

6                   MS. CHOVANES:  Okay.  We're off.

7   Thank you.

8           (Luncheon recess taken from 1:13

9       p.m. to 1:17 p.m.)

10                  THE VIDEOGRAPHER:  Time is now

11  1:17 p.m.  We're back on the video record.

12                  MS. CHOVANES:  Let the record

13  reflect, we were here at 1:10, as agreed.

14                  MR. RYAN:  Okay.  Mrs. Chovanes, I

15  asked you during the break whether you would allow

16  me to go back and ask questions of the witness that

17  you instructed her not to answer.  Are you willing

18  to allow me to do that?

19                  MS. CHOVANES:  I'm sorry.  What?

20                  MR. RYAN:  I asked you during the

21  break whether you would allow me to ask questions

22  of the witness that you previously instructed her

23  not to answer.

24                  Will you allow me to do that now?

25                  MS. CHOVANES:  I don't think it's up

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1   to me to allow you to do anything.  Why don't you

2   just start the deposition.

3   BY MR. RYAN:

4       **Q.   Okay.  Other than licensing and selling**

5   **the Vitaphenol products, has Avidas ever licensed**

6   **and sold other products that it has not developed**

7   **and produced?**

8       A.   Yes, we have.

9       **Q.   What are those other products?**

10      A.   One product was Avidoxy, and another

11  product was Scalacort.

12      **Q.   How do you spell those?**

13      A.   S-C-A-L-A-C-O-R-T.

14              MS. CHOVANES:  Objection; relevance.

15  BY MR. RYAN:

16      **Q.   And how do you spell Avidoxy?**

17      A.   A-V-I-D-O X-Y.

18      **Q.   Is Avidoxy still for sale?**

19      A.   No.

20              MS. CHOVANES:  Objection; relevance.

21  BY MR. RYAN:

22      **Q.   Is Scalacort still for sell?**

23      A.   No.

24              MS. CHOVANES:  Objection;

25  irrelevant.

**Page 130**

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    Margie, let me get my objection in.

 2    BY MR. RYAN:

 3         Q.   Does Dan McCall have any involvement in

 4    Avidas?

 5                    MS. CHOVANES:  Objection to

 6    relevance plus vagueness.

 7                    THE WITNESS:  Dan McCall?

 8    BY MR. RYAN:

 9         Q.   Yes.

10         A.   Dan McCall is a member of Avidas, as I

11    stated previously.

12         Q.   Does he have anything to do with any of

13    the business decisions that happen at Avidas?

14                    MS. CHOVANES:  Objection to

15    relevance.  Objection to vagueness.

16                    THE WITNESS:  No, Dan is just a

17    member of the LLC.

18    BY MR. RYAN:

19         Q.   Does Dan hold any officer or director

20    positions for the LLC?

21                    MS. CHOVANES:  Objection; asked and

22    answered, relevance.

23                    THE WITNESS:  No, Dan is just a

24    member of the LLC.

25    BY MR. RYAN:
```

Page 131

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1        Q.   Does Avidas have any current employees?

 2                  MS. CHOVANES:  Objection; asked and

 3   answered.

 4                  THE WITNESS:  It does not have any

 5   full-time or part-time employees.

 6   BY MR. RYAN:

 7        Q.   When was the last time Avidas had a

 8   full-time or part-time employee?

 9                  MS. CHOVANES:  Objection;

10   irrelevant.

11                  THE WITNESS:  I don't recall the

12   specific date.

13   BY MR. RYAN:

14        Q.   Can you give me a year?

15        A.   No, unfortunately.

16        Q.   Do you think it was before or after May

17   of 2014 was the last date that Avidas employed

18   somebody full or part time?

19        A.   It was before 2014.

20        Q.   So Avidas has not had any employees since

21   May of 2014; is that accurate?

22                  MS. CHOVANES:  Objection; asked and

23   answered.

24                  THE WITNESS:  Yeah, that's correct.

25   BY MR. RYAN:
```

Margaret Gardner - 30(b)(6)        La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1       Q.   Do you recall the name of the last
 2   employee who worked for Avidas?
 3       A.   Oh, my God, no.  I'm sorry.
 4       Q.   Was there a gentleman who used to be
 5   employed by Avidas who passed away?
 6                MS. CHOVANES:  Objection; relevance.
 7   It's a pretty broad question.  Can you narrow it
 8   down?
 9   BY MR. RYAN:
10       Q.   Can you think of any employees who worked
11   at Avidas and passed away while they were employees
12   of Avidas?
13                MS. CHOVANES:  Okay.  Note my
14   objection to the question; it's irrelevant.
15                You can answer to the extent you
16   can.
17                THE WITNESS:  There was not an
18   employee of Avidas who passed away.  There was a
19   consultant for Avidas.
20   BY MR. RYAN:
21       Q.   What was the name of that consultant who
22   passed away?
23       A.   Jack Henn.
24                MS. CHOVANES:  Objection; relevance.
25                THE COURT REPORTER:  What was his
```

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   last name?

 2                    THE WITNESS:  Henn, H-E-N-N.

 3                    MS. CHOVANES:  Let me get my

 4   objection in.

 5   BY MR. RYAN:

 6        Q.   So Mr. Henn was an outside consultant to

 7   Avidas; is that correct?

 8                    MS. CHOVANES:  Objection; asked and

 9   answered.  Plus the vagueness of the term "outside

10   consultant" is objectionable.

11                    THE WITNESS:  He was a consultant to

12   Avidas.

13   BY MR. RYAN:

14        Q.   Was he a W-2 employee of Avidas?

15                    MS. CHOVANES:  Objection;

16   irrelevant.

17                    THE WITNESS:  I believe a W-2 is an

18   employee.  He was not an employee.

19   BY MR. RYAN:

20        Q.   Did Mr. Henn work for a company when he

21   was a consultant for Avidas?

22                    MS. CHOVANES:  Objection;

23   irrelevant.

24                    THE WITNESS:  No, he was an

25   independent.
```

**Page 134**

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   BY MR. RYAN:
 2        Q.   For what period of time did Mr. Henn
 3   consult for Avidas?
 4                  MS. CHOVANES:  Objection;
 5   irrelevant.
 6                  THE WITNESS:  Several years.
 7   BY MR. RYAN:
 8        Q.   Could you give me the approximate years
 9   that he consulted?
10        A.   No, I don't remember the exact dates.
11        Q.   Do you know what year Mr. Henn passed
12   away?
13        A.   I don't remember if it was 2013 or 2014.
14   I do remember that it was the month of -- I think
15   it was the month of January.
16                  MS. CHOVANES:  Note my continuing
17   objection to this whole line of questioning.
18   BY MR. RYAN:
19        Q.   So could have either been January 2013 or
20   January 2014?
21        A.   Yeah, I just don't remember.
22        Q.   What type of consulting work did Mr. Henn
23   do for Avidas?
24                  MS. CHOVANES:  Objection;
25   irrelevant.
```

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    THE WITNESS:  He was the sales

 2   support to Avidas.

 3   BY MR. RYAN:

 4        Q.   How did he support sales for Avidas?

 5        A.   He went out to visit customers, and he

 6   coordinated as well our selling activity with

 7   various partners.

 8        Q.   Would one of those partners have been

 9   SciDerma?

10        A.   Yes; correct.

11        Q.   What did Mr. Henn do for Avidas after the

12   period of time that SciDerma entered into the

13   inventory and license agreement?

14                    MS. CHOVANES:  Objection; misstates

15   the -- assumes a fact not in evidence.

16                    THE WITNESS:  Can you repeat the

17   question, please.

18   BY MR. RYAN:

19        Q.   What did Mr. Henn do for Avidas after the

20   period of time that SciDerma entered the inventory

21   and license agreement?

22                    MS. CHOVANES:  Objection to form;

23   assumes a fact not in evidence.

24                    THE WITNESS:  Mr. Henn's role was to

25   coordinate any activities related to selling.  So
```

Margaret Gardner - 30(b)(6)　　　　　La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1  he would participate in teleconferences and really

 2  do anything to help to try to improve the selling

 3  efforts.

 4  BY MR. RYAN:

 5      Q.   You mentioned that Avidas Pharmaceuticals

 6  has a location in Doylestown.

 7              MS. CHOVANES:  Objection; incorrect.

 8  BY MR. RYAN:

 9      Q.   Does Avidas Pharmaceuticals have an

10  office in Doylestown today?

11      A.   We don't have a physical office.

12      Q.   When was the last time Avidas had a

13  physical office in Doylestown?

14      A.   I don't know.  I don't remember the

15  specific date.  It's been several years that we

16  have not had a physical office there.

17      Q.   Can you tell me what year Avidas stopped

18  having a physical office in Doylestown.

19              MS. CHOVANES:  Objection; asked and

20  answered.

21              THE WITNESS:  No, I don't remember

22  the year.

23  BY MR. RYAN:

24      Q.   Do you know if Avidas had a physical

25  office in Doylestown after May of 2014?
```

**Page 137**

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    MS. CHOVANES:  Objection; asked and
 2      answered.
 3                    THE WITNESS:  I just don't remember
 4      the date.  I'm sorry.
 5      BY MR. RYAN:
 6          Q.   At the time that Avidas terminated the
 7      agreement with La Jolla Spa, did Avidas have a
 8      physical office in Doylestown?
 9          A.   I really don't remember when we stopped
10      having a physical office.  We used the offices
11      there as needed -- say, a consulting room.  But
12      when we stopped having physical offices there, I do
13      not remember the date.
14          Q.   And you don't remember the year either?
15          A.   No.
16                    MS. CHOVANES:  Objection; asked and
17      answered.
18                    Please mark the past five or so
19      questions.  Thank you.
20                    (Following portion deemed subject to
21      protective order, attorneys' eyes only, and
22      included under separate cover.)
23
24
25
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    (Continued from attorneys' eyes only
 2      portion of the transcript.)
 3                    (Whereupon, Mr. Ryan places a
 4      telephone call.)
 5                    MS. YORK:  Good morning.  This is
 6      Dianne.
 7                    MR. RYAN:  Hi, Dianne.  Please put
 8      it on mute.  You're back in the conference room.
 9                    MS. YORK:  Thank you.
10      BY MR. RYAN:
11           Q.   Did Avidas license the items to
12      Vitaphenol to any other company other than
13      SciDerma.
14                    MS. CHOVANES:  Objection to the term
15      "license."  You mean license or sublicense, or is
16      it a generic term?  Because it's very important
17      that you clarify.
18      BY MR. RYAN:
19           Q.   Did Avidas sublicense the right to
20      Vitaphenol to any other company besides SciDerma?
21           A.   No.  We did not have any sublicense for
22      Vitaphenol other than with SciDerma.
23           Q.   Did SciDerma repackage the existing
24      inventory of Vitaphenol products in 2012?
25           A.   Yes.  SciDerma not only repackaged all of
```

**Page 147**

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1   the inventory; they did a whole new campaign, and

2   we had sent all of the new look, et cetera, to La

3   Jolla Spa MD.

4        Q.   When you say we "sent it," who sent it?

5        A.   I sent it.

6        Q.   Who did you send it to?

7        A.   I sent it to Dianne.

8        Q.   What did you send to Dianne York?

9        A.   All of the exhibits of the new campaign

10  with the pictures of the new people, the new

11  packaging.

12       Q.   How did you send it to Ms. York?

13       A.   Probably by email and snail mail.

14       Q.   Describe how the SciDerma-packaged

15  Vitaphenol products differed from the Vitaphenol

16  products that were sold by Avidas.

17            MS. CHOVANES:  Is that a question?

18  BY MR. RYAN:

19       Q.   Yeah.

20            MS. CHOVANES:  I didn't hear the

21  whole thing.  It sort of tapered off at the end.

22  Can you repeat the question, please.

23  BY MR. RYAN:

24       Q.   Describe how the SciDerma-packaged

25  Vitaphenol products differed from the Vitaphenol

Margaret Gardner - 30(b)(6)            La Jolla Spa MD vs. Avidas Pharmaceuticals

1    products that were sold by Avidas.

2                    MS. CHOVANES:  Okay.  I'm going to

3    ask you to define your terms.  What's a

4    "SciDerma-packaged" --

5    BY MR. RYAN:

6         Q.   After the period of time that SciDerma

7    repackaged the Vitaphenol products, there was new

8    packaging; correct?

9         A.   Correct.

10        Q.   Did the new packaging just consist of

11   cartons or did it also contain new bottles?

12                   MS. CHOVANES:  Bottles?

13                   THE WITNESS:  I heard "bottles."

14                   Yes, it had both.  They repackaged

15   both the carton as well as packaging around the

16   bottles.

17   BY MR. RYAN:

18        Q.   You say "the packaging around the

19   bottles."  What do you mean by that?

20        A.   Bottles are typically wrapped, so that's

21   how they are packaged.  There's sort of a wrap that

22   goes around them, and they redid that as well as

23   redid the outside cartons.

24        Q.   So they put new labels on the bottles

25   themselves; is that what you're saying?

**Page 149**

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                  MS. CHOVANES:  Objection.  Don't
 2    mischaracterize her testimony.
 3                  THE WITNESS:  It's just called
 4    repackaging.  They repackaged the bottles and they
 5    repackaged the box.
 6    BY MR. RYAN:
 7        Q.   Well, there's a difference between taking
 8    a bottle that's existing and pouring it into a new
 9    bottle, and taking the existing bottle and then
10    putting a new label on it.  I'm trying to
11    understand which of those two things, or something
12    else, that SciDerma did.
13                  Do you have an understanding --
14                  MS. CHOVANES:  Objection.  Can you
15    ask a question that makes sense?  That made no
16    sense.  I'm not going to let her answer it because
17    it's inconsiderate of her to give her questions
18    that make no sense.  Come on.
19    BY MR. RYAN:
20        Q.   Do you understand the question that I
21    asked?
22        A.   I'm not sure.
23                  What I know that SciDerma did was,
24    they had a new label for the bottles and they had a
25    new box to replace the old carton.  That's what I
```

Margaret Gardner - 30(b)(6)　　　La Jolla Spa MD vs. Avidas Pharmaceuticals

 1  know.

 2  　　Q.　**What's the basis of your knowledge?**

 3  　　A.　I was sent the product and shown it.  And

 4  then all of their promotional material had the

 5  photographs of the new packaged product.

 6  　　Q.　**Can you describe how the repackaged**

 7  **products that SciDerma created differed in look**

 8  **from the products that Avidas sold when it sold the**

 9  **Vitaphenol products?**

10  　　　　　MS. CHOVANES:  That's a really long

11  question.  And what do you mean by "look"?  Because

12  "look and feel" is actually a legal question,

13  what's look and feel.  So I -- excuse me, let me

14  finish.

15  　　　　　So I'm going to ask you to rephrase

16  in light of the definition of "look" as possibly a

17  legal definition.  I mean, do you have one?  Why is

18  this relevant anyway?  Having her factually

19  describe stuff.

20  　　　　　I mean, go ahead if you can answer

21  it, but I would rather that you not use those legal

22  terms, Mr. Ryan.

23  　　　　　MR. RYAN:  I'm not intending them in

24  any legal sense.

25  　　　　　MS. CHOVANES:  Okay.  Well, if you

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   can answer, go ahead.

 2                THE WITNESS:  There were some basic

 3   differences.  I think the coloring was different --

 4   slightly different than the original packaging, and

 5   also there wasn't any kind of embossing that I can

 6   remember on the new -- newly packaged products.

 7                Anything that had the wording "Spa

 8   MD" was removed because the customers wouldn't buy

 9   it with -- with that on the product.

10                And I think we sent some pictures,

11   as I said -- Dianne should have the pictures, and

12   we sent them to counsel as well.

13   BY MR. RYAN:

14        Q.   You said that the customers wouldn't buy

15   the product with the Spa MD logo on it.  How do you

16   know that?

17        A.   We had received customer feedback that

18   was collected from SciDerma about why the products

19   were being rejected in certain stores or in certain

20   spas.

21        Q.   Was that in connection with surveys that

22   were sent out by SciDerma?

23        A.   I don't know how they collected the

24   information.  We only saw the summary reports of

25   the market research that was done.
```

**Page 152**

1      Q.   Who did the market research?

2      A.   SciDerma.

3      Q.   Do you still have that market research?

4      A.   No.  I might have --

5           MS. CHOVANES:  Object to the

6    question that said "do you still have it."  But she

7    didn't do it so why would she have it?

8    BY MR. RYAN:

9      Q.   Well, you said that you saw the market

10   research; correct?

11     A.   No, I saw the results from the market

12   research.  That's not the same.

13     Q.   Were the results printed on paper when

14   you saw them?

15     A.   I have an email, I think, that was part

16   of the information that I was asked to provide that

17   shows the SciDerma response about the issue with

18   the packaging.

