**EXHIBIT 1**

Case 3:17-cv-01124-MMA-WVG   Document 97-6   Filed 08/05/19   PageID.1784   Page 2 of 40

Non-Confidential
Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF CALIFORNIA

 3                       -    -    -

 4  LA JOLLA SPA MD INC.,            :

 5       Plaintiff,                  : Civil Action No.

 6            vs.                    : 3:17-CV-01124-MMA-WVG

 7  AVIDAS PHARMACEUTICALS, LLC,   :

 8  a limited liability company;   :

 9  and DOES 1 through 10           :

10  inclusive,                      :

11       Defendants.                :

12                       -    -    -

13              ***NON-CONFIDENTIAL***

14             Videotaped deposition of

15            MARGARET GARDNER - 30(b)(6)

16            Philadelphia, Pennsylvania

17              Friday, May 3, 2019

18                  10:15 a.m.

19
    BEFORE:
20

21  Gail L. Inghram Verbano:

22       Registered Diplomate Reporter,

23       Certified Realtime Reporter,

24       Certified Shorthand Reporter-CA (No. 8635)

25  JOB NO. 10055415
```

1

2

3

4                    ***NON-CONFIDENTIAL***

5

6                    Videotaped deposition of MARGARET

7    GARDNER - 30(b)(6) , held at the offices of HOGAN

8    LOVELLS, LLP, 1735 Market Street, 23rd Floor,

9    Philadelphia, Pennsylvania 19103, on Friday, May

10   3, 2019, beginning at approximately 10:15 a.m., the

11   proceedings being recorded stenographically by Gail

12   Inghram Verbano, Registered Diplomate Reporter,

13   Certified Realtime Reporter, Certified Shorthand

14   Reporter-CA (No. 8635), and transcribed under her

15   direction.

16

17

18

19

20

21

22

23

24

25

```
 1        A P P E A R A N C E S

 2

 3   On behalf of PLAINTIFF:

 4        JAMES T. RYAN, P.C., ESQ.

 5        jr@jamestryan.com

 6        1110 Glenville Drive #307

 7        Los Angeles, California 90035

 8

 9

10   On behalf of Defendants:

11        JULIE CHOVANES, ESQ.

12        jchovanes@chovanes.com

13        25 Springfield Avenue

14        Philadelphia, Pennsylvania 19118

15

16   ALSO PRESENT:

17        DENNIS MULLIN, Legal Videographer

18        DIANNE YORK, via telephone

19

20

21

22

23

24

25
```

Case 3:17-cv-01124-MMA-WVG   Document 97-6   Filed 08/05/19   PageID.1787   Page 5 of 40

**Non-Confidential**
Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                    C O N T E N T S

 2    EXAMINATION OF:                            PAGE

 3    MARGARET GARDNER

 4          By Mr. Ryan                            9

 5

 6

 7                    E X H I B I T S

 8

 9    EXHIBIT                              IDENTIFIED

10    Exhibit 50  Notice of Deposition           17

11    Exhibit 51  Know-How and Trademark License  36
                  and Purchase Agreement
12
      Exhibit 52  Sales and distribution agreement  38
13
      Exhibit 53  Modification Know-How and        43
14                Trademark License and Purchase
                  Agreement
15
      Exhibit 54  Manufacturing and Technical      62
16                Services Agreement, Bates-stamped
                  A_1138 to 1166
17
      Exhibit 55  Letter from Ms. Gardner to Ms.   97
18                York dated 6-10-14, Bates-stamped
                  P-153 to 156
19
      Exhibit 56  Inventory and License Agreement  100
20
      Exhibit 57  Photograph of Vitaphenol        156
21                Anti-Aging toner package

22    Exhibit 58  Photographs of Vitaphenol       159
                  Anti-Aging toner package, Bates
23                P-545 to 546

24    Exhibit 59  Photographs of Vitaphenol Ultra 163
                  Gentle Daily Cleanser package
25
```

```
 1    EXHIBIT                                          IDENTIFIED

 2    Exhibit 60   Packet of documents Bates-stamped  173
                   A-1044 to 1066
 3
      Exhibit 61   Packet of documents Bates-stamped  191
 4                 A-1003 to 1042

 5    Exhibit 62   Letter from Ms. Gardner to Ms.      218
                   York dated 5-8-14, with
 6                 attachment, Bates-stamped P-151
                   and 152
 7
      Exhibit 63   La Jolla Spa sales summary,         225
 8                 Bates-stamped A-1001

 9    Exhibit 64   IFS Inventory Summary,              236
                   Bates-stamped A-1051
10    PREVIOUSLY MARKED EXHIBITS REFERENCED:           PAGE

11               Exhibit 33                             61

12               Exhibit 5                             240

13               Exhibit 24                            251

14               Exhibit 8                             253

15               Exhibit 7                             254

16

17    DOCUMENTS REQUESTED:

18          PAGE   LINE

19           137      5

20

21    PAGES MARKED AS CONFIDENTIAL:

22        PAGE to PAGE

23           139   146

24           256   258

25
```

```
 1   QUESTIONS INSTRUCTED NOT TO ANSWER:

 2            PAGE   LINE

 3            14     14

 4            14     19

 5            15      6

 6            18      9

 7            19      2

 8            25     20

 9            28      3

10            29      2

11            29      7

12            29     11

13            29     16

14            30      5

15            31      3

16            33     10

17            37     17

18            39     25

19            40     22

20            41     23

21            42      7

22            44     15

23            45     10

24            50      6

25            51     14
```

