**EXHIBIT 2**

### INVENTORY AND LICENSE AGREEMENT

THIS INVENTORY AND LICENSE AGREEMENT is made and entered into this 25th day of August, 2010, by and between Avidas Pharmaceuticals LLC, a limited liability company (hereinafter referred to as "Avidas" or the "Licensor"), and  SciDerma Medical LLC, a limited liability company (hereinafter referred to as the "Sub-licensee").

WHEREAS, Licensor has an exclusive worldwide license to grant sublicenses, to make, have made, market, promote, use and sell a line of cosmetic and sunscreen products ("Products") under the Product Trademarks and has an exclusive worldwide license to the Know-How upon which the Products are based; and

WHEREAS Licensor has inventory of some of the Products and Sub-licensee desires to purchase such inventory to initiate sales of the Products in the Territory; and

WHEREAS Licensor wishes to sub-license and grant to Sub-licensee the right to use the Know-How, to market, promote, use and sell the Products in the Territory and wishes to sub-license the Product Trademarks in the Territory and;

WHEREAS Sub-licensee wishes to sublicense the right to market, promote, use and sell the Products in *IN THE* Territory and wishes to sub-license the Product Trademarks Territory.

NOW, THEREFORE, in consideration of the premises, the parties agree as follows:

1. **DEFINITIONS:** The following terms as used in this Agreement shall have the meanings set forth in this Article 1.

    a. "Affiliate" shall mean with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, such Person. A Person shall be regarded as in control of another Person if such Person owns, or directly or indirectly controls, more than fifty percent (50%) of the voting securities (or comparable equity interests) or other ownership interests of the other Person, or if such Person directly or indirectly possesses the power to direct or cause the direction of the management or policies of the other Person, whether through the ownership of voting securities, by contract or any other means whatsoever.

    b. "Agreement" shall mean this Agreement, together with all appendices, exhibits and schedules referenced herein or attached hereto, and as the same may be amended or supplemented from time to time hereafter pursuant to the provisions hereof.

    c. "Applicable Laws and Regulations" shall mean all applicable federal, state and local laws, regulations, rules or guidelines then applicable in the Territory that govern the services and transactions contemplated by this Agreement.

    d. "Avidas Trademarks" shall mean the trademarks of Licensor, including the name Avidas.

    e. "Intellectual Property" shall mean the intellectual property rights, shall include without limitation, any patents, patents pending, know-how, confidential trade secrets or other proprietary information owned, licensed or developed by Licensor with respect to the Products. Intellectual Property shall include all data, results, reports, customer data, including the Vitaphenol web-site, sales and marketing data and the interpretation of data by its contractors, sub-contractors and by the Sub-licensee, and its contractors and sub-contractors, during the term of this agreement.



PLAINTIFF'S EXHIBIT 54
54
5-2-19



1

f. "Know-How" shall mean all information and material, technical data and other know-how, developed, licensed or acquired by Licensor which relates to the manufacture, promotion, use or sale of a Product. Know-How shall include but not be limited to detailed formulation information concerning the Products as well as all clinical and laboratory and any other scientific or medical data and information concerning such Products. Know How shall also include all information concerning Licensor's vendors supplying products or services in respect of the Products, including copies of all agreements with such vendors. <u>Exhibit I</u> hereto is a list of all vendors of Licensor supplying products or services in respect of the Products.

g. "La Jolla Spa MD Trademarks" shall mean those Product Trademarks identified as La Jolla Spa MD Trademarks on <u>Exhibit II</u> hereto, including, without limitation the name La Jolla Spa MD.

h. "Net Sales" shall mean the gross amount invoiced for the Products by Sub-licensee or its affiliates to unaffiliated third parties in the Territory, less returns and less the following amounts to the extent deducted from or on such invoice or absorbed or accrued by Sub-licensee or its affiliates as required by United States generally accepted accounting principles: (i) customary quantity, trade and/or cash discounts, chargebacks, returns, allowances, rebates and price adjustments allowed or given; and (ii) sales and other excise taxes and duties directly related to the sale, to the extent such items are included in the gross invoice price.

i. "Product" shall mean any formulation manufactured, developed or to be developed or marketed and sold by Sub-licensee under the Product Trademarks, including, without limitation, the products listed on <u>Exhibit III</u> hereto.

j. "Product Trademarks" shall mean the trademarks listed in <u>Exhibit II</u> hereto, including, without limitation, the Vitaphenol Trademarks and La Jolla Spa MD Trademarks.

k. "Professional Customers" shall mean dermatologists, aestheticians, plastic surgeons and other healthcare providers in the Territory.

l. "Retail Customers" shall mean all customers in the Territory other than Professional Customers.

m. "Territory" shall mean the United States of America, including Puerto Rico, Guam and any other territories or protectorates of the United States and Canada.

n. "Vitaphenol Trademarks" shall mean those Product Trademarks identified as Vitaphenol Trademarks on <u>Exhibit II</u> hereto, including, without limitation the name Vitaphenol.

2. Licensor's Grant of Rights

a. Licensor grants to Sub-licensee an exclusive sub-license to make, market and sell the Products in the Territory. The Parties agree that the Licensor is granting no rights with respect to the Product outside of the Territory and that Licensor retains all rights to the Product, including but not limited to the license to make, develop, market and sell, for all other worldwide territories outside of the Territory.

b. Licensor hereby grants to Sub-licensee an exclusive right to use the Know-How, to market, promote and sell the Products in the Territory soley in connection with its direct sales and marketing of the Products.

2



c.  Licensor hereby grants to Sub-licensee an exclusive license to use the Vitaphenol Trademarks in the Territory soley in connection with its direct sales and marketing of the Products.

d.  Licensor hereby grants to Sub-licensee a non-exclusive license to use the La Jolla Spa MD Trademarks in the Territory. La Jolla Spa MD of La Jolla, California, shall retain the right to use the La Jolla Spa MD Trademarks in connection with the spa and products other than the Products. Sub-licensee shall have an exclusive license within the Territory to use the La Jolla Spa MD Trademarks in connection with the Products soley in connection with its direct sales and marketing of the Products.

e.  Sub-licensee shall not (a) use the Product Trademarks in a way that might materially prejudice their distinctiveness or validity or the goodwill, or (b) use any trademarks or trade names so resembling any of the Product Trademarks as to be likely to cause confusion or deception.

f.  Licensor hereby grants to Sub-licensee a non-exclusive, royalty-free license to use the Avidas Trademark solely in connection with performing its obligations hereunder.

g.  Sub-licensee shall not (a) use the Avidas Trademarks in a way that might materially prejudice their distinctiveness or validity or the goodwill of Licensor therein, or (b) use any trademarks or trade names so resembling any of the Avidas Trademarks as to be likely to cause confusion or deception.

h.  This Agreement shall not transfer ownership of any of the Product Trademarks or Avidas Trademarks to Sub-licensee.