19     Q.   When you say "the SciDerma response," you

20   mean SciDerma told Avidas that the customers didn't

21   want to buy the Vitaphenol products with the La

22   Jolla Spa MD logo on it?

23     A.   That's correct.

24     Q.   Did you ever see the actual results of

25   the research that was conducted by SciDerma?

```
 1              MS. CHOVANES:  Objection;

 2    irrelevant.

 3              THE WITNESS:  No.  That was their

 4    proprietary information.

 5    BY MR. RYAN:

 6       Q.  From August of 2010 through November of

 7    2012, SciDerma sold Vitaphenol products that had

 8    the La Jolla Spa logo on it; correct?

 9              MS. CHOVANES:  Objection; that's not

10    what she said.  Don't mischaracterize testimony,

11    please, Counsel.

12    BY MR. RYAN:

13       Q.  You can answer.

14       A.  So no, that's -- that's not actually

15    correct.

16       Q.  What's incorrect?

17       A.   In that period of time, there was a

18    mixture of product that had the old packaging mixed

19    with product that was new packaging from Harmony

20    that Avidas had purchased.  So it was a mixture of

21    both.

22       Q.  The new packaging that was created by

23    Harmony at the request of Avidas, was that

24    packaging just the cartons or did Harmony also

25    relabel the bottles that were contained inside the
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1    cartons?

2         A.    If my memory is correct, I think it was

3    just the outer carton.

4         **Q.    So it would be true then that from**

5    **August 2010 through November of 2012, SciDerma sold**

6    **Vitaphenol products that had the La Jolla Spa logo**

7    **on the bottles; correct?**

8                   MS. CHOVANES:   Objection; that's not

9    what she said.   Don't mischaracterize it.

10                   THE WITNESS:   Again, I'm pretty sure

11   but I don't -- I'm not certain that Harmony did

12   only the cartons for us, but I may be mistaken.

13   That's really what I remember.

14   BY MR. RYAN:

15        **Q.    Do you recall Harmony manufacturing new**

16   **labels for the Vitaphenol products to wrap around**

17   **the bottles?**

18        A.    My recollection is that I remember seeing

19   labels and reviewing labels.   But I don't remember

20   what was the purpose for my reviewing them, if it

21   was because they were being done for us or if it

22   was because they were being done for SciDerma.

23                   MS. CHOVANES:   You want a break?

24   You can ask any time.   You all right?

25                   THE WITNESS:   Yeah, I just need to

**Page 155**

1   move.

2            MS. CHOVANES:  You want to get up.

3   If you're in pain, you can get up.

4            THE WITNESS:  Can I stand a little

5   bit?

6            MS. CHOVANES:  Yeah.  Video guy,

7   she's going to stand a little.

8            THE VIDEOGRAPHER:  Just watch the

9   length on the mic.  You should be fine.

10           MR. RYAN:  If you few need to take a

11  break, we can break.

12           THE WITNESS:  I just can't sit this

13  long.  That's all.

14           MR. RYAN:  Understood.

15           I'm going to mark as Exhibit 57 a

16  document that was produced in connection with the

17  file that Avidas made with the Court.

18        (Exhibit 57, Photograph of

19     Vitaphenol Anti-Aging toner package, was

20     marked for identification.)

21           MS. CHOVANES:  What is it?  I didn't

22  hear what you said.  A document in connection with

23  what?

24           MR. RYAN:  A filing that Avidas made

25  with the Court.

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    MS. CHOVANES:  What filing, sir?

 2                    MR. RYAN:  Filing document 47-3.

 3                    MS. CHOVANES:  And why was this --

 4      do you have the rest of where this was?  An

 5      appendix or something?

 6                    MR. RYAN:  No.

 7                    MS. CHOVANES:  Note my -- excuse me.

 8      Let me object to this because we didn't produce

 9      anything like this, exclusive of other information,

10      so I think it's unfair and out of context.  Plus

11      I'll note that there is no identification, there's

12      no Bates number or anything on this, so I don't

13      really accept counsel's representation.

14                    With that said, you may answer if

15      it's a relevant, nonprivileged question.

16      BY MR. RYAN:

17           Q.   Do you recognize the packaging in Exhibit

18      57?

19           A.   Yes, this is Vitaphenol packaging.

20           Q.   Do you know who created that packaging?

21                    MS. CHOVANES:  Objection.  What do

22      you mean "created"?

23      BY MR. RYAN:

24           Q.   Do you know who manufactured the

25      packaging that we see in Exhibit 57?
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1        A.    It's been a long time since I looked at

 2   any of this.  This -- I'm sorry.  Without my files,

 3   I can't be sure.  This looks like what we might

 4   have produced at Harmony, but I don't have the

 5   context to put this in with my files.

 6               MS. CHOVANES:  I'm going to caution

 7   the witness, Counsel doesn't want a guess from you.

 8   So if you're guessing, just say "I don't know,"

 9   because Counsel doesn't want guesses.  That will

10   just clutter the record.

11               THE WITNESS:  Okay.

12   BY MR. RYAN:

13        Q.    Do you believe that Exhibit 57 depicts

14   the Vitaphenol packaging that was created by

15   Harmony Labs?

16        A.    I believe so but I'm not certain.

17               MS. CHOVANES:  I'm sure something

18   was said about this.  Again, I'll note my

19   continuing objection, as this was in a brief, and

20   pulling it out of a context of a brief is unfair to

21   the witness.

22               MR. RYAN:  Do you agree that any

23   statements made in the briefs filed by Avidas can

24   be used as admissions against Avidas, Ms. Chovanes.

25               MS. CHOVANES:  Don't answer that.
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1    That's a privileged question.  Don't answer that.

2                    MR. RYAN:  I'm asking you,

3    Ms. Chovanes.

4                    MS. CHOVANES:  I have no idea what

5    you're talking about.  We're here to ask the

6    witness questions.  Keep going.  Note my objection.

7                    MR. RYAN:  Next, I'm going to mark

8    as Exhibit 58 a document that's Bates number P-545

9    to 546.

10             (Exhibit 58, Photographs of

11         Vitaphenol Anti-Aging toner package,

12         Bates P-545 to 546, was marked for

13         identification.)

14                    MS. CHOVANES:  Who produced this?

15                    MR. RYAN:  La Jolla Spa.

16                    MS. CHOVANES:  When?

17                    MR. RYAN:  I don't know but it's got

18   the Bates number on it.  Weeks or months ago.

19                    MS. CHOVANES:  No, I don't think you

20   ever produced this.  I think this is brand new.

21                    MR. RYAN:  Well, I disagree.

22                    MS. CHOVANES:  Okay, I'll look into

23   it.  But I'm going to object to it because I don't

24   think this was produced to us.

25                    MR. RYAN:  Okay.  You're incorrect,

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   but that's okay.

 2   BY MR. RYAN:

 3        Q.   The packaging that we see on the left

 4   side of Exhibit 58 that's similar to the packaging

 5   we see in Exhibit 57.

 6                    Do you see that?

 7                    MS. CHOVANES:  Objection to your

 8   statement about similarity.  Ask a question.  Don't

 9   editorialize.

10   BY MR. RYAN:

11        Q.   Do you know who created the packaging

12   that we see --

13                    MS. CHOVANES:  Objection to the word

14   "created."

15                    MR. RYAN:  Can you wait until I

16   finish my question.

17                    MS. CHOVANES:  It was finished.  You

18   said objection to "created it."  And before you had

19   done the same question, I just want to make sure

20   you realize you had used it before.

21   BY MR. RYAN:

22        Q.   Do you know who manufactured the

23   packaging that we see on page -- Exhibit 58?

24        A.   I believe this is Harmony packaging.

25                    MS. CHOVANES:  Did you see it's two
```

Page 160

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1  pages?

 2  BY MR. RYAN:

 3      Q.   So turn to the second page of Exhibit 58,

 4  which is Bates-stamped P-546.

 5               Do you the side profile image of the

 6  carton and it says at the bottom "Manufactured for

 7  Avidas Pharmaceuticals" there?  Do you see that?

 8      A.   Yes, I do.

 9      Q.   Okay.  And when Harmony manufactured

10  cartons for the Vitaphenol products at the request

11  of Avidas, it added that information "Manufactured

12  for Avidas" on the packages; correct?

13               MS. CHOVANES:  Objection; asked and

14  answered many times.

15               THE WITNESS:  Yes, that's correct.

16               MS. CHOVANES:  Margie, let me get my

17  objection in, please.

18               THE WITNESS:  Uh-huh.

19               MS. CHOVANES:  Just take your time.

20  BY MR. RYAN:

21      Q.   And it's true that Harmony Labs created

22  new cartons for the Vitaphenol anti-aging toner;

23  correct?

24               MS. CHOVANES:  Objection; asked and

25  answered.

Page 161

Margaret Gardner - 30(b)(6)            La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    THE WITNESS:  Yes, they created new

 2    cartons for the anti-aging -- the toner product.

 3    BY MR. RYAN:

 4        Q.    And Harmony Labs created new cartons for

 5    all of the Vitaphenol products other than the CRS

 6    product; is that correct?

 7                    MS. CHOVANES:  Objection; asked and

 8    answered.

 9                    THE WITNESS:  So Harmony was

10    responsible for the manufacturing of all of the

11    Vitaphenol products except for the CRS.

12    BY MR. RYAN:

13        Q.    I understand that.  My question is a

14    little bit different.

15                    My question is:  Harmony Labs

16    created new cartons for all of the Vitaphenol

17    products other than the CRS product; correct?

18        A.    That's my understanding.

19        Q.    What's your understanding based on?

20        A.    Based on the request that we made for new

21    products from Harmony.

22                    MR. RYAN:  Next I want to mark as

23    Exhibit 59 some images that were attached --

24    whoops -- to a filing that Avidas made in this

25    case.
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1              MS. CHOVANES:  Specifically what

 2    filing?

 3              MR. RYAN:  Docket 47-3.

 4              MS. CHOVANES:  And what context?

 5    Again, I'm going to object to just producing

 6    documents out of context.

 7              MR. RYAN:  Well, these are your

 8    filings so I'll leave it up to you.

 9              MS. CHOVANES:  No, you have to give

10    a context.  We produced many files in this case,

11    and if your answer is "that's your filing," it's

12    simply unfair.

13              MR. RYAN:  The filing is Document

14    47-3 that was filed by Avidas in this lawsuit.

15              MS. CHOVANES:  Great.  And what

16    paper was it filed with?  And what was the context?

17    You can't ask the witness about something that's

18    been filed with the particular context out of

19    context.  It's just unfair, Mr. Ryan.  But you go

20    ahead.

21           (Exhibit 59, Photographs of

22      Vitaphenol Ultra Gentle Daily Cleanser

23      package was marked for identification.)

24    BY MR. RYAN:

25      Q.   Do you recognize the packaging that we
```

Page 163

Margaret Gardner - 30(b)(6)        La Jolla Spa MD vs. Avidas Pharmaceuticals

1 | see in Exhibit 59?

2 |     A.   Yes.   The -- the packaging for the Ultra

3 | Gentle Daily Cleanser.

4 |     **Q.   Was that packaging that was manufactured**

5 | **by Harmony Labs for Avidas?**

6 |     A.   I believe so, yes.

7 |     **Q.   To your knowledge, did Avidas sell any**

8 | **Vitaphenol products outside the United States?**

9 |               MS. CHOVANES:   Objection; asked and

10 | answered.

11 |               THE WITNESS:   No, Avidas did not

12 | sell outside of the United States.

13 | BY MR. RYAN:

14 |     **Q.   To your knowledge, did SciDerma sell any**

15 | **products -- any Vitaphenol products outside the**

16 | **United States?**

17 |     A.   No, I'm not aware that SciDerma sold any

18 | products outside of the US.

19 |     **Q.   Were any Vitaphenol products --**

20 |     A.   Or excuse me.   I should say outside of

21 | their territory, because I don't really know if

22 | they ever sold anything to Canada.

23 |     **Q.   Were any Vitaphenol products sold to a**

24 | **company that does business at Strawberry Cosmetics?**

25 |     A.   No, I don't know who Strawberry Cosmetics

**Page 164**

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1    is.

2         Q.   Were any Vitaphenol products sold to a

3    company that does business as Strawberry.net?

4         A.   I'm sorry.  Could you ask me that

5    question again.

6         Q.   Sure.

7                   Were any Vitaphenol products sold to

8    a company that does business as Strawberry.net,

9    N-E-T?

10        A.   No.  Avidas did not sell their products

11   to anyone -- any internet-based company.  We sold

12   to doctors' offices and plastic surgeons.  That was

13   our core selling audience.

14        Q.   That's during the period of time that

15   Avidas sold Vitaphenol products; correct?

16                   MS. CHOVANES:  Objection.  Excuse

17   me --

18                   THE WITNESS:  I'm sorry.  But your

19   question was Avidas, was it not?

20   BY MR. RYAN:

21        Q.   Yes.

22        A.   Okay.

23        Q.   So I just want to make sure that we're

24   clear.  So from 2008 until Avidas entered into the

25   inventory and license agreement with SciDerma, it

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1    did not --

 2         A.   We did not sell to Strawberry.net or

 3    anyone with a sound like that.  We were selling to

 4    dermatology offices and plastic surgeons.

 5              MS. CHOVANES:  Okay.  While there's

 6    no question outstanding, we're going to take a

 7    short break.  Can you come outside for a second?

 8              MR. RYAN:  Off the record.

 9              THE VIDEOGRAPHER:  Time is now

10    1:57 p.m.  We're going off the video record.

11         (Recess.)

12              THE VIDEOGRAPHER:  Time is now

13    1:58 p.m.  We're back on the video record.

14    BY MR. RYAN:

15         Q.   Did Avidas sell any Vitaphenol products

16    to a company called Solid Commerce HK, Limited?

17         A.   I'm sorry.  Who is Solid Commerce HK,

18    Limited?

19         Q.   I'm asking whether -- I'm sorry --

20    whether Avidas sold Vitaphenol products to a

21    company called Solid Commerce HK, Limited?

22         A.   I'm sorry.  I'm not familiar with the

23    name of that company.  As I said before, we sold

24    products to dermatologists and plastic surgeons

25    who, in turn, then sold products via the internet
```

Page 166

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1    or to their customers in this practice.

2              We sold wholesale to doctors and

3    plastic surgeons, and then they were the resellers.

4         Q.   How do you know that they were resellers?

5         A.   Because most of them had internet sites.

6    In fact, we had asked several times for La Jolla

7    Spa to shut down their internet site because they

8    were selling products and that was not in our

9    agreement.

10        Q.   Did you ask any other dermatologists or

11   doctors' offices to stop selling Vitaphenol

12   products on the internet other than La Jolla Spa?

13             MS. CHOVANES:  Objection;

14   mischaracterization of her testimony.

15             THE WITNESS:  We asked all

16   physicians that we did business with to focus their

17   selling on their clients in their practice.

18   BY MR. RYAN:

19        Q.   Did Avidas ask any other dermatologists

20   or doctors' offices to stop selling Vitaphenol

21   products on the internet other than La Jolla Spa?

22        A.   I don't believe that we found anyone else

23   who was, you know, selling through resellers as

24   opposed to selling to their own customer base.

25             MS. CHOVANES:  When you say "anyone

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1  else," just so it's clear, who is that "anyone

 2  else"?

 3              THE WITNESS:  I don't think we found

 4  any other doctors' offices or spas that we sold to

 5  who were then reselling on an internet basis to

 6  resellers.  Most of the people who we did business

 7  with were selling to their own clientele -- you

 8  know, the people who came to the spa or the people

 9  who were coming in for some kind of treatment for

10  dermatology or plastic surgery.

11  BY MR. RYAN:

12      Q.   **What company filled the orders during the**

13  **period of time that Avidas was selling the**

14  **Vitaphenol products?**

15      A.   I'm sorry.  What company?

16      Q.   **Yeah, filled the orders.  Was that IFS?**

17      A.   Yes, that would have been IFS.  Yes.

18      Q.   **How were orders taken for the Vitaphenol**

19  **products during the period of time that Avidas sold**

20  **the products?**

21      A.   A customer could either call in or fax an

22  order, and those orders went directly to IFS to

23  fulfill.

24      Q.   **Would payment for the sale of Vitaphenol**

25  **products go to IFS first before payment would be**

Margaret Gardner - 30(b)(6)　　　　La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   received by Avidas?

 2        A.   No, I don't believe so.  There was

 3   another merchant account that payments were

 4   processed through.

 5             MS. CHOVANES:  Can we have a time

 6   frame to clarify this testimony?

 7             MR. RYAN:  Yeah, this is during the

 8   period of time that Avidas sold the Vitaphenol

 9   products.

10             MS. CHOVANES:  Up to 2010.  We're

11   asking questions about 2008 to 2010.

12             MR. RYAN:  Correct.

13             MS. CHOVANES:  Okay.

14   BY MR. RYAN:

15        Q.   Who controlled the merchant account that

16   you just described?

17        A.   I'm sorry.  I don't understand what you

18   mean by who "controlled" it.

19        Q.   I believe your testimony was that there

20   was a merchant account that payments were processed

21   through.  Was that merchant account controlled by

22   Avidas or IFS?

23        A.   No, it was controlled by Avidas.

24        Q.   Did Avidas ever sell any Vitaphenol

25   products to a company called Skin, Etc., E-T-C?
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1        A.   Not that I am aware of.  As I said, we
 2   sold to doctors' offices and plastic surgery
 3   offices and some spas.
 4        Q.   Did Avidas ever sell any Vitaphenol
 5   products to a company called Kruzco, K-R-U-Z-C-O?
 6        A.   Again, unless there was a doctor in front
 7   of it -- Dr. Kruzco or Spa Kruzco -- it's really
 8   not likely, because we didn't -- as I said, we sold
 9   to physicians' offices and spas.
10        Q.   Did Avidas sell any Vitaphenol products
11   to a person named Theresa Hart, H-A-R-T?
12        A.   I have no idea.
13        Q.   Did Avidas sell any products to a company
14   called Freipost, F-R-E-I-P-O-S-T?
15        A.   Again, it's not anything that I have
16   heard of.  And our customer base is not other
17   companies --
18             MS. CHOVANES:  Go ahead, sorry.  I
19   want to make an objection when you're done.
20             THE WITNESS:  It was physicians,
21   spas and plastic surgeons.
22             MS. CHOVANES:  I want to note for
23   the record, this is information that's nine years
24   old.  Can we hurry this up?
25   BY MR. RYAN:
```

Margaret Gardner - 30(b)(6)                     La Jolla Spa MD vs. Avidas Pharmaceuticals

1       Q.   Did Avidas sell any Vitaphenol products

2   to a company called Make Me Heal?

3       A.   Again, unless there was a spa that was

4   called Make Me Heal, I -- it's not a company or a

5   name that I recognize at all.

6       Q.   Did Avidas sell any Vitaphenol products

7   to a company called S.C. Mart?

8                 MS. CHOVANES:  Objection; asked and

9   answered.

10                THE WITNESS:  Not a company that I

11  am aware that we sold anything to.

12  BY MR. RYAN:

13      Q.   Did Avidas sell any Vitaphenol products

14  to a company called Perfume Warehouse doing

15  business as AZ Perfume?

16      A.   No, we did not.  They're not -- they were

17  not one of our customers.

18      Q.   Did Avidas sell any Vitaphenol products

19  to a company doing business as The Beauty Club?

20      A.   Again, I don't know if that was the name

21  of one of the spas that we sold to.  If it was not

22  one of the spas that we sold to -- I don't know who

23  they are and we wouldn't have sold to them.

24      Q.   Did Avidas sell any Vitaphenol products

25  to a company doing business as Jewlzie,

Page 171

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1   J-E-W-L-Z-I-E?

2        A.   My response is the same, that unless it

3   was the same of a spa -- Jewlzie Spa or something

4   like that -- they would not have been our customer.

5        **Q.   Did Avidas ever sell any Vitaphenol**

6   **products, after it entered the inventory and**

7   **license agreement, with SciDerma?**

8        A.   I'm sorry.  Say that again.

9        **Q.   Did Avidas ever sell any Vitaphenol**

10  **products, after it entered into the inventory and**

11  **license agreement, with SciDerma?**

12       A.   No.  That would have been impossible,

13  because we didn't have any Vitaphenol product.

14       **Q.   When you say "we didn't have any**

15  **Vitaphenol product" --**

16       A.   Avidas had no Vitaphenol product.

17            MS. CHOVANES:  Don't argue with him.

18  Don't argue with him.

19            THE WITNESS:  I thought that was my

20  answer.

21            MS. CHOVANES:  There's no question

22  outstanding.  Don't argue with him.

23  BY MR. RYAN:

24       **Q.   And that's because all of the Vitaphenol**

25  **product was transferred to SciDerma?**

Non-Confidential

Margaret Gardner - 30(b)(6)                La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                   MS. CHOVANES:  Okay.  Let's just --
 2     what's "that's"?  What is that in reference to?
 3     Can you ask a question with a clear clause, because
 4     otherwise, it make no sense.
 5     BY MR. RYAN:
 6          Q.   Your testimony is that "we didn't have
 7     any Vitaphenol product."
 8                   And my question is:  Is that because
 9     all of the Vitaphenol product was transferred to
10     SciDerma in 2010?
11                   MS. CHOVANES:  Asked and answered.
12                   You may answer.
13                   THE WITNESS:  Yes, all of the
14     Vitaphenol inventory of any kind was transferred to
15     SciDerma back in 2010.
16                   MR. RYAN:  Next I'll mark as Exhibit
17     60 a document that Avidas produced in this case
18     Bates-stamped A_1044 to 1066.
19              (Exhibit 60, Packet of documents
20         Bates-stamped A-1044 to 1066, was marked
21         for identification.)
22                   MS. CHOVANES:  Is there a question?
23     BY MR. RYAN:
24          Q.   What is this document that we see here as
25     Exhibit 60?
```

**Page 173**

Non-Confidential

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

 1                    MS. CHOVANES:  Objection.  You're

 2    assuming it's a single document do you want to

 3    rephrase?