| | | |
|---|---|---|
| 1 | QUESTIONS INSTRUCTED NOT TO ANSWER: | |
| 2 | PAGE | LINE |
| 3 | 52 | 13 |
| 4 | 53 | 13 |
| 5 | 53 | 24 |
| 6 | 68 | 18 |
| 7 | 70 | 9 |
| 8 | 72 | 12 |
| 9 | 73 | 8 |
| 10 | 75 | 22 |
| 11 | 76 | 3 |
| 12 | 78 | 11 |
| 13 | 79 | 6 |
| 14 | 84 | 19 |
| 15 | 93 | 12 |
| 16 | 109 | 12 |
| 17 | 117 | 17 |
| 18 | 118 | 10 |
| 19 | 245 | 7 |
| 20 | 265 | 13 |
| 21 | 271 | 14 |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1                  Philadelphia, Pennsylvania

 2                Friday, May 3, 2019; 10:15 a.m.

 3                       -   -   -

 4                  THE VIDEOGRAPHER:  We're now on the

 5    record.  Today's date is May 3rd, 2019, and the

 6    time is 10:18 a.m.

 7                  This video deposition of Margaret

 8    Gardner, being taken in the matter of La Jolla Spa

 9    MD, v. Avidas Pharmaceuticals, pending in the US

10    District Court, Southern District of California,

11    Case No. 3:17-cv-01124-MMA.

12                  We are at 1735 Market Street,

13    Philadelphia, PA.  My name is Dennis Mullin of

14    Aptus Court Reporting.

15                  Will counsel please identify

16    yourselves and whom you represent.

17                  MR. RYAN:  James Ryan for plaintiff.

18                  MS. CHOVANES:  Julie Chovanes,

19    C-H-O-V as in Victor, A-N-E-S for defense.

20                  THE VIDEOGRAPHER:  Our court

21    reporter today is Gail Verbano, and she may now

22    swear in the witness.

23                       -   -   -

24                  MARGARET GARDNER, having first been

25    duly sworn according to law, was examined and
```

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1    testified as follows:

 2                        -   -   -

 3                     EXAMINATION

 4    BY MR. RYAN:

 5        Q.   Could you please state and spell your

 6    name.

 7        A.   Yes, my name is Margaret Gardner.

 8    M-A-R-G-A-R-E-T, Gardner, G-A-R-D-N-E-R.

 9        Q.   Do you sometimes go by Margaret

10    Gardner-Hunt?

11        A.   Uh-huh, sometimes.

12        Q.   Is there a distinction as to when you use

13    Gardner-Hunt versus Gardner?

14        A.   Not really.  My husband prefers that I

15    use it more often but --

16        Q.   Sure.

17              MS. CHOVANES:  Please -- I thought

18    you were going to open this by giving me an

19    opportunity to put my objection on the record.

20              Do you want to state who is present

21    in the room?

22              MR. RYAN:  Ms. York is present on

23    the phone for this deposition.

24              MS. CHOVANES:  And my objection to

25    her presence is that we have been given no notice
```

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

 1   ask a nice clean question.  Please restate the

 2   question.

 3   BY MR. RYAN:

 4       Q.   At the time Avidas Pharmaceuticals was

 5   formed, was Vitaphenol the first product that it

 6   sold?

 7                 MS. CHOVANES:  You can answer that.

 8                 THE WITNESS:  I honestly don't

 9   remember.

10                 MR. RYAN:  Again, Ms. Chovanes,

11   you're making speaking objections.

12                 MS. CHOVANES:  No, I'm not.

13                 MR. RYAN:  You just told the witness

14   "to the extent that you can remember."  That's

15   suggesting an answer.

16                 MS. CHOVANES:  No, it's not.

17   BY MR. RYAN:

18       Q.   Did Avidas enter into a -- any agreements

19   with La Jolla Spa in connection with the Vitaphenol

20   products?

21                 MS. CHOVANES:  Objection to the

22   extent the term "agreement" has a legal meaning

23   that you're trying to force on the client.  We

24   object to its use.

25                 To the extent you can answer that,

1    that objection aside, please do so.

2                    THE WITNESS:  Yes.

3    BY MR. RYAN:

4         **Q.   How many agreements?**

5                    MS. CHOVANES:  Objection.  Same

6    objection.

7                    THE WITNESS:  I believe there were

8    three agreements.