3.  Licensor's obligations

a.  Payment for and transfer of Inventory located at Innovative Fulfillment Solutions ("IFS"). Upon payment by Sub-licensee to Licensor for the Product inventory located at IFS, title to such inventory shall pass to Sub-licensee. The parties agree that risk of loss for the inventory, or any part thereof, shall remain with the title to such inventory and not pass to Sub-licensee until the payment by Sub-licensee to Licensor for such inventory. The Product inventory as of August 13, 2010 is listed on Exhibit IV hereto. The parties agree that in the event the Product inventory changes from the amount shown on Exhibit IV, Sub-licensee shall only pay for the inventory it receives in good and marketable condition. Licensor shall advise IFS of this Agreement and cooperate with Sub-licensee to transition inventory held in IFS in a timely fashion until the final inventory transition is complete. Payment and transfer of title shall occur in three parts. Title for one-third of the inventory of each SKU on Exhibit IV shall be transferred to Sub-licensee upon payment to Licensor on August 27th, 2010 for one third of such inventory. Title to the next one-third of the inventory on Exhibit IV shall be transferred to Sub-licensee on September 27th, 2010 on receipt of payment by Licensor for such inventory. Title to the balance of inventory shall be transferred on October 27th, 2010 on receipt of payment from Sub-licensee for such inventory. Both parties acknowledge there is product which has been sold to professional customers still available for resale.

b.  Manufacture/ Product Supply. Upon the last payment by Licensee to Licensor for the Product inventory located at IFS, Licensor shall facilitate the transfer of the management of the Product manufacture and supply in the Territory to Sub-licensee.

c.  Marketing Materials. Licensor shall supply a copy of all Licensor's marketing information that Licensor has used in marketing the Product promptly following execution of this Agreement. A list of such information may be found on Exhibit V hereto. Licensor further agrees to consult with Sub-licensee to explain the marketing

3



information to enable Sub-licensee to make full use of such information in support of its efforts to promote and sell the Products. Licensor authorizes Sub-licensee to continue to make all claims and representations concerning the Products that Licensor is or has been making.

d.   Promotion Materials. Licensor agrees to supply Sub-licensee with electronic Portable Document Format (PDF) files and appropriate high resolution files (e.g. Quark files, Illustrator files, JPEG files, etc) in its possession that can be used to create promotional materials, or any literature, promotional materials, or similar items that Licensor possesses. Sub-licensee shall have the right to use all such marketing materials. Licensor shall provide marketing materials and samples currently in inventory to Sub-licensee for a price not greater than the cost paid by Licensor for such materials. The payment terms shall be negotiated in good faith between the Parties. Sub-licensee shall have the right to create its own marketing materials utilizing the trademarks owned by Licensor in accordance with Article 4h.

e.   Transfer of Website and Telephone Numbers. Licensor agrees to transfer to Sub-licensee management of the Product website and phone numbers associated with the Products. During the Term of this Agreement, Sub-licensee shall be responsible for the costs of maintaining and updating the Products' website and phone numbers. The Products' website shall continue to be owned by Licensor.

4.   Sub-licensee obligations

a.   Inventory located at IFS. Sub-licensee inspected the physical inventory on August 13, 2010. IFS provided a written confirmation of the physical inventory count as of August 13, 2010 which is reflected in Exhibit IV. Sub-licensee shall be responsible to pay Licensor only for the Products it receives in good and marketable condition. The price to be paid by Sub-licensee for each item of Product inventory is set forth in Exhibit IV.

b.   IFS Product Services. Upon execution of this agreement, Sub-licensee shall be responsible for the payment of IFS for Products warehousing, distribution and all IFS-related services. Sub-licensee's costs for Products distribution shall include the actual cost of selling and delivering Product to sub-licensee's customers.

c.   Manufacture/ Product Supply. The parties agree that, following execution of this Agreement, Licensor shall initiate transition of manufacturing responsibility to Sub-licensee but such transition shall not be finalized until Sub-licensee has paid Licensor for all inventory located at IFS. The current manufacturers are Harmony for all Vitaphenol Products with the exception of Vitaphenol CRS which is manufactured by Topix Pharmaceuticals ("Topix"). Licensor retains the manufacturing rights to continue manufacture with Harmony and Topix for Product outside of the Territory. Sub-licensee shall be responsible for the packaging changes to the Product to include Sub-licensee's name and logo on the Product packaging and shall be responsible to make any additional packaging changes as agreed by the Parties and in accordance with the manufacturing contracts. Sub-licensee shall be responsible for Sub-licensee's product supply orders for the Territory and such supply payments to any manufacturer, including Harmony, in accordance with the manufacturing contracts accepted by Sub-licensee, including the payment set forth in Article 6 for the Product inventory items listed in Exhibit VI which are intended for the Territory located at Harmony. This amount shall be paid prior to the transfer of any manufacturing responsibilities of Product to Sub-licensee in the Territory and before the first purchase order from Sub-licensee to Harmony, unless mutually agreed by Licensor and Harmony. Sub-licensee shall also be responsible for Product packaging, supply order and payment for samples of Products in accordance with the manufacturing contracts accepted by Sub-licensee.



d. **Licensing Fees.** Sub-licensee shall pay all Licensing fees and royalties in accordance with Article 6 of this Agreement and payments shall be in United States currency.

e. **Marketing and Promotion.** As of the Execution Date and continuing throughout the Term, Sub-licensee agrees to use commercially reasonable efforts to promote the products in the Territory with the same resource commitment that Sub-licensee would make to its own product in the first position.

f. **Customer Representation.** Sub-licensee will not make any false or misleading representations to Professional Customers, Retail Customers or others regarding Licensor or the Products and will not make any representations, warranties or guarantees with respect to the specifications, features or capabilities of the Products that are false or misleading or otherwise inconsistent with the documentation accompanying or describing the Product. Sub-licensee agrees to undertake timely and complete corrective action for any deviations from this.