 4                    And "document" is sometimes used for

 5    "page" too.  Could you just clarify your question.

 6    BY MR. RYAN:

 7        Q.    So focusing on Exhibit 60 for the purpose

 8    of the next several questions --

 9                    MS. CHOVANES:  But Exhibit 60 is it

10    not a document produced as such.  That's why I'm

11    objecting, and your question is unfair.  You're

12    assuming it is a document produced as such.  It

13    wasn't.  So you can't just say "what is this

14    document" because you're misidentifying the

15    question -- the objection --

16                    MR. RYAN:  Please wait until I ask

17    question.

18                    MS. CHOVANES:  No, I'm going to

19    finish.  You did ask a question and I'm objecting

20    to it.  You can't --

21                    MR. RYAN:  I didn't ask a question.

22                    MS. CHOVANES:  You did.  It started

23    with "it's a document."

24                    MR. RYAN:  I'm withdrawing the

25    question.

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1            MS. CHOVANES:  Okay.  Thank you.  Go

2    ahead.

3    BY MR. RYAN:

4        **Q.   I want to focus your attention on Exhibit**

5    **60.  Please look at the first page of Exhibit 60,**

6    **which is Bates number A-1044.  What is this**

7    **document that we see that's Bates-stamped 1044?**

8            MS. CHOVANES:  Objection.  What is

9    this document?  What does that mean?  Do you want

10   to ask her just what it is in -- with regard to her

11   business?

12            And, by the way, this probably also

13   objected to under the protective order, so your

14   client has to get off the phone.

15            MR. RYAN:  It's not subject to the

16   protective order.

17            MS. CHOVANES:  It is, and I'm

18   declaring it as such.  It has to do with the

19   company's business.

20            If you're going to ignore the

21   protective order, we're not going to have testimony

22   on this basis, and the judge just said that.  Okay?

23   If you want to give me a proffer while your client

24   gets off the phone and we go off the record, I'm

25   willing to listen.  But right now, since this is

Page 175

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

 1  getting into their business, I have a real issue

 2  with you asking about it with her on the phone.

 3              MR. RYAN:  You didn't mark this

 4  document as confidential.

 5              MS. CHOVANES:  Great.  And now

 6  you're asking about it.

 7              MR. RYAN:  Okay.  I'm disconnecting.

 8              MS. CHOVANES:  Okay, thank you.

 9  BY MR. RYAN:

10      Q.   Focusing on Exhibit 60, Bates-stamped

11  Page A-1044, what is this document that we see

12  here, this one page?

13      A.   I'm -- this is a -- this looks like a

14  copy of a report that was done on a monthly basis

15  and sent to La Jolla Spa MD.

16      Q.   Who created this report that we see on

17  Bates-stamped Page 1044?

18              (Simultaneous cross-talk.)

19              (Clarification by reporter.)

20              MS. CHOVANES:  Objection to form.

21              THE WITNESS:  I'm sorry.

22  BY MR. RYAN:

23      Q.   Who created Page 1044?

24      A.   Actually, it was a collaboration with the

25  finance person from La Jolla Spa MD who worked with

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   the finance person from Avidas to come up with the
 2   layout for the monthly reporting.
 3                 MS. CHOVANES:  In light of her
 4   answer, I'm going to instruct you that this is not
 5   subject to the protective order, since it has to do
 6   with the La Jolla, apparently.  So you can get your
 7   client back on the phone if you want.
 8                 (Whereupon, Mr. Ryan places a
 9   telephone call.)
10                 MS. YORK:  Good morning.  This is
11   Dianne.
12                 MR. RYAN:  Hi, Dianne.  We're back
13   in the conference room.  Please put it on mute.
14                 MS. YORK:  Okay, great, thank you.
15   BY MR. RYAN:
16       Q.   So you mentioned that Bates-stamped
17   Page 1044 was a collaborative effort between the
18   finance person for La Jolla Spa and somebody from
19   Avidas; is that correct?
20       A.   Yes, correct.
21       Q.   Who was the person from Avidas that
22   collaborated with the person from La Jolla Spa to
23   create Page 1044?
24       A.   That would have been Michael Warne.  He
25   was a certified chartered accountant.
```

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

1      Q.   Who was the financial person from La

2   Jolla Spa MD that Michael Warne collaborated with

3   to create this Exhibit 60, Page 1044?

4      A.   I know there were a couple of people that

5   he worked with, and I don't know if her position

6   was specifically finance.  But one of the people

7   who was involved in it was a person by the name of

8   Lilian either Wills or Wells.  And there was

9   another person too, but I just don't remember their

10  name.

11     Q.   So with respect to Page 1044 on Exhibit

12  60, can you determine what month or months this

13  report was focused on?

14     A.   No I can't -- I can't tell on this one.

15  I mean, I see that there -- shows what the total

16  payable was.  And that would have been the amount

17  that was paid to La Jolla for whatever the sales

18  transactions and movements were.  But I don't see

19  it.

20     Q.   In the middle of the columns, there is a

21  column titled "Closing book inventory at 6/30/10."

22               Do you know what that refers to?

23     A.   No, I don't.  If you give me a minute,

24  I'll look to see if there's some --

25               No, I don't.

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1        Q.    Next to that column, there's a column
 2   titled "IFS report."  Do you know what that column
 3   refers to?
 4        A.    Based on what the document says here --
 5   it says "inventory."  So I'm not going to question
 6   the document.  It says "inventory."
 7                    MS. CHOVANES:  I'm going to caution
 8   the witness again not to guess.  Counsel is
 9   entitled to your best recollection, but don't
10   guess.
11   BY MR. RYAN:
12        Q.    Do you believe that Page 1044 reflects
13   the inventory of Vitaphenol products that was
14   located at IFS as of June 30th, 2010?
15                    MS. CHOVANES:  Objection.  Your
16   belief is irrelevant.
17                    You can answer.
18                    THE WITNESS:  I don't know.  I can't
19   put this document in context.  There's no date on
20   it.  There's nothing here that even says to me that
21   this was a final document of something.
22                    MS. CHOVANES:  Let's take a break,
23   please.
24                    MR. RYAN:  Go off the record.
25                    THE VIDEOGRAPHER:  Time is 2:16 p.m.
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1  We're going off the video record.

 2          (Recess.)

 3              THE VIDEOGRAPHER:  Time is now

 4  2:21 p.m.  We're back on the video record.

 5  BY MR. RYAN:

 6      **Q.  Starting at Page 1049 on Exhibit 60 and**

 7  **going to the end, 1066, there are a number of**

 8  **monthly reports.**

 9              **Were those reports sent to La Jolla**

10  **Spa by Avidas?**

11              MS. CHOVANES:  You characterized

12  them as monthly reports, and I'm going to object to

13  that just because I don't see that here.  Is that

14  anyplace you could point to that statement?

15              Maybe you should ask the witness

16  what kind of reports they are.

17              Note that counsel is calling his

18  client and, therefore, not answering.

19              MR. RYAN:  I'm not here to answer

20  questions.  I'm here to ask questions.

21              MS. CHOVANES:  So ask.

22              (Whereupon, Mr. Ryan places a

23  telephone call.)

24              MS. YORK:  Good morning.  This is

25  Dianne.

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    MR. RYAN:  Hi, Dianne.  Please, put
 2    it on mute.
 3                    MS. YORK:  Thank you.
 4                    THE WITNESS:  Can you repeat your
 5    question, please?
 6    BY MR. RYAN:
 7         Q.   Did Avidas send monthly reports to La
 8    Jolla Spa during the period of time that Avidas
 9    sold the Vitaphenol products?
10         A.   Yes, we did.
11         Q.   Looking at Exhibit 60, is Exhibit 60
12    reflective of the types of monthly reports that
13    Avidas would send to La Jolla Spa?
14                    MS. CHOVANES:  Objection to the
15    nature of the question.  Exhibit 60 is many pages.
16    Do you want to point her to the Bates numbers you
17    referred to earlier?
18                    MR. RYAN:  Bates numbers 1049
19    through 1066.
20                    THE WITNESS:  Yes, these are the
21    reports that were sent to La Jolla Spa.
22    BY MR. RYAN:
23         Q.   How do you know they were sent to La
24    Jolla Spa?
25         A.   I'm not understanding your question.
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1        Q.   How do you know these reports were

 2   actually sent to La Jolla Spa?

 3        A.   Because they were sent by myself or sent

 4   by Michael Warne; and in some cases, some of them

 5   were even sent certified to make sure that they got

 6   to La Jolla Spa.

 7        Q.   When you say some of them were sent by

 8   Michael Warne, did he send them from South Africa?

 9        A.   No.

10        Q.   Was -- did Michael Warne work in

11   Pennsylvania for a certain period of time?

12        A.   Yes.  He worked in Doylestown.

13        Q.   Okay.  When did Mr. Warne leave

14   Doylestown?

15        A.   I have no idea.  It was a long time ago.

16        Q.   Was it after 2010?

17        A.   I'm sorry.  I do not remember what

18   year --

19             MS. CHOVANES:  Don't apologize.

20   BY MR. RYAN:

21        Q.   With respect to the monthly reports that

22   we see between Bates stamps 1049 and 1066, does

23   Avidas have any copies of canceled checks that are

24   associated with any payments made in connection

25   with those reports?
```

Page 182

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1      A.    I produced a document, which was prepared

2   showing all the payments that were made with these

3   reports and the bank statements showing that they

4   were all cashed.

5              MS. CHOVANES:  Let's just answer the

6   question asked, please.  Answer the question asked.

7   BY MR. RYAN:

8      Q.    You produced -- you located bank

9   statements showing that the checks were cashed?

10     A.    That's correct.

11     Q.    Did you turn those over to your counsel?

12     A.    That's correct.

13     Q.    How far back did the bank statements go?

14     A.    I believe they went back to 2008.

15     Q.    Were those bank statements that you

16  maintained at your home office location, in the

17  files that you have for Vitaphenol?

18     A.    Some of them.

19     Q.    Where were the other ones maintained?

20              MS. CHOVANES:  Objection;

21  irrelevant.

22              THE WITNESS:  I needed to request

23  them from the bank.

24  BY MR. RYAN:

25     Q.    Did you do that?

**Page 183**

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1        A.    Yes.

 2        Q.    Did you request them from Fulton Bank?

 3        A.    I don't remember if it was Fulton or

 4   First Trust.

 5        Q.    Were you able to obtain bank statements

 6   from one of those two banks going back to 2008?

 7        A.    I was able to obtain some -- or I should

 8   say most.

 9        Q.    Were you able to obtain bank statements

10   that showed any checks that were sent to La Jolla

11   Spa along with the reports that were sent?

12        A.    I don't understand the question.

13        Q.    Sorry.  Were you able to obtain bank

14   statements that showed canceled checks whereby La

15   Jolla Spa signed the checks that you sent to it?

16        A.    I was able to obtain the bank statement

17   that showed the checks were cashed.

18        Q.    Did the bank statements just show the

19   check number, for example, or did it have an image

20   of the checks as well?

21        A.    I believe there was not an image; it's

22   just the transaction.

23        Q.    And to your knowledge, did La Jolla Spa

24   cash every check that Avidas ever sent to it?

25        A.    Yes, they did.
```

Margaret Gardner - 30(b)(6)                La Jolla Spa MD vs. Avidas Pharmaceuticals

1      Q.   And you confirmed that by looking at the

2  bank statements that you referred to?

3      A.   Yes.

4      Q.   Do you know who signed any of the checks

5  that Avidas sent to La Jolla Spa at any point in

6  time?

7               MS. CHOVANES:   Objection;

8  irrelevant.   It's your client.   How should she know

9  that?

10               THE WITNESS:   No, I do not.

11  BY MR. RYAN:

12      Q.   Do you have any documents that reflect

13  the back sides of the checks that were cashed that

14  Avidas sent to La Jolla Spa?

15      A.   I don't believe so, but I don't remember.

16      Q.   Do you remember receiving any bank

17  statements and seeing any check images that showed

18  signatures on the backs of checks that were sent to

19  La Jolla Spa?

20      A.   I don't recall.

21      Q.   Turning back to the first page of Exhibit

22  63, Bates-stamped 1044, do you know why there was a

23  closing book inventory done on June 30th of 2010?

24      A.   No, I don't.

25      Q.   Do you know if the closing inventory was

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1   done because, after that time, Avidas entered into

2   the inventory and license agreement with SciDerma?

3                    MS. CHOVANES:  I'm going to object

4   to that question as it involves a hypothetical.  Do

5   you want to rephrase it.

6                    MR. RYAN:  No.

7                    MS. CHOVANES:  Okay, if you can

8   answer it.

9                    THE WITNESS:  No, I don't.

10  BY MR. RYAN:

11       Q.   So with respect to any of the checks that

12  were sent to La Jolla Spa prior to June 30th of

13  2010, is the only record that Avidas has reflecting

14  that those checks were cashed the bank statements,

15  or are there any other records that Avidas has

16  showing that the La Jolla Spa cashed the check that

17  Avidas sent to it?

18                   MS. CHOVANES:  Objection to the form

19  of the question.  I'm going to ask counsel to

20  rephrase.  I'm not going to let her answer that

21  because it's too confusing.

22  BY MR. RYAN:

23       Q.   Do you understand what I'm asking?

24       A.   I got lost in the middle of it.

25       Q.   So we've already established that Avidas

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

1  has bank statements that show that checks were

2  cashed by La Jolla Spa.  Would you agree with that?

3     A.  Yes.

4     Q.  Okay.  Other than those bank statements,

5  does Avidas have any other records showing that La

6  Jolla Spa cashed the checks that Avidas sent to it?

7     A.  Not that I'm aware of.

8     Q.  Looking at Bates-stamped Page 1049 on

9  Exhibit 60, there are a number of columns, and I'm

10  going to ask some questions about the columns.

11             One of the columns says "Unit

12  third-party sales."  What does that refer to?

13             MS. CHOVANES:  Let the record

14  reflect my objection is this document is dated

15  12/31/08, and I don't know why it's relevant.

16             MR. RYAN:  Well, I don't agree that

17  it's dated that.

18             MS. CHOVANES:  There's a date at the

19  top that says 12/31/08.

20             MR. RYAN:  There's also a date that

21  it says "YGE report, 4/30/2010."

22             MS. CHOVANES:  Right, 2010 too.

23  Again, let the record reflect my objection to this

24  material.  It's all irrelevant.

25             MR. RYAN:  Just so you understand,

Margaret Gardner - 30(b)(6)                     La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   the record is going to reflect everything that you

 2   say today.

 3   BY MR. RYAN:

 4       Q.   So looking at --

 5               MS. CHOVANES:  What?  I'm sorry.  I

 6   didn't hear what you said.

 7               MR. RYAN:  Looking at --

 8               MS. CHOVANES:  No, no, you said

 9   something.  I want to know what you said.

10               MR. RYAN:  I said the record is

11   going to reflect everything that you say today.

12               MS. CHOVANES:  Okay.  I don't know

13   if it will or not, but let the record reflect that

14   he said that.

15               MR. RYAN:  Okay.

16   BY MR. RYAN:

17       Q.   Looking at the column that says, "Unit

18   third-party sales," what does that refer to?

19       A.   It refers to Vitaphenol units that were

20   sold to a third party, like a doctor.

21       Q.   There's a column that says "Launch

22   testers."  What does that column refer to?

23       A.   They were units that were tester units

24   for new customers, customers to try the product, to

25   get them to buy the product.
```

**Page 188**

Margaret Gardner - 30(b)(6)         La Jolla Spa MD vs. Avidas Pharmaceuticals

1      Q.    There's a column that says "Unit selling

2    price."  What is that column for?

3      A.    That is the price that we sold to

4    physicians and plastic surgeons.