9    BY MR. RYAN:

10        **Q.   Can you generally describe what those**

11   **agreements were.**

12                   MS. CHOVANES:  Objection.  No don't

13   answer that question.  That's a ridiculous

14   question.  What do you mean by "generally

15   describe."  That's dangerous.  I'm not going to let

16   her answer that.

17                   Rephrase.  There are titles right

18   here so why don't you just ask her that.  Why are

19   you wasting our time?

20                   MR. RYAN:  I'm not wasting your

21   time.

22                   MS. CHOVANES:  They're right in the

23   30(b)(6) notice.  In fact, since there's no

24   question outstanding -- is there?  Or my objection

25   to it, asking to rephrase.  No, no question

1   aren't wasting our time.  And this is a garbage

2   case, and we've known that since the beginning, and

3   you're just wasting our time more.

4              Now ask questions that she can

5   answer with regard to the 30(b)(6).  Whether or not

6   she remembers the agreements independently of a

7   30(b)(6) is meaningless and a waste of our time.

8   BY MR. RYAN:

9        Q.   You mentioned that Avidas entered into

10   three agreements with La Jolla Spa regarding the

11   Vitaphenol products; correct?

12        A.   Correct.

13        Q.   Is one of those agreements called the

14   sales and distribution agreement?

15        A.   Yes.

16        Q.   Is another one of those agreements called

17   the know-how agreement?

18        A.   Yes.

19        Q.   What's the third agreement called?

20        A.   It was a modification.  I don't remember

21   if it was a modification to the know-how or a

22   modification to the sales and distribution, but it

23   was a modification.

24              MS. CHOVANES:  Do you want

25   anything -- do you need a break?

 1   going to answer.

 2   BY MR. RYAN:

 3        **Q.   The second agreement you mentioned was**

 4   **that Avidas entered into a sales and distribution**

 5   **agreement with La Jolla Spa; is that correct?**

 6        **A.   Yes.**

 7                  MS. CHOVANES:  Excuse me.  I didn't

 8   hear what you said at the end.

 9                  MR. RYAN:  I said "is that correct?"

10                  We'll mark as Exhibit 52 a copy of a

11   sales and distribution agreement.

12            (Exhibit 52, Sales and distribution

13        agreement, was marked for

14        identification.)

15   BY MR. RYAN:

16        **Q.   Please take a look at this and let me**

17   **know if your signature appears on Page 7 of Exhibit**

18   **52.**

19                  MS. CHOVANES:  Objection to the form

20   of the question.

21                  I'll notice there's highlighting on

22   Page 3 of my copy.  That apparently was copied --

23   that is, it's not original highlighting.  Is that

24   on the original document, Mr. Ryan?

25                  MR. RYAN:  It's on my version.

1   agreements with La Jolla Spa regarding the

2   Vitaphenol products?

3        A.   It was based on the advice of our

4   attorneys.

5             MR. RYAN:   Next I'm going to mark as

6   Exhibit 53 a document entitled "Modification

7   Know-How and Trademark License and Purchase

8   Agreement."

9             (Exhibit 53, Modification Know-How

10       and Trademark License and Purchase

11       Agreement, was marked for

12       identification.)

13  BY MR. RYAN:

14       Q.   Does your signature appear on Page 2 of

15  Exhibit 53?

16       A.   Yes, that appears to be my signature.

17       Q.   So other than Exhibit 51, the know-how

18  agreement, Exhibit 52, the sales and distribution

19  agreement, and Exhibit 53, the modification to the

20  know-how agreement, did Avidas Pharmaceuticals

21  enter into any other agreements with La Jolla Spa

22  relating to the Vitaphenol products?

23       A.   Not that I -- not that I recall.

24       Q.   If you look at Exhibit 52, the sales and

25  distribution agreement, on Page 8 there is Exhibit

1    didn't do that.  So if you had any objections to

2    the scope of discovery, you could have raised them

3    with the Court at the time, but you didn't.

4              MS. CHOVANES:   The Court -- that's

5    because right after I said that, the Court said, Of

6    course that's limited by our orders.  That's what's

7    in the transcript.

8              I'm not going to argue anymore.  Do

9    you want to take her deposition with the allowable

10   questions after 2014, which are, by the way, on

11   your 30(b)(6).  There are plenty of them.  Go.

12   BY MR. RYAN:

13        Q.   Did Avidas Pharmaceuticals receive

14   inventory from La Jolla Spa prior to 2014?

15        A.   We did receive inventory.

16        Q.   What year?

17              MS. CHOVANES:   Excuse me.  What was

18   the question?

19              MR. RYAN:   What year?

20              MS. CHOVANES:   What year for what?

21   BY MR. RYAN:

22        Q.   What year did Avidas Pharmaceuticals

23   receive inventory from La Jolla Spa?

24        A.   I believe it was in 2008.

25        Q.   Did Avidas receive approximately 17,000

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   Avidas and SciDerma other than this inventory and

 2   license agreement we see in Exhibit 56?