g. **Product Pricing/Wholesalers/Third Party Payers.** Sub-licensee shall have the sole authority for product pricing to Professional Customers, Retail Customers, wholesalers and third party payers, however Net Selling Prices shall not be less than 75% of the prices set forth in Exhibit III hereto. Net Selling Prices are the gross invoiced price less any discounts, rebates or any reductions from gross selling price as defined by Net Sales in Article 1h.

h. **Marketing Materials.** At Sub-licensee's expense, Sub-licensee shall have responsibility for all sales, promotion and advertising materials to promote the Product. Any new materials developed or distributed, regardless of the form relating to the Product shall be reviewed by Licensor to ensure the Product trademarks are properly displayed, such review shall be completed within ten (10) days from submission by Sub-licensee to Licensor. Sub-licensee shall not distribute any Product materials which have not been approved by Licensor, provided that Licensor may not unreasonably withhold approval.

i. **Insurance.** During the Term and for one (1) year after any expiration or termination of this Agreement, Sub-licensee shall maintain commercial liability insurance for the Products in the Territory. It is further agreed that Sub-licensee, prior to making any sales of the Products, shall enter into a customary product contractual liability insurance policy evidence of products and contractual liability insurance coverage of not less than two million dollars ($2,000,000) aggregate liability limits and no less than the amount of coverage required by manufacturers. Each insurer shall name the other as an additional insured, as their interests may appear. Such evidence of insurance coverage can be in the form of the original policy or Certificate of Insurance, which shall provide that the insurer has assumed the liability. In addition, such insurers shall warrant that such insurance will not be changed or canceled without at least thirty (30) days prior written notice to the respective indemnities. Sub-licensee shall provide to Licensor a copy of the certificates of insurance, evidencing the coverage specified herein.

j. **Sales and Royalty Monthly Reporting.** Sub-licensee shall provide a detailed electronic report with each monthly royalty payment detailing the Net Sales and for each Product sold, the customer name and address, the customer type (i.e., Retail or Professional) the Product identity (e.g.,. VDC), the quantity sold and the selling price and the details of any deductions from the invoiced price including any Product returns. Monthly payments and reports shall begin in the first month following the date of first invoice of any Product sold under this Agreement for which a royalty is due and shall continue through the Term of this Agreement.

k. **Record Keeping and Audits.** Sub-licensee agrees to keep full and accurate records in accordance with GAAP. Such records shall be maintained for a period of twelve (12)

5



months after the end of the Term or longer if required by applicable law. Upon the request of Licensor, Sub-licensee shall permit an independent public accountant selected by Licensor and acceptable to Sub-licensee, which acceptance will not be unreasonably denied, to have access to such of the records of Sub-licensee as may be necessary to verify the accuracy of the royalty reports, but this right may not be exercised more than twice in any one calendar year during the Term of this Agreement and for a period of one year following its expiration or early termination. Any such audit shall be at Licensor's expense and must be conducted during normal business hours and in a manner that does not disturb the business of Sub-licensee.

l.   Sub-licensee agrees to sell Product to Diane York-Goldman and Mitch Goldman in accordance with the terms of Licensor's La Jolla Spa Agreement. In accordance with such agreement, Diane York-Goldman may purchase the Products solely for resale on the premises of the La Jolla Spa located at 7630 Fay Avenue, La Jolla, CA and Mitch Goldman may purchase the Products solely for resale on the premises of Mitch Goldman's Spa located at 9339 Genesee Avenue, Suite125, La Jolla, CA at a price equal to actual full cost of goods. Sub-licensee shall not be obligated to pay royalties to Licensor on sales to Diane York-Goldman and Mitch Goldman. Sub-licensee also agrees to sell the Products to Licensor at a price equal to actual full costs of goods for Product business development opportunities outside of the Territory. Sub-licensee shall not be obligated to pay royalties to Licensor on sales of the Products to Licensor. Sub-licensee shall also continue to sell Product to Licensor's Professional Customers at the Professional Customers' Selling price listed on Exhibit I.

m.   Notice of Infringement. Sub-licensee shall provide prompt notice of any infringement or threatened infringement of any of the Product Trademarks or the Avidas Trademark used in connection with the Products.

5.   Government Matters and Communication

a.   Regulatory/Government Responsibility. All regulatory matters regarding the Product shall remain the exclusive responsibility of Licensor. Each party shall promptly notify the other party of any event(s) that materially affect(s) or could materially affect the marketing of the Product, including without limitation adverse reactions, product complaints and governmental inquiries. Sub-licensee shall not without the consent of Licensor or unless so required by applicable law correspond or communicate with any Governmental or Regulatory Authority, whether within the Territory or otherwise, concerning the Product or otherwise take any action concerning any authorization or permission under which the Product is sold or any application for the same. Licensor hereby represents and warrants that it has the authority to enter into this agreement and that the Products and this agreement do not violate any applicable law or regulation. Furthermore, Sub-licensee shall, immediately upon receipt of any Governmental or Regulatory communication relating to the Product, forward such information to Licensor. Licensor during the Term shall promptly inform Sub-licensee of any Governmental or Regulatory Authority any Product issues or any Marketing issues which may negatively impact the promotion of the Product within the Territory. All communications with Government Authorities concerning the Product shall remain the sole responsibility of Licensor. Sub-licensee shall not respond to any Product inquiry by a Government Authority until and only as directed by Licensor provided, however, that the foregoing shall not be construed to prevent Sub-licensee in any way from complying with any Governmental or Regulatory Authority or applicable laws, rules or regulations. Licensor will notify Sub-licensee of any such information as it relates to any negative impact on the promotion of the Product within three business days.

b.   Communications and Press Releases. As between the parties, all external public

6



communications, including but not limited to press releases relating to the Products, including the timing of such releases and communications will be mutually agreed by the parties to ensure a coordinated effort.