5      Q.    There's a column that says "Harmony

6    price."  What does that refer to?

7      A.    That's how much we paid to Harmony for a

8    specific unit.

9      Q.    The next column says "Avidas unit CGS."

10   What does that refer to?

11     A.    That's the cost of goods of Avidas, which

12   includes, as I said before, other factors besides

13   the Harmony price.

14     Q.    There's a column that says "Total $ LJSMD

15   CJS."  What does that refer to?

16     A.    So Avidas sold as well product to La

17   Jolla Spa MD.  And that was shown separately,

18   because the pricing for La Jolla Spa MD was not the

19   same as third party.

20     Q.    There's a column that says "Third-party

21   profit."  What does that refer to?

22     A.    It's just the -- the selling minus the

23   cost of goods for the units that were sold to the

24   third party.

25     Q.    That's the selling price minus the cost

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1  of goods sold to the third party?

2      A.   Yeah.

3      Q.   There's a column that says "Royalty

4  payable."  What does that refer to?

5      A.   That would be the royalty calculation

6  that was due to La Jolla Spa.

7      Q.   There's a column that says "Invoiced

8  sales third party."  What does that refer to?

9      A.   I think that's what it is:  It's the

10  third-party sale, sale to the customer.  I think it

11  is what it says it is.

12      Q.   Those are the amounts that are invoiced

13  to the third parties?

14      A.   That's what it appears to be.

15      Q.   Below the chart there's a legend with

16  some information.  And next to the word "legend" it

17  says "Payable by Avidas to YGE per clause 3C of the

18  sales and distribution agreement."

19           Do you know what that refers to?

20      A.   Well, it says it refers to 3C of the

21  sales and distribution agreement, which said

22  basically what we paid -- when La Jolla Spa and how

23  La Jolla Spa was paid.

24           MR. RYAN:  Next I'm going to mark as

25  Exhibit 61 a document produced by Avidas in this

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1   case Bates-stamped A-1003 to 1042.

 2              (Exhibit 61, Packet of documents

 3        Bates-stamped A-1003 to 1042, was marked

 4        for identification.)

 5                   MS. CHOVANES:  I'm going to object

 6   again that this is not a document produced as we

 7   produced it.  It's just made up by counsel.

 8   BY MR. RYAN:

 9        Q.   Do you recognize the documents that are

10   contained in Exhibit 61 as documents that are

11   maintained by Avidas?

12        A.   Yes.

13                   MS. CHOVANES:  Take your time.

14   BY MR. RYAN:

15        Q.   Was that a yes?

16        A.   Yes, I do recognize the documents.

17        Q.   Focusing on the first page of Exhibit 61,

18   Bates stamp A-1003, who created the layout that we

19   see on this report?

20                   MS. CHOVANES:  Objection.

21                   You can answer if you understand it.

22                   THE WITNESS:  So this is the same

23   template that was created with La Jolla Spa MD and

24   Avidas' finance person, Michael Warne.  It's the

25   same report.

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   BY MR. RYAN:

 2        Q.   Well, just if we could compare, for

 3   example, Bates stamp Page 1049 on Exhibit 60, that

 4   report appears to have additional information on it

 5   that's not reflected on 1003-61.  So can you

 6   explain why the reports at least visually look

 7   different?

 8        A.   No, I can't -- I can't.  They work

 9   together collaboratively, so I can't --

10        Q.   For what period of time did Michael

11   Warne work together with Lilian Wells from La Jolla

12   Spa?

13             MS. CHOVANES:  Objection; assumption

14   of the question.  It's also irrelevant, but you can

15   answer to the extent you can answer.

16             THE WITNESS:  I don't remember when

17   Lilian left.  She was the primary contact for

18   Avidas.  So I don't remember the date of when she

19   left company.

20   BY MR. RYAN:

21        Q.   Do you remember the year?

22        A.   No.

23        Q.   The information that's contained in

24   Exhibit 61, the monthly reports, what's the source

25   information for those reports?
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1              MS. CHOVANES:  I'm going to object.
 2     That's an impossible question to answer, because
 3     this is a made-up document.
 4              Go through slowly and ask her the
 5     source of individual information to the extent she
 6     knows.  But to say the source of all this
 7     information, if she can answer that summarily, go
 8     for it.  But I think the question is confusing and
 9     unfair.
10     BY MR. RYAN:
11        Q.   The information that's contained in
12     Exhibit 61, what's the source of the information
13     for those reports?
14              MS. CHOVANES:  No, I'm going to
15     object again.  You can't say the information that's
16     contained in exhibit and hand her a phone book,
17     which is what you've done here.  That's an
18     impossible question to answer.
19     BY MR. RYAN:
20        Q.   How was Avidas able to --
21              MS. CHOVANES:  Take -- excuse me.
22     Take each piece of information and ask her, "Is it
23     generated in the ordinary course?"  That's the way
24     usually this stuff is done.
25              MR. RYAN:  Thanks for the legal
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   lesson.

 2                 MS. CHOVANES:  Yeah, you're welcome.

 3   It looked like you needed it.  I'm glad you

 4   appreciated it.

 5                 MR. RYAN:  That's a personal attack.

 6                 MS. CHOVANES:  You're attacking me?

 7   Don't attack me.

 8                 MR. RYAN:  No, you've attacked me.

 9   BY MR. RYAN:

10       Q.   So let's focus on Bates stamp A-1003.

11   There are dollar figures on that document.  What's

12   the source information used to create this

13   document --

14                 MS. CHOVANES:  Objection.

15   BY MR. RYAN:

16       Q.    -- Bates stamp 1003.

17                 MS. CHOVANES:  Objection.  There are

18   many separate dollar figures here and there are a

19   whole bunch of numbers.  She could take all day

20   defining this.

21                 MR. RYAN:  I'm asking about all the

22   numbers.

23                 MS. CHOVANES:  Each individual

24   number starts with -- do you want the zeros too?

25   Under the third column "7/31/14, third-party sales
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1   dollars," there's a zero there.  Do you want her to

2   give you that number, and then the next zero, and

3   then the next zero?  Is that what you want?  I'm

4   trying to clarify what you want.

5   BY MR. RYAN:

6       **Q.   I want to know how Avidas was able to**

7   **create this report that we see as Bates stamp**

8   **A-1003, and I'm asking about the source information**

9   **that was used to put the information in the report.**

10              MS. CHOVANES:  If you can answer

11   with that clarification, go right ahead.

12              THE WITNESS:  The sales information

13   in 2014 was provided by SciDerma to Avidas.

14   BY MR. RYAN:

15      **Q.   How did SciDerma provide that information**

16   **to Avidas?**

17      A.   Usually by email.

18      **Q.   Did the email contain some sort of Excel**

19   **document with information in it?**

20      A.   The email contained the information that

21   was required as part of the contract.

22      **Q.   What type of information was required as**

23   **part of the contract?**

24      A.   What was sold, how many units, what was

25   used as testers or samples, and what the sales

Page 195

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   transaction was.

 2       Q.   What format was the information in that

 3   SciDerma sent to Avidas in order to create the

 4   monthly reports that Avidas sent to La Jolla Spa?

 5       A.   I don't believe there was a standard

 6   format.

 7       Q.   What formats do you recall receiving from

 8   SciDerma?

 9                MS. CHOVANES:  Objection to the

10   extent you understand the word "format."

11                THE WITNESS:  Sometimes a Word

12   document, sometimes an Excel sheet, sometimes just

13   an email.  Various forms.

14   BY MR. RYAN:

15       Q.   And that would be true for the entire

16   period of time that SciDerma sold the Vitaphenol

17   products:  Information would come in various forms.

18                MS. CHOVANES:  Objection.

19                MR. RYAN:  -- related to sales?

20                MS. CHOVANES:  Sorry.

21                Objection.  Can you ask a question

22   that makes sense, because that one doesn't.  It's

23   got too many parts.

24   BY MR. RYAN:

25       Q.   Do you understand the question?
```

Page 196

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1        A.   SciDerma sent us monthly information, and
 2   that was what we used.
 3        Q.   And that monthly information came in
 4   different types of formats; is that true?
 5        A.   That's correct.
 6        Q.   Would that be true going back to August
 7   of 2010?
 8        A.   That's correct.
 9        Q.   With respect to the report that we see
10   for Bates stamp A-1003, does Avidas have a copy of
11   the check that's associated with that report?
12                 MS. CHOVANES:  Objection.
13                 THE WITNESS:  Do I have what kind of
14   check?
15   BY MR. RYAN:
16        Q.   A copy of a check.
17                 MS. CHOVANES:  Objection.
18                 THE WITNESS:  I can't tell you if
19   it's with the bank statements or not.  They're not
20   here, so -- these documents were sort of all
21   together, so I don't know which check goes with
22   which statement.
23   BY MR. RYAN:
24        Q.   You turn to Bates stamp 1005 on Exhibit
25   61 --
```

Margaret Gardner - 30(b)(6)                La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1        A.    Uh-huh, uh-huh.

 2        Q.    -- we see a report, and then we see a

 3   copy of the front side of a check.

 4              Can you explain the process whereby

 5   the front side of the check was copied along with

 6   the report?  Is that how Avidas maintained its

 7   records?

 8              MS. CHOVANES:  Objection.  There are

 9   two questions there.  Why don't you -- hold it,

10   Margie.  Why don't you ask one question.

11   BY MR. RYAN:

12        Q.    How did Avidas maintain its records --

13              MS. CHOVANES:  There you go.

14   BY MR. RYAN:

15        Q.    -- when it would send reports to La Jolla

16   Spa?

17        A.    We would typically send the check at the

18   same time we sent the report -- they both went

19   together, unless there wasn't a payment -- and then

20   a copy of the record was kept.  I don't think a

21   copy of every check was kept because we had the

22   bank statement showing that the checks were cashed.

23        Q.    Were you the person that always signed

24   the checks that were sent to La Jolla Spa?

25        A.    I do not remember if -- in the early
```

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1   period, 2008 or 2009, if Dan McCall signed

 2   anything.  Typically, I would be the signer.

 3       **Q.   You mentioned that once the report and**

 4   **the check was sent to La Jolla Spa, a copy of the**

 5   **record was kept.  Who actually made the copy of the**

 6   **record?  Would that have been you?**

 7              MS. CHOVANES:  Objection to the

 8   characterization of the previous testimony.

 9              You can answer if you can.

10              THE WITNESS:  It could have been

11   Michael Warne.  It could have been me.  One of the

12   two of us.

13   BY MR. RYAN:

14       **Q.   If you turn to Bates stamp**

15   **Page A-1001031 --**

16              MS. CHOVANES:  I'm sorry.  This is

17   60 or 61?

18              MR. RYAN:  1031.

19              MS. CHOVANES:  Which is in which

20   exhibit?

21              MR. RYAN:  Exhibit 61.

22              MS. CHOVANES:  Thank you.

23              Are you there?

24              THE WITNESS:  Yes, I am.

25   BY MR. RYAN:

**Page 199**

Non-Confidential

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

1    Q.   So this is the monthly report for

2    November 30th of 2011; is that true?

3              MS. CHOVANES:  Objection; document

4    speaks for itself.

5              THE WITNESS:  It appears, yes, it

6    is.

7    BY MR. RYAN:

8    Q.   Okay.  There's a note below the chart and

9    above the check that says "Avidas purchased

10   Harmony."

11             What does that refer to?

12   A.   I have no idea.

13   Q.   If you turn to the very last page of

14   Exhibit 61, which is Bates stamp A-1042, there's

15   some handwriting below the report and above the

16   check.

17             Is that your handwriting?

18   A.   Yes, I believe it is.

19   Q.   So the note says there were no sales in

20   August, September or October; is that correct?

21   A.   That's what the note says.

22   Q.   That's what you wrote?

23   A.   Yes.

24   Q.   Was that note contained on the report

25   that you sent to La Jolla Spa?

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1        A.   I don't know.
 2        Q.   Did you typically advise La Jolla Spa
 3   when there weren't any sales in a given month?
 4        A.   Yes, I did.
 5        Q.   So based on the process that you
 6   described earlier where, after the report was
 7   created and the check was written, then a copy
 8   would be maintained by Avidas, do you believe that
 9   this Bates stamp page, 1042, reflects a copy of
10   what was sent to La Jolla Spa?
11                  MS. CHOVANES:  Now I'm going to
12   object to the mischaracterization of her testimony.
13   If you want to rephrase or ask a question without
14   mischaracterizing it, I'm sure we can get you an
15   answer.  But you mischaracterized what she said
16   before.
17                  MR. RYAN:  I don't believe I did.
18   BY MR. RYAN:
19        Q.   Could you answer the question, please.
20        A.   Can you ask me the question, please.
21        Q.   Do you believe that Exhibit 61, Bates
22   stamp Page A-1042, is a copy of what was sent to La
23   Jolla Spa?
24                  MS. CHOVANES:  I'm going to object
25   to the extent her belief is irrelevant.  Just ask a
```

Page 201

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   question.

 2   BY MR. RYAN:

 3       Q.   I need an answer.

 4              MS. CHOVANES:  Not with the word

 5   "belief" in it.  Can you rephrase --

 6              MR. RYAN:  No.

 7              MS. CHOVANES:  -- because it's

 8   irrelevant as constructed.

 9              MR. RYAN:  I can't.

10              MS. CHOVANES:  Okay.  You're

11   insisting on an irrelevant question.  Let the

12   record reflect that.

13              You may answer.

14              THE WITNESS:  So the report that

15   would have gone to La Jolla would not have looked

16   like this.  It would have been this report without

17   a photocopy of the check, and I do not know whether

18   or not the note was -- I assume I put the note on

19   there to advise her.

20   BY MR. RYAN:

21       Q.   This report on Bates-stamped Page 1042 in

22   the upper left-hand corner says "November and

23   December sales."

24              So is it your belief that these are

25   November and December sales from the year 2010?
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1              MS. CHOVANES:  You're not entitled
 2   to her belief.  Ask a question that seeks relevant
 3   information.
 4              MR. RYAN:  I disagree.
 5              MS. CHOVANES:  You're not entitled
 6   to her belief.  That's an opinion.  You're entitled
 7   to facts.
 8              Ask a simple question.  I don't know
 9   why you mess them up by putting "belief" in.  That
10   calls for opinion testimony on its face.
11              MR. RYAN:  I'm entitled to her
12   opinion based on her foundation so far.
13              MS. CHOVANES:  No, you're not
14   entitled to her opinion.  We'll go to the judge on
15   that.  You're not entitled to a person's opinion.
16   They're a fact witness.
17              So ask the question if you want.
18   Again, I'll make the same objection.
19   BY MR. RYAN:
20       Q.   What month and year is the report that we
21   see on Bates stamp Page A-1042?
22       A.   It appears to be November and December.
23       Q.   Of what year?
24       A.   It appears to be 2010, from the payment.
25       Q.   Because the payment was sent sometime in
```

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

1    February of 2011; is that correct?

2         A.    That's what it says, yes.

3         Q.    Were there any Vitaphenol sales in August

4    of 2010?

5         A.    I'm -- according to this document that

6    I'm looking at, there were no sales in August.

7         Q.    Were there any sales of Vitaphenol

8    products in September of 2010?

9         A.    In accordance with this document, there

10   were no sales in September.

11        Q.    Were there any sales of Vitaphenol

12   product in October of 2010?

13        A.    According to this document, there were no

14   sales in October of 2010.

15        Q.    Do you have any information other than

16   what you see on Bates stamp A-1042 to know whether

17   there were any sales of Vitaphenol products for the

18   months August, September and October of 2010?

19              MS. CHOVANES:   Objection; asked and

20   answered.

21              THE WITNESS:   I'm sorry.   You need

22   to ask that again.   I thought you just asked me

23   that question.

24   BY MR. RYAN:

25        Q.    I said do you have any information other

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1    than what you're reading on Bates stamp Page 1042

2    to know whether there were any sales of Vitaphenol

3    products for the months of August, September and

4    October of 2010?

5         A.   This is 2011 so any information that we

6    would have had would have come from SciDerma, and

7    that was the basis of this report.

8         Q.   Did SciDerma reflect any Vitaphenol sales

9    in the months of August, September or October of

10   2010?

11                  MS. CHOVANES:  Objection; asked and

12   answered.

13                  THE WITNESS:  Based on this report,

14   there were no sales.

15                  MS. CHOVANES:  Let the record

16   reflect counsel is referring to his phone where his

17   client is apparently sending him questions.

18                  Do you want to enter that into

19   record?

20                  MR. RYAN:  Do you want to see my

21   phone?

22                  MS. CHOVANES:  Sure.

23                  MR. RYAN:  There's nothing from my

24   client.

25                  MS. CHOVANES:  Sure, let me have it.

Page 205

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    MR. RYAN:  Go ahead.

 2                    MS. CHOVANES:  Keep asking your

 3      questions.  Don't delay.

 4                    MR. RYAN:  No, give it back to me,

 5      just look.  Just scroll.

 6                    MS. CHOVANES:  Oh, no, I want to

 7      scroll.  So go ahead, ask your questions.  Let's

 8      finish this.

 9                    MR. RYAN:  Well, you keep

10      interrupting.

11                    MS. CHOVANES:  Note the personal

12      attack.

13                    MR. RYAN:  By the way, my client is

14      allowed to send me questions if she wants to.  She

15      hasn't yet.

16                    MS. CHOVANES:  Go ahead, keep

17      moving.

18                    MR. RYAN:  All right.

19                    THE VIDEOGRAPHER:  About eight

20      minutes left.

21                    MS. CHOVANES:  All right.  Let's

22      take a break right now.

23                    MR. RYAN:  Let's take a break right

24      now, sure.

25                    THE VIDEOGRAPHER:  Time is now
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1   2:55 p.m.  We're going off the video record.

 2              (Recess.)

 3                   THE VIDEOGRAPHER:  Time is 3:01 p.m.

 4   We're back on the video record.

 5                   MS. YORK:  This is Dianne.

 6                   MR. RYAN:  Hi, Dianne.  We're back

 7   in the room.  Please, put it on mute.

 8                   MS. YORK:  Oh, thank you.

 9   BY MR. RYAN:

10       Q.   After Avidas started selling the

11   Vitaphenol products -- I'm sorry.  Let me start

12   again.

13                   After SciDerma started selling the

14   Vitaphenol products, was the only information that

15   Avidas had regarding those sales -- did it only

16   come from SciDerma?

17                   MS. CHOVANES:  Objection to form.

18                   THE WITNESS:  Is the only

19   information that we received about SciDerma sales

20   from SciDerma?

21   BY MR. RYAN:

22       Q.   No.  Is the only information that Avidas

23   received regarding Vitaphenol product sales, did it

24   only come from SciDerma?

25                   MS. CHOVANES:  Objection.

Page 207

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    THE WITNESS:  SciDerma provided us
 2    with the information regarding their selling
 3    activities.
 4    BY MR. RYAN:
 5         Q.   Did Avidas have any information regarding
 6    Vitaphenol sales other than the information that
 7    SciDerma provided to it?
 8         A.   No.  I'm not sure what we would have.
 9         Q.   Did Avidas ever audit SciDerma regarding
10    Vitaphenol sales?
11         A.   No.  We did not do an audit of SciDerma.
12         Q.   So with respect to the report that Avidas
13    sent to La Jolla Spa after SciDerma started selling
14    the Vitaphenol products, if SciDerma misstated
15    information regarding sales, then that information
16    would have gotten translated into the reports that
17    Avidas sent to La Jolla Spa; correct?
18                    MS. CHOVANES:  Objection; that's not
19    a question; that's a statement first of all.  And
20    secondly, it's objectionable because it calls for a
21    hypothetical answer.  I'm not going to let her
22    answer it.  Restructure it and ask it more
23    precisely and maybe you could get an answer.
24    BY MR. RYAN:
25         Q.   If SciDerma sold Vitaphenol products but
```

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   did not report those sales to Avidas, then Avidas

 2   would have no way of knowing that SciDerma was

 3   underreporting; correct?