 3        A.   Yes, there was.

 4        Q.   How many agreements?

 5        A.   Yes.

 6        Q.   What was that agreement?

 7        A.   A letter of intent.

 8             MS. CHOVANES:  I'm going to object

 9   to the extent that the witness characterized it as

10   an agreement.  A letter of intent legally may or

11   may not be an agreement.

12   BY MR. RYAN:

13        Q.   The letter of agreement that you're

14   referring to, did that --

15             MS. CHOVANES:  Letter of intent.

16   BY MR. RYAN:

17        Q.   Sorry.  The letter of intent that you

18   referred to, did that precede the inventory and

19   license agreement?

20        A.   Yes, it did.

21        Q.   Does Exhibit 56, the inventory and

22   license agreement, reflect the final agreement

23   between Avidas Pharmaceuticals and SciDerma LLC

24   related to the Vitaphenol products?

25        A.   Yes, it does.
```

**Non-Confidential**

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1       **Q.   Avidas entered into this agreement in**

2   **August of 2010; is that correct?**

3       A.   Yes.

4                  MS. CHOVANES:   Document speaks for

5   itself.   Objection.

6   BY MR. RYAN:

7       **Q.   In connection with this agreement, Avidas**

8   **sold its inventory of Vitaphenol products to**

9   **SciDerma; is that correct?**

10                  MS. CHOVANES:   I'm going to object,

11  because we had an issue with regard to the word

12  "sold."   And that's a leading question, and it is

13  unfair.   So I'm going to ask you to restate in

14  light of the dispute we already had with regard to

15  legal conclusions.

16                  Can you do that?   Can you ask just

17  open-ended questions -- was inventory

18  transferred? -- and then maybe we can get into it

19  that way.

20                  MR. RYAN:   Well, I don't think I'm

21  required to only ask open-ended questions.

22                  MS. CHOVANES:   Well, I understand.

23  You can ask them how you -- but my objection is

24  with regard to the word "sold," which as you recall

25  we already went through on an extensive go-around

1    already with regard to paper discovery.

2                    I mean, I would just ask the

3    witness -- you're pulling teeth.  Why don't you

4    just ask her what happened as a result of the

5    agreement and see what happens.  Maybe you'll get

6    the statement you want.

7                    MR. RYAN:  Let's start there.

8    BY MR. RYAN:

9        Q.   **What happened as a result of Avidas and**

10   **SciDerma entering into the inventory and license**

11   **agreement?**

12       A.   I'm not sure I understand "what

13   happened."

14       Q.   **Did Avidas sell its inventory of**

15   **Vitaphenol products to SciDerma?**

16       A.   Avidas sublicensed its Vitaphenol rights

17   to SciDerma.

18       Q.   **Did Avidas sell any --**

19                   MS. CHOVANES:  Objection; asked and

20   answered.  Don't -- don't belabor the witness.  She

21   clearly rejected your use of the word "sell" so

22   please don't argue with that.

23                   MR. RYAN:  I didn't finish my

24   question.

25                   MS. CHOVANES:  Well, you started

1    using "sell" again.

2    BY MR. RYAN:

3          Q.    So I'm asking:  Did Avidas sell any

4    Vitaphenol inventory to SciDerma?

5                  MS. CHOVANES:  Objection; asked and

6    answered.

7    BY MR. RYAN:

8          Q.    You can answer.

9          A.    This -- the agreement was a sublicense of

10   all the product rights to SciDerma.

11                 MS. CHOVANES:  The agreement speaks

12   for itself, and that's my ongoing objection with

13   regard to these questions.

14   BY MR. RYAN:

15         Q.    Please turn to Page 7 of Exhibit 56.  And