6.  Grant of Rights Consideration

    a.  License Fee.  In consideration of Licensor's grant, Sub-licensee agrees to pay a payment of $100,000.00 (one hundred thousand US dollars) of which $50,000.00 (fifty thousand US dollars) was paid on signing of the Letter of Intent and $50,000.00 (fifty thousand US dollars) shall be paid on, or before, November 15, 2010.  The initial payment of $50,000 shall be fully refundable if this agreement is not fully executed.

    b.  Royalty.  In consideration of Licensor's grant, Sub-licensee agrees to pay a royalty to Licensor of fifteen percent (15%) of all Net Sales in the Territory. Royalties shall be paid on a monthly basis within thirty days following calendar month end in a single royalty payment to Licensor  For purposes of illustration, payment to Licensor for all Products invoiced to a customer during month 1 shall be made on or about the last business day of month 2. Licensor agrees that up to 10% (ten percent) of items in Product inventory may be allocated for sampling, demonstration of product, and product testers and no royalty shall be paid in respect of such items.

    c.  IFS Product Inventory.  Sub-licensee agrees to pay $316,501.00 (three hundred sixteen thousand five hundred one US dollars) for the Product inventory located at IFS to be purchased by Sub-licensee.

    d.  Harmony Product Inventory.  Sub-licensee agrees to pay $86,014.04 (eighty six thousand fourteen dollars and four cents) for the Product inventory located at Harmony to be purchased by Sub-licensee.

7.  Representations and Warranties of Licensor

    a.  Organization.  Licensor is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Delaware and has all the necessary corporate power and authority to conduct its business.

    b.  Authorization.  The execution and delivery of this Agreement are within the corporate power of Licensor and the execution, delivery and performance of this Agreement by Licensor does not require the consent of any Person or the authorization (by notice or otherwise) of any Government or Regulatory Authority.

    c.  The license agreement between Licensor and La Jolla Spa MD granting Licensor the ability to manufacture, market, distribute, and sell the Products, to use the Product Trademarks, and to sublicense those same rights is valid and is in full force and effect. Licensor has the ability under such license agreement to grant the sublicenses contained in this Agreement.  Licensor is not in default under such agreement and Licensor shall immediately notify Sub-licensee if Licensor receives any notice from La Jolla Spa MD that Licensor becomes in default under such agreement.

    d.  No Conflict.  The execution, delivery and performance of this Agreement by Licensor does not conflict with, or constitute a breach of or under, any order, judgment, agreement or instrument to which Licensor is a party; and does not require Licensor to obtain any material approval or consent from any Third Party and does not violate any Legal Requirements applicable to Licensor in any material respect.

    e.  Enforceability.  This Agreement constitutes the valid and binding obligation of Licensor, enforceable in accordance with its terms, subject to bankruptcy, reorganization,

7



insolvency and other similar laws affecting the enforcement of creditors' rights in general and to general principles of equity (regardless of whether considered in a proceeding in equity or an action at law). Licensor has the right, power and authority to sublicense the Product and the Trademarks in the Territory.

f.  Litigation. There is no litigation, arbitration proceeding, governmental investigation, action or claim of any kind, pending or, to the knowledge of Licensor threatened, by or against Licensor or any of its Affiliates which would reasonably be expected to materially affect performance by Licensor of its Agreement obligations. Licensor is not aware of any current or threatened litigation or third party claim concerning the Vitaphenol trademark or the Vitaphenol Products that may impair Sub-licensee's ability to freely sell the Inventory or continue to sell the Products. Licensor is not aware of any current or threatened government enforcement action or investigation concerning the Products.

g.  Legal Requirements. None of Licensor, its affiliates or Persons under its direction or control is currently excluded from a federal or state health care program under Section 1128 or 1156 of the Social Security Act as may be amended or supplemented. None of Licensor, its Affiliates or persons under its direction or control is otherwise currently excluded, suspended, or debarred from any federal or state program. Licensor shall immediately notify if, at any time during the Term, Licensor, it's Affiliates, or any Person under its direct control is convicted of an offense that would subject it or Licensor to exclusion, suspension, or debarment from any federal or state program.

h.  Inventory located at IFS. Upon Sub-licensee's payment to Licensor for the Product inventory located at IFS (4346 Belgium Blvd. Kansas City, MO. 64150) Sub-licensee shall receive good and marketable title to such inventory, free and clear of all security interests, liens, or other encumbrances of any kind or character. Licensor represents and warrants that the quantity of Product inventory listed in <u>Exhibit IV</u> is accurate and shall immediately notify Sub-licensee if any of the inventory becomes damaged or otherwise unmarketable.

i.  Inventory located at Harmony. Upon Sub-licensee's payment to Harmony for the Product inventory located at Harmony, to the best of Licensor's knowledge, Sub-licensee shall receive good and marketable title to such inventory, free and clear of all security interests, liens, or other encumbrances of any kind or character. Licensor represents and warrants that the quantity of Product inventory listed in <u>Exhibit VI</u> is accurate.

j.  Know-How and Trademarks. Licensor represents and warrants that the Know-How, the Products Trademarks and the Avidas Trademarks do not infringe, misappropriate or otherwise conflict with any rights of any third parties.

8.  Representations and Warranties of Sub-licensee

a.  Organization. Sub-licensee is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Pennsylvania and has all the necessary corporate power and authority to conduct its business.

b.  Authorization. The execution and delivery of this Agreement are within the corporate power of Sub-licensee and the execution, delivery and performance of this Agreement by sub-licensee does not require the consent of any Person or the authorization (by notice or otherwise) of any Government or Regulatory Authority. Sub-licensee has the financial backing to fulfill the financial obligations of this Agreement.

c.  No Conflict. The execution, delivery and performance of this Agreement by Sub-licensee does not conflict with, or constitute a breach of or under, any order, judgment,

8



agreement or instrument to which Sub-licensee is a party; and does not require Sub-licensee to obtain any material approval or consent from any Third Party and does not violate any Legal Requirements applicable to Sub-licensee in any material respect.

d.  Enforceability.  This Agreement constitutes the valid and binding obligation of Sub-licensee, enforceable in accordance with its terms, subject to bankruptcy, reorganization, insolvency and other similar laws affecting the enforcement of creditors' rights in general and to general principles of equity (regardless of whether considered in a proceeding in equity or an action at law).  Sub-licensee has the right, power and authority to promote and sell the Product in the Territory.

e.  Litigation.  There is no litigation, arbitration proceeding, governmental investigation, action or claim of any kind, pending or, to the knowledge of Sub-licensee threatened, by or against Sub-licensee or any of its Affiliates which would reasonably be expected to materially affect performance by Sub-licensee of its Agreement obligations.

f.  Legal Requirements.  None of Sub-licensee, its affiliates or Persons under its direction or control is currently excluded from a federal or state health care program under Section 1128 or 1156 of the Social Security Act as may be amended or supplemented.  None of Sub-licensee, its Affiliates or Person under its director or control is otherwise currently excluded, suspended, or debarred from any federal or state program.  Sub-licensee shall immediately notify if, at any time during the Term, Sub-licensee, it's Affiliates, or any Person under its direct control is convicted of an offense that would subject it or Sub-licensee to exclusion, suspension, or debarment from any federal or state program.

g.  Trademarks.  Sub-licensee represents and warrants that Sub-licensee shall continue to use the Vitaphenol Trademarks on all printed and electronic material and that it will not be altered in any way.  Sub-licensee represents and warrants that if Sub-licensee should continue to use the La Jolla Spa MD Trademarks on printed and electronic material that it will not be altered in any way.  Sub-licensee shall continue to display Licensor's company name on all printed and electronic materials in a font size inferior to Sub-licensee.