 4                  MS. CHOVANES:  Objection; calls for

 5   speculation.

 6                  THE WITNESS:  We reported what

 7   SciDerma reported was the selling activity.

 8   BY MR. RYAN:

 9       Q.   And you relied on what SciDerma told you;

10   right?

11       A.   Yes.  They were our selling partner.

12       Q.   So if SciDerma made a mistake in the

13   reports that it sent to Avidas, Avidas wouldn't

14   know that there was a mistake; correct?

15                  MS. CHOVANES:  Objection; asked and

16   answered, plus it calls for speculation.

17                  You can answer if you are able.

18                  THE WITNESS:  We didn't have any

19   reason to mistrust the information --

20                  MS. CHOVANES:  Just answer the

21   question.

22                  THE WITNESS:  -- from --

23   BY MR. RYAN:

24       Q.   And you didn't have any way to

25   independently verify the information that SciDerma
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1   was providing to you regarding the Vitaphenol

2   sales; correct?

3                    MS. CHOVANES:  Objection; asked and

4   answered.

5                    THE WITNESS:  No, we did not.

6   BY MR. RYAN:

7       Q.   When did SciDerma stop sending

8   information regarding Vitaphenol sales to Avidas?

9       A.   Can you rephrase that question, please.

10      Q.   When did SciDerma stop sending

11  information regarding Vitaphenol sales to Avidas?

12      A.   I believe all Vitaphenol activity stopped

13  in May of 2014.

14      Q.   Why do you believe that?

15      A.   Because we terminated the contract and

16  SciDerma was asked to discontinue using the

17  trademarks that -- the Vitaphenol trademarks as

18  part of the agreement with La Jolla Spa.

19      Q.   When you say we terminated the contract,

20  which contract was terminated?

21                   MS. CHOVANES:  Objection; first

22  let's clarify who the "we" is.

23                   "We" is Avidas; correct?

24                   THE WITNESS:  Yes.  Avidas

25  terminated the contract --

**Page 210**

Margaret Gardner - 30(b)(6)　　　　La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   BY MR. RYAN:
 2        Q.   With whom?
 3        A.   -- with La Jolla Spa MD, and advised
 4   SciDerma that we were terminating the
 5   contract so, therefore, also terminating with
 6   SciDerma.
 7        Q.   Did SciDerma terminate the inventory and
 8   license agreement with Avidas before Avidas
 9   terminated the agreements with La Jolla Spa?
10        A.   No.  Not officially, no.
11        Q.   What do you mean, "not officially"?
12        A.   We had discussed looking for other
13   strategic options, but we didn't terminate the
14   contract until we terminated the contract with La
15   Jolla Spa.
16        Q.   Why did Avidas terminate the contract
17   with La Jolla Spa?
18                    MS. CHOVANES:  Objection.
19                    THE WITNESS:  Why?  Two reasons.
20                    We weren't making any money.  There
21   were no revenues.  And my lead person, Jack Henn,
22   who was running the selling efforts in the
23   coordination of selling efforts, died, and it made
24   no sense for us to invest even more money in the
25   brand to continue to sell it.
```

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   BY MR. RYAN:
 2        Q.   Why would Avidas have to invest more
 3   money in the brand, given that it had the inventory
 4   and license agreement with SciDerma?
 5                MS. CHOVANES:  Objection.  That
 6   calls for facts, A., not in evidence and, B.,
 7   reaches for a conclusion.
 8                So I'm going to object to that
 9   question and ask you to rephrase.
10                MR. RYAN:  I'm not going to rephrase
11   it.
12   BY MR. RYAN:
13        Q.   The question is:  Why would Avidas have
14   to invest more money in the brand, given that it
15   had the inventory and license agreement with
16   SciDerma?
17        A.   People time is money.  And it would have
18   meant that I needed another coordinator to get the
19   information from SciDerma in an accurate, if you
20   will, in a timely manner so that I could respond as
21   well for the obligations that we had under the Spa
22   MD contract.
23                For me, it was involved in spending
24   money as well on the finance people to do the
25   transactions, even with SciDerma and Avidas.  It
```

Page 212

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   was -- it was not worth it.  It was not worth it.

 2   There was not enough revenues.

 3       Q.   So you mentioned one of the reasons why

 4   Avidas terminated the agreements with La Jolla Spa

 5   was because Jack Henn died.

 6            When did Jack Henn die in relation

 7   to the May 2014 termination with La Jolla Spa?

 8       A.   It was -- I believe it was like within

 9   six months.  It was in a time frame of -- could

10   have been that was the January, and May is when we

11   terminated.

12       Q.   Before Avidas told La Jolla Spa that it

13   was terminating its agreements with La Jolla Spa,

14   did SciDerma tell Avidas that it wanted to

15   terminate the inventory and license agreement?

16       A.   I'm sorry.  Repeat your question again.

17       Q.   Before Avidas told La Jolla Spa that it

18   was terminating its agreements with La Jolla Spa --

19            MS. CHOVANES:  Can you speak up?

20   BY MR. RYAN:

21       Q.   -- did SciDerma tell Avidas that it

22   wanted to terminate the inventory and license

23   agreement?

24       A.   I don't believe so.  I don't recall that.

25       Q.   So you believe the sequence of events is
```

**Page 213**

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

1    that Avidas told La Jolla Spa that it wanted to

2    terminate its agreements with La Jolla Spa; and

3    then after, that SciDerma told Avidas that it

4    wanted to terminate the inventory and license

5    agreement?

6              MS. CHOVANES:  Objection; asked and

7    answered.  Objection to the mischaracterization of

8    the testimony and to the relevance generally, since

9    you're wasting our time for me.

10             You may answer.

11             THE WITNESS:  I really -- I really

12   do not recall.  Jack was my coordinator for the

13   activities with SciDerma.  So I don't recall

14   specifically.

15   BY MR. RYAN:

16      Q.  Well, I think you said that you thought

17   Jack had passed away approximately six months

18   before Avidas terminated the agreements with La

19   Jolla Spa.

20             So assuming the sequence of events

21   is that Jack Henn died first, then Avidas

22   terminated the agreements with La Jolla Spa, my

23   question is:  Did -- after the period of time that

24   Avidas notified La Jolla Spa that it was

25   terminating the agreements, which happened in May

Margaret Gardner - 30(b)(6)                La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1    of 2014, did SciDerma then tell Avidas that it was

 2    terminating the inventory and license agreement?

 3         A.   I believe it was the opposite.  I believe

 4    that the discussion that we had with SciDerma was

 5    that we were intending to terminate the agreement,

 6    and SciDerma as well was not selling very much of

 7    the product and, therefore, they were in agreement

 8    with the termination.

 9              MS. CHOVANES:  Is there a question?

10    Are we done?

11    BY MR. RYAN:

12         Q.   Who did you have discussions with at

13    SciDerma about terminating the agreement between

14    Avidas and SciDerma?

15              MS. CHOVANES:  Assumes a fact not

16    evidence.  Objection.

17              THE WITNESS:  I'm sorry.  I have to

18    remember his name.

19    BY MR. RYAN:

20         Q.   Was it Joe Kuchta?

21         A.   It was Joe Kuchta, yeah.

22         Q.   Did you have any discussions with anyone

23    else at SciDerma about terminating the agreement

24    between Avidas and SciDerma other than Joe Kuchta?

25         A.   I think he had a partner as well who
```

**Page 215**

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   might have been on one of the calls, but I don't
 2   recall his name.
 3        Q.   Does Mark Goble ring a bell?
 4        A.   It may have been.
 5        Q.   You recall a phone call where you, Mark
 6   Goble and Joe Kuchta talked about terminating the
 7   inventory and license agreement?
 8        A.   Yes, I do remember we did have a
 9   teleconference.
10        Q.   When did that teleconference occur?
11        A.   I don't know.  It would have been
12   after -- it would have been probably right after
13   Jack had died and somewhere between then and May.
14        Q.   What do you recall Joe Kuchta or Mark
15   Goble saying in that phone call?
16        A.   I remember them saying that they had an
17   extremely difficult time in selling the product and
18   that the lead person for SciDerma, who was no
19   longer with SciDerma, had left and they wanted to
20   sort of look for -- if there were any other
21   options, but they weren't doing a good job of
22   selling it.
23        Q.   Do you recall anything else that was
24   discussed in that call by either Mr. Kuchta or
25   Mr. Goble?
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1         A.   No, I don't.

 2         Q.   Do you recall anything that you said

 3   during that call?

 4         A.   No, I don't really remember it.

 5         Q.   Was there a discussion made during that

 6   call to terminate the agreement between Avidas and

 7   SciDerma?

 8         A.   I don't know if it was specifically that

 9   call, so --

10         Q.   But there was discussion about

11   terminating the agreements during that call?

12         A.   Yes.

13         Q.   Did SciDerma tell Avidas why it wanted to

14   terminate the inventory and license agreement?

15              MS. CHOVANES:  Objection; asked and

16   answered.

17   BY MR. RYAN:

18         Q.   At any point in time, not just during

19   that call.

20              MS. CHOVANES:  Objection;

21   irrelevant.

22              THE WITNESS:  SciDerma was having a

23   difficult time selling the product in the market.

24   The market for the product wasn't what the

25   expectations were.
```

Page 217

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    MR. RYAN:  Mark as Exhibit 62 letter
 2     dated May 8th, 2014, from you to Ms. York.
 3                    (Exhibit 62, Letter from Ms.
 4          Gardner to Ms. York dated 5-8-14, with
 5          attachment, Bates-stamped P-151 and 152,
 6          was marked for identification.)
 7     BY MR. RYAN:
 8          Q.   First I'll ask you, is that your
 9     signature on the letter?
10          A.   Yes, that's my signature.
11          Q.   Is this the letter that you sent to
12     Dianne York on or about May 8th of 2014 notifying
13     her that Avidas was going to be terminating the
14     agreements with La Jolla Spa?
15          A.   Yes.
16          Q.   Did you write this letter?
17          A.   Did I write the letter?  Yes, I did.
18          Q.   There's an attachment on the second page
19     that has some information -- it looks like it was
20     requested.
21                    What is this information we see on
22     Page 2 of Exhibit 26?
23                    MS. CHOVANES:  Objection to the
24     preamble and to the form of the question.
25                    THE WITNESS:  It says that it is the
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1    sales backup for details of January, February,

2    March and April.

3    BY MR. RYAN:

4         **Q.   Where did the sales backup information**

5    **come from?**

6         A.   This information?

7         **Q.   Yes, Page 2 of Exhibit 62.**

8         A.   Yes, it would have come from SciDerma.

9         **Q.   Is this the type of information that**

10   **Avidas would typically receive from SciDerma, as we**

11   **see on Page 2 of Exhibit 62?**

12              MS. CHOVANES:  Can you read that

13   question back.  I don't know what was said.  Is

14   this the something of information?

15   BY MR. RYAN:

16        **Q.   Is this the type of information that**

17   **Avidas would typically receive from SciDerma that**

18   **we see on Page 2 of Exhibit 62?**

19        A.   The content, but the format was different

20   most of the time.

21        **Q.   Were there any sales of Vitaphenol**

22   **products after May 8th of 2014?**

23              MS. CHOVANES:  Objection.  Again the

24   use of word "sales" and by whom?  Are you talking

25   about Avidas?  Like, we don't know if your client

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1   sold the products; right?

2   BY MR. RYAN:

3        Q.   Were there any sales by Avidas after

4   May 8th of 2014 of Vitaphenol products?

5        A.   No, there were not.

6        Q.   Were there any sales of Vitaphenol

7   products by SciDerma after May 8th of 2014?

8                   MS. CHOVANES:  To the extent you

9   know.

10                  Please, make the question fair,

11  Mr. Ryan.

12                  THE WITNESS:  I believe that there

13  was one transaction that was reported in the

14  schedules that we had here, a May transaction that

15  was paid for in July of 2014.

16  BY MR. RYAN:

17       Q.   You think that is the last sale of

18  Vitaphenol products that SciDerma had?

19                  MS. CHOVANES:  Objection; calls for

20  speculation.

21                  THE WITNESS:  To my knowledge, yes,

22  there were no sales after that date.

23  BY MR. RYAN:

24       Q.   How was -- how were the Vitaphenol

25  products being sold in early 2014, before May of

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1    2014?

 2              MS. CHOVANES:   Objection.   Please

 3    clarify the question.   "How" means so many things.

 4    I'm not going to let her answer it because it's too

 5    ambiguous.

 6    BY MR. RYAN:

 7         Q.   Well, SciDerma was the only person, to

 8    your knowledge, that was selling Vitaphenol

 9    products prior to May 8th of 2014; correct?

10         A.   Correct.

11         Q.   Do you know the methods of how Vitaphenol

12    products were being sold by SciDerma?

13         A.   Are you asking me the methods or the

14    customers?

15         Q.   The methods.

16         A.   I know they had salespeople or a selling

17    person at least that I was aware of.  I don't know

18    how many salespeople they had.  But they did

19    marketing -- internet marketing as well as people

20    on the ground selling and marketing.

21         Q.   Do you know whether SciDerma had an

22    e-commerce site to sell Vitaphenol products on the

23    internet?

24         A.   I don't remember.  I remember they had a

25    website, but I don't remember if -- if there was an

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1    e-commerce element to it.

2        **Q.   Do you know what types of sales other**

3    **than possibly e-commerce site SciDerma had for**

4    **Vitaphenol products?**

5                MS. CHOVANES:  I'm going to object

6    to the term "types of sales" as it's too ambiguous

7    to form a meaningful answer.  Would you please

8    restate your question.

9                Are you talking about within market

10   divisions, like she talked before about?

11   BY MR. RYAN:

12       **Q.   Well, what types of markets did SciDerma**

13   **sell Vitaphenol products in?**

14               MS. CHOVANES:  Thank you.

15               THE WITNESS:  So they sold

16   Vitaphenol products mainly to stores --

17   resellers -- skin care stores that buy wholesale

18   and then resell to the customers of the store.

19   BY MR. RYAN:

20       **Q.   How do you know that?**

21       A.   Well, there were the reports that they

22   sent me.

23       **Q.   So that's based on you reading the**

24   **reports that SciDerma sent you?**

25       A.   And information from Jack, because they

Non-Confidential

Margaret Gardner - 30(b)(6)            La Jolla Spa MD vs. Avidas Pharmaceuticals

 1   did teleconferences to discuss where they were

 2   selling, who was a potential new customer.

 3        Q.   Did you participate in those

 4   teleconferences or just did Jack, on the Avidas

 5   side?

 6        A.   Rarely did I participate.

 7        Q.   So SciDerma would tell Jack what types of

 8   markets it was selling in, and then Jack would

 9   convey that information to you?

10             MS. CHOVANES:  Objection; that's

11   your testimony.  It's inaccurate.  And plus, there

12   are too many ambiguities within it as far as

13   undefined words.

14   BY MR. RYAN:

15        Q.   I'm trying to understand how you,

16   sitting here today, know how SciDerma products were

17   sold or Vitaphenol products were sold by SciDerma.

18             MS. CHOVANES:  Okay.  Is there a

19   question?  Why don't you put a "how" in front of

20   that give to her a question, because there's no

21   question on the table.  "I'm trying to determine"

22   is not a preamble.

23   BY MR. RYAN:

24        Q.   How do you know, as you sit here today,

25   how SciDerma was selling Vitaphenol products?

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1        A.   When we licensed the product, the head of

2    SciDerma told us who their customers were, who they

3    were going to be approaching with these products

4    and who they would be selling to.

5                   And he -- Doug, the president of the

6    company, was affiliated with a promotion and

7    advertising company that was going to assist in all

8    of the marketing and selling of the Vitaphenol

9    customers -- of the Vitaphenol products to the

10   customer base.

11       **Q.   Any other ways you know how, as you sit**

12   **here today, SciDerma was selling Vitaphenol**

13   **products other than what you just testified to?**

14       A.   The reports, the monthly reports, the

15   names of the customers were on them.

16       **Q.   So from reading the reports sent by**

17   **SciDerma?  That's how you knew?**

18                   MS. CHOVANES:  Objection; that's not

19   what she testified to at all.  You asked what ways,

20   and she said it was a possible way but she didn't

21   testify to anything about actually reviewing them.

22   BY MR. RYAN:

23       **Q.   Did you ever review any of the reports**

24   **that SciDerma sent to Avidas reflecting Vitaphenol**

25   **sales?**

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1        A.   Yes, I did.

 2        Q.   How often would you do that?

 3        A.   Probably once a month.

 4             MR. RYAN:  Next I'm going to mark as

 5   Exhibit 63 a document that's been Bates-stamped

 6   A-1001 by Avidas.

 7             (Exhibit 63, La Jolla Spa sales

 8        summary, Bates-stamped A-1001, was

 9        marked for identification.)

10             MS. CHOVANES:  Again, I'll object to

11   the characterization of this as a document.  I

12   don't know what was before or after this.

13   BY MR. RYAN:

14        Q.   Do you recognize Exhibit 63?

15        A.   Yes, I do.

16        Q.   Who created Exhibit 63?

17        A.   I don't recall, but -- I don't recall.

18        Q.   Did you create it?

19        A.   No, I did not.

20             MS. CHOVANES:  Objection; asked and

21   answered.

22   BY MR. RYAN:

23        Q.   Did you ask someone to create it?

24             MS. CHOVANES:  Objection; asked and

25   answered.
```

Non-Confidential

Margaret Gardner - 30(b)(6)        La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   BY MR. RYAN:

 2        Q.   Did you ask someone to create it?

 3        A.   No, I did not.

 4        Q.   Do you know how it came to be created?

 5        A.   Yes, I do.

 6        Q.   How did it come to be created?

 7        A.   The finance person, Michael Warne, was

 8   coordinating all of the financial activity, and he

 9   had to prepare a running summary to give to the

10   outside accountants of the transactions -- of all

11   transactions, not just this one.