16   focusing your attention on Paragraph 6C, do you see

17   where it starts "IFS product inventory"?

18         A.    Uh-huh.

19         Q.    It says, Sublicensee agrees to pay

20   $316,501 for the product inventory located at IFS."

21                 Did SciDerma pay Avidas $316,501 in

22   connection with this agreement?

23         A.    Yes.

24         Q.    Was the inventory of Vitaphenol products

25   that were located at IFS transferred to SciDerma

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1   after this agreement?

2        A.   Ask me that question again, please.

3        Q.   Was the inventory of Vitaphenol products

4   that Avidas maintained at IFS, was that transferred

5   to SciDerma after this agreement?

6        A.   Yes, it was.

7        Q.   When did SciDerma pay the $316,501 to

8   Avidas?

9        A.   There were payments over time.  I don't

10  know specifically the dates, but they were -- they

11  made multiple payments over time.

12       Q.   Can you give me an estimate about how

13  much time elapsed between the first payment and the

14  last payment?

15       A.   No, I'm sorry, I don't remember.

16       Q.   Would it have been more than one year?

17       A.   No, I don't think so.

18       Q.   If you look at Paragraph 6A also on

19  Page 7, it refers to a license fee.  It says that

20  the "Sublicensee agrees to pay a payment of

21  $100,000."

22            Did SciDerma pay Avidas a license

23  fee of $100,000?

24       A.   Yes, they did.

25       Q.   And it looks like the license fee was

1   BY MR. RYAN:

2        Q.   So you mentioned that SciDerma was making

3   payments in connection with the Harmony inventory;

4   is that correct?

5        A.   This specific inventory.

6        Q.   Meaning the Harmony product inventory?

7        A.   Correct.

8             MS. CHOVANES:   Reflect the witness

9   pointing to Paragraph 6D of Exhibit 56.

10  BY MR. RYAN:

11       Q.   As SciDerma made payments for the Harmony

12  inventory, was that Harmony inventory then

13  transferred to SciDerma?

14       A.   The inventory was transferred on the

15  signing, actually, of the agreement; and how they

16  paid for it was just a matter of payment terms.  So

17  they were transferred all of the inventory,

18  including anything that was at Harmony as part of

19  the sublicense agreement.

20            THE VIDEOGRAPHER:   Pardon me,

21  Counsel.  About five minutes until I have to change

22  tape.

23            MR. RYAN:   Okay.

24  BY MR. RYAN:

25       Q.   How much did SciDerma still owe for the

Non-Confidential

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1    to her interpretation of the scope of license.

2                    You can answer.

3                    THE WITNESS:  This is the territory

4    that SciDerma was interested in.

5    BY MR. RYAN:

6         Q.   Do you know if SciDerma ever sold outside

7    of that defined territory?

8         A.   Not that I'm aware of.

9         Q.   If you turn to Page 20 of Exhibit 56,

10   there's Exhibit Roman numeral IV, relating to the

11   product inventory located at IFS.

12                    Do you see that?

13        A.   Yes, I do.

14        Q.   Were these product units transferred to

15   SciDerma in connection with this agreement?

16        A.   Yes, that's what this document is.

17        Q.   Okay.  So Avidas transferred 22,215 units

18   of Vitaphenol product to SciDerma; is that correct?

19                    MS. CHOVANES:  Objection; asked and

20   answered, document speaks for itself.

21                    THE WITNESS:  Yes.

22   BY MR. RYAN:

23        Q.   In the last column on Exhibit Roman

24   numeral IV it lists inventory values for various

25   products.