9.  Cooperation

a.  Development of Business.  Following execution of this Agreement Licensor agrees to cooperate with Sub-licensee as reasonably requested by Sub-licensee to facilitate Sub-licensee's development of its business utilizing the Know-How, the Vitaphenol and La Jolla Spa MD trademarks.

b.  Additional Product Data.  During the Term of this Agreement, the Parties agree to promptly furnish to each other any new additional information and data developed or acquired by either Party relating to the Products in the Territory.  For clarity purposes, all data is proprietary information and as such is solely and exclusively owned by Licensor.

10.  Covenant not to Compete

a.  Product Competition.  Licensor agrees that during the Term of the Agreement, Licensor will not market or promote any product that is in direct competition with the Products. Sub-licensee agrees that for a period of 12 (twelve) months following the expiration of the Term of the Agreement that Sub-licensee will not market or promote any product which is in direct competition with the Products.  Products in direct competition shall mean Products containing similar antioxidants as those found in Vitaphenol complex and used as a cleanser, toner, anti-aging serum, or moisturizer.

b.  The Parties agree that the Licensor's prescription products do not directly compete with

9



Products, and Licensor's development products, Avidas-001 and additional line extensions, are exempt from consideration as competition with the Products. Following execution of this Agreement, Licensor agrees during the Term of this Agreement not to engage in marketing and selling any additional new product which directly competes with Sub-licensee's marketing and selling of Products in the Territory. Licensee further agrees not to use, or permit to be used, Product trademark or Know-How to promote and sell products competitive with the Products, or for any other products sold by Sub-licensee.

11. Dispute Resolution.

    a.   Dispute Resolution. The parties agree to attempt to settle any disputes that arise in connection with this Agreement through good faith mediation efforts. The parties agree that any dispute that arises in connection with this Agreement which is not settled through good faith mediation efforts shall be settled by arbitration which shall be in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Such arbitration shall be held in the Commonwealth of Pennsylvania, USA. There shall be three (3) arbitrators, one (1) to be chosen by Licensor, one (1) to be chosen by Sub-licensee and a third to be selected by the two arbitrators so chosen. Each party shall bear its own costs relating to such arbitration, and the parties shall equally share the arbitrators' fees. The decision of the arbitrators shall be final and binding upon all parties and their respective successors and assigns.

12. Term and Termination

    a.   Term. The Term of this Agreement shall begin upon the date of this Agreement and shall continue for a period of five years unless otherwise terminated as provided herein. Unless terminated as provided herein, the Agreement shall automatically renew for one year periods.

    b.   Termination for Non-Payment of Fees. Licensor may terminate this Agreement immediately upon notice if Sub-licensee fails to make any payment required by Article 3a and Article 6 within 15 days after the due date for each such payment.

    c.   Termination Non-Performance. After the first twelve months of this Agreement, Licensor may terminate this Agreement early upon sixty days prior written notice, if Licensor determines in its sole discretion that Sub-licensee has not met the Minimal Level of Performance in the Territory. The Minimal Level of Performance in the Territory is defined as royalty payments (15% of Net Sales) of no less than (i) twenty-five thousand dollars ($25,000) per quarter for the first twelve months of this Agreement (or $100,000 for such first 12 months) (ii) thirty-seven thousand five hundred dollars ($37,500) per quarter for month thirteen to month twenty four; and (iii) fifty thousand dollars ($50,000) per quarter for each subsequent quarter.

    d.   Termination upon Mutual Agreement. This Agreement may be terminated at any time by mutual agreement of the parties.

    e.   Termination for Breach. Either party may terminate this Agreement, effective any time after providing sixty (60) days written notice and an opportunity to cure during such sixty (60) days in the event of a material failure of the other party to comply with its material obligations contained in this Agreement. If such cure is effected, such notice with respect to such termination shall be null and void.

    f.   Termination for Force Majeure or Bankruptcy. To the extent permitted by law, each party will have the right to terminate this Agreement immediately upon notice to the

10

other party, in the event of any Force Majeure Event affecting the other party beyond the other party's control which lasts for a period of at least six months and which is of sufficient intensity to interrupt or prevent the carrying out of such other party's material obligations under this Agreement during such period. In no circumstances shall either Party be liable to the other for its inability to perform under this Agreement due to Force Majeure. Licensor may terminate this Agreement if Sub-licensee files for relief under the United States Bankruptcy Code; files a petition under any bankruptcy, insolvency or similar law (which petition is not dismissed within sixty (60) days after filing). In no circumstance shall Sub-licensee be liable to the Licensor for its inability to perform under this Agreement due to Bankruptcy. Sub-licensee may terminate this Agreement if Licensor files for relief under the United States Bankruptcy Code; files a petition under any bankruptcy, insolvency or similar law (which petition is not dismissed within sixty (60) days after filing), except Chapter 11 of the United States Bankruptcy Code or any successor statute that permits a corporation or company to continue its operations while protecting it from creditors; the appointment of a receiver for the business or property; or the making of a general assignment for the benefit of its creditors. As a condition of this Agreement, should Sub-licensee not terminate the Agreement in the event that Licensor files a petition under any bankruptcy, insolvency or similar law (which petition is not dismissed within sixty (60) days after filing), except Chapter 11 of the United States Bankruptcy Code or any successor statute that permits a corporation or company to continue its operations while protecting it from creditors; the appointment of a receiver for the business or property; or the making of a general assignment for the benefit of its creditors, Sub-licensee shall be obligated to continue to pay Product Royalties to Licensor and Licensor shall be obligated to pay the York-Goldman Royalty in effect at such time for the Term of this Agreement. In the event that Sub-licensee discontinues to pay Product Royalties to Licensor, Licensor may terminate this Agreement.

g.  **Effects of Termination.** Early termination of this Agreement for any reason shall be without prejudice to Licensor's right to receive all payments accrued and unpaid on the effective date of such termination and any other rights and remedies which Licensor may then or thereafter have hereunder.

h.  **Actions upon Termination.** In the event of early termination, Sub-licensee shall have the right to dispose of its stock of Product and shall have the right to manufacture such finished Product as may be necessary to balance out inventory or to convert raw materials, or goods in process, into finished goods. All sales made pursuant to this Article shall be subject to the payment of royalties as provided above. In the event of early termination, following discontinuation of Product sales, Sub-licensee shall discontinue its use of the Product trademark, Avidas trademark and the Know-How.