12        Q.   When did Michael Warne create Exhibit 63?

13        A.   I'm guessing.

14             MS. CHOVANES:  Don't guess.

15             THE WITNESS:  Then I --

16   BY MR. RYAN:

17        Q.   Can you give me your best estimate as to

18   when it was created?

19        A.   2008, 2009.

20        Q.   Well, it contains information through

21   September of 2014, so I don't think it's possible

22   that Mr. Warne could have created it during that

23   period of time.

24             MS. CHOVANES:  Don't argue with the

25   witness.  Do you have a question?
```

Page 226

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1    BY MR. RYAN:

2        Q.    I just want to make sure that your

3    testimony is accurate.

4                MS. CHOVANES:  No, don't argue.

5    That's not a question.  Ask a question.  This is

6    the second time you've talked to the witness

7    directly, and I'm objecting to it.  Ask a question.

8    BY MR. RYAN:

9        Q.    Do you believe that Exhibit 63 was

10   created after September 14th, 2014, or before?

11               MS. CHOVANES:  Objection to the word

12   "believe" and to the alternative.  She already said

13   she doesn't know, so it's been asked and answered.

14   BY MR. RYAN:

15       Q.    Please answer the question.

16       A.    It was created -- created -- back in

17   2008, 2009, and the template continued to be used.

18       Q.    When was the last time information was

19   added to Exhibit 63?

20               MS. CHOVANES:  Objection; document

21   speaks for itself, and she already said she has no

22   way of knowing that so it's asked and answered as

23   well.

24               MR. RYAN:  You're making a speaking

25   objection.  Please don't --

Page 227

Margaret Gardner - 30(b)(6)        La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    MS. CHOVANES:  No, I'm explaining
 2    the objection.
 3                    MR. RYAN:  You don't need to explain
 4    it.
 5                    MS. CHOVANES:  Don't characterize my
 6    objections, Counsel.  Ask your question and let's
 7    get out of here.
 8                    MR. RYAN:  You keep making
 9    objections, we're not going to get anywhere.
10                    MS. CHOVANES:  Right.  If you keep
11    asking questions that are objectionable, we're
12    really not getting anywhere.  So let's go, come on
13    Counsel.  Ask questions that are good ones.
14    BY MR. RYAN:
15        Q.   When was the last time information was
16    added to Exhibit 63?
17                    MS. CHOVANES:  Objection; asked and
18    answered.
19                    You can answer if you know.
20                    THE WITNESS:  According to the
21    document, the last entry that was entered here was
22    for the payment that was made in July.  And I can
23    attest to that because I updated the document.
24    BY MR. RYAN:
25        Q.   Did you update the document in or about
```

Non-Confidential

Margaret Gardner - 30(b)(6)　　　　La Jolla Spa MD vs. Avidas Pharmaceuticals

```
1   September of 2014?

2                    MS. CHOVANES:  Objection; asked and

3   answered.

4                    THE WITNESS:  Yes, I would think so.

5                    MS. CHOVANES:  Don't speculate.  I'm

6   going to caution the witness.

7                    THE WITNESS:  Yes.  This is my

8   update, so . . .

9   BY MR. RYAN:

10       Q.   Do you believe the information contained

11  on Exhibit 63 is correct?

12                    MS. CHOVANES:  I'm going to object

13  to that statement with regard to "belief."

14                    You can testify that it's however

15  you see fit, in light of that.

16                    THE WITNESS:  Can you ask me your

17  question again.

18  BY MR. RYAN:

19       Q.   Do you believe the information contained

20  in Exhibit 63 is correct?

21       A.   I believe the information is correct.

22       Q.   Why do you believe it's correct?

23       A.   There's no reason for me not to believe

24  it's correct.  There's all the details of the

25  transactions, every transaction and every check.
```

Page 229

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                MS. CHOVANES:  Mr. Ryan, I'm going
 2    to ask you to speed this up.  Your constant pauses
 3    are just extending this dep.  If you're not
 4    prepared with other questions, we can take a break
 5    while you formulate the rest of them, but please
 6    move it along.  The gaps between questions are
 7    becoming longer and longer, and we'll start timing
 8    them soon.
 9    BY MR. RYAN:
10        Q.   If you look at the months of August,
11    September and October of 2011, there are no dollar
12    figures reflected for sales.
13                MS. CHOVANES:  I'm sorry.  What are
14    you talking about?  With regard to a document?
15    With regard to what months?  Where on the document?
16    BY MR. RYAN:
17        Q.   On Exhibit 63, do you see the months of
18    August, September and October --
19                MS. CHOVANES:  What years, sir?
20                MR. RYAN:  -- of 2011?
21                MS. CHOVANES:  Thank you.
22                Can you help us -- point to them if
23    you have them in mind, Mr. Ryan, because obviously
24    we can't find them.
25                MR. RYAN:  (Indicating.)
```

Page 230

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    MS. CHOVANES:  Why -- that doesn't

 2    say anything about 2011.  Okay?  I object to you

 3    putting the year in there.

 4    BY MR. RYAN:

 5        Q.   Oh, let me ask you:  The months of

 6    August, September and October that have zero next

 7    to them -- do you see where I'm at on the page?

 8                    MS. CHOVANES:  Let's write right on

 9    it, okay, so it's clear.  What?  October, November

10    and December.

11                    MR. RYAN:  No, no.

12                    MS. CHOVANES:  Why don't you mark

13    them, because I don't know what you're talking

14    about and you are taking our time, our valuable

15    time.

16    BY MR. RYAN:

17        Q.   So I put a bracket next to the

18    leftmost-hand column, which has different months.

19    But I think that the months that are in the second

20    column are the ones that I'm referring to, August,

21    September and October.

22                    Do you see those?

23        A.   Uh-huh.

24        Q.   Is that a yes?

25        A.   I see them, yes.  Sorry.
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1        Q.   Are those for August, September and
 2   October of the year 2010?
 3        A.   Yes, it appears that way.
 4        Q.   And does this document reflect that there
 5   were no sales for those months in 2010?
 6        A.   Yes.
 7        Q.   Do you have something to add?
 8        A.   No, I -- I just wanted to make sure I
 9   answered the correct question.
10             There were no sales in the months of
11   November, December, January.
12        Q.   You mean you didn't report any sales to
13   La Jolla Spa for the months of November, December
14   and January; correct?
15                  MS. CHOVANES:  Wait a minute.  Wait
16   a minute.
17                  THE WITNESS:  No, that's not
18   correct.
19                  MS. CHOVANES:  That's not right.
20   Objection.
21   BY MR. RYAN:
22        Q.   Okay.  Well, let's talk about the exhibit
23   some more, Exhibit 63.
24                  The first column on the
25   leftmost-hand side, what information is reflected
```

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1    in that column?

 2                    MS. CHOVANES:  Which column, sir?

 3                    MR. RYAN:  The one on the left.

 4                    MS. CHOVANES:  The one you put the

 5    brackets on?

 6                    MR. RYAN:  No, columns go up and

 7    down.

 8                    MS. CHOVANES:  What's the heading of

 9    the column?

10                    MR. RYAN:  There is no heading.

11                    MS. CHOVANES:  The one that's headed

12    "October 22nd La Jolla order"?  That one?

13                    MR. RYAN:  That's the first item in

14    that column.

15                    MS. CHOVANES:  Well, it may be a

16    heading.  Why would you categorize it as such?  We

17    don't know what it is.

18    BY MR. RYAN:

19        Q.  So focusing on the column that has the

20    row that says "October 22nd La Jolla order" --

21                    MS. CHOVANES:  On the row?  The

22    column or the row?  Because you just said focus on

23    the column that has the row.  So you want to focus

24    on the row or the column?

25    BY MR. RYAN:
```

Non-Confidential

Margaret Gardner - 30(b)(6)              La Jolla Spa MD vs. Avidas Pharmaceuticals

1      Q.    You want you to focus on the leftmost

2   column.   At the top it says "October 22nd La

3   Jolla Spa order."

4              Do you see where I'm at?

5      A.    Uh-huh, uh-huh, yes.

6      Q.    What information is reflected in those --

7   in that column?

8              MS. CHOVANES:   Objection; the

9   document speaks for itself.   I'm going to start

10  really objecting to these relevance things.

11             THE WITNESS:   So the first column is

12  when the payment was being made.   And then the next

13  column is when the sales activity took place.

14             So if you look down at the bottom,

15  we talked about the transaction, which was done in

16  May and paid for in July of 2014.   So the sale was

17  in May and the payment was in July.

18  BY MR. RYAN:

19     Q.    Okay.   And that's the -- you're talking

20  about the transaction that reflects $173.76?

21     A.    Yes.

22     Q.    So the second column on Exhibit 63, which

23  starts at the top January '09, that is the month of

24  activity; correct?

25     A.    That's correct.

Page 234

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    MS. CHOVANES:  Let the record
 2    reflect we're now a minute between questions.
 3    BY MR. RYAN:
 4         Q.   What's the total amount of royalties that
 5    Avidas paid to La Jolla Spa?
 6         A.   I'm sorry?
 7         Q.   What's the total amount of royalties that
 8    Avidas paid to La Jolla Spa?
 9         A.   The total that's on this document is
10    $100,000.
11         Q.   To be more precise, $100,763.78?
12         A.   That's correct.
13         Q.   Do you have personal knowledge of that or
14    are you just relying on what this Exhibit 63 says?
15                    MS. CHOVANES:  Objection; she's
16    appearing here as a witness representative as a
17    30(b)(6) witness.  Her personal knowledge is
18    irrelevant.
19                    MR. RYAN:  I disagree.
20                    MS. CHOVANES:  Okay.
21    BY MR. RYAN:
22         Q.   Do you have personal knowledge of that or
23    are you relying on what Exhibit 63 says?
24         A.   No, I have personal knowledge that these
25    amounts were paid.
```

**Page 235**

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    MR. RYAN:  Next I'll mark as Exhibit

 2    64 a document Bates-stamped A-1051.  It was

 3    produced by Avidas in this case.

 4              (Exhibit 64, IFS Inventory Summary,

 5          Bates-stamped A-1051, was marked for

 6          identification.)

 7    BY MR. RYAN:

 8         Q.   Do you know who created Exhibit 64?

 9                    MS. CHOVANES:  Objection.

10                    You can answer.  Do you have a

11    bigger copy of this?  Mine is very hard to read.

12                    MR. RYAN:  I don't.

13                    MS. CHOVANES:  If you could read it.

14                    THE WITNESS:  Unfortunately, there's

15    no year date on here.  So no, I don't.

16    BY MR. RYAN:

17         Q.   My question is:  Do you know who created

18    it?

19                    MS. CHOVANES:  Objection.

20                    THE WITNESS:  Do I know who created

21    it?

22                    No, I do not.

23    BY MR. RYAN:

24         Q.   At the bottom of the document there's a

25    section that's underlined that says "Accounting
```

**Page 236**

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1     treatment."

2                    Do you see that?

3         A.    Uh-huh.

4         Q.    Is that a yes, you see that?

5         A.    I do see that, yes.

6         Q.    And there's several notes in there

7     regarding accounting treatment.

8                    Do you know who created those notes?

9                    MS. CHOVANES:  Objection; asked and

10    answered.

11                   THE WITNESS:  The accounting side of

12    the business was managed by the CPA, Michael Warne,

13    who worked with our outside accounting group.

14                   MS. CHOVANES:  Can you read that

15    question back, please.

16            (Record read as:  "do you know who

17        created those notes?")

18                   MS. CHOVANES:  And now would you

19    read the answer back.

20            (Record read as:  "The accounting

21        side of the business was managed by the

22        CPA, Michael Warne, who worked with our

23        outside accounting group.")

24                   MS. CHOVANES:  All right.  Thank

25    you.

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1    BY MR. RYAN:
 2         Q.    At the top of Exhibit 64 it says, "IFS
 3    inventory summary as of 29 January," and then the
 4    year is cut off.
 5                   Did IFS send inventory reports to
 6    Avidas during the period of time that Avidas was
 7    selling the Vitaphenol products?
 8         A.    Yes, they did.
 9         Q.    Does Avidas still have possession of
10    those inventory reports that IFS created for
11    Vitaphenol?
12         A.    No, we do not, at least that I recall.
13                   MS. CHOVANES:   Wait for a question.
14    BY MR. RYAN:
15         Q.    Where was the Vitaphenol inventory
16    located on May 8th of 2014?
17         A.    Are you asking me where physically it was
18    located?
19         Q.    Yes.
20         A.    Yes, I don't know.
21         Q.    Who would know?
22         A.    SciDerma.
23         Q.    Do you know who at SciDerma would know
24    that?
25         A.    Probably Joe Kuchta.
```

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                  MS. CHOVANES:  Caution the witness
 2    not to speculate.
 3    BY MR. RYAN:
 4        Q.    Did SciDerma have possession of the
 5    Vitaphenol inventory on May 8th of 2014?
 6                  MS. CHOVANES:  Objection to the
 7    extent possession is deemed to be a -- have a legal
 8    meaning.  Otherwise, you can answer.
 9                  THE WITNESS:  So all of the
10    inventory was transferred to SciDerma in 2014.
11    SciDerma had whatever product they had.
12                  MS. CHOVANES:  I just want to make
13    sure that the witness is not getting tired because
14    I think that date was wrong.
15                  THE WITNESS:  2014?
16                  MS. CHOVANES:  Yes.  Wasn't it 2010?
17                  THE WITNESS:  Oh, it was
18    transferred.
19                  MS. CHOVANES:  Right.  Right.
20                  THE WITNESS:  Correct, in 2010.  But
21    in 2014, SciDerma still had whatever inventory they
22    had.
23                  I am getting tired.
24                  MS. CHOVANES:  All right.  Let's
25    take a break.
```

Page 239

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    MR. RYAN:  All right.  Take a break.

 2   Off the record.

 3                    THE VIDEOGRAPHER:  Time is 3:43 p.m.

 4   We're going off the video record.

 5           (Recess.)

 6                    THE VIDEOGRAPHER:  Time is now

 7   3:49 p.m.  We're back on the video record.

 8   BY MR. RYAN:

 9      Q.    Handing you a document that was

10   previously marked as Exhibit 5.

11                    MS. CHOVANES:  Where was it marked

12   as Exhibit 5?

13                    MR. RYAN:  At the deposition of Joe

14   Kuchta.

15                    MS. CHOVANES:  I'm going to object

16   to that characterization.  There's no exhibit

17   sticker on here.

18                    MR. RYAN:  Your objection is noted.

19                    MS. CHOVANES:  So this exhibit for

20   here will be what?

21                    MR. RYAN:  Exhibit 5.

22                    MS. CHOVANES:  No -- well, okay.

23   Number however you want.  So that's Exhibit 5.

24   BY MR. RYAN:

25      Q.    Do you recall having some emails with Joe
```

Page 240

**Margaret Gardner - 30(b)(6)**          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   Kuchta regarding the Vitaphenol products?

 2              MS. CHOVANES:  You have to put this

 3   away until he asks a specific question about it.  I

 4   just want you to listen to the question.

 5   BY MR. RYAN:

 6       Q.   Do you recall having email exchanges with

 7   Joe Kuchta in May of 2014 regarding the Vitaphenol

 8   products?

 9       A.   Not specifically, no.

10       Q.   If you take a look at Exhibit 5, there's

11   a series of emails.  And the sequence of how the

12   emails are set up is that the oldest email is on

13   the top, and then the latest email in the chain

14   is -- follows behind there.

15              MS. CHOVANES:  Did you produce this

16   in discovery?

17              MR. RYAN:  Yes.

18              MS. CHOVANES:  You produced this in

19   discovery?

20              MR. RYAN:  No, Mr. Kuchta did.

21              MS. CHOVANES:  No, you produced it,

22   your client.