```
 1                   MS. CHOVANES:  Okay.  Let's just --

 2    what's "that's"?  What is that in reference to?

 3    Can you ask a question with a clear clause, because

 4    otherwise, it make no sense.

 5    BY MR. RYAN:

 6        Q.   Your testimony is that "we didn't have

 7    any Vitaphenol product."

 8                   And my question is:  Is that because

 9    all of the Vitaphenol product was transferred to

10    SciDerma in 2010?

11                   MS. CHOVANES:  Asked and answered.

12                   You may answer.

13                   THE WITNESS:  Yes, all of the

14    Vitaphenol inventory of any kind was transferred to

15    SciDerma back in 2010.

16                   MR. RYAN:  Next I'll mark as Exhibit

17    60 a document that Avidas produced in this case

18    Bates-stamped A_1044 to 1066.

19              (Exhibit 60, Packet of documents

20         Bates-stamped A-1044 to 1066, was marked

21         for identification.)

22                   MS. CHOVANES:  Is there a question?

23    BY MR. RYAN:

24        Q.   What is this document that we see here as

25    Exhibit 60?
```

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1     Q.   So this is the monthly report for

2  November 30th of 2011; is that true?

3              MS. CHOVANES:   Objection; document

4  speaks for itself.

5              THE WITNESS:   It appears, yes, it

6  is.

7  BY MR. RYAN:

8     Q.   Okay.   There's a note below the chart and

9  above the check that says "Avidas purchased

10  Harmony."

11              What does that refer to?

12     A.   I have no idea.

13     Q.   If you turn to the very last page of

14  Exhibit 61, which is Bates stamp A-1042, there's

15  some handwriting below the report and above the

16  check.

17              Is that your handwriting?

18     A.   Yes, I believe it is.

19     Q.   So the note says there were no sales in

20  August, September or October; is that correct?

21     A.   That's what the note says.

22     Q.   That's what you wrote?

23     A.   Yes.

24     Q.   Was that note contained on the report

25  that you sent to La Jolla Spa?

1          A.    I don't know.

2          Q.    Did you typically advise La Jolla Spa

3     when there weren't any sales in a given month?

4          A.    Yes, I did.

5          Q.    So based on the process that you

6     described earlier where, after the report was

7     created and the check was written, then a copy

8     would be maintained by Avidas, do you believe that

9     this Bates stamp page, 1042, reflects a copy of

10    what was sent to La Jolla Spa?

11                    MS. CHOVANES:   Now I'm going to

12    object to the mischaracterization of her testimony.

13    If you want to rephrase or ask a question without

14    mischaracterizing it, I'm sure we can get you an

15    answer.   But you mischaracterized what she said

16    before.

17                    MR. RYAN:   I don't believe I did.

18    BY MR. RYAN:

19         Q.    Could you answer the question, please.

20         A.    Can you ask me the question, please.

21         Q.    Do you believe that Exhibit 61, Bates

22    stamp Page A-1042, is a copy of what was sent to La

23    Jolla Spa?

24                    MS. CHOVANES:   I'm going to object

25    to the extent her belief is irrelevant.   Just ask a

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1    question.

2    BY MR. RYAN:

3         Q.    I need an answer.

4                    MS. CHOVANES:  Not with the word

5    "belief" in it.  Can you rephrase --

6                    MR. RYAN:  No.

7                    MS. CHOVANES:   -- because it's

8    irrelevant as constructed.

9                    MR. RYAN:  I can't.

10                   MS. CHOVANES:  Okay.  You're

11   insisting on an irrelevant question.  Let the

12   record reflect that.

13                   You may answer.

14                   THE WITNESS:  So the report that

15   would have gone to La Jolla would not have looked

16   like this.  It would have been this report without

17   a photocopy of the check, and I do not know whether

18   or not the note was -- I assume I put the note on

19   there to advise her.

20   BY MR. RYAN:

21        Q.    This report on Bates-stamped Page 1042 in

22   the upper left-hand corner says "November and

23   December sales."

24                   So is it your belief that these are

25   November and December sales from the year 2010?

**Non-Confidential**

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1                    MS. CHOVANES:  You're not entitled

2     to her belief.  Ask a question that seeks relevant

3     information.

4                    MR. RYAN:  I disagree.

5                    MS. CHOVANES:  You're not entitled

6     to her belief.  That's an opinion.  You're entitled

7     to facts.

8                    Ask a simple question.  I don't know

9     why you mess them up by putting "belief" in.  That

10    calls for opinion testimony on its face.

11                    MR. RYAN:  I'm entitled to her

12    opinion based on her foundation so far.

13                    MS. CHOVANES:  No, you're not

14    entitled to her opinion.  We'll go to the judge on

15    that.  You're not entitled to a person's opinion.

16    They're a fact witness.

17                    So ask the question if you want.

18    Again, I'll make the same objection.

19    BY MR. RYAN:

20         Q.   **What month and year is the report that we**

21    **see on Bates stamp Page A-1042?**

22         A.   It appears to be November and December.

23         Q.   **Of what year?**

24         A.   It appears to be 2010, from the payment.

25         Q.   **Because the payment was sent sometime in**

1    February of 2011; is that correct?

2         A.    That's what it says, yes.

3         Q.    Were there any Vitaphenol sales in August

4    of 2010?

5         A.    I'm -- according to this document that

6    I'm looking at, there were no sales in August.

7         Q.    Were there any sales of Vitaphenol

8    products in September of 2010?

9         A.    In accordance with this document, there

10   were no sales in September.

11        Q.    Were there any sales of Vitaphenol

12   product in October of 2010?

13        A.    According to this document, there were no

14   sales in October of 2010.

15        Q.    Do you have any information other than

16   what you see on Bates stamp A-1042 to know whether

17   there were any sales of Vitaphenol products for the

18   months August, September and October of 2010?

19               MS. CHOVANES:  Objection; asked and

20   answered.

21               THE WITNESS:  I'm sorry.  You need

22   to ask that again.  I thought you just asked me

23   that question.

24   BY MR. RYAN:

25        Q.    I said do you have any information other

```
 1   2:55 p.m.  We're going off the video record.

 2            (Recess.)

 3                 THE VIDEOGRAPHER:  Time is 3:01 p.m.

 4   We're back on the video record.

 5                 MS. YORK:  This is Dianne.

 6                 MR. RYAN:  Hi, Dianne.  We're back

 7   in the room.  Please, put it on mute.

 8                 MS. YORK:  Oh, thank you.

 9   BY MR. RYAN:

10       Q.   After Avidas started selling the

11   Vitaphenol products -- I'm sorry.  Let me start

12   again.

13                 After SciDerma started selling the

14   Vitaphenol products, was the only information that

15   Avidas had regarding those sales -- did it only

16   come from SciDerma?

17                 MS. CHOVANES:  Objection to form.

18                 THE WITNESS:  Is the only

19   information that we received about SciDerma sales

20   from SciDerma?

21   BY MR. RYAN:

22       Q.   No.  Is the only information that Avidas

23   received regarding Vitaphenol product sales, did it

24   only come from SciDerma?