13.  Indemnification

a.  Licensor agrees to indemnify and hold Sub-licensee harmless from and against all loss, damage, cost or expense arising from or relating to any claim, action or proceeding made or brought against Sub-licensee by a third party as a result of (i) Licensor's negligence, willful misconduct or any breach of the terms of this Agreement (including any of its representations and warranties set forth herein); and (ii) any infringement or threatened infringement of any of the Product Trademarks or the Avidas Trademark used in connection with the Products.

b.  Sub-licensee agrees to indemnify and hold Licensor harmless from and against all loss, damage, cost or expense arising from or relating to (i) any claim, action or proceeding made or brought against Licensor by a third party as a result of Sub-licensee's negligence, willful misconduct or any breach of the terms of this Agreement (including any of its representations and warranties set forth herein) (ii) any promotional claims or

11

representations made by Sub-licensee that are materially different from claims and representations that have been made by Licensor.

c.   A party seeking indemnification under this Agreement (an "indemnified party") shall give notice to the party from whom such indemnification is sought ("indemnifying party") within thirty (30) days of the assertion of any claim (including discovery of any loss, damage or injury giving rise to any claim by the indemnified party), or the commencement of any action, suit, or proceeding, in respect of which indemnity may be sought hereunder, provided, however, the obligation of the indemnified party to give notice to the indemnifying party shall not arise until the later to occur of: (i) the assertion of a claim or commencement of an action, or (ii) the receipt by the indemnified party of notice of claim or service of court process with regard to such proceeding.  The indemnified party shall give the indemnifying party such information regarding the claim, action or proceeding as the indemnifying party may reasonably request.  If a claim for indemnification arises from any action, suit or proceeding, the indemnifying party shall, at its expense assume the defense of such action, suit or proceeding.  In such case the indemnified party shall have the right, but not the duty, to participate in its own defense and to employ at its own expense counsel separate from counsel employed by the indemnifying party; provided, however, if a conflict exists in conducting the defense of the parties on a joint basis, the indemnifying party will be responsible for the expenses and fees of separate counsel for the indemnified party.  The indemnifying party shall be liable for the fees and expenses of counsel employed by the indemnified party if the indemnifying party has not assumed the defense thereof.  Whether or not the indemnifying party chooses to defend or prosecute any claim, all the parties hereto shall cooperate in the defense or prosecution thereof and shall furnish such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials and appeals, as may reasonably be requested therewith.  The indemnifying party shall not be liable under this subparagraph for any settlement effective without its consent, which consent shall not be unreasonably withheld.

d.   The Party's obligations under this Article shall survive expiration or early termination of this Agreement

e.   NEITHER LICENSOR NOR SUB-LICENSEE (WHICH FOR PURPOSES OF THIS ARTICLE SHALL INCLUDE THEIR RESPECTIVE AFFILIATES, OFFICES, DIRECTORS, EMPLOYEES AND AGENTS) SHALL HAVE ANY LIABILITY TO THE OTHER FOR ANY PUNITIVE DAMAGES, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES, RELATING TO OR ARISING FROM THIS AGREEMENT, EVEN IF SUCH DAMAGES MAY HAVE BEEN FORSEEABLE; PROVIDED THAT SUCH LIMITATION SHALL NOT APPLY IN THE CASE OF FRAUD OR WILLFUL MISCONDUCT.

14.  Confidential and Proprietary Information and Intellectual Property.

a.   Each party hereto agrees that it shall not use for its own benefit or advantage, or disclose to any third party, any confidential or proprietary business information of the other without the express written consent of the other party hereto except that Sub-licensee is permitted to disclose non-confidential Know-How in support of promotional claims for Products.  For the purposes hereof, the term "confidential and proprietary business information" shall be deemed to include: (i) any and all information disclosed by one party to the other pursuant to this Agreement that relates to the business affairs or operations of the disclosing party, other than information that is generally publicly available; and (ii) any and all information relating to product development or other research and development intended to improve existing products.  "Confidential and proprietary business information" shall not include information that: 1) was in the public domain at the time of the disclosure or subsequently becomes part of the public domain

through no breach by the recipient, 2) was in the recipient's possession free of any obligation of confidence at the time it was communicated to the recipient by discloser; 3) the recipient has independently developed it without either using discloser's confidential and proprietary business information or breaching this Agreement; or 4) was rightfully communicated to the recipient free of any obligation of confidence subsequent to the time it was communicated to the recipient by discloser.

b.  The receiving party may disclose confidential and proprietary business information pursuant to legal, judicial, or administrative proceeding or otherwise as required by law; provided that the recipient shall give reasonable prior notice, if not prohibited by applicable law, to the discloser and shall assist the discloser, at discloser's expense, to obtain protective or other appropriate confidentiality orders, and further provided that a required disclosure of confidential and proprietary business information to an agency or Court does not relieve the recipient of its confidentiality obligations with respect to any other party.

c.  The obligations of this agreement shall continue to apply to confidential and proprietary business information for as long as required by law and as to trade secrets for as long as the owner maintains them as confidential, but shall otherwise continue until the sooner of five (5) years after the exchange of such information or until superseded by a subsequent agreement between the parties relating the confidential treatment of the confidential and proprietary business information.  Upon written request of the other party, each party shall either promptly return to the other all documents, notes and other tangible materials representing the other's confidential and proprietary business information and all copies thereof or destroy all other copies containing such confidential and proprietary business information and certify such destruction in writing to the discloser except that a party may retain one copy of the confidential information solely for archival purposes.

d.  Intellectual Property.  Sub-licensee shall have the right to use the Intellectual Property for purposes of meeting its obligations as provided in this Agreement.  Licensor retains all ownership rights to all Intellectual Property related to the Products during the Terms of this agreement.