23              MR. RYAN:  No, no, no.  Mr. Kuchta.

24              MS. CHOVANES:  Yeah, why didn't your

25   client produce this in discovery?
```

Page 241

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1              MR. RYAN:  My client is not on the
 2   document.  Why would my client have it?
 3              MS. CHOVANES:  I thought you just
 4   said it's a series of emails, and what's that?  Her
 5   name right in the front here.  Why didn't you
 6   produce this?
 7              MR. RYAN:  This is an embedded
 8   email.  It's forwarded by Ms. Gardner to
 9   Mr. Kuchta?
10              MS. CHOVANES:  Right.  And why
11   didn't you produced this email?
12              MR. RYAN:  We'll deal with it at a
13   different point in time.
14              MS. CHOVANES:  No, no, no.  It's
15   unfair for you to be hiding documents and then all
16   of a sudden produce them here.
17              MR. RYAN:  I'm not hiding anything.
18              MS. CHOVANES:  Are you saying you
19   produced this?  And if so, let me know exactly
20   when.
21              MR. RYAN:  I'm talking about Exhibit
22   5 as an entirety, this document was produced by
23   Mr. Kuchta.  Okay?
24              MS. CHOVANES:  What document?
25   There's no Bates numbers or anything on it.  I just
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   don't -- I'm -- all this is objection.  We're going
 2   to go real slow, because I don't believe you, and
 3   your client should have produced this document.
 4                   MR. RYAN:  Okay, thank you.
 5   BY MR. RYAN:
 6       Q.   So focusing on the first page of Exhibit
 7   5, there's an email from you to Joe Kuchta dated
 8   May 7th of 2014.
 9                   MS. CHOVANES:  Objection to
10   characterization.  It's not from her.
11                   Why don't you ask about the emails
12   rather than characterizing what's in the document.
13   Okay?  Ask her if she recognizes the email first.
14   BY MR. RYAN:
15       Q.   Did you send an email to Joe Kuchta on
16   July 7th, 2014?
17                   MS. CHOVANES:  To the extent you can
18   answer -- has nothing to do with this document, so
19   you can ignore the document.  He's not asking about
20   the document; he's just asking generally.
21                   THE WITNESS:  Oh, so I'm -- then I
22   don't recall.
23   BY MR. RYAN:
24       Q.   Okay.  Please take a look at Exhibit 5
25   and see if that refreshes your recollection as to
```

**Page 243**

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   whether you set an email to Joe Kuchta on May 7th
 2   of 2014.
 3        A.   Okay.  It appears I did.
 4        Q.   Why did you send the email to Joe Kuchta
 5   on May 7th of 2014?
 6               MS. CHOVANES:  Objection.
 7               THE WITNESS:  I'm reading this.
 8               MS. CHOVANES:  Okay.  Why don't you
 9   take your time and read the whole thing then.  This
10   is a long document.  Don't rush.
11               (Witness reviews document.)
12               MS. CHOVANES:  Is there a question
13   outstanding?
14               MR. RYAN:  I'm pretty sure you asked
15   the witness to read it.
16   BY MR. RYAN:
17        Q.   Have you completed read the document?
18        A.   Yes, I did.
19        Q.   The question is:  Why did you send the
20   email to Joe Kuchta on May 7th of 2014?
21               MS. CHOVANES:  I'm sorry.  I can't
22   hear your question.  Can you speak up?
23   BY MR. RYAN:
24        Q.   Why did you send the email to Joe Kuchta
25   on May 7th of 2014?
```

Margaret Gardner - 30(b)(6)                La Jolla Spa MD vs. Avidas Pharmaceuticals

1       A.   It appears we were asked for an audit

2   from La Jolla Spa MD for the sales transactions for

3   2009 to 2014; and I had asked Joe to provide the

4   information for 2014.

5       **Q.   In your email to Joe Kuchta, you say,**

6   **"Joe, my gut was right."**

7                 **What did you mean by that?**

8                 MS. CHOVANES:   Objection; that's not

9   what she said.   Read the whole statement, please.

10  I'm not going to have her answer a partial

11  question.   Read the whole statement.

12                MR. RYAN:   You're instructing her

13  not to answer?

14                MS. CHOVANES:   Yeah, if you're going

15  to read her out-of-context stuff that we have no

16  idea where this document came from or the

17  provenance of it.   Read the whole sentence.

18                Come on.   You didn't produce it too.

19  This is really unfair upon unfair so read the whole

20  sentence.

21                MR. RYAN:   We did produce it, per

22  your request.

23                MS. CHOVANES:   No, you didn't

24  produce this document.   I guarantee your client did

25  not produce this document.   That's my unfairness

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1  statement.
 2              Now, secondly, I'm going to ask you
 3  to read the whole sentence.  Are you going to do
 4  it?
 5  BY MR. RYAN:
 6      Q.   Why did you say to Joe Kuchta on
 7  May 7th, 2014, "My gut was right based on this we
 8  will need to discuss audit and similar response for
 9  La Jolla"?
10              Why did you make that statement?
11      A.   I really don't know.  I don't recall.
12      Q.   On May 8th of 2014, you emailed Joe
13  Kuchta, "Joe, this is the draft of the email I will
14  send to Dianne York."
15              Why did you send that email to Joe
16  Kuchta?
17              MS. CHOVANES:  Objection; there's
18  been no foundation laid for the fact it's an email.
19  Do you want to do that first?
20  BY MR. RYAN:
21      Q.   Did you send an email to Joe Kuchta on
22  May 8th of 2014 at 7:35 a.m.?
23      A.   Yes.
24              MS. CHOVANES:  No, that's not the
25  way to do it.  Come on, Counsel.
```

Margaret Gardner - 30(b)(6)        La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   BY MR. RYAN:
 2        Q.   Your answer was yes; right?
 3             You did say yes?
 4        A.   I said, yes.  The document is here.
 5        Q.   Okay.  And did you send an email to Joe
 6   Kuchta that said, "Joe, this is the draft of the
 7   email I will send to Dianne York"?
 8        A.   Yes, correct.
 9        Q.   Why did you do that?
10        A.   Because SciDerma needed to make sure that
11   the information was accurate.
12        Q.   What information?
13        A.   The information regarding the sales.
14        Q.   In the email that you sent to Joe Kuchta
15   on May 8th, not only did you provide information
16   regarding sales, but then you also said that you
17   were going to tell Dianne York that you were going
18   to be giving her written notice of termination.
19             Why did you provide that information
20   to Mr. Kuchta?
21             MS. CHOVANES:  Objection; that's a
22   mischaracterization of what the document says.
23             THE WITNESS:  I believe, as we
24   discussed previously, we had discussed with
25   SciDerma about terminating the contract.
```

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                         This is May time frame.  This is the
 2      May time frame.
 3      BY MR. RYAN:
 4           Q.   So you were advising Mr. Kuchta that you
 5      were going to advise Ms. York that Avidas was going
 6      to terminate its agreements with La Jolla Spa?
 7                         MS. CHOVANES:   Objection; the
 8      document speaks for itself.  Ask a question
 9      unrelated to that.  Your document -- your question
10      is objectionable because you're rephrasing the
11      document or asking independently of it.  That's my
12      question to you.
13      BY MR. RYAN:
14           Q.   Please answer the question.
15           A.   I don't know what question you asked me.
16                (Record read as:  "So you were
17           advising Mr. Kuchta that you were going
18           to advise Ms. York that Avidas was going
19           to terminate its agreements with La
20           Jolla Spa?")
21                         THE WITNESS:   I'm sorry.  Can you
22      say it again.
23      BY MR. RYAN:
24           Q.   You were advising Mr. Kuchta that you
25      were going to advise Ms. York that Avidas was going
```

**Page 248**

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   to terminate its agreements with La Jolla Spa on

 2   May 8th; correct?

 3                   MS. CHOVANES:  Are you referring to

 4   the email?

 5                   MR. RYAN:  I'm just asking a

 6   question.

 7                   MS. CHOVANES:  Just asking

 8   generally.

 9                   Put the email away and just listen

10   to his question because he's confusing you.  I get

11   it.

12                   Go ahead, ask the question again.

13   You were confusing her.

14   BY MR. RYAN:

15       Q.   You advised Mr. Kuchta that you were

16   going to tell Ms. York that Avidas was going to

17   terminate its agreements with La Jolla Spa;

18   correct?

19       A.   Yes, that's correct.

20       Q.   And you did so on May 8th of 2014;

21   correct?

22       A.   If that's the date that's here, yes.

23       Q.   And that was before Avidas gave notice to

24   La Jolla Spa that it was terminating the

25   agreements; correct?
```

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    MS. CHOVANES:  Excuse me.

 2                    THE WITNESS:  I'm sorry?

 3   BY MR. RYAN:

 4        Q.   That was before Avidas gave notice to La

 5   Jolla Spa that it was terminating the agreements;

 6   correct?

 7                    MS. CHOVANES:  Objection; asked and

 8   answered.

 9                    THE WITNESS:  There's a document in

10   here that shows the notice given to La Jolla as

11   well -- at least I thought that's what I read.

12   BY MR. RYAN:

13        Q.   So yes -- you answer is yes --

14                    MS. CHOVANES:  No, no, no, no, no.

15   Objection.  Don't mischaracterize a question.  Come

16   on, it's getting late, do it right.  Don't say, "So

17   the answer is yes."  You told her -- ask her a

18   question.  Stop mischaracterizing her testimony.

19   BY MR. RYAN:

20        Q.   Did you tell Joe Kuchta that Avidas was

21   going to terminate its agreements with La Jolla Spa

22   before Avidas actually terminated its agreements

23   with La Jolla Spa?

24                    MS. CHOVANES:  Objection.  All those

25   statements with termination and the legal
```

Margaret Gardner - 30(b)(6)              La Jolla Spa MD vs. Avidas Pharmaceuticals

 1  consequences I'm really worried about them.

 2              But you can answer to the extent you

 3  can.

 4              THE WITNESS:  Yes, we informed

 5  SciDerma that we were going to terminate the

 6  agreement with La Jolla Spa.

 7  BY MR. RYAN:

 8      **Q.   Next I'm handing you a document that's**

 9  **previously marked as Exhibit 24.**

10              MS. CHOVANES:  By whom?  By when?

11              MR. RYAN:  By me.

12              MS. CHOVANES:  When?

13              MR. RYAN:  At the deposition of Joe

14  Kuchta.

15              MS. CHOVANES:  Again, the record

16  will reflect there's no exhibit number, there's no

17  Bates number, and I have a continuing objection to

18  asking questions about this material.

19              If counsel could show me in the

20  transcript where this document has been marked, I

21  would gladly withdraw my objection.

22  BY MR. RYAN:

23      **Q.   Do you recognize this series of emails**

24  **that we see in Exhibit 24 between you, Joe Kuchta**

25  **and Mark Goble?**

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1        A.   Yes, I do.

 2        Q.   Are were you inquiring, in June of 2014,

 3   as to the Vitaphenol website?

 4        A.   Yes.  It appears that's this email.

 5        Q.   Why were you inquiring about the

 6   Vitaphenol website from Mr. Kuchta and Mr. Goble in

 7   June of 2014?

 8        A.   Why?

 9        Q.   Yes.

10        A.   Because I wanted to make sure that when

11   we terminated the agreement, that the Vitaphenol

12   website was shut down.

13        Q.   Did you ever receive confirmation from

14   anyone that the Vitaphenol website was shut down?

15        A.   Yes.  I received it from Joe Kuchta.

16        Q.   When did you receive it?

17        A.   I don't recall the exact date.

18        Q.   How did you receive it?

19        A.   I believe by email.

20             MS. CHOVANES:  Let the record

21   reflect apparently the client has hung up.

22             THE COURT REPORTER:  That was me.

23             MS. CHOVANES:  Yeah, but the light

24   is off here.

25             Is she on the phone or not?  I want
```

Page 252

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1 | to know who is at this deposition, Mr. Ryan.

 2 |                    MR. RYAN:  She's not on the phone.

 3 |                    MS. CHOVANES:  Okay.

 4 |                    MR. RYAN:  Handing you a document

 5 | that's previously marked as Exhibit 8 at the

 6 | deposition of Joe Kuchta.

 7 |                    MS. CHOVANES:  Again, note my

 8 | objection to these unprovenanced documents.  And,

 9 | again, if counsel wants to present me with a

10 | transcript showing where these were testified to,

11 | we can talk about it.  Otherwise, note my

12 | objection, please.

13 | BY MR. RYAN:

14 |      **Q.   Do you recognize the email exchanges in**

15 | **Exhibit 8, Ms. Gardner?**

16 |      A.   (Witness reviews document.)

17 |                    Yes, I recognize them.

18 |      **Q.   The email on the first page of Exhibit 8,**

19 | **which is dated July 8th, 2014, you say to Joe**

20 | **Kuchta and Mark Goble, "Can you send the sales**

21 | **information from this May transaction, please."**

22 |                    **Why did you make that request of**

23 | **him?**

24 |      A.   They weren't very diligent about sending

25 | reports, so I constantly had to ask for the month

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   activity.

 2        Q.   Then you also asked, "Can we set you a

 3   quick call on Monday to discuss the inventory sell

 4   off."

 5                  What did you mean by that?

 6        A.   SciDerma was hoping that they could find

 7   a strategic partner to sell their inventory to

 8   another strategic partner, because we were

 9   terminating the arrangement and they weren't

10   interested -- as I said, they weren't doing a good

11   job of selling the product.  So they were really

12   trying to see if they could find a partner to sell

13   the inventory to.

14        Q.   Do you know if SciDerma ever found that

15   strategic partner?

16        A.   It's my understanding from SciDerma that

17   they did not.

18        Q.   Next I'm handing you a document that's

19   previously marked as Exhibit 7 at the deposition of

20   Joe Kuchta.

21                  Do you recognize these emails?

22                  MS. CHOVANES:  Again, same

23   objection.

24                  THE WITNESS:  Yes.

25                  (Following portion deemed subject to
```

Page 254

1    protective order, attorneys' eyes only, and

2    included under separate cover.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                 (Continued from confidential portion
 2    of the transcript.)
 3    BY MR. RYAN:
 4         Q.   Did you ever have any communications with
 5    Lilian Wells?
 6                    MS. CHOVANES:  Objection;
 7    irrelevant.
 8                    THE WITNESS:  I don't really
 9    remember if I emailed Lilian.  If I had a
10    communication, it would have been an email.
11    BY MR. RYAN:
12         Q.   When is the last time you spoke to
13    Dr. Mitchell Goldman?
14         A.   Oh, my God.  It's too long ago to
15    remember.
16         Q.   Have you ever seen Dr. Mitchell Goldman
17    in any of the pharmaceutical conferences?
18         A.   No, I have not.
19         Q.   Have you ever spoken with Dianne York on
20    the telephone?
21         A.   Yes, I have.
22         Q.   On how many occasions?
23         A.   Very few.  Very few times.
24         Q.   When was the last time you spoke with
25    Ms. York on the telephone?
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1        A.    I -- I don't remember.

 2        Q.    Was it before or after May of 2014?

 3        A.    It would have been before.

 4        Q.    Have you spoken with Ms. York on the

 5   phone since Avidas gave notice of the termination

 6   of the agreements?

 7        A.    I'm sorry.  Ask me again.

 8        Q.    Have you spoken with Ms. York on the

 9   telephone since Avidas gave notice of the

10   termination of the agreements?

11        A.    After we gave notice?  No, I have not.

12        Q.    Did Avidas do anything to formally

13   terminate the agreement with SciDerma medical?

14              MS. CHOVANES:  Wait a minute.  Can

15   you restate that question, because I think it's

16   objectionable.  Can you please read it back.

17   BY MR. RYAN:

18        Q.    Did Avidas do anything formally to

19   terminate the agreement with SciDerma medical?

20              MS. CHOVANES:  I don't know what the

21   word "formally" means.  Can you explain that?

22   Since we're in a legal area, I'd like to proceed

23   slowly here.

24   BY MR. RYAN:

25        Q.    Did Avidas ever send a letter to SciDerma
```

Page 260

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1   **Medical stating that it was terminating the**

2   **inventory and license agreement?**

3                     MS. CHOVANES:  Objection; irrelevant

4   and without foundation.

5                     You can answer.

6                     THE WITNESS:  I think there was an

7   email.  I think there was an email exchange between

8   SciDerma and Avidas regarding terminating the

9   contract.

10  BY MR. RYAN:

11      **Q.   Did the email just confirm that the**

12  **agreement had been terminated?**

13                    MS. CHOVANES:  Objection.

14                    THE WITNESS:  I -- I believe there

15  was an email that confirmed we were terminating the

16  agreement.  I believe then it was just doing the

17  things that needed to be done post-termination.

18  BY MR. RYAN:

19      **Q.   So other than in an email, you don't**

20  **recall any other type of writing that reflected**

21  **termination of the agreement between Avidas and**

22  **SciDerma?**

23      A.   I don't recall.

24                    MS. CHOVANES:  Objection.

25  BY MR. RYAN:

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1        Q.   Do you know how many units of Vitaphenol

 2    products existed at the time that Avidas terminated

 3    the agreements with La Jolla Spa?

 4                    MS. CHOVANES:  Objection.

 5                    THE WITNESS:  Do I know?  No, and if

 6    I had been informed, I don't remember.

 7    BY MR. RYAN:

 8        Q.   Do you know whether the Vitaphenol

 9    inventory that existed as of May 8th, 2014, was

10    destroyed?

11        A.   I know that Joe from SciDerma told me

12    they destroyed it.  I know that from an email.

13        Q.   When did Joe Kuchta send that email to

14    you?

15        A.   I don't recall.

16        Q.   Would it have been in 2014 or more

17    recently?

18        A.   No, it was after 2014.

19        Q.   Would it have been after Avidas learned

20    of this lawsuit?

21        A.   I don't recall.

22        Q.   So the only information you have that the

23    Vitaphenol inventory was destroyed was based on an

24    email that Joe Kuchta sent to you; is that

25    accurate?

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1        A.    That's correct.
 2        Q.    Did Joe Kuchta tell you when the
 3  Vitaphenol inventory was destroyed?
 4        A.    Are you asking me the date of
 5  destruction?
 6        Q.    Yes.
 7        A.    No, I don't know that.
 8        Q.    Mr. Kuchta didn't tell you that?
 9        A.    I don't -- I don't recall that he did.
10        Q.    Did Joe Kuchta tell you who destroyed the
11  Vitaphenol inventory?
12        A.    No, I don't recall that he did.
13        Q.    Did Avidas have any problem with the
14  Vitaphenol inventory being destroyed by SciDerma?
15        A.    SciDerma sublicensed.  It was their
16  inventory.  We had contractual obligations which
17  they fulfilled, and so I didn't see there was a
18  problem.
19        Q.    Is there any reason why Avidas didn't
20  have SciDerma return the Vitaphenol inventory to La
21  Jolla Spa after May of 2014?
22              MS. CHOVANES:  I'm going to object
23  to that question as too indefinite, too broad,
24  calls for much irrelevant information.
25              If you can answer, go ahead.
```

```
 1              THE WITNESS:  The inventory didn't
 2    belong to La Jolla Spa.  It belonged to SciDerma.
 3    BY MR. RYAN:
 4         Q.   Why do you say that?
 5         A.   Because SciDerma paid for it.
 6         Q.   Are there any other reasons why Avidas
 7    didn't have SciDerma return the Vitaphenol
 8    inventory to La Jolla Spa after May of 2014?
 9         A.   Are there -- ?
10         Q.   Any other reasons why?
11         A.   No.
12         Q.   If you could take a look at Exhibit 52,
13    which is the sales and distribution agreement.
14         A.   Uh-huh, yes.
15         Q.   If you turn to Page 4 there's a Paragraph
16    4G.
17              Do you see that?
18         A.   Yes.
19         Q.   It says, "In the event of termination in
20    whole or in respect of any product, Avidas shall
21    return all unsold inventory to YGE or unsold
22    inventory of terminated products (SKUs) if the
23    agreement is terminated in respect of fewer than
24    all products."
25              Is there some reason why Avidas
```

**Page 264**

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   didn't return the unsold inventory to La Jolla Spa,

 2   according to Paragraph 4G of the sales and

 3   distribution agreement?