25                 MS. CHOVANES:  Objection.
```

Page 207

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

1          THE WITNESS:  SciDerma provided us

2    with the information regarding their selling

3    activities.

4    BY MR. RYAN:

5          Q.    Did Avidas have any information regarding

6    Vitaphenol sales other than the information that

7    SciDerma provided to it?

8          A.    No.  I'm not sure what we would have.

9          Q.    Did Avidas ever audit SciDerma regarding

10   Vitaphenol sales?

11         A.    No.  We did not do an audit of SciDerma.

12         Q.    So with respect to the report that Avidas

13   sent to La Jolla Spa after SciDerma started selling

14   the Vitaphenol products, if SciDerma misstated

15   information regarding sales, then that information

16   would have gotten translated into the reports that

17   Avidas sent to La Jolla Spa; correct?

18         MS. CHOVANES:  Objection; that's not

19   a question; that's a statement first of all.  And

20   secondly, it's objectionable because it calls for a

21   hypothetical answer.  I'm not going to let her

22   answer it.  Restructure it and ask it more

23   precisely and maybe you could get an answer.

24   BY MR. RYAN:

25         Q.    If SciDerma sold Vitaphenol products but

1    did not report those sales to Avidas, then Avidas

2    would have no way of knowing that SciDerma was

3    underreporting; correct?

4                    MS. CHOVANES:  Objection; calls for

5    speculation.

6                    THE WITNESS:  We reported what

7    SciDerma reported was the selling activity.

8    BY MR. RYAN:

9         Q.   And you relied on what SciDerma told you;

10   right?

11        A.   Yes.  They were our selling partner.

12        Q.   So if SciDerma made a mistake in the

13   reports that it sent to Avidas, Avidas wouldn't

14   know that there was a mistake; correct?

15                   MS. CHOVANES:  Objection; asked and

16   answered, plus it calls for speculation.

17                   You can answer if you are able.

18                   THE WITNESS:  We didn't have any

19   reason to mistrust the information --

20                   MS. CHOVANES:  Just answer the

21   question.

22                   THE WITNESS:  -- from --

23   BY MR. RYAN:

24        Q.   And you didn't have any way to

25   independently verify the information that SciDerma

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1   was providing to you regarding the Vitaphenol

 2   sales; correct?

 3                   MS. CHOVANES:  Objection; asked and

 4   answered.

 5                   THE WITNESS:  No, we did not.

 6   BY MR. RYAN:

 7        Q.   When did SciDerma stop sending

 8   information regarding Vitaphenol sales to Avidas?

 9        A.   Can you rephrase that question, please.

10        Q.   When did SciDerma stop sending

11   information regarding Vitaphenol sales to Avidas?

12        A.   I believe all Vitaphenol activity stopped

13   in May of 2014.

14        Q.   Why do you believe that?

15        A.   Because we terminated the contract and

16   SciDerma was asked to discontinue using the

17   trademarks that -- the Vitaphenol trademarks as

18   part of the agreement with La Jolla Spa.

19        Q.   When you say we terminated the contract,

20   which contract was terminated?

21                   MS. CHOVANES:  Objection; first

22   let's clarify who the "we" is.

23                   "We" is Avidas; correct?

24                   THE WITNESS:  Yes.  Avidas

25   terminated the contract --
```

Margaret Gardner - 30(b)(6)                La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1    BY MR. RYAN:
 2         Q.    With whom?
 3         A.    -- with La Jolla Spa MD, and advised
 4    SciDerma that we were terminating the
 5    contract so, therefore, also terminating with
 6    SciDerma.
 7         Q.    Did SciDerma terminate the inventory and
 8    license agreement with Avidas before Avidas
 9    terminated the agreements with La Jolla Spa?
10         A.    No.  Not officially, no.
11         Q.    What do you mean, "not officially"?
12         A.    We had discussed looking for other
13    strategic options, but we didn't terminate the
14    contract until we terminated the contract with La
15    Jolla Spa.
16         Q.    Why did Avidas terminate the contract
17    with La Jolla Spa?
18              MS. CHOVANES:  Objection.
19              THE WITNESS:  Why?  Two reasons.
20              We weren't making any money.  There
21    were no revenues.  And my lead person, Jack Henn,
22    who was running the selling efforts in the
23    coordination of selling efforts, died, and it made
24    no sense for us to invest even more money in the
25    brand to continue to sell it.
```

 1   to know who is at this deposition, Mr. Ryan.

 2                    MR. RYAN:  She's not on the phone.

 3                    MS. CHOVANES:  Okay.

 4                    MR. RYAN:  Handing you a document

 5   that's previously marked as Exhibit 8 at the

 6   deposition of Joe Kuchta.

 7                    MS. CHOVANES:  Again, note my

 8   objection to these unprovenanced documents.  And,

 9   again, if counsel wants to present me with a

10   transcript showing where these were testified to,

11   we can talk about it.  Otherwise, note my

12   objection, please.

13   BY MR. RYAN:

14       Q.   Do you recognize the email exchanges in

15   Exhibit 8, Ms. Gardner?

16       A.   (Witness reviews document.)

17                    Yes, I recognize them.

18       Q.   The email on the first page of Exhibit 8,

19   which is dated July 8th, 2014, you say to Joe

20   Kuchta and Mark Goble, "Can you send the sales

21   information from this May transaction, please."

22                    Why did you make that request of

23   him?

24       A.   They weren't very diligent about sending

25   reports, so I constantly had to ask for the month

1   activity.

2      Q.   Then you also asked, "Can we set you a

3   quick call on Monday to discuss the inventory sell

4   off."

5              What did you mean by that?

6      A.   SciDerma was hoping that they could find

7   a strategic partner to sell their inventory to

8   another strategic partner, because we were

9   terminating the arrangement and they weren't

10  interested -- as I said, they weren't doing a good

11  job of selling the product.  So they were really

12  trying to see if they could find a partner to sell

13  the inventory to.

14     Q.   Do you know if SciDerma ever found that

15  strategic partner?

16     A.   It's my understanding from SciDerma that

17  they did not.

18     Q.   Next I'm handing you a document that's

19  previously marked as Exhibit 7 at the deposition of

20  Joe Kuchta.

21             Do you recognize these emails?

22             MS. CHOVANES:  Again, same

23  objection.

24             THE WITNESS:  Yes.

25             (Following portion deemed subject to

Page 254

www.aptusCR.com

Margaret Gardner - 30(b)(6)          La Jolla Spa MD vs. Avidas Pharmaceuticals