15.  General Provisions

a.  Relationship to the Parties.  In performing their respective obligations hereunder, each party shall, in all respects, be an independent contractor and shall not be deemed to be an agent of the other for any purpose whatsoever.  Neither party shall represent itself as having any authority to make any contracts or agreements or undertake obligations in the name of the other, or pledge credit, or extend credit to anyone in the other's name.

b.  Non-Waiver.  Any waiver by either of the parties hereto of a breach of the provisions of this Agreement by the other party shall not operate or be construed as a waiver by the aggrieved party of any of the rights and privileges of the aggrieved party hereunder, or of any subsequent breach.

c.  Assignment. Neither party shall assign or otherwise transfer its rights or obligations under this Agreement or any interest herein or right hereunder without the prior written consent of the other party, and any such purported assignment, transfer or attempt to assign or transfer any interest herein or right hereunder shall be void and of no effect; except that each party may assign all (but not less than all) of its rights and obligations hereunder to an Affiliate or to the transferee or successor of its assets or securities in the event of a change of control without the prior consent of the other party, provided that in the case of an assignment to an Affiliate, the assigning party shall remain responsible for all of its obligations and agreements set forth herein, notwithstanding such assignment.



13

Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

d.  **Entire Agreement.** This Agreement and any and all documents or agreements referenced herein contain all of the terms agreed to by the parties regarding the subject matter of this Agreement and shall supersede any prior oral or written agreements, understandings or arrangements between them.  This Agreement may not be amended, modified, altered or supplemented except by means of a written agreement or other instrument executed by both of the parties hereto. No course of conduct or dealing between the parties shall act as a modification or waiver of any provisions of this Agreement.

e.  **Severability.**  In the event that any provision (or portion thereof) of this Agreement is held to be invalid, illegal or unenforceable by a court of competent jurisdiction or a Governmental or Regulatory Authority, such provision (or portion of provision) shall be construed and enforced as if it had been narrowly drawn so as not to be invalid, illegal or unenforceable and the validity, legality and enforceability of the enforceable portion of any such provision and the remaining provisions shall not be adversely affected thereby.

f.  **Headings.**  The titles, headings or captions and paragraphs in this Agreement are for convenience only and do not define, limit, extend, explain or describe the scope or extent of this Agreement or any of its terms or conditions and therefore shall not be considered in the interpretation, construction or application of this Agreement.

g.  **Counterparts.** This Agreement shall become binding when any one or more counterparts hereof, individually or taken together, shall bear the signatures of each of the parties hereto. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original as against the party whose signature appears thereon, but all of which taken together shall constitute but one and the same instrument.

h.  **Third Party Services.**  Sub-licensee may use third-party contractors, including, but not limited to, retail account managers, telemarketing sales, contract sales organizations during the Term of this Agreement. In the event that Sub-licensee appoints a third party contractor, such contractor shall be subject to confidentiality obligations no less stringent than the confidentiality provisions of this Agreement. Sub-licensee shall be solely responsible and liable for such contractors and contracted services and shall ensure that the contractor complies in all material respects with the requirements of Governmental or Regulatory Authorities and Applicable Laws and Regulations as it relates to the Product or otherwise.  The parties hereto acknowledge that the use of third-party contractors does not transfer any of the Sub-licensee's obligations under this Agreement and Sub-licensee shall remain solely and exclusively responsible for its obligations to the Licensor under this Agreement.  Sub-licensee may not sublicense to a third party its obligations under this Agreement.

i.  **Governing Law.**  This Agreement shall be construed, interpreted, administered and governed in accordance with the laws of Pennsylvania.

j.  **Interpretation.** The parties hereto acknowledge and agree that:(a) each party and its representatives have reviewed and negotiated the terms and provisions of this Agreement and have contributed to its preparation; and (b) the terms and provisions of this Agreement shall be construed fairly as to each party hereto and not in favor of or against either party, regardless of which party was generally responsible for the preparation or drafting of this Agreement.

k.  **Notices.**  All written notices and other communications between the parties shall or may be given pursuant to this Agreement shall be deemed to have been sufficiently given

14



when delivered by personal service or sent by registered mail, to the recipient addressed as follows:

> If to Licensor –
> M. Gardner
> 135 Conshohocken State Road, Gladwyne, PA  19035
> Fax:  610-642-1186
> Margiegardner@avidaspharma.com

> If to Sub-licensee –
> D. Neale
> SciDerma Medical LLC
> 196 West Ashland Street, Doylestown, PA  18901
> Fax:
> dneale@sciderma.com

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]



IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the day and date first above written.

Avidas Pharmaceuticals LLC

Name: _MARGARET GARDNER-HUNT_

Signature: _[signature]_

Date: _8/25/2010_

SciDerma Medical LLC

Name: _DOUGLAS S. NEALS_

Signature: _[signature]_

Date: _8.25.10_

16

<u>Exhibit I</u>
Vendors of Licensor

1.   Harmony Laboratories
2.   Topix
3.   IFS

<u>Exhibit II</u>
Product Trademarks

Vitaphenol Trademarks
1.   Vitaphenol

La Jolla Spa MD Trademarks
1.   La Jolla Spa MD

Avidas Pharmaceuticals
1.   Avidas





18

<u>Exhibit III</u>
Vitaphenol Skin Care Line

|  |  | Current Net Selling Price* | Professional Selling Price** |
|---|---|---|---|
| VCRS | CRS with Vitaphenol | 195.00 | 97.50 |
| VDC | Vitaphenol Daily Cleanser | 45.00 | 22.50 |
| VDD | Vitaphenol Daily Defense Cream | 95.00 | 47.50 |
| VMF | Vitaphenol Fortified Moisturizer | 95.00 | 47.50 |
| VMS | Vitaphenol Sheer Moisturizer | 95.00 | 47.50 |
| VS | Vitaphenol Anti-Aging Serum | 95.00 | 47.50 |
| VT | Vitaphenol Anti-Aging Toner | 45.00 | 22.50 |
| VGTS | Vitaphenol Green Tea Serum | TBD | |
| VGTC | Vitaphenol Green Tea Cream | TBD | |

\*  With the exception of sales to Professional customers, Net Selling Product prices shall not be less than 75% of the prices above.  Net Selling Prices are the gross invoiced price less any discounts, rebates or any reductions from gross selling price as defined by Net Sales in Article 1h.

\*\*  Professional Selling Price is the gross invoiced selling prices to Licensor's current customers. Notwithstanding anything to the contrary, Sub-licensee has the right to increase the invoiced selling prices to the Professional Customers and Retail Customers during the Term of this Agreement.



<u>Exhibit IV</u>
Product inventory located at IFS

**8/13/2010 Inventory located at IFS**

| Stock Number | Description | IFS Physical Inventory | Inventory Value |
|---|---|---|---|
| VCRS | CRS w/ Vitaphenol | 1667 | 82,499.83 |
| VDC | Vitaphenol Daily Cleanser | 2657 | 31,086.90 |
| VDD | Vitaphenol Daily Defense Cream | 1728 | 20,321.28 |
| VMF | Vitaphenol Fortified Moisturizer | 3455 | 39,594.30 |
| VMS | Vitaphenol Sheer Moisturizer | 1625 | 19,223.75 |
| VMS-2 | Vitaphenol Sheer Moisturizer | 3087 | 36,519.21 |
| VS | Vitaphenol Anti-Aging Serum | 3885 | 44,172.45 |
| VT | Vitaphenol Anti-Aging Toner | 2712 | 28,421.76 |
| VT-2 | Vitaphenol Anti-Aging Toner | 1399 | 14,661.52 |
| | | 22215 | 316,501.00 |

20



<u>Exhibit V</u>
Marketing Materials

1. Vitaphenol website:  www.vitaphenol.com (domain rights also include vitaphenolcomplex.com)
2. Vitaphenol order phone number: 1-877-970-1811; fax # 1-816-587-5881
3. Other Marketing Materials:
   a. Vitaphenol Professional Order Form
   b. Vitaphenol CRS samples
   c. Erichlich Publication
   d. Hsu Publication
   e. MedcoForum Publication
   f. Vitaphenol Skin Care Collection Booklet
   g. Vitaphenol Facial Card
   h. Vitaphenol Rack Card
   i. Vitaphenol Rep Detailer
   j. Vitaphenol Rep Introductory Letter



**Exhibit VI**
**Product inventory located at Harmony Labs**

Avidas inventory items at Harmony Labs, Inc.

| Item | Item Description | Lot | Cost |
|---|---|---|---|
| | | | |
| | **Bulk Cost** | | |
| B01137 | Ultra Gentle Cleanser | 153700 | 1,657.98 |
| B01137 | Ultra Gentle Cleanser | 153600 | 1,629.87 |
| B01154 | Advanced Fortified | 154000 | 1,330.31 |
| B03922 | Green Tea Serum | 153800 | 653.15 |
| B04768 | Rejuvenating Toner | 153300 | 410.16 |
| B01147 | Daily Defense Cream | 150500 | 953.52 |
| Total | | | 6,634.99 |
| | | | |
| | **Finished or Filled Goods** | | |
| | Anti-Aging Toner Finished Goods: 1,400 units | 153400 | 0.00 |
| | Sheer Moisturizer Filled Goods: 3,354 units | 313200 | 0.00 |
| Total | | | 0.00 |
| | | | |
| | **Packaging Costs** | | |
| U131900 | 120ml Anti-Aging Toner Unit Carton | 00002426 | 367.53 |
| U130300 | 100ml Ultra Gentle Daily Cleanser Unit Carton | 00002427 | 656.82 |
| PB1311BA | 30ml Green Tea Cream unit carton | P07B124 | 1,289.46 |
| PB1312CA | 30ml Green Tea Serum unit carton | P07B127 | 1,327.95 |
| D131900 | 120ml Anti-Aging Toner Screened Cylinder | 00003105 | 11,868.77 |
| D131100 | 50ml Daily Defense Cream Screened Plastic Bottle | 00003103 | 5,562.00 |
| D131500 | 50ml Sheer Moisturizer Screened Plastic Bottle | 00003102 | 1,786.51 |
| D131200 | 30ml Anti-Aging Serum Screened Plastic Bottle | 00003097 | 6,480.00 |
| D130300 | 100ml Ultra Gentle Daily Cleanser Screened Bottle | 00003104 | 5,797.00 |
| PS1312CA | New version is D131200; Old 30ml Anti Aging Serum Bottle | P07B046 | 964.55 |
| PS1311BA | New item version is D131100; Old Daily Defense Cream Bottle | P07B049 | 2,122.85 |
| P701303 | overcap for 100ml cylinder | 00003094 | 3,161.20 |
| P701319 | overcap for 120ml cylinder | 00003096 | 5,001.29 |
| P791312 | overcap for 30ml cylinder | 00003100 | 4,212.00 |
| P798991 | Metalized pump for 100ml bottle, shiny silver | 00003093 | 3,507.62 |
| P798992 | Metalized pump for 30ml/50ml pump, shiny silver | 00003099 | 13,780.80 |
| P798318 | Metalized sprayer for 120ml bottle, shiny silver | 00003095 | 6,519.90 |
| P801319 | shipper for 120ml cylinder (x 12) | 00002566 | 394.71 |
| P801312 | shipper for 30ml cylinder (x 12) | 00002574 | 723.63 |
| | Unit Carton Prep and Proof charges | | 1,015.00 |
| Total | | | 76,539.59 |
| | | | |
| | **Product Specific Chemicals** | | |
| C011901 | Cucumber Extract AQ (Tea Serum) | C07A107 | 125.34 |
| C040770 | Honeyquat 50 (Ultra Gentle) | 00002246 | 206.24 |
| C040770 | Honeyquat 50 (Ultra Gentle) | C06L084 | 216.05 |
| C056552 | Arkopal N 090 (Ultra Gentle) | 00003844 | 6.41 |
| C060040 | Carbowax PEG-400 Sentry NF (Fortified/Sheer) | C06L102 | 247.20 |
| C101690 | Brookosome TRF (Fortified) | 00002539 | 224.73 |
| C101790 | Aromaphyte of Grapefruit Peel PG (Toner, Ultra,Sheer, Rej) | 00002520 | 265.50 |
| C103970 | Actiphyte of Yucca GL (Fortified) | 00002623 | 187.99 |
| C104320 | Vitaphenol Blend -Botanique Tea Blend W (All) | 00002601 | 493.72 |
| C503710 | Bell Flavor Oil Blend 6500055 (Serum/Cream) | 00002348 | 744.63 |
| C503710 | Bell Flavor Oil Blend 6500055 (Serum/Cream) | C06L082 | 0.00 |
| C503720 | Bell Lavender Orange Oil (Sheer/Advanced) | C06L083 | 121.65 |
| Total | | | 2,839.46 |
| | | | |
| | | | |
| **Total Amounts** | | | 86,014.04 |