 4             MS. CHOVANES:  I'm going to object

 5   to that.  You're calling for a legal opinion and

 6   referring to this.  She's already asked and

 7   answered the question within the scope of hers --

 8   through the scope of her competence.  And she'll

 9   restate that answer here if you want her to.

10   Otherwise, she's not able to testify with regard to

11   any legal interpretation of this paragraph.

12   BY MR. RYAN:

13       Q.   I'm not asking you to interpret the

14   paragraph.  My question is why unsold inventory was

15   not returned to La Jolla Spa.

16             MS. CHOVANES:  You're asking --

17   first of all, that question is at the heart of this

18   case, as you well know.  So it's a ultimate

19   question.

20             Second, you're assuming there is

21   unsold inventory.  You're not allowed to ask her

22   about documents and her interpretation.  That's

23   what the lawyers are for; right?  Her legal

24   opinion.  You can't do that.

25             MR. RYAN:  I'm not asking for a
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1   legal opinion.

 2              MS. CHOVANES:  Well, then ask a

 3   question that doesn't ask for a legal opinion.

 4   Very simple.  She gave you an answer.  I don't know

 5   why you're trying now to push it further, because

 6   you are asking for a legal opinion.

 7              MR. RYAN:  She didn't answer this

 8   question.

 9              MS. CHOVANES:  She answered the

10   exact same question.  I'm going to ask the reporter

11   to read back the reason why Avidas didn't -- or why

12   La Jolla did not get any sort of inventory.  It was

13   about five minutes ago.

14         (Record read as:  Is there any

15         reason why Avidas didn't have SciDerma

16         return the Vitaphenol inventory to La

17         Jolla Spa after May of 2014?

18              "Objection, too broad.

19         "The inventory didn't belong to La

20         Jolla Spa.  It belonged to SciDerma.")

21              MS. CHOVANES:  That's the same

22   answer as to this paragraph, sir.  Tell me why it's

23   different.

24              MR. RYAN:  Well, I don't think you

25   get to answer the question.

Margaret Gardner - 30(b)(6)            La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1              MS. CHOVANES:  I get to decide

 2    whether you're asking the witness for an

 3    impressible legal opinion.  I absolutely get to do

 4    that.  So just tell me why that doesn't answer the

 5    question with regard to the facts.

 6              MR. RYAN:  It doesn't --

 7              MS. CHOVANES:  Otherwise, you're

 8    asking for a legal opinion, and she's not going to

 9    answer with regard to this document.

10    BY MR. RYAN:

11       Q.   Did Avidas agree to return all unsold

12    inventory to La Jolla Spa in the event of a

13    termination?

14              MS. CHOVANES:  I'm going to object

15    to that in terms of vagueness, agree with whom?

16    She can't answer that question.  Ask a real

17    question with a noun, a topic and a date.

18    BY MR. RYAN:

19       Q.   Did Avidas agree with La Jolla Spa that

20    it would return all unsold inventory to La Jolla

21    Spa in the event of a termination?

22              MS. CHOVANES:  Okay.  I'm going to

23    object to that question.  The documents speak for

24    themselves, and that's why we're here.

25              You can answer it generally.
```

Page 267

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1              THE WITNESS:  So Avidas agreed to
 2    return inventory that had been purchased from La
 3    Jolla Spa MD that was not sold.  And that inventory
 4    was paid for, all of it.  So there was nothing left
 5    to return.
 6    BY MR. RYAN:
 7         Q.   When you say that inventory was paid for,
 8    what do you mean by that?
 9         A.   So the payment for the inventory related
10    to this sales and distribution agreement.  La Jolla
11    Spa was paid for that inventory.  Any of the
12    additional inventory was not inventory of
13    La Jolla's.
14         Q.   So you're saying that all of the
15    inventory that's listed on Exhibit Roman numeral I
16    to the sales and distribution agreement, all of
17    that inventory was paid for?
18              MS. CHOVANES:  Objection.  We
19    already discussed that inventory, and it's not a
20    real amount.  I think she testified it wasn't
21    accurate, those numbers.
22    BY MR. RYAN:
23         Q.   Did Avidas pay La Jolla Spa for all of
24    the inventory that La Jolla Spa transferred to
25    Avidas?
```

Page 268

Margaret Gardner - 30(b)(6)                La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1        A.   Yes.  Avidas paid for all of the
 2   inventory -- paid for the value of the inventory.
 3        Q.   And when did Avidas make those payments
 4   for the value of the inventory?
 5        A.   The payments were made in two parts.  One
 6   part, we paid whatever the outstanding amount was
 7   that was due to Harmony that La Jolla had not paid;
 8   and the balance of those payments were made every
 9   month that a sales transaction took place until it
10   was paid up.
11        Q.   What -- what month and year was the
12   inventory that La Jolla Spa transferred to Avidas
13   paid off?
14        A.   I believe --
15             MS. CHOVANES:  By "paid off" -- I'm
16   going to interrupt here because "paid off" is
17   assuming a legal conclusion.  So I'm going to ask
18   you to clarify that you mean it in a nonlegal
19   sense.
20             MR. RYAN:  I do.
21             MS. CHOVANES:  You mean it in a
22   nonlegal sense?
23             MR. RYAN:  When did they send the
24   last installment to La Jolla?  That's your
25   question.
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                 THE WITNESS:  If I recall, it was
 2   either 2011 or 2012.
 3   BY MR. RYAN:
 4        Q.   You state that the payments for the
 5   inventory were made to La Jolla Spa in two parts.
 6   The first part you mentioned was an outstanding
 7   amount that was due to Harmony.  How much was owed
 8   to Harmony?
 9        A.   Harmony was about $85,000.
10        Q.   And you're saying that La Jolla Spa owed
11   $85,000 to Harmony in 2008?
12        A.   That's correct.
13        Q.   What documents reflect that?
14        A.   There was a Harmony document but I don't
15   know where it is currently.
16        Q.   Is there anything in the sales and
17   distribution agreement between Avidas and La Jolla
18   Spa that reflects that Avidas was going to pay off
19   amounts owed by La Jolla Spa to Harmony?
20                 MS. CHOVANES:  You're asking, in
21   this entire multipage agreement right now, for her
22   to review it for that statement?  And we will do
23   that if that's what you're asking.
24                 MR. RYAN:  I am asking that.
25                 MS. CHOVANES:  Excuse me?
```

Margaret Gardner - 30(b)(6)              La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1              MR. RYAN:  Yes, I'm asking that.

 2              MS. CHOVANES:  Okay.  Well, let's

 3    take a minute, and then we're going to review.

 4              Take your time.

 5              Do you have anywhere you want to

 6    point us to speed this up, because your time is

 7    running out.

 8              MR. RYAN:  I can't point you

 9    anywhere because I don't think it's anywhere in the

10    agreement.

11              MS. CHOVANES:  Okay.  So what is the

12    question again, please?

13    BY MR. RYAN:

14        Q.   Where in the sales and distribution

15    agreement between Avidas and La Jolla Spa does it

16    reflect that Avidas was going to pay off amounts

17    owed by La Jolla Spa to Harmony.

18              MS. CHOVANES:  I'm going to object

19    to that question because it's calling for a legal

20    because he just gave his legal opinion.

21              So you're not going to answer that

22    question because it's improper.

23              MR. RYAN:  I'm not giving you my

24    legal opinion.

25              MS. CHOVANES:  I'm not arguing about
```

Page 271

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1   it.  You heard my stance.  Let's keep moving here

 2   because you only have something like 20 minutes.

 3                     MR. RYAN:  I have more than that,

 4   but thank you.

 5                     MS. CHOVANES:  Not much more.

 6   BY MR. RYAN:

 7        **Q.   So are there any agreements between**

 8   **Avidas and La Jolla Spa that state that Avidas is**

 9   **going to pay off an amount owed to Harmony Labs?**

10                     MS. CHOVANES:  I'm going to object

11   to that question.  It was asked and answered way in

12   the beginning of the deposition with regard to

13   number of agreements between the parties.  Plus, it

14   doesn't make sense.

15                     Do you want to rephrase it?

16   BY MR. RYAN:

17        **Q.   My question is:  Are there any agreements**

18   **between Avidas and La Jolla Spa that state that**

19   **Avidas is going to pay off an amount that La Jolla**

20   **Spa owed to Harmony Labs?**

21        A.   Was there an agreement?

22        **Q.   Were there any agreements that stated**

23   **that?**

24                     MS. CHOVANES:  Yeah, I don't know.

25   We have agreements in front of us.  Are you going

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1   to -- do you want us to look through these to

 2   verify, or are you asking for her knowledge

 3   independently -- the corporation's knowledge

 4   independently of these pieces of paper?

 5                    MR. RYAN:  I want her to answer.

 6                    MS. CHOVANES:  Okay.  So you're

 7   asking for your knowledge independently of all

 8   these pieces of paper.  That's all.

 9                    THE WITNESS:  Yes.

10                    So post the execution of these

11   agreements, there were a lot of things that were

12   discovered.

13                    One, the inventory that was

14   reflected in the agreement was not the inventory,

15   in fact, that we received; it was less.  And we

16   also found, when we were trying to get to the next

17   stage, which was to have an agreement with Harmony,

18   that Harmony would not allow us to move forward to

19   produce any product until La Jolla Spa's balance

20   was paid for.

21                    And there was an agreement between

22   Dan McCall and Dr. Goldman that if Avidas was to

23   pay this balance for Dr. Goldman, that it would be

24   deducted from the inventory.  And that's how it

25   came to fruition.

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   BY MR. RYAN:
 2        Q.   How do you have knowledge of that -- what
 3   you just described?
 4        A.   I was there at the time.
 5        Q.   When did that occur?
 6        A.   2008.  It was right after the signing of
 7   the agreements.
 8        Q.   And when you say you were there, where
 9   did this discussion take place that you just
10   testified to?
11        A.   Well, the discussion that I had with Dan
12   McCall took place in Doylestown.  The discussion
13   that he had with Dr. Goldman was telephonic.
14        Q.   Were you on the call between Dan McCall
15   and Dr. Goldman regarding paying off the balance
16   owed at Harmony Labs?
17        A.   No.  I believe Dan McCall was on the
18   phone and -- I don't recall if Michael Warne was on
19   the call as well.
20        Q.   But you weren't on the call?
21        A.   No, I was not on the call.
22        Q.   And then one of those two gentlemen
23   relayed to you what was said in the call; is that
24   accurate?
25        A.   Correct.
```

Non-Confidential

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

1      Q.    Do you -- does Avidas have any records of

2   payments to Harmony Labs in 2008?

3      A.    Yes, we do.

4      Q.    What kind of records?

5      A.    We have records regarding checks that

6   were issued and the amounts that were issued to

7   Harmony.

8      Q.    Does Avidas have any records that reflect

9   payments of debt owed by La Jolla Spa at Harmony?

10     A.    I'm not understanding what you're asking

11   me.

12     Q.    Does Avidas have any records showing that

13   it paid off some outstanding debt that La Jolla Spa

14   had at Harmony?

15     A.    As I stated before, we weren't able to

16   actually execute a contract with Harmony without

17   agreeing to pay the debt.  So that's -- that's the

18   record that I have that I recall.

19     Q.    Does Avidas have any copies of checks or

20   wires that reflect payments to Harmony Labs to pay

21   off any debt that La Jolla Spa owed to it?

22     A.    We made many payments to Harmony because

23   they manufactured for us.

24     Q.    Was the amount owed by La Jolla Spa to

25   Harmony in 2008, was that included in the agreement

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   between Avidas and Harmony?
 2       A.   I'm sorry?
 3       Q.   The amount that was owed by La Jolla Spa
 4   to Harmony Labs in 2008, was that amount included
 5   in the agreement between Harmony and Avidas?
 6       A.   I don't recall.  I don't think so.
 7       Q.   And as you sit here today, you're not
 8   aware of any checks that were specifically to pay
 9   any debt that La Jolla Spa owed to Harmony; is that
10   correct?
11       A.   I'm sorry.  Say that again.
12       Q.   As you sit here today, you're not aware
13   of any checks that Avidas wrote that were
14   specifically to pay off debt that La Jolla Spa owed
15   to Harmony?
16             MS. CHOVANES:  Objection.
17             THE WITNESS:  So -- yeah, I -- I
18   think you understand what I said.
19             We made the payments to Harmony to
20   pay off La Jolla's debt, as well as we made
21   payments to Harmony for any materials that we asked
22   Harmony to produce for us.
23   BY MR. RYAN:
24       Q.   Okay.  How was it documented as to what
25   Avidas was paying Harmony for the old debt versus
```

Non-Confidential

Margaret Gardner - 30(b)(6)                La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   for new products that Harmony was manufacturing for
 2   Avidas?
 3              MS. CHOVANES:  Objection; assumes
 4   fact not evidence.  Plus I'm going to ask you again
 5   to restate the question louder because, again,
 6   you're tapering off at the end.
 7              So would you please state the
 8   question again just so I can hear it.
 9   BY MR. RYAN:
10      Q.   Was it documented at all as to payments
11   that Avidas was making to Harmony regarding which
12   amount was for an old debt that La Jolla Spa owed
13   versus which amount was for new product that
14   Harmony was manufacturing for Avidas?
15      A.   Yes, they would have been separate
16   invoices.
17      Q.   Does Avidas still have those invoices?
18      A.   No -- or not that I'm aware of.
19      Q.   Do you know how much the payments were
20   for the invoices related to the debt owed by La
21   Jolla Spa?
22      A.   No, we -- we -- we had an agreement with
23   Harmony about just continuously making monthly --
24   sort of like monthly installment payments to them.
25      Q.   Do you know how long the installment
```

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

1    payments were made or how many months?

2                    MS. CHOVANES:  Objection; asked and

3    answered.  She said they stopped in May of 2012, I

4    recall.

5                    Come on, let's move this along.

6                    THE WITNESS:  I -- I don't know how

7    many months.

8    BY MR. RYAN:

9         Q.   Do you believe that payments were made

10   through 2012?

11        A.   Yes, they were definitely made through

12   2012.

13        Q.   And those payments were specifically for

14   debt that La Jolla Spa owed to Harmony; is that

15   correct?

16        A.   No, I don't know that.  I know we were on

17   a consistent payment basis with Harmony.  So I

18   don't know definitively when one invoice was paid

19   for versus another invoice.

20        Q.   Can you state when you believe the

21   invoices that were just related to the La Jolla Spa

22   debt were paid off?

23                    MS. CHOVANES:  Objection --

24                    THE WITNESS:  No.

25                    MS. CHOVANES:  -- asked and

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   answered.

 2                   THE WITNESS:  I don't recall.

 3                   MR. RYAN:  We'll take a break.

 4                   MS. CHOVANES:  No, no, no.  Let's

 5   finish.  We don't want to break.  Let's finish

 6   this.

 7                   MR. RYAN:  We're going to take a

 8   break.

 9                   MS. CHOVANES:  You have no more

10   questions?

11                   MR. RYAN:  I need to take a break.

12                   THE VIDEOGRAPHER:  Time on 4:37 p.m.

13                   MS. CHOVANES:  Excuse me, Mr. Video,

14   we're not off yet.  How long are you going to take?

15                   MR. RYAN:  Five minutes.

16                   MS. CHOVANES:  All right.

17              (Recess.)

18                   THE VIDEOGRAPHER:  Time is 4:42 p.m.

19   We're back on the video record.

20   BY MR. RYAN:

21       Q.   Are there any documents that reflect the

22   agreement that was reached between Dr. Goldman and

23   Dan McCall regarding paying off the Harmony

24   inventory invoice?

25       A.   I don't remember.
```

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    MR. RYAN:  I don't have any further

 2    questions.  Thank you.

 3                    MS. CHOVANES:  We have nothing.

 4    Deposition is over.

 5                    THE VIDEOGRAPHER:  Time is 4:42 p.m.

 6    This is the end of today's deposition.

 7              (Signature having been waived, the

 8         deposition of MARGARET GARDNER was

 9         concluded at 4:42 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Margaret Gardner - 30(b)(6)                    La Jolla Spa MD vs. Avidas Pharmaceuticals

1              CERTIFICATE OF SHORTHAND REPORTER

2

3              I, Gail Inghram Verbano, Registered

4    Diplomate Reporter, Certified Realtime Reporter,

5    Certified Shorthand Reporter (CA) and Notary

6    Public, the officer before whom the foregoing

7    proceedings were taken, do hereby certify that the

8    foregoing transcript is a true and correct record

9    of the proceedings; that said proceedings were

10   taken by me stenographically and thereafter reduced

11   to typewriting under my supervision; and that I am

12   neither counsel for, related to, nor employed by

13   any of the parties to this case and have no

14   interest, financial or otherwise, in its outcome.

15        Further, that if the foregoing pertains to the

16   original transcript of a deposition in a federal case,

17   before completion of the proceedings, review of the

18   transcript [] was [] was not requested [X] waived.

19

20

21   _____

22   Gail Inghram Verbano, CSR, RDR, CRR

23   CA-CSR No. 8635

24

25

Page 281