```
 1        Q.   Do you know how many units of Vitaphenol
 2   products existed at the time that Avidas terminated
 3   the agreements with La Jolla Spa?
 4               MS. CHOVANES:   Objection.
 5               THE WITNESS:   Do I know?   No, and if
 6   I had been informed, I don't remember.
 7   BY MR. RYAN:
 8        Q.   Do you know whether the Vitaphenol
 9   inventory that existed as of May 8th, 2014, was
10   destroyed?
11        A.   I know that Joe from SciDerma told me
12   they destroyed it.   I know that from an email.
13        Q.   When did Joe Kuchta send that email to
14   you?
15        A.   I don't recall.
16        Q.   Would it have been in 2014 or more
17   recently?
18        A.   No, it was after 2014.
19        Q.   Would it have been after Avidas learned
20   of this lawsuit?
21        A.   I don't recall.
22        Q.   So the only information you have that the
23   Vitaphenol inventory was destroyed was based on an
24   email that Joe Kuchta sent to you; is that
25   accurate?
```

```
 1           A.    That's correct.
 2           Q.    Did Joe Kuchta tell you when the
 3    Vitaphenol inventory was destroyed?
 4           A.    Are you asking me the date of
 5    destruction?
 6           Q.    Yes.
 7           A.    No, I don't know that.
 8           Q.    Mr. Kuchta didn't tell you that?
 9           A.    I don't -- I don't recall that he did.
10           Q.    Did Joe Kuchta tell you who destroyed the
11    Vitaphenol inventory?
12           A.    No, I don't recall that he did.
13           Q.    Did Avidas have any problem with the
14    Vitaphenol inventory being destroyed by SciDerma?
15           A.    SciDerma sublicensed.  It was their
16    inventory.  We had contractual obligations which
17    they fulfilled, and so I didn't see there was a
18    problem.
19           Q.    Is there any reason why Avidas didn't
20    have SciDerma return the Vitaphenol inventory to La
21    Jolla Spa after May of 2014?
22                   MS. CHOVANES:  I'm going to object
23    to that question as too indefinite, too broad,
24    calls for much irrelevant information.
25                   If you can answer, go ahead.
```

```
 1                    THE WITNESS:  The inventory didn't
 2     belong to La Jolla Spa.  It belonged to SciDerma.
 3     BY MR. RYAN:
 4          Q.   Why do you say that?
 5          A.   Because SciDerma paid for it.
 6          Q.   Are there any other reasons why Avidas
 7     didn't have SciDerma return the Vitaphenol
 8     inventory to La Jolla Spa after May of 2014?
 9          A.   Are there -- ?
10          Q.   Any other reasons why?
11          A.   No.
12          Q.   If you could take a look at Exhibit 52,
13     which is the sales and distribution agreement.
14          A.   Uh-huh, yes.
15          Q.   If you turn to Page 4 there's a Paragraph
16     4G.
17                    Do you see that?
18          A.   Yes.
19          Q.   It says, "In the event of termination in
20     whole or in respect of any product, Avidas shall
21     return all unsold inventory to YGE or unsold
22     inventory of terminated products (SKUs) if the
23     agreement is terminated in respect of fewer than
24     all products."
25                    Is there some reason why Avidas
```

```
 1              CERTIFICATE OF SHORTHAND REPORTER

 2

 3              I, Gail Inghram Verbano, Registered

 4   Diplomate Reporter, Certified Realtime Reporter,

 5   Certified Shorthand Reporter (CA) and Notary

 6   Public, the officer before whom the foregoing

 7   proceedings were taken, do hereby certify that the

 8   foregoing transcript is a true and correct record

 9   of the proceedings; that said proceedings were

10   taken by me stenographically and thereafter reduced

11   to typewriting under my supervision; and that I am

12   neither counsel for, related to, nor employed by

13   any of the parties to this case and have no

14   interest, financial or otherwise, in its outcome.

15        Further, that if the foregoing pertains to the

16   original transcript of a deposition in a federal case,

17   before completion of the proceedings, review of the

18   transcript [] was [] was not requested [X] waived.

19

20

21   _____

22        Gail Inghram Verbano, CSR, RDR, CRR

23        CA-CSR No. 8635

24

25
```