UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA JOLLA SPA MD, INC., | Case No.: 17-CV-1124-MMA(WVG) |
| Plaintiff, | |
| | **ORDER GRANTING PLAINTIFF'S MOTION FOR SANCTIONS** |
| v. | |
| AVIDAS PHARMACEUTICALS, LLC, | **[Doc. No. 93.]** |
| Defendant. | |

Incivility is a scourge upon the once-venerable legal profession and has unfortunately become increasingly more rampant in the profession in recent years. *See generally Lasalle v. Vogel*, 36 Cal. App. 5th 127 (Cal. Ct. App. 2019) (lamenting the state of the modern legal profession and discussing its degradation through the years). In today's combative, battle-minded society, the lay perception of a "good" attorney is someone who engages in the obstreperous, scorched-earth tactics seen on television and makes litigation for the opposing side as painful as possible at every turn. However, outside the fictional absurdities of television drama, attorneys in the real world—presumably educated in the law and presumably committed to upholding the honor of the profession–should know and behave much more honorably.

1

When unchecked, incivility further erodes the fabric of the legal profession. Judges rightfully expect and demand more of officers of the court, and rules exist to ensure that lack of civility does not hinder litigation and does not go unpunished. Thus, Courts are equipped to address incivility under appropriate circumstances. This case sadly presents the Court with such an opportunity—to address the atrociously uncivil and unprofessional conduct of an attorney whose behavior wantonly and unnecessarily multiplied proceedings and aggressively harassed opposing counsel far beyond any sensible measure of what could be considered reasonably zealous advocacy for a client. Such behavior before this Court will not be chalked up to being simply "just part of the game." As explained below, this Court GRANTS Plaintiff's motion for sanctions in the amount of $28,502.03.

## I.    BACKGROUND

Once the parties finally settled upon their current counsel earlier this year after a total of five sets of attorneys between them, the stage was set for the sanctions motion now pending before the Court. On January 9, 2019, the Court held a second Case Management Conference in which defense counsel Julie Chovanes participated the day after the Court approved her request to appear pro hac vice. (Doc. Nos. 52-53; 55 (Transcript of CMC).) Although the Court had allowed prior counsel to conduct discovery, they apparently had failed to take much discovery, and new Plaintiff's counsel, James Ryan, requested additional time to do so. Accordingly, this Court granted Plaintiff's motion to amend the original Scheduling Order and allowed the parties to take fact discovery until April 8, 2019 and take expert discovery until June 17, 2019. (Doc. No. 54 ¶ 7.)

A short few weeks later, the parties called this Court to mediate a discovery dispute. (Doc. Nos. 57-60.) However, the disputes did not end there, and the Court held additional discovery conferences on February 26, 2019 (Doc. Nos. 67-68); March 22, 2019 (Doc. Nos. 74-75);[1] April 1, 2019 (Doc. Nos. 78-80); April 10, 2019 (Doc. Nos. 81-82); May 3,

---

[1] This discovery conference resulted in extension of the fact and expert discovery deadlines to April 23, 2019 and June 17, 2019, respectively. (Doc. No. 76 ¶ 7.)

2019 (Doc. No. 88); and May 10, 2019 (Doc. No. 89). In all, this Court held seven discovery conferences in a short four-month period.

As a result of these numerous disputes, the Court spent hours on teleconferences with Chovanes and Ryan, hearing arguments, and generally observing the demeanor and tenor of both attorneys. Because the Court was able to observe the attorneys' behavior on these conferences, the Court can now confirm that both of their demeanors and behavior during the deposition at the heart of the pending sanctions motion was consistent with how they conducted themselves during the discovery conferences. The Court observed Plaintiff's attorney Ryan as consistently even-keeled and respectful—though at times frustrated—as he argued in favor of his client. He did not raise his voice, engage in any attacks against the other side or opposing counsel, and dispassionately argued his positions. Defense counsel Chovanes, however, displayed a wholly different demeanor. The Court witnessed Chovanes repeatedly raise her voice at Ryan and even the Court, continuously interrupt Ryan and this Court, and characterize Plaintiff's case as a "garbage case" on multiple occasions. Outside the presence of this Court, Chovanes repeatedly failed to meet and confer about discovery disputes, often stating she would respond at a later date but then failing to respond despite multiple efforts to follow up by Ryan. At times, Chovanes also simply ignored Ryan's meet and confer communications. Chovanes's general demeanor during teleconferences with the Court was consistently flippant, overly-aggressive, truculent, and quick to confrontation.

One aspect of the fact discovery process that led to a dispute was the deposition of Margaret Gardner, the founder and designated Rule 30(b)(6) witness for Defendant. Leading up to Gardner's deposition and the May 10, 2019 Mandatory Settlement Conference, Defendant sought to limit her deposition due to her health concerns. After receiving a physician's note, the Court ordered that the deposition take place in Philadelphia for seven hours and that it proceed in two-hour increments with 30-minute breaks. (Doc. No. 82.) Also at that discovery conference on April 10, 2019, Chovanes indicated she wished to seek a protective order to limit the scope and length of Gardner's

deposition given Chovanes's belief that the deposition should not take "more than a few hours." The Court provided Chovanes the opportunity to file a motion for a protective order and set an April 15, 2019 deadline to do so. (Doc. No. 82 ¶ 2.) However, although Chovanes referenced filing a motion for a protective order several times, the motion was never filed and so a protective order never issued.

The deposition of Margaret Gardner took place on May 3, 2019 in Philadelphia, and Chovanes quickly set the tone for the day.[2] As Ryan opened the deposition by providing standard instructions ordinarily given in depositions—such as for Gardner and Ryan to speak in turn to avoid speaking over each other—Chovanes stated: "Objection to that preamble. No need to lecture my client." (Doc. No. 93-6 at 11.)[3] When Ryan shortly thereafter benignly advised Gardner that he would clarify any questions that she did not understand if she so requested, Chovanes stated: "Objection to the lecture." (*Id.* at 12.) And so began a protracted day of Ryan attempting to take Gardner's deposition while Chovanes continuously interrupted, lodged frivolous objections, improperly instructed Gardner to not answer questions, and extensively argued with Ryan. Chovanes's continuous, relentless interrupting Ryan's questioning also included an outburst by

---

[2] The only restrictions the Court had placed on the deposition was that it be taken over the course of one day, in two-hour blocks, with 30-minute breaks, and for seven hours, exclusive of breaks. Because Defendant did not seek a protective order despite the opportunity the Court had provided, there were no substantive restrictions on the deposition aside from the standard restrictions applicable to all depositions.

[3] Unless otherwise noted, all citations to documents filed on the CM/ECF docket refer to the electronic page numbers generated by the CM/ECF system, not to the document's original pagination. However, citations to the Gardner deposition transcript refer to the transcript's original page numbers.

Chovanes, where she and Gardner left the room after Chovanes falsely and bizarrely accused Ryan of threatening Gardner.[4]

Approximately two hours into the deposition, the parties successfully contacted this Court for a discovery conference regarding Chovanes's objections and instructions to Gardner. (Doc. No. 93-6 at 120:7-128:7.) Up to that point, Chovanes had repeatedly objected to Ryan's questions on relevance grounds, objected that his questions exceeded the scope of the Rule 30(b)(6) deposition notice, and objected that some of the questions were outside the scope of discovery. Based on these objections, Chovanes had repeatedly instructed Gardner to not answer Ryan's questions. The Court instructed the parties to continue the deposition, preserve objections, and told the parties that objections based on scope and relevance were not proper bases to instruct Gardner to not answer questions. The deposition thus continued, and the parties did not contact the Court again that day.

After the discovery conference with the Court, Chovanes stopped instructing Gardner to not answer questions but continued to interrupt and make objections of various kinds. She also continued to relentlessly argue with Ryan, constantly trying to hurry up his questioning, making frivolous objections, making objections that made no sense in the context of a deposition, and instructing Ryan how he should ask questions and conduct the deposition.

The deposition was recorded by a videographer and a stenographer. As part of its sanctions motion, Plaintiff submitted video clips and the entire transcript of the deposition. Plaintiff divided the interruptions into six categories and provided 128 video clips encompassing 133 examples of behavior that Plaintiff contends cumulatively warrant

---

[4] The cold typewritten words of the deposition transcript fail to do justice to the truly hostile environment Chovanes created at the deposition. To be sure, the transcript conveys great tension and hostility, but the video shows the true story. The Court has reviewed each of the 128 video clips Plaintiff submitted in support of its sanctions motion. Chovanes's aggressive, argumentative, accusatory, and hostile tone of voice greatly amplified the thick tension and hostile atmosphere of the room even beyond what the transcript conveys.

5

sanctions.[5] (Doc. No. 93-2.) Defendant filed an opposition to the sanctions motion, but despite the opportunity, provided no video clips in rebuttal.

After the deposition, Ryan sought and was granted leave to file a motion for sanctions after his attempts to meet and confer with Chovanes about sanctions failed. Ryan now seeks $28,502.03 in sanctions pursuant to Federal Rule of Civil Procedure 30(d)(2), 28 U.S.C. § 1927, and the court's inherent power to sanction.

In response, Defendant contends sanctions are not warranted because Ryan was able to ask questions and concluded the deposition by confirming he had no further questions. Defendant argues Chovanes's conduct did not result in prejudice to Plaintiff. Continuing Chovanes's personal attacks on Ryan at the deposition, Defendant's opposition papers contend that Ryan was unprepared near the end of the deposition because of the pauses between his questions, he was "wasting time," and contends it was proper for Chovanes to note these things for the record to protect Gardner from "further abuse." (Doc. No. 94 at 4-5.) With respect to the amount of sanctions Plaintiff seeks, Defendant does not address any specific components of the sanctions amount, instead asserting that there's a lack of documentary evidence to support the entire amount. Defendant also notes a discrepancy with respect to the date on which Ryan travelled to Philadelphia, though there is no dispute that he did in fact travel there for the deposition.

The Court held a hearing on the sanctions motion on August 16, 2019 and heard argument from Chovanes and Ryan. Chovanes continued to deny any impropriety, did not present any new evidence, and did not challenge any specific monetary component of the amount of sanctions Plaintiff seeks. She did not defend her conduct. She did not show any

---

[5] Because the Court's imposition of sanctions will necessarily require discussion of the specific conduct and findings thereon, the specifics of these 133 examples—and other examples the Court found in the transcript—will be set forth in greater detail in Part III below. In addition to these 128 clips, the full deposition transcript evidences other instances of Chovanes's unjustified obstructive, cantankerous behavior.

remorse. And she again characterized Plaintiff's case a "garbage case." This Order follows.

## II.   LEGAL STANDARD

### A.   Sanctions Under Federal Rule of Civil Procedure 30(d)(2)

Under Rule 30(d)(2), a court may "impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." Rule 30's advisory committee notes make clear that the sanction may be imposed on parties and attorneys alike. District courts within the Ninth Circuit have held that Rule 30(d)(2) sanctions do not require a finding of bad faith. *See, e.g.*, *BNSF Ry. Co. v. San Joaquin Valley R.R. Co.*, No. 08CV1086-AWI-SMS, 2009 U.S. Dist. LEXIS 111569, at *9 (E.D. Cal. Nov. 17, 2009); *Robinson v. Chefs' Warehouse*, No. 15CV5421-RS(KAW), 2017 U.S. Dist. LEXIS 40824, at *7 (N.D. Cal. Mar. 21, 2017), on reconsideration, 2017 U.S. Dist. LEXIS 93339 (N.D. Cal. June 16, 2017).

### B.   Sanctions Under 28 U.S.C. § 1927

Under 28 U.S.C. § 1927, any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Section 1927 thus provides the Court the authority "to hold attorneys personally liable for excessive costs for unreasonably multiplying proceedings." *Gadda v. Ashcroft*, 377 F.3d 934, 943 n.4 (9th Cir. 2004).

Section 1927 indicates that actions that multiply the proceedings must be both unreasonable and vexatious, and the Ninth Circuit has also stated that recklessness alone will not suffice; what is required is recklessness plus something more—for example, knowledge, intent to harass, or frivolousness. *See Thomas v. Girardi*, 611 F.3d 1027, 1061 (9th Cir. 2010) (reckless plus intentionally misleading); *Lahiri v. Universal Music & Video Distrib. Corp.*, 606 F.3d 1216, 1221-22 (9th Cir. 2010) (cumulative acts over five years evidenced a pattern of recklessness and bad faith warranting sanctions); *B.K.B. v. Maui*

*Police Dep't*, 276 F.3d 1091, 1107 (9th Cir. 2002) (recklessness plus knowledge); *Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir. 2001) (recklessness plus frivolousness, harassment, or improper purpose). "Tactics undertaken with the intent to increase expenses, or delay, may also support a finding of bad faith." *New Alaska Dev. Corp. v. Guetschow*, 869 F.2d 1298, 1306 (9th Cir. 1989) (internal citations omitted). Indeed, "[e]ven if an attorney's arguments are meritorious, his conduct may be sanctionable if in bad faith." *Id.* (citation omitted).

## C.    "Inherent Powers" Sanctions

The Supreme Court in *Roadway Express, Inc. v. Piper*, 447 U.S. 752 (1980), delivered the definitive summary of the bases on which a federal court may levy sanctions under its inherent power. The Court confirmed that federal courts have the inherent power to levy sanctions, including attorneys' fees, for "willful disobedience of a court order . . . or when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . ." 447 U.S. at 766 (internal quotation marks and citations omitted). The Court also noted that a court "certainly may assess [sanctions] against counsel who willfully abuse judicial processes." *Id.* The Court later reaffirmed the *Roadway* principles in *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), emphasizing the continuing need for resort to the court's inherent power because it is "both broader and narrower than other means of imposing sanctions." 501 U.S. at 46. On the one hand, the inherent power "extends to a full range of litigation abuses." *Id.* On the other, the litigant must have "engaged in bad faith or willful disobedience of a court's order." *Id.* at 46-47. In *Chambers*, the Supreme Court left no question that a court may levy fee-based sanctions when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, delaying or disrupting litigation, or has taken actions in the litigation for an improper purpose. *Id.* at 45-46 & n.10.

As is relevant here, "[b]efore awarding sanctions under its inherent powers . . . the court must make an explicit finding that counsel's conduct constituted or was tantamount to bad faith." *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997)

(internal quotations and citation omitted). The Ninth Circuit has extensively explained what constitutes bad faith in the context of "inherent powers" sanctioning authority:

> Under both *Roadway* and *Chambers*, . . . the district court has the inherent authority to impose sanctions for bad faith, which includes a broad range of willful improper conduct. For example, in *In re Itel Sec. Litig. v. Itel*, 791 F.2d 672 (9th Cir. 1986), counsel filed objections to exact fee concessions in an action pending before another court. The objections were not frivolous, nor were they submitted with any knowledge that they were meritless. But counsel's goal was to gain an advantage in the other case, which we concluded was "sufficient to support a finding of bad faith." *Id.* at 675. "For purposes of imposing sanctions under the inherent power of the court, a finding of bad faith 'does not require that the legal and factual basis for the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy, or mala fides, the assertion of a colorable claim will not bar the assessment of attorney's fees.'" *Id.* (quoting *Lipsig v. Nat'l Student Mktg. Corp.*, 663 F.2d 178, 182 (D.C. Cir. 1980) (per curiam)).

> *Itel* teaches that sanctions are justified when a party acts for an improper purpose -- even if the act consists of making a truthful statement or a non-frivolous argument or objection. In *Itel*, the improper purpose was the attempt to gain tactical advantage in another case. 791 F.2d at 675 (discussing improper motivation). This approach is in harmony with *Roadway*, where the Supreme Court made clear that courts possess inherent power to impose sanctions for "willful abuse of judicial processes." 447 U.S. at 766.

> In reviewing sanctions under the court's inherent power, our cases have consistently focused on bad faith. For example, in *United States v. Stoneberger*, 805 F.2d 1391 (9th Cir. 1986), the district court imposed sanctions on a chronically late attorney. Reversing the imposition of sanctions, we held that mere tardiness does not demonstrate the improper purpose or intent required for inherent power sanctions. *Id.* at 1393. Rather, "[a] specific finding of bad faith . . . must 'precede any sanction under the court's inherent powers.'" *Id.* (quoting *Roadway*, 447 U.S. at 767).

> We again reversed sanctions due to a lack of intent in *Zambrano v. City of Tustin*, 885 F.2d 1473 (9th Cir. 1989). In that case, the plaintiff's counsel negligently failed to comply with local court rules that required admission to the district court bar. We vacated the sanctions, holding that the district court may not sanction mere "inadvertent" conduct. *Id.* at 1485; *see also id.* at 1483 ("Nothing in the record indicates that their failure to request admission to the

district bar was anything more than an oversight or ordinary negligence on their part."); *id.* at 1484 ("Willful or reckless disregard of court rules justifies punitive action."). Similarly, in *Yagman v. Republic Ins.*, 987 F.2d 622, 628 (9th Cir. 1993), we vacated the imposition of sanctions where there was no evidence that the attorney had "acted in bad faith or intended to mislead the court."

*Fink v. Gomez*, 239 F.3d 989, 992-94 (9th Cir. 2001).

## III. DISCUSSION

The Court first sets forth Chovanes's specific unprofessional, obstructive, harassing, frivolous, and willful conduct. The Court thereafter concludes Chovanes acted in bad faith and that sanctions are warranted based on the totality of her conduct.

**A. Chovanes's Conduct**

**1. Instances of Chovanes Instructing Gardner to Not Answer Based on Impermissible Grounds**

Under Rule 30, an attorney may instruct a client not to answer "only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)" to terminate or limit the deposition on grounds of bad faith, oppression, and the like. Fed. R. Civ. P. 30(c)(2), (d)(3). If none of the enumerated objection grounds exists, the objection may be noted on the record, "but the examination still proceeds; the testimony is taken subject to any objection." *Id.* at 30(c)(2).

1. As Plaintiff argues, on at least approximately 39 occasions, Chovanes did not adhere to Rule 30's limits on instructing a deponent to not answer or adhere to its procedures for addressing possible bad faith questioning. Instead, Chovanes cited impermissible grounds and did not allow Gardner to answer various basic questions despite preserving the objections on the record. The vast majority of these instances occurred before the parties' discovery conference with this Court and included instances where no reasonable attorney would object or instruct a witness to not answer a question. For example, Chovanes instructed Gardner to not answer the following benign foundational questions that any competent attorney would ask in the early stages of a deposition:

- Are you an officer of Avidas Pharmaceuticals?  (Doc. No. 93-6 at 14:14-17.)

- Are you a member of Avidas Pharmaceuticals?  (*Id.* at 14:19-22.)

- Are you a managing member of Avidas?  (*Id.* at 15:7-8.)

- When was Avidas Pharmaceuticals formed?  (*Id.* at 18:9-11.)

- Are there any current employees of Avidas Pharmaceuticals?  (*Id.* at 29:2-5.)

- Where has Avidas been located since 2008?  (*Id.* at 29:7-9.)

- Is Dan McCall a member of Avidas Pharmaceuticals, LLC?  (*Id.* at 29:16-30:3.)

- Is Michael Warne . . . a member of Avidas Pharmaceuticals, LLC?  (*Id.* at 30:5-8.)

2.    In addition to these simple background questions, Chovanes instructed Gardner to not answer several questions based on her erroneous assertion that they were beyond the scope of the Rule 30(b)(6) deposition notice and thus not subject to proper questioning.  At the beginning of the deposition, Chovanes demanded that Ryan produce the deposition notice and proclaimed that deposition questioning would be limited to the topics in the notice.  (Doc. No. 93-6 at 13:5-8 ("I would suggest . . . you get the 30(b)(6) notice out, because you're not going to be able to go anywhere beyond that."); 14:2-4 ("But right now let's stick to the 30(b)(6) notice.  Okay?  Otherwise, you're not going to be getting answers."))   Chovanes even ludicrously contended Ryan could not ask basic foundational background questions because the deposition notice did not include such a category:

What -- there's nothing on . . . your 30(b)(6) notice, that says "foundational information."
So you're beyond the scope of the 30(b)(6) notice too.  So that makes no sense, foundational information.  You're just making that up, sir.
Let's proceed to what's on the 30(b)(6) notice, which is why we're here.

17-CV-1124-MMA(WVG)

(*Id.* at 23:24-24:7.)  The deposition transcript contains several other instances where Gardner was instructed to not answer based on "scope" objections, all of which were based on Chovanes's contention that any question not specifically tethered to one of the categories in the deposition notice was beyond the scope of the notice and thus beyond the scope of the deposition.  (*See, e.g.*, *id.* at 28:5-10 (question about how to spell a product Gardner had mentioned in testimony); 31:3-8 (question about other products Defendant may have sold); 46:22-48:15 (Chovanes attempting to prevent questions related to inventory topic that *was* listed in the deposition notice); 51:14-22.)

Chovanes's objections here were baseless, of course, because Rule 30(b)(6) deposition notices *do not* limit the examiner to the topics listed in the notice.  Although a party noticing a deposition pursuant to Rule 30(b)(6) "must describe with reasonable particularity the matters on which the examination is requested, . . . the 'reasonable particularity' requirement of Rule 30(b)(6) *cannot be used to limit what is asked of the designated witness at a deposition*."  *ChriMar Systems Inc. v. Cisco Systems Inc.*, 312 F.R.D. 560, 563 (N.D. Cal. 2016) (emphasis added); *see also Moriarty v. Am. Gen. Life. Ins. Co.*, No. 17CV1709-BTM(WVG), 2019 US. Dist. LEXIS 62041, at *8 (S.D. Cal. Apr. 10, 2019) (Gallo, J.).  "The 30(b)(6) notice *establishes the minimum* about which the witness must be prepared to testify, *not the maximum*."  *ChriMar Systems Inc.*, 312 F.R.D. at 563 (emphasis added); *see also see also Moriarty*, 2019 US. Dist. LEXIS 62041, at *8.  Thus, deposition notice categories are simply the basic informational categories that a corporate representative should familiarize herself with to competently answer questions on behalf of the entity—they do not serve as handcuffs to limit the examiner from asking, for example, basic foundational questions about the deponent or the entity itself.

Accordingly, Chovanes's unrelenting attempts to limit Ryan to the categories specified in the deposition notice were untethered to any legal authority or principle and were utterly baseless.  Chovanes then compounded the error by instructing Gardner to not answer questions because, as explained below, "scope of deposition notice" is not a proper basis upon which a deponent can be instructed to not answer.

3.     Chovanes also instructed Gardner to not answer various questions based on relevance grounds.  (*See, e.g.*, Doc. No. 93-6 at 31:3-8; 45:10-20; 50:6-51:1; 53:13-22; 53:24-54:4; 60:4-61:8; 68:18-69:12; 73:8-12; 75:22-76:2; 78:11-15; 118:10-120:1.)   A sub-set of Chovanes's relevance-based objections were based on Chovanes's incorrect assertion that this Court had limited the scope of *all* discovery to matters after May 2014.  Chovanes's reference to the May 2014 "cutoff" was related to an Order this Court issued on February 8, 2019 following a discovery conference regarding disputed written discovery responses.  (*See* Doc. No. 60.)  Although the language of that Order seemed to limit all discovery to the time period after May 2014, the Court later issued a second written Order, clarifying that the first Order was limited to the written discovery at issue in that dispute— not discovery in general.  (*See* Doc. No. 73.)  At the deposition, Ryan was prepared, had a copy of the clarifying Order in hand, and he read the relevant portions to Chovanes.  (Doc. No. 93-6 at 21:8-23.)  Chovanes then shifted tactics, stating she recalled this Court orally limiting discovery to events after May 2014 during a telephonic discovery conference— but she could not identify when that occurred.  (*Id.* at 21:25-22:11.)

This Court has never limited the scope of all discovery as Chovanes asserted.  However, this did not deter her from repeatedly instructing Gardner to not answer questions based on this erroneous reasoning—even after Ryan had read her the clarifying Order.  (*See, e.g.*, *id.* at 45:16-20 ("Objection.  Why is it relevant?  This is dated '08 and we're talking about '14 and beyond.  Objection.  Don't answer that question.  Move ahead."); 45:22-46:1 ("You can answer with regard to anything after May of 2014."); 46:15-18 ("You disagree with it, but she's not going to answer anything before May of 2014.  [I]t's beyond the scope and it's not within the judge's order."); 52:13-17; 60:4-61:8 (Chovanes "foreclosing" questioning); 68:10-69:12 (question about other persons who may have maintained records related to the subject product); 70:15-18 ("I want to get to areas the Court said we should get to, not to areas that are irrelevant and before May of 2014."))

Even if the above objections were factually accurate, Chovanes's instructions to not answer the questions based on relevance grounds nonetheless would have run afoul of basic

17-CV-1124-MMA(WVG)

principles of objecting during depositions. The plain and simple language of Rule 30 makes clear that

> [a]n objection at the time of the examination—whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to any other aspect of the deposition—must be noted on the record, *but the examination still proceeds*; the testimony is taken subject to any objection. . . . *A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3).*

Fed. R. Civ. P. 30(c)(2); *see also Brincko v. Rio Properties, Inc.*, 278 F.R.D. 576, 581 (D. Nev. 2011) ("The remedy for oppressive, annoying and improper deposition questioning is not simply to instruct a witness not to answer."); *Detoy v. City & Cnty. of San Francisco*, 196 F.R.D. 262, 365 (N.D. Cal. 2000) ("As a rule, instructions not to answer questions at a deposition are improper."); Rutter Group Prac. Guide Fed. Civ. Pro. Before Trial Ch. 11(IV)-A § 11:1565 ("Rule 30(c)(2) renders 'relevancy' objections meaningless in most depositions. The deponent must even answer questions calling for blatantly irrelevant information 'subject to the objection.'"). Although Chovanes at times instructed Gardner to not answer based on privilege, the *vast* majority of Chovanes's instructions to Gardner did not fall within the Rule's enumerated bases and violated this exceedingly simple rule.

    4.    Although the above categories constituted the bulk of the inappropriate objections and instructions to not answer, there are other violative examples sprinkled in the transcript:

- MS. CHOVANES: Well, don't answer that question. "Required to follow" is not a legal question – I mean, it's asking for your opinion, and that's not what we're here for. (Doc. No. 93-6 at 117:25-118:2.)

- Q. Can you generally describe what those agreements were.

  MS. CHOVANES: Objection. No don't answer that question. That's a ridiculous question. What do you mean by "generally describe." That's dangerous. I'm not going to let her answer that. Rephrase. There are titles right here so why don't you just ask her that. Why are you wasting our time? (*Id.* at 33:10-19.)

- Q. And generally speaking -- and I know you're not a lawyer. Generally speaking, what is your understanding as to what the know-how agreement provides?

  MS. CHOVANES: Objection. I'm not going to let you answer that question. If you want to point her to specific areas and ask her questions about facts, but that comes too close to opinion testimony so we're not going to answer. (*Id.* at 37:17-28:1.)

- Q. Exhibit 1 reflects a number of units of inventory of Vitaphenol products. Did Avidas confirm that it received each of those units of inventory that is stated on Exhibit 52 of Exhibit 1?

  MS. CHOVANES: Objection to the question. It's not understandable. It also misstates the document itself. So I'm not going to let you answer the question because it's not an accurate reflection of what's in the document. You can't make up stuff about the documents and ask the witness to testify. Go from the document itself. (*Id.* at 44:13-45:1.)

- Q. Where were those records located?
  A. In the Doylestown office.

  Q. Did the Vitaphenol records that were maintained in the Doylestown office, were they transferred to your home office at some point?

  MS. CHOVANES: Objection; inference. I'm not going to let her answer that question because it's leading and it implies facts that aren't in evidence. (*Id.* at 79:4-12.)

- Q. Do you know whether all of the records that Avidas maintained relating to Vitaphenol products were retained?

  MS. CHOVANES: Objection. Don't answer that question.
  MR. RYAN: On what grounds?

  MS. CHOVANES: It makes no sense; and I'm not going to get into these areas without a specific question making sense. (*Id.* at 84:19-85:2.)

In addition to at times being nonsensical, none of these refusals to allow Gardner to answer complied with Rule 30(c)(2).

In sum, the transcript contains at least 39 instances where Chovanes violated Rule 30(c)(2) by instructing Gardner to not answer questions based on improper grounds.

**2.** **Instances Where Chovanes Disruptively Instructed Ryan On How to Pose Questions to Gardner**

In addition to the above, there can be no question that Chovanes deliberately frustrated, delayed, and impeded Gardner's deposition in other ways. Under Rule 30(c)(2), an objection "must be made concisely in a nonargumentative . . . manner." However, Chovanes repeatedly violated this rule by making objections that were an attempt to instruct Ryan how to pose questions and disrupted the flow of the deposition. In many instances, Chovanes's objections were verbose, argumentative, accusatory, and anything but concise—all in violation of Rule 30(c)(2). Chovanes routinely engaged in speaking objections and then extensively argued with Ryan when he attempted to clarify or meet and confer about the objections. The following are representative examples from the 39 instances of this conduct identified by Plaintiff:

- Q.  Are you an employee of Avidas Pharmaceuticals?
  A.  I am the founder.

  MS. CHOVANES:  Objection; irrelevant.  Why don't you identify why the witness is here first.  Okay?  She's here pursuant to the 30(b)(6) notice that you issued.  I think it's usually presentable to the witness at this point.  Whether or not she's an employee or not is irrelevant; right?  (Doc. No. 93-6 at 11:20-12:5.)

- Q.  And you mentioned that Avidas Pharmaceuticals was -- began operations in around 2008.  At the time that Avidas Pharmaceuticals began operations, was Vitaphenol the first product that it sold?
  . . . .
  MS. CHOVANES:  Objection.  That question is in two parts, and I object to your saying that the witness mentioned anything.  No need for a preamble.  Let's just ask a nice clean question.  Please restate the question.  (*Id.* at 31:13-32:2.)

- Q.  So Exhibit 51 is one of the agreements that Avidas Pharmaceuticals entered into with La Jolla Spa MD; is that correct?

17-CV-1124-MMA(WVG)

MS. CHOVANES: Objection. Don't ask questions so they lead, please. You may answer. (*Id.* at 37:7-12.)[6]

- Q. Did Avidas have Harmony manufacture new Vitaphenol anti-aging toner?
  A. Yes.

MS. CHOVANES: You know what? While there's no question, I'm going to ask you to speed this up and say: Are there any products on that list that they did not manufacture? Can we do it quicker?

MR. RYAN: No.
MS. CHOVANES: Why not, Counsel?
MR. RYAN: But I think it's important that we go through each one.

MS. CHOVANES: Yeah, I know you think it's important to waste our time, but we're trying to get out of here and with concern – out of courtesy for everyone's time. (*Id.* at 58:9-24.)

- Q. Where were those records located?
  A. In the Doylestown office.

  Q. Did the Vitaphenol records that were maintained in the Doylestown office, were they transferred to your home office at some point?

MS. CHOVANES: . . . . Just ask her simple questions. It's not that complicated.
MR. RYAN: It's a simple question.
MS. CHOVANES: No, it's not.[7]  (*Id.* at 79:4-16.)

- Q. Do you believe that your file folder that contains emails relating to Vitaphenol contains all of the emails that were sent or received relating to Vitaphenol from 2008 to the present?

---

[6] As an initial matter, this was not a leading question. The question sought confirmation or denial of the nature of the document Ryan referenced. But in any event, of course Ryan was allowed to ask leading question of Gardner, who was a witness identified with an adverse party. Fed. R. Evid. 611(c)(2). This objection and admonition was frivolous, unnecessary, and another example of the frivolous and incessant haranguing Ryan endured throughout the deposition. (*See also* Doc. No. 93-6 at 79:11-12; 103:12-13.)

[7] In fact, Ryan's question *was* exceeding simple.

17-CV-1124-MMA(WVG)

MS. CHOVANES:  Objection to the question; it's irrelevant, the use of the word "believe."  Do you want to rephrase the question, please?  I mean, you're obviously hunting to pin her down for destroying documents, and I think it's unfair.  So ask a good question.  (*Id.* at 88:24-89:9.)

- Q.  In connection with this agreement, Avidas sold its inventory of Vitaphenol products to SciDerma; is that correct?

MS. CHOVANES:  . . . .  Can you do that?  Can you ask just open-ended questions -- was inventory transferred? -- and then maybe we can get into it that way.

MR. RYAN:  Well, I don't think I'm required to only ask open-ended questions.

MS. CHOVANES:  Well, I understand.  You can ask them how you -- but my objection is with regard to the word "sold," which as you recall we already went through on an extensive go-around already with regard to paper discovery.  I mean, I would just ask the witness -- you're pulling teeth.  Why don't you just ask her what happened as a result of the agreement and see what happens.  Maybe you'll get the statement you want.  (*Id.* at 103:7-104:6)

- Q.  Does SciDerma still owe Avidas some money in connection with the Harmony product inventory that was transferred to it?

MS. CHOVANES:  To the extent SciDerma is a company, that's an interesting question.  I don't know if they're still in business.  So why don't you ask within the scope of if the client knows they're -- if the witness even knows they're a company.

MR. RYAN:  Well, I just want to know whether Avidas believes that SciDerma still owes money in connection with the Harmony product.

MS. CHOVANES:  Avidas' belief is not relevant to this case, and she's not going to testify with regard to a legal matter.  (*Id.* at 109:21-110:11.)

- Q.  With respect to the inventory values that we see on Exhibit Roman numeral IV, do you know who came up with those values for the inventory?

MS. CHOVANES:  Objection to the question.  I don't know what "come up with" means," and I'd ask you to clarify and be precise with regard to your question.  (*Id.* at 113:7-13.)

17-CV-1124-MMA(WVG)

- Q. The packaging that we see on the left side of Exhibit 58 that's similar to the packaging we see in Exhibit 57. Do you see that?

  MS. CHOVANES: Objection to your statement about similarity. Ask a question. Don't editorialize. (*Id.* at 160:3-9.)

- Q. And that would be true for the entire period of time that SciDerma sold the Vitaphenol products: Information would come in various forms.

  MS. CHOVANES: . . . . . Objection. Can you ask a question that makes sense, because that one doesn't. It's got too many parts. (*Id.* at 196:15-23.)

- Q. This report on Bates-stamped Page 1042 in the upper left-hand corner says "November and December sales." So is it your belief that these are November and December sales from the year 2010?

  MS. CHOVANES: You're not entitled to her belief. Ask a question that seeks relevant information.

  MR. RYAN: I disagree.

  MS. CHOVANES: You're not entitled to her belief. That's an opinion. You're entitled to facts. Ask a simple question. I don't know why you mess them up by putting "belief" in. That calls for opinion testimony on its face.

  MR. RYAN: I'm entitled to her opinion based on her foundation so far.

  MS. CHOVANES: No, you're not entitled to her opinion. We'll go to the judge on that. You're not entitled to a person's opinion. They're a fact witness. So ask the question if you want. Again, I'll make the same objection. (*Id.* at 202:21-203:18.)[8]

---

[8] Of Course, lay witnesses—like Gardner was—may provide opinion testimony if the opinion is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. In any event, even if Gardner's testimony eventually would not be admissible at trial, Rule 30(c)(2) nonetheless did not allow Chovanes to instruct Gardner to not answer or to completely preclude questions that called for opinion testimony. The testimony should have proceeded subject to the objection. These are basic principles that are not confusing, ambiguous, or subject to differing interpretations.

17-CV-1124-MMA(WVG)

- Q. On May 8th of 2014, you emailed Joe Kuchta, "Joe, this is the draft of the email I will send to Dianne York." Why did you send that email to Joe Kuchta?

  MS. CHOVANES: Objection; there's been no foundation laid for the fact it's an email. Do you want to do that first?

  BY MR. RYAN: Q. Did you send an email to Joe Kuchta on May 8th of 2014 a 7:35 a.m.?

  A. Yes.

  MS. CHOVANES: No, that's not the way to do it. Come on, Counsel. (*Id.* at 246:12-25.)

### 3. Instances of Chovanes Initiating or Attempting to Initiate Unnecessary Colloquy

Under Rule 30(d)(2), sanctions may be imposed for impeding, delaying or frustrating the fair examination of the deponent. Chovanes did all of these things by initiating or attempting to initiate unnecessary and frivolous colloquy and unnecessarily "noting" things during the deposition. Plaintiff identifies fifteen instances during which Chovanes initiated or attempted to initiate unnecessary colloquy. These unnecessary interruptions and discussions prolonged the deposition and served to continually harass Ryan. Some examples include:

- Q. Are you an employee of Avidas Pharmaceuticals?

  MS. CHOVANES: Are you going to respond to what I said?[9]

---

[9] Chovanes began the deposition by insisting that Ryan produce the Rule 30(b)(6) deposition notice and enter it into the deposition record. This Court is not aware of any requirement for such a procedure. Nonetheless, Chovanes refused to allow Gardner to answer questions until Ryan produced the notice (Doc. No. 93-6 at 14:16-17; 14:21-22; 15:7-10; 16:8-16) and threatened to terminate the deposition if he did not do so (*id.* at 14:32-15:4). Apparently seeing that he would get nowhere without capitulating to Chovanes's demand, Ryan finally yielded and marked the notice as an exhibit. (*Id.* at 17:7-13.)

MR. RYAN: No, you made your objection.

THE WITNESS: I'm the founder of the company.

MS. CHOVANES: Okay. I would like to know why we're here then, if you're not going to produce a 30(b)(6) notice. Are you going to acknowledge we're here pursuant to that?

MR. RYAN: We are here pursuant to a 30(b)(6) notice.

MS. CHOVANES: And what are the categories of that notice? Do you want to present them? Because as I pointed out to the Court, it's very difficult, given the history of this case and your repeated items -- your repeated arguments that you keep identifying, it's very difficult for us to have this deposition when you should have done this a long time ago.

You have been carefully proscribed by the Court to certain areas of relevance. I would suggest we start with those and, therefore, you get that 30(b)(6) notice out, because you're not going to be able to go anywhere beyond that.

Do you understand?

MR. RYAN: I've listened to your objection. I feel like I'm allowed to ask questions.

MS. CHOVANES: Okay. Well, you're not going to be. Anything beyond the scope of what the Court has ordered is the scope. And we reiterated at our last conference. We're not going to get into -- and don't interrupt me please. Let me finish.

Anything the Court specifically noted at the last conference that the Court's order was in place and the witness is not to answer anything beyond those orders. So we're going to have a continuing objection to anything beyond those and she's not going to answer.

You can either identify those categorically or waste everyone's time by going through those individually. But right now let's stick to the 30(b)(6) notice. Okay? Otherwise, you're not going to be getting answers.

MR. RYAN: Okay. Well, here's what I'm going to do. I'm going to ask questions, and you can make objections. And if you want to instruct the witness not to answer, you have that right.

MS. CHOVANES: Okay. Note that you've refused my offer to speed this up. Go ahead. (Doc. No. 93-6 at 12:7-14:12.)

17-CV-1124-MMA(WVG)

- MR. RYAN: Well, I'm trying to develop foundational information, and this witness has already testified that she's the founder of the defendant in this case. So I'm trying to get some information –[10]

  MS. CHOVANES: What -- there's nothing on here, on your 30(b)(6) notice, that says "foundational information."[11]

  So you're beyond the scope of the 30(b)(6) notice too.[12] So that makes no sense, foundational information. You're just making that up, sir.

  Let's proceed to what's on the 30(b)(6) notice, which is why we're here. (*Id.* at 23:3-24:7.)

- Q. The information that's contained in Exhibit 61, the monthly reports, what's the source information for those reports?

  MS. CHOVANES: I'm going to object. That's an impossible question to answer, because this is a made-up document.

  Go through slowly and ask her the source of individual information to the extent she knows. But to say the source of all this information, if she can answer that summarily, go for it. But I think the question is confusing and unfair. (*Id.* at 192:23-193:9.)

- MR. RYAN: I'm not wasting your time.

  MS. CHOVANES: They're right in the 30(b)(6) notice. In fact, since there's no question outstanding -- is there? Or my objection to it, asking to rephrase. No, no question outstanding?

  I'm going to ask the witness to reread the 30(b)(6). And counsel do the courtesy of rereading the 30(b)(6) with the witness so as not to try to trick her.

---

[10] While she herself demanded she not be interrupted and be allowed to finish statements (*see, e.g.*, Doc. No. 93-6 at 10:5-6; 13:16-18; 151:13-14, 174:16-20), Chovanes repeatedly interrupted Ryan and did not allow him the same courtesy (*see, e.g.*, *id.* at 26:21-22; 27:1-2; 62:9-11; 160:11-14).

[11] Of course basic foundational or background information is plainly a proper area to question a witness.

[12] Chovanes repeatedly pushed this Rule 30(b)(6) deposition notice scope issue, which was neither a valid basis for objecting nor instructing Gardner to not answer questions. The Court addresses this issue of Chovanes's dubious instructions elsewhere in this Order.

17-CV-1124-MMA(WVG)

MR. RYAN:  I don't need to read it.  I wrote it.

MS. CHOVANES:  You need to read it, because you're trying to trick the witness, which I object to.

    So why don't you read it carefully and show her what agreements you're talking about.

MR. RYAN:  I'm not trying to trick the witness.

MS. CHOVANES:  Then why are you asking her questions without any foundation -- tenure to this 30(b)(6) notice?  It just makes no sense.

MR. RYAN:  I'm sorry it doesn't make sense to you.

MS. CHOVANES:  Right --
MR. RYAN:  I'm allowed to ask questions.

MS. CHOVANES:  Right, you are, questions that make sense and are relevant and aren't wasting our time.  And this is a garbage case, and we've known that since the beginning, and you're just wasting our time more.

    Now ask questions that she can answer with regard to the 30(b)(6).  Whether or not she remembers the agreements independently of a 30(b)(6) is meaningless and a waste of our time.  (*Id.* at 33:20-35:7.)

- MR. RYAN:  Well, it's not beyond the scope because the 30(b)(6) notice doesn't have any specific dates in it.

MS. CHOVANES:  Where does it have your statement about inventory?

MR. RYAN:  I'm asking questions about the sales and distribution agreement.

MS. CHOVANES:  Right.  Where is -- no, you're asking about something that was received.  That has nothing to do with this except it's listed in the agreement.  You're not asking about the agreement, sir.

MR. RYAN:  I am.  It's --

MS. CHOVANES:  No, you're asking about inventory, which is totally different and not on your list.

17-CV-1124-MMA(WVG)

MR. RYAN:  It's No. 8 on my list.

MS. CHOVANES:  Inventory of products, not whether they were received from -- whatever.  So your question, again, is not on this, according to your own example.

MR. RYAN:  Well, just so we're clear, a 30(b)(6) notice does not require me to list every question that I'm going to ask of a witness.
    Do you agree with that?

MS. CHOVANES:  I'm not going to talk about 30(b)(6) depositions generally.  I'm talking about this one, and the scope is proscribed -- there's that word again -- by the 30(b)(6) as well the judge's order.[13]  We've been going over this again and again.  Please answer your questions – ask your questions within that scope.  Why are you  surprised?  You keep re-attacking it.  It's a statement, and we made it.

MR. RYAN:  Because you keep preventing me from asking questions.

MS. CHOVANES:  Right.  That's exactly right.  Yes, you're right.

MR. RYAN:  Right.  So you're preventing me from asking questions about inventory at Avidas; is that true?

MS. CHOVANES:  Beyond the scope of the judge's order.  Okay.  Stop it.  Go ask questions.  We're not going to -- you've already wasted five minutes making meaningless arguments.
    Ask questions that are acceptable.  Go.  Otherwise, we're going to leave because you're wasting our time.

MR. RYAN:  I've already read you the judge's order clarifying his prior order.  He said that his prior order is only limited to the interrogatories.
    Now, you had an opportunity to make a protective order motion, which you said you were going to do at one of the conferences, and you didn't do that.  So if you had any objections to the scope of discovery, you could have raised them with the Court at the time, but you didn't.

---

[13] This Court issued no orders limiting the substantive scope of the deposition.  Although this Court provided Defendant the opportunity to file a motion for a protective order for this very deposition (*see* Doc. No. 82 ¶ 2), Defendant failed to eve file any such motion.

MS. CHOVANES:  The Court -- that's because right after I said that, the Court said, Of course that's limited by our orders.  That's what's in the transcript.

I'm not going to argue anymore.  Do you want to take her deposition with the allowable questions after 2014, which are, by the way, on your 30(b)(6).  There are plenty of them.  Go.  (*Id.* at 46:19-49:11.)

- Q.  I'm handing you a document that was previously marked as Exhibit 33 --

MS. CHOVANES:  Previously marked where?
MR. RYAN:  At a deposition of Topix?
MS. CHOVANES:  What deposition?
MR. RYAN:  Of Topix Pharmaceuticals.

MS. CHOVANES:  Where is the exhibit marker from Topix?  Where is the original?  Because otherwise, it's your reference, and I don't believe you.

MR. RYAN:  I'm representing that it was previously marked as Exhibit 33.

MS. CHOVANES:  Okay.  We're subject to the objection that this is an unmarked exhibit, we're not going to -- we're going to take this whole area under advisement.

What do you want to ask about this?  Why don't you let me know that.  And if you want to go off the record and tell me why you want to ask about an unmarked exhibit that we've never seen before, that would be good.

MR. RYAN:  I'm not sure why you can say you've never seen this before because this document was produced by Avidas and it's Bates number A_1138 --

MS. CHOVANES:  There's no exhibit sticker on this, sir.  There's no exhibit sticker.  We've never seen this before, and you just represented it as an exhibit.  You can't do that.

Where is the one with the exhibit sticker?  Would you answer that?

MR. RYAN:  Here's what I'll do.  I'm going to mark this as Exhibit 54, as a new exhibit.  (*Id.* at 61:10-62:18.)

- MS. CHOVANES:  Well, what's the relevance of your question?  Transaction happened in 2010.  Give me an offer of proof and maybe we can forestall the Court.

MR. RYAN:  I'm not required to give you an offer.

17-CV-1124-MMA(WVG)

MS. CHOVANES:  I know that, but maybe we can forestall the Court because you're asking about stuff that's in 2010 and makes no sense.

I'm sure you have some elements in mind and you're just holding it back to extend this and torture me and the Court.  So what's your -- what's your --

MR. RYAN:  If you've reviewed the third amended complaint –

MS. CHOVANES:  Okay.  Well, tell me.

MR. RYAN:  If you've read the third amended complaint, you would know why this document was --

MS. CHOVANES:  Okay.  Well, tell me.  Don't hide it.  Tell me.

MR. RYAN:  I don't need to educate you about the case.

MS. CHOVANES:  Oh, my goodness.  Okay.  Well, if you're not going to talk about why it's relevant and you're not going to explain what you have in mind -- (*Id.* at 118:24-120:1.)

- MR. RYAN:  Next I want to mark as Exhibit 59 some images that were attached . . . to a filing that Avidas made in this case.

MS. CHOVANES:  Specifically what filing?

MR. RYAN:  Docket 47-3.

MS. CHOVANES:  And what context?  Again, I'm going to object to just producing documents out of context.

MR. RYAN:  Well, these are your filings so I'll leave it up to you.

MS. CHOVANES:  No, you have to give a context.  We produced many files in this case, and if your answer is "that's your filing," it's simply unfair.

MR. RYAN:  The filing is Document 47-3 that was filed by Avidas in this lawsuit.

MS. CHOVANES: Great.  And what paper was it filed with?  And what was the context?  You can't ask the witness about something that's been filed with the particular context out of context.  It's just unfair, Mr. Ryan.  But you go ahead.  (*Id.* at 162:22-163:20)[14]

---

[14] Docket Entry 47 was Defendant's opposition to Plaintiff's motion for leave to file a third amended complaint.  Docket Entry 47-3 contained ten color photographs attached as

- Q. I want to focus your attention on Exhibit 60. Please look at the first page of Exhibit 60, which is Bates number A-1044. What is this document that we see that's Bates-stamped 1044?

MS. CHOVANES: Objection. What is this document? What does that mean? Do you want to ask her just what it is in -- with regard to her business?

And, by the way, this probably also objected to under the protective order, so your client has to get off the phone.

MR. RYAN: It's not subject to the protective order.

MS. CHOVANES: It is, and I'm declaring it as such. It has to do with the company's business.

If you're going to ignore the protective order, we're not going to have testimony on this basis, and the judge just said that. Okay?

If you want to give me a proffer while your client gets off the phone and we go off the record, I'm willing to listen. But right now, since this is getting into their business, I have a real issue with you asking about it with her on the phone.

MR. RYAN: You didn't mark this document as confidential.

MS. CHOVANES: Great. And now you're asking about it.[15] (*Id.* at 175:4-176:6)

- Q. If you take a look at Exhibit 5, there's a series of emails. And the sequence of how the emails are set up is that the oldest email is on the top, and then the latest email in the chain is -- follows behind there.

---

exhibits to the opposition. The opposition included a declaration signed by Chovanes, stating that these specific exhibits were "true and correct copies of images of products and invoices that LaJolla [sic] provided Avidas in discovery." (Doc. No. 47-1 ¶ 27.) Here, Chovanes challenges the very exhibits her own client filed on the case docket.

[15] Of course Ryan had no reason not to ask about the document since Chovanes had admittedly not marked it as covered by the general Protective Order that covered the confidentiality of documents and information in this litigation. (*See* Doc. No. 63.) Regardless, to appease Chovanes, Ryan hung up the telephone call with his client. (*Id.* at 176:7-8.) But after briefly discussing the document, Chovanes conceded it was not covered by the Protective Order after all. (*Id.* at 177:3-7.)

17-CV-1124-MMA(WVG)

MS. CHOVANES:  Did you produce this in discovery?
MR. RYAN:  Yes.

MS. CHOVANES:  You produced this in discovery?
MR. RYAN:  No, Mr. Kuchta did.

MS. CHOVANES:  No, you produced it, your client.
MR. RYAN:  No, no, no.  Mr. Kuchta.

MS. CHOVANES:  Yeah, why didn't your client produce this in discovery?
MR. RYAN:  My client is not on the document.  Why would my client have it?

MS. CHOVANES:  I thought you just said it's a series of emails, and what's that?
Her name right in the front here.  Why didn't you produce this?

MR. RYAN:  This is an embedded email.  It's forwarded by Ms. Gardner to Mr.
Kuchta?

MS. CHOVANES:  Right.  And why didn't you produced [sic] this email?
MR. RYAN:  We'll deal with it at a different point in time.

MS. CHOVANES:  No, no, no.  It's unfair for you to be hiding documents and then
all of a sudden produce them here.
MR. RYAN:  I'm not hiding anything.

MS. CHOVANES:  Are you saying you produced this?  And if so, let me know
exactly when.

MR. RYAN:  I'm talking about Exhibit 5 as an entirety, this document was produced
by Mr. Kuchta.  Okay?

MS. CHOVANES:  What document?  There's no Bates numbers or anything on it.
I just don't -- I'm -- all this is objection.  We're going to go real slow, because I
don't believe you, and your client should have produced this document.  (*Id.* at
241:10-243:3)[16]

---

[16] This is yet another example of an unnecessary diatribe that wastefully consumed Ryan's
available deposition time.  The email communication in question was a forwarded message
from Kuchta (Defendant's buyer) to Gardner (Defendant's founder).

17-CV-1124-MMA(WVG)

### 4.     Instances of Chovanes Unnecessarily "Noting" For the Record

Plaintiff also identifies seventeen instances when Chovanes unnecessarily noted various things for the record.  However, the Court isn't particularly concerned with many of these instances.  Although many were gratuitous and certainly pointless, some happened when Ryan was calling his client or when the unnecessary "noting" did not disrupt the flow of the deposition.  However, the following instances when Chovanes unnecessarily made objections or comments did disrupt and delay the deposition:

- [Discussing photographic exhibits attached to a motion Defendant had filed and Chovanes had submitted as part of a declaration.] MS. CHOVANES:  What filing, sir?
  MR. RYAN:  Filing document 47-3.

  MS. CHOVANES:  And why was this -- do you have the rest of where this was?  An appendix or something?
  MR. RYAN:  No.

  MS. CHOVANES:  Note my -- excuse me.  Let me object to this because we didn't produce anything like this, exclusive of other information, so I think it's unfair and out of context.  Plus I'll note that there is no identification, there's no Bates number or anything on this, so I don't really accept counsel's representation.
      With that said, you may answer if it's a relevant, nonprivileged question.  (*Id.* at 157:1-15.)

- [Discussing the same photographic exhibits as above.]  Do you believe that Exhibit 57 depicts the Vitaphenol packaging that was created by Harmony Labs?
  A.  I believe so but I'm not certain.

  MS. CHOVANES:  I'm sure something was said about this.  Again, I'll note my continuing objection, as this was in a brief, and pulling it out of a context of a brief is unfair to the witness.

  MR. RYAN:  Do you agree that any statements made in the briefs filed by Avidas can be used as admissions against Avidas, Ms. Chovanes.

  MS. CHOVANES:  Don't answer that.  That's a privileged question.  Don't answer that.

  MR. RYAN:  I'm asking you, Ms. Chovanes.

MS. CHOVANES: I have no idea what you're talking about. We're here to ask the witness questions. Keep going. Note my objection. (*Id.* at 158:13-159:6.)

- Q. Next I'm handing you a document that's previously marked as Exhibit 24.
  MS. CHOVANES: By whom? By when?
  MR. RYAN: By me.
  MS. CHOVANES: When?
  MR. RYAN: At the deposition of Joe Kuchta.

  MS. CHOVANES: Again, the record will reflect there's no exhibit number, there's no Bates number, and I have a continuing objection to asking questions about this material.
      If counsel could show me in the transcript where this document has been marked, I would gladly withdraw my objection. (*Id.* at 251:8-21.)

None of the above colloquy served any reasonably practical purpose and served only to disrupt Ryan's questioning and delay the deposition further. Chovanes's petty quibbling about photographs that had been filed in this case by her own client were frivolous and served no useful purpose. Nor did her objections about Ryan's use of those photographs during the deposition based on them being used out of context simply because the photographs had originally been used as exhibits to one of Chovanes's client's court filings. What these continuous, unnecessary interruptions did do, however, was to systematically eat away at Ryan's allotted seven hours of deposition, disrupt Ryan's line of thinking and flow of questioning, and continue to obstruct the deposition.

### 5. Instances Where Chovanes Made Objections That Suggested To Gardner How She Should Answer the Question

Under Rule 30(c)(2), an objection "must be made concisely in a . . . nonsuggestive manner." However, Chovanes repeatedly violated this rule by making suggestive objections that subtly coached Gardner how to answer Ryan's questions. The following are some representative examples.

- Q. What are the brand names of the products that Avidas has developed and produced since 2008?

17-CV-1124-MMA(WVG)

1

2      A.  We have –

3      MS. CHOVANES:  To the best of your recollection.

4      MR. RYAN:  Ms. Chovanes, please don't provide speaking objections for the
5      witness.

6      MS. CHOVANES:  That's an objection.  I'm allowed to object.  Are you objecting
7      to the fact that I'm objecting?

8      MR. RYAN:  Yes, because --
9
10     MS. CHOVANES:  I'm allowed to object.  It's not a speaking objection to say that
       your assumption may be incorrect.
11
12     MR. RYAN:  That wasn't what you said.  You said to the witness --

13     MS. CHOVANES:  Your assumption – of course that's what I said.  Your
14     assumption was -- we're not going to read back.  Just please go on.

15     MR. RYAN:  Please don't make speaking objections.

16     MS. CHOVANES:  Please ask questions that aren't objectionable; I won't be
17     making speaking objections, which I'm not doing anyway.  (Doc. No. 93-6 at 26:11-
18     27:9.)

19   • Q.  Has Avidas Pharmaceuticals ever had any involvement with a product called
20       Vitaphenol?

21     MS. CHOVANES:  You can answer that.
22     THE WITNESS:  Yes.

23     MS. CHOVANES:  To the extent you understand what "involvement" means.  (*Id.*
24     at 30:10-15.)

25   • Q.  Can you describe how the repackaged products that SciDerma created differed
26       in look from the products that Avidas sold when it sold the Vitaphenol products?

27

28

MS. CHOVANES: That's a really long question. And what do you mean by "look" Because "look and feel" is actually a legal question, what's look and feel. So I -- excuse me, let me finish.

So I'm going to ask you to rephrase in light of the definition of "look" as possibly a legal definition. I mean, do you have one? Why is this relevant anyway? Having her factually describe stuff.

I mean, go ahead if you can answer it, but I would rather that you not use those legal terms, Mr. Ryan.

MR. RYAN: I'm not intending them in any legal sense.

MS. CHOVANES: Okay. Well, if you can answer, go ahead. (*Id.* at 151:6-152:1.)

- Q. Do you know who signed any of the checks that Avidas sent to La Jolla Spa at any point in time?

MS. CHOVANES: Objection; irrelevant. It's your client. How should she know that?

THE WITNESS: No, I do not. (*Id.* at 185:4-10.)

- Q. So if SciDerma made a mistake in the reports that it sent to Avidas, Avidas wouldn't know that there was a mistake; correct?

MS. CHOVANES: Objection; asked and answered, plus it calls for speculation. You can answer if you are able.

THE WITNESS: We didn't have any reason to mistrust the information --

MS. CHOVANES: Just answer the question. (*Id.* at 209:12-21.)

Like Chovanes's other objections quoted throughout this Order, these objections lacked conciseness. While it appears Gardner at times did not heed Chovanes's comments, the objections nonetheless suggestively coached Gardner on how to answer Ryan's questions.

**6.    Instances of Chovanes's Discourteous or Aggressive Behavior Towards Ryan**

Plaintiff also identifies two instances of Chovanes's discourteous behavior towards Ryan, one of which was an inexplicable outburst during which Chovanes stood and loomed

over the examination table, aggressively accused Ryan of threatening Gardner, and then left the deposition room for a break. This bizarre incident occurred after Ryan declined Chovanes's request to take a break. Ryan instead stated he wished to proceed to finish the two-hour block of time since the Court had previously ordered the deposition proceed in two-hour increments with thirty-minute breaks. When Chovanes persisted, Ryan simply asked Gardner if she needed a break and likely would have taken a break had Gardner said she needed one. The bizarre outburst proceeded as follows:

> MR. RYAN: We're not off the record.

> MS. CHOVANES: Okay. Well, let's stay on. I want to talk about taking a break. It's 11:30, and the Court said they'll call in at 12:30 our time; right?

> MR. RYAN: Yes.

> MS. CHOVANES: Okay. So what do you want to do about a break?

> MR. RYAN: Well, I think we need to go for our allotted two hours, and then we'll take a break.

> MS. CHOVANES: There's no allotted two hours.[17]

> MR. RYAN: That's what the Court said, is we should take --

> MS. CHOVANES: No, the Court didn't say anything about timing.[18] The witness – the witness is doing the best she can. And we moved this precisely for your convenience. Don't start doing that game. You've wasted plenty of time.

> MR. RYAN: Do you need to take a break?

> MS. CHOVANES: No, don't talk to my witness, ever. Don't you ever talk to my witness. Do you understand how threatening that is?

---

[17] (*But see* Doc. No. 82 ¶ 1.)

[18] (*But see id.*)

MR. RYAN: Why are you standing up?[19]

MS. CHOVANES: And how unprofessional that is?

MR. RYAN: Why are you standing up?

MS. CHOVANES: Because you're a male exercising male privilege and talking to my witness in a situation where she's already nervous. And you're talking to her directly? That's, first of all, a violation of the ethical rules, as you know.

MR. RYAN: Why are you standing up?

MS. CHOVANES: We're going to take a break. Come on, Margie, let's take a break.

MR. RYAN: You're leaning over the table.

MS. CHOVANES: Yes, because of your threatening nature --

THE VIDEOGRAPHER: I'm sorry. You have the microphone on.

MS. CHOVANES: Because you threatened my witness just now. Don't you ever talk to her directly.

MR. RYAN: I did not threaten the witness.

MS. CHOVANES: Okay.

THE VIDEOGRAPHER: The [microphone] clip is still on it.

THE WITNESS: I'm sorry. I hope I didn't break it.

---

[19] The video clip shows Chovanes standing and leaning across the examination table with her arm half extended across the table. At the sanctions hearing, Chovanes briefly mentioned displeasure with the videographer's choice of camera angles. However, the camera was placed directly in front of Gardner and did not show either of the attorneys until Chovanes stood up and leaned across the table and into the video frame. The video angle is standard, and the Court finds nothing questionable about the videographer's positioning of the camera.

THE VIDEOGRAPHER:  You can just leave it there.  Off the video?

MR. RYAN:  Not yet.

THE WITNESS:  Excuse me.
(Whereupon, Ms. Chovanes and Ms. Gardner leave the deposition room.)

MR. RYAN:  Now we're off the record.

THE VIDEOGRAPHER:  Time is 11:37 a.m.  We're going off the video record.
(Doc. No. 93-6 at 80:19-83:7.)  This troubling tirade began with Ryan's seemingly benign question to Gardner, asking whether she needed to take a break.  As with the rest of Chovanes's conduct during this deposition, the cold, typed words of the transcript truly do not do justice to the tone and tenor of Chovanes's sustained harassment of Ryan.  This Court has reviewed the video clip of the above exchange.  The video demonstrates that Ryan's voice was calm, relaxed, and non-threatening in any way.  He also said nothing to Gardner that could remotely be considered threatening to trigger Chovanes's grossly disproportionate response.

What the Court can surmise from this interaction following Chovanes's rebuffed request to take a break is that it may have been fabricated in order to take the break.  This appears to be the only reasonable explanation because nothing Ryan said could have warranted the inexplicably disproportionate response from Chovanes.  However, once Chovanes reacted in this manner, she was able to leave the room and take the break she had requested under the guise of some feigned outrage in response to Ryan's completely benign and reasonable question to Gardner about her need for a break.  Based on the transcript, this appears to be the only reasonable explanation for Chovanes's outburst.  It certainly cannot be justified as a reasonable, rational response to anything Ryan said or did.  In any event, such irrationally aggressive conduct toward opposing counsel is precisely the type of disturbing, unprofessional behavior that has no place in the legal profession.  This conduct further served to disrupt the deposition and perpetuate the incredibly tense,

rancorous atmosphere Chovanes had singlehandedly created from the opening minutes of the deposition.

### 7. Additional Examples of Chovanes's Harassing, Obstructive Behavior

In addition to the above categories and examples Plaintiff cited, the Court's review of the full deposition transcript revealed many more instances of Chovanes's obstructive behavior.

1. For example, Chovanes constantly instructed Ryan to "hurry up," accused him of wasting her and Gardner's time, and generally attempted to rush Ryan's questioning. (*See, e.g.*, Doc. No. 93-6 at 14:24-15:1; 30:3; 33:18-19 ("Why are you wasting our time?"); 35:3; 48:16-18 ("Ask questions that are acceptable. Go. Otherwise, we're going to leave because you're wasting our time."); 50:16; 58:21-24 ("Yeah, I know you think it's important to waste our time, but we're trying to get out of here and with concern – out of courtesy for everyone's time."); 60:25; 74:18-20 ("You can answer, but that's the last question, because this is just wasting everyone's time."); 81:13; 85:25-86:1; 170:24; 214:8-9.) These comments by Chovanes are quite puzzling because Ryan was entitled to question Gardner for 7 hours regardless of how quickly or slowly he questioned her. Thus, these repeated comments by Chovanes served no other purpose than to harass and antagonize opposing counsel and to perpetuate the hostile atmosphere of the deposition.

2. Additionally, Chovanes made at least thirty "asked and answered" objections. (Doc. No. 93-6 at 70:4-6; 77:12-13; 77:19-20; 79:21-22; 85:23-24; 86:9-10; 87:13-14; 90:5-6; 92:13-14; 99:23-24; 105:5-6; 114:7-8; 132:22-23; 137:19-20; 138:1-2; 138:16-17; 161:13-14; 161:24-25; 162:7-8; 171:8-9; 173:11-12; 205:11-12; 210:3-4; 217:15-16; 225:20-21; 225:24-25; 228:12-19; 229:2-3; 237:9-10; 278:23-279:1.) In the context of a deposition, "asked and answered" objections are utterly pointless and serve no purpose.

3. Then there were eleven instances on which Chovanes simply objected by saying "objection" without specifying any basis for the objection. (Doc. No. 93-6 at 117:8; 191:20; 197:12; 197:17; 211:18; 236:19; 244:6; 261:13; 261:24; 262:4; 276:16.) Without a specific basis for an objection, "objection" alone is a pointless interjection and can serve

no other purpose but to interrupt. These objections were consistent with Chovanes overall obstructive modus operandi in this deposition.

4.  And then there were eighteen objections with a basis identified where the basis was nonsensical in the context of a deposition or intentionally obtuse about the meanings of words and could only be intended to obstruct and harass Ryan. Also included are argumentative "objections." These instances included:

- Q. How long has Avidas done that?
  MS. CHOVANES: Objection to the term "long." (Doc. No. 93-6 at 18:22-24.)

- Q. You signed as the president on behalf of Avidas Pharmaceuticals; is that correct?
  MS. CHOVANES: Objection; the document speaks for itself. (*Id.* at 39:6-9.)

- Q. Do you have any documents that reflect how much inventory Avidas received in 2008 from La Jolla Spa?

  MS. CHOVANES: Objection. Don't answer that question. You're getting into materials that even by your own admission are foreclosed.

  MR. RYAN: I didn't make any admissions. (*Id.* at 52:13-21.)

- MS. CHOVANES: Objection; mischaracterization of her -- now, don't start mischaracterizing her testimony just because you're upset. (*Id.* at 69:16-19.)

- Q. Did the Vitaphenol records that were maintained in the Doylestown office, were they transferred to your home office at some point?

  MS. CHOVANES: Objection; inference. I'm not going to let her answer that question because it's leading and it implies facts that aren't in evidence. (*Id.* at 79:6-12.)

- Q. Do you know whether all of the records that Avidas maintained relating to Vitaphenol products were retained?

  MS. CHOVANES: Objection. Don't answer that question.

  MR. RYAN: On what grounds?
  MS. CHOVANES: It makes no sense; and I'm not going to get into these areas without a specific question making sense. (*Id.* at 84:19-85:2.)

17-CV-1124-MMA(WVG)

- Q. This document is also signed on behalf of SciDerma Medical by someone named Douglas S. Neal. Do you know who that is?

  MS. CHOVANES: Objection to the characterization. (*Id.* at 101:3-7.)

- Q. Has it done anything affirmatively to try to collect that money?

  MS. CHOVANES: Objection to the question. Don't answer. I don't like the prejudicial nature of the word "anything" and what was the other part -- anyway, rephrase the question, if you would. (*Id.* at 109:12-19.)

- Q. In the last column on Exhibit Roman numeral IV it lists inventory values for various products. Do you know who placed the value on those inventory items?

  MS. CHOVANES: Objection; assumes a fact not in evidence. (*Id.* at 112:23-113:4.)

- Q. So Mr. Henn was an outside consultant to Avidas; is that correct?

  MS. CHOVANES: Objection; asked and answered. Plus the vagueness of the term "outside consultant" is objectionable. (*Id.* at 134:6-10.)

- Q. Well, there's a difference between taking a bottle that's existing and pouring it into a new bottle, and taking the existing bottle and then putting a new label on it. I'm trying to understand which of those two things, or something else, that SciDerma did. Do you have an understanding --

  MS. CHOVANES: Objection. Can you ask a question that makes sense? That made no sense. I'm not going to let her answer it because it's inconsiderate of her to give her questions that make no sense. Come on. (*Id.* at 150:7-18.)

- Q. Can you describe how the repackaged products that SciDerma created differed in look from the products that Avidas sold when it sold the Vitaphenol products?

  MS. CHOVANES: That's a really long question. And what do you mean by "look"? Because "look and feel" is actually a legal question, what's look and feel. So I -- excuse me, let me finish.

  So I'm going to ask you to rephrase in light of the definition of "look" as possibly a legal definition. I mean, do you have one? Why is this relevant anyway? Having her factually describe stuff.

I mean, go ahead if you can answer it, but I would rather that you not use those legal terms, Mr. Ryan.

MR. RYAN: I'm not intending them in any legal sense. (*Id.* at 151:6-24.)

- [Chovanes objecting to a document that her client filed on the docket.] MS. CHOVANES: Note my -- excuse me. Let me object to this because we didn't produce anything like this, exclusive of other information, so I think it's unfair and out of context. Plus I'll note that there is no identification, there's no Bates number or anything on this, so I don't really accept counsel's representation. With that said, you may answer if it's a relevant, nonprivileged question. (*Id.* at 157:7-15.)

- [Same as above.] MS. CHOVANES: No, you have to give a context. We produced many files in this case, and if your answer is "that's your filing," it's simply unfair.

MR. RYAN: The filing is Document 47-3 that was filed by Avidas in this lawsuit.

MS. CHOVANES: Great. And what paper was it filed with? And what was the context? You can't ask the witness about something that's been filed with the particular context out of context. It's just unfair, Mr. Ryan. But you go ahead. (*Id.* at 162:1-20.)

- Q. And that would be true for the entire period of time that SciDerma sold the Vitaphenol products: Information would come in various forms.
  MS. CHOVANES: Objection.

  MR. RYAN: -- related to sales?
  MS. CHOVANES: Sorry. Objection. Can you ask a question that makes sense, because that one doesn't. It's got too many parts.

- Q. So this is the monthly report for November 30th of 2011; is that true?

  MS. CHOVANES: Objection; document speaks for itself.

- Q. Who did you have discussions with at SciDerma about terminating the agreement between Avidas and SciDerma?

  MS. CHOVANES: Assumes a fact not evidence. Objection. (*Id.* at 215:12-16.)

- Q. How was -- how were the Vitaphenol products being sold in early 2014, before May of 2014?

17-CV-1124-MMA(WVG)

MS. CHOVANES: Objection. Please clarify the question. "How" means so many things I'm not going to let her answer it because it's too ambiguous. (*Id.* at 220:24-221:5.)

The deposition transcript contains additional examples, and the Court could go on. Suffice it to say that all of the above representative examples of various pointless or nonsensical objections highlight Chovanes's unrelenting interruptions of Ryan's questioning, interposing objections that either made no sense or served no practical purpose in the context of a deposition (as opposed to a trial). For example, there is no planet in any solar system on which the word "how" is ambiguous in the context of Ryan's final question above. The same is true for the word "long" in the first example cited above.

5.    Finally, the transcript contains examples of discourteous conduct towards Ryan that interrupted and delayed the completion of the deposition. Chovanes disparaged Ryan and his case throughout the deposition, calling the case "garbage" (Doc. No. 93-6 at 35:1-2, 68:24) or maligning him personally and the nature of his questioning (*see, e.g.*, *id.* at 118:3-4 ("Again, you're belaboring the witness, you have so many 'belief' questions."); 228:10-13 ("If you keep asking questions that are objectionable, we're really not getting anywhere. So let's go, come on Counsel. Ask questions that are good ones."); 267:16-17 ("Ask a real question with a noun, a topic and date.")).

## B.    Chovanes's Conduct Multiplied Proceedings Under Rule 30(d)(2)

The Court has painstakingly enumerated numerous examples that collectively demonstrate Chovanes systematic impeding, delaying, and frustrating the fair examination of Gardner. From the opening moments of the deposition, Chovanes adopted a hostile tone and posture against Ryan and then unrelentingly proceeded to make Ryan's examination as difficult as possible. Chovanes employed all of the categories of tactics identified above to continuously interrupt the deposition and mercilessly harass Ryan. Every baseless objection, diatribe, argumentative comment, and petty argument cumulatively compounded to greatly extend the time spent in deposition. And every baseless interruption identified above served to harass Ryan, shift his focus away from the purpose

of the deposition and towards battling Chovanes, and greatly frustrated the fair examination of Gardner. Rather than being able to focus on Gardner and this case, Ryan was continuously drawn into squabbles with Chovanes as the seven hours allotted for the deposition quickly burned away. Accordingly, this Court easily finds sanctions upon Chovanes are appropriate under Federal Rule of Civil Procedure 30(d)(2).[20]

## C. Chovanes Unreasonably and Vexatiously Multiplied Proceedings Under 28 U.S.C. § 1927

Under 28 U.S.C. § 1927, any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Section 1927 thus provides the Court the authority "to hold attorneys personally liable for excessive costs for unreasonably multiplying proceedings." *Gadda v. Ashcroft*, 377 F.3d 934, 943 n.4 (9th Cir. 2004). Here, the Court finds Chovanes unreasonably and vexatiously prolonged Garner's deposition *far* longer than necessary and *far* longer than it would have taken without Chovanes's incessant, baseless, petty interruptions and drawing Ryan into unnecessary, frivolous disputes and discussions. Indeed, the transcript is replete with Chovanes's misconduct, and it appears Chovanes spoke more at the deposition than Garner spoke. Without Chovanes's conduct, the deposition would have concluded far sooner and would have been a far more productive and pleasant experience for everyone involved, including Garner. Interruptions and objections could be justified if they could reasonably add value to representing a client in a deposition. However, Chovanes's frivolous conduct added no such value and instead created a highly corrosive atmosphere that never should have been created. Because

---

[20] Although a finding of bad faith is not required for Rule 30(d)(2) sanctions, this Court expressly finds Chovanes's impeding, delaying, and frustrating Gardner's fair examination was in bad faith. (*See*, *infra*, Part III(E).)

Chovanes's conduct was often baseless, it was unreasonable and vexatious.[21]  Accordingly, this Court finds ample basis to impose section 1927 sanctions upon Chovanes.[22]

**D.      Sanctions Are Also Appropriate Under the Court's Inherent Power**

Finally, sanctions are appropriate under the Court's inherent power because Chovanes's conduct went far beyond the multiplication of proceedings that Rule 30(d)(2) and section 1927 address.  The Court's inherent power "extends to a full range of litigation abuses." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991); *see also Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001) ("Under both *Roadway* and *Chambers*, . . . the district court has the inherent authority to impose sanctions for bad faith, which includes a broad range of willful improper conduct.")  In addition to wastefully prolonging and multiplying proceedings at the Gardner deposition, Chovanes engaged in a wide range of harassing and abusive behavior that this Court finds intolerable.  As explained immediately below, this

---

[21] However, this conclusion does not end the section 1927 analysis.  Because subjective bad faith is relevant to both section 1927 sanction and "inherent powers" sanctions, the Court will discuss Chovanes's subjective bad faith below.

[22] *Accord Grochocinski v. Mayer Brown Rowe & Maw LLP*, 452 B.R. 676, 686 (N.D. Ill. 2011) (exercising discretion to impose section 1927 sanctions for counsel's unprofessional and childish behavior because plaintiff's counsel, during plaintiff's deposition, repeatedly obstructed questioning with improper interruptions, objections, insults, and accusations that defendants' motions were fraud.); *Unique Concepts, Inc. v. Brown*, 115 F.R.D. 292 (S.D.N.Y. 1987) (finding attorney was personally liable, without reimbursement from client, for costs of deposition of plaintiff where counsel's "contentious, abusive, obstructive, scurrilous, and insulting conduct" resulting in comments and statements other than objections to form of question apparent on 132 out of 147 pages of deposition transcript, constituted bad faith, intended to harass and delay and reflected willful disregard for orderly process of justice.); *Brignoli v. Balch, Hardy & Scheinman, Inc.*, 126 F.R.D. 462, 466-67 (S.D.N.Y. 1989), modified, 1989 U.S. Dist. LEXIS 14190 (S.D.N.Y. Nov. 30, 1989) (finding attorney was subject to sanctions for discovery behavior in asking repetitive questions, making improper objections and directing clients not to answer proper questions, and made speaking objections even after court expressly prohibited them, resulting in deposition proceeding lasting hours longer than necessary.)

17-CV-1124-MMA(WVG)

behavior was carried out in bad faith and with the intent to obstruct the fair examination of Gardner.

**E.      Chovanes Acted In Bad Faith**

For the purposes of both section 1927 and inherent power sanctions, this Court finds Chovanes acted in bad faith.  Because this Court has had extensive experience with Chovanes and Ryan over the past seven months over many hours of hearing arguments and a Mandatory Settlement Conference, this Court has become very familiar with both attorneys.  *See generally Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 404 (1990) ("Deference to the determination of courts on the front lines of litigation [that sanctions are warranted] will enhance these courts' ability to control the litigants before them."); *see also Aloe Vera of Am., Inc. v. United States*, 376 F.3d 960, 965, 966 (9th Cir. 2004).  Based on this Court's extensive experience with Chovanes, her conduct at the deposition was hardly surprising.  It was simply a *drastically* amplified version of the conduct that the Court had witnessed first-hand in the past.  Given the totality of the deposition transcript, this Court finds that Chovanes acted with knowledge, with the intent to harass Ryan, and to delay and obstruct the questioning of Gardner as much as possible.  The Court further finds that her conduct was frivolous and that she acted with subjective bad faith.

Chovanes demonstrated a knowing intent to harass Ryan based on the long-held belief that this case is "garbage"—a belief that Chovanes has repeated multiple times during on-the-record discovery conferences before this Court prior to the deposition and even during the very hearing the Court held on this sanctions motion.  Based on that long-standing belief, Chovanes unleashed her harassing, obstructive behavior full force against Ryan during a critical moment in Plaintiff's case—the deposition of the founder of Defendant that could potentially yield valuable information for Plaintiff's case.  The transcript amply demonstrates that Chovanes's conduct was not inadvertent, accidental, or negligent—it was knowing, intentional, and willful.  And the transcript is littered with example after example of frivolous objections, comments, arguments, and attacks—many so ludicrous that any competent attorney would refrain from employing.  In addition to the

frivolity of the objections, comments, and interruptions, Chovanes's improper purpose is plainly evident in the transcript. She intended to harass and obstruct Ryan's questioning as much as possible based on the staunch belief that this is a "garbage" case brought to harass Defendant. Obviously, the more frequently Chovanes interrupted Ryan and engaged him in distractions and argument for extended periods, the more of the seven hours allotted for Gardner's deposition would be consumed by Chovanes speaking rather than Gardner answering questions that could harm Defendant's case. And that is precisely what happened here, as the transcript is littered throughout with Chovanes's wasteful, frivolous interruptions.

In her defense, all Chovanes can muster is that Plaintiff suffered no prejudice despite her conduct because Ryan was ultimately able to ask his questions and stated at the end of the deposition that he had no further questions. Chovanes has never acknowledged that her conduct was in any way improper. Unfortunately, Chovanes's weak defense falls flat because sanctions under the Court's inherent powers are available *even if* an attorney's conduct was not frivolous if that conduct was for an improper purpose. *Fink v. Gomez*, 239 F.3d 989, 992-94 (9th Cir. 2001). And for purposes of section 1927, the relevant inquiry is not whether the victim suffered prejudice, but whether the improper tactics were intended to increase expenses or delay proceedings. *See New Alaska Dev. Corp. v. Guetschow*, 869 F.2d 1298, 1306 (9th Cir. 1989) ("Tactics undertaken with the intent to increase expenses, or delay, may also support a finding of bad faith.").

Here, of course, Chovanes's conduct *was* frivolous and, as the Court concludes above, her conduct was undertaken for an improper purpose to harass, obstruct, and delay the orderly questioning of Gardner to which Ryan was entitled. Chovanes's repeated and unyielding interference with Ryan's efforts to conduct a professional, orderly deposition revealed her true motive—to improperly frustrate Gardner's deposition. This obstructive tactic, which has no place in the legal process, was conceived and executed in bad faith.

Chovanes accordingly violated the basic standards of professionalism expected of all attorneys appearing before this Court. *See* S.D. Cal. Civ. L.R. 83.4 Chovanes was not

courteous or civil; acted in a manner detrimental to the proper functioning of the judicial system; disparaged opposing counsel; and engaged in excessive argument, abusive comments, and delay tactics at Gardner's deposition. The sheer volume of Chovanes's antics belie any notion of mistake or negligent conduct on her part but rather disturbingly reveal a systematic effort to obstruct Ryan for no good or justifiable reason or purpose. Chovanes undeniably acted in bad faith.

## F.    Amount of Sanctions

Plaintiff seeks a two-fold sanctions award of $7,242.03 in costs incurred by Dianne York, the President of Plaintiff La Jolla Spa MD, Inc., and $21,360 in its attorney's fees incurred for the Gardner deposition and these sanctions proceedings. Although Defendant has now had two opportunities to challenge the propriety or amount of costs and fees, Defendant failed to argue these amounts were either improper or excessive. Defendant's opposition made no such attempt, and Chovanes also made no such attempt at the sanctions hearing. The only objection to these amounts is as follows: "The sworn statements seeking the thousands of dollars lack any back up documents and counsel and his client tell different stories about what happened and their supposed expenses." (Doc. No. 94 at 5.) First, with respect to the "back up documents," the Court finds York and Ryan's sworn declarations sufficient and reliable evidence of their fees and costs. Ryan's declaration sets forth his hourly rate, the time spent on each billing entry, and describes each entry with reasonable particularity to allow the Court to review its propriety. This is common practice for plaintiffs' attorneys who seek fees or sanctions. And York's declaration sets forth sufficient details and supporting documentation to justify the costs incurred. This Court has no reason to doubt the accuracy or veracity of the declarations or the amounts set forth therein.

Second, it is of no moment that the two declarations differ as to the date on which Ryan travelled for the Gardner deposition. Whether he travelled on May 1 or May 2, there is no dispute that he actually travelled to Philadelphia for the deposition. He was there,

and he incurred costs and fees to get there. The trivial discrepancy between the declarations does nothing in this Court's mind to discredit the declarations *in toto*.

Other than the objection discussed above, Chovanes has not provided any other specific basis or challenge to the amount Plaintiff requests in sanctions. Nor has she even argued that sanctions amount is generally excessive. At the sanctions hearing, although the Court specifically addressed Chovanes's failure to do so, she again failed to raise any challenge to the amount or portions thereof. As a result, no reduction is appropriate. *See Bylin Heating Sys. v. Thermal Techs., Inc.*, No. 11CV1402-KJM-KJN, 2014 U.S. Dist. LEXIS 30809, at *13-14 (E.D. Cal. Mar. 10, 2014) (imposing $32,851.29 in sanctions and finding: "In any event, by twice failing to oppose plaintiffs' motion for attorneys' fees and costs after appropriate notice, defendant has waived any argument that the time spent on any particular task, and/or the total number of hours spent on this case, are unreasonable."); *see generally Gates v. Rowland*, 39 F.3d 1439, 1449 (9th Cir. 1994) (fee opponents failed to meet burden of rebuttal, because opponents failed to point out with specificity any charges that were excessive or duplicative); *Columbia Pictures Tel. v. Krypton Broad. of Birmingham, Inc.*, 106 F.3d 284, 296 (9th Cir. 1997), rev'd on other grounds, 523 U.S. 340 (1998) (rejecting argument that certain hours should have been excluded, because no specific objection was raised in district court); *see also Smith v. Rogers Galvanizing*, 148 F.3d 1196, 1199 (10th Cir. 1998) (district court did not abuse discretion in refusing to reduce hours as to which fee opponent made no specific objection); *Sheets v. Salt Lake City*, 45 F.3d 1383, 1391 (10th Cir. 1995) (fee opponent who argued merely that fee request was exorbitant and duplicative failed to carry burden of opposing fee, and waived issue for purposes of appeal). In any event, the Court has independently reviewed both declarations and requests for sanctions and finds the hourly rate, total amounts, and bases for sanctions reasonable and proper. *See Gates v. Deukmejian*, 987 F.2d 1392, 1401 (9th Cir. 1992) (court has duty "to independently review plaintiffs' fee request even absent defense objections").

17-CV-1124-MMA(WVG)

## IV.  CONCLUSION

Never before in this Court's nearly ten-year tenure have the sanctions the Court imposes today been more fitting and more deserved by an attorney.  Chovanes's atrocious conduct at the Gardner deposition in particular fell far below the standard of professional conduct becoming an attorney practicing before this—or any other—Court.  There may be a fine line between zealous advocacy and unprofessional conduct, but Chovanes trampled that line long before barreling past it.  Chovanes's frivolous, willful, vexatious conduct greatly expanded the Gardner deposition far beyond what the proceedings would have lasted without her unending unjustified interruptions and harassment of Ryan.  Plaintiff's motion for sanctions is GRANTED, and Chovanes is sanctioned for the conduct, reasons, and under the authority set forth above.  Accordingly:

1.     Without reimbursement from Defendant, Chovanes is sanctioned in the amount of $28,502.03 payable to Ryan's trust account **on or before September 17, 2019**.

2.     Chovanes shall self-report to the State Bar of Pennsylvania **on or before September 24, 2019**.  The reporting shall consist of a copy of this Order, the full transcript of the Gardner deposition, the full transcript of the August 16, 2019 sanctions hearing, and the 128 video clips submitted as part of Plaintiff's sanctions motion.  **On or before October 1, 2019,** Chovanes shall file a declaration under oath that confirms compliance with this Order and that all documents and video clips were submitted to the State Bar of Pennsylvania.

3.     Chovanes shall henceforth attach a copy of this Order as an exhibit to any pro hac vice application for admission to practice before the United States District Court for the Southern District of California.  This requirement shall have no expiration date and shall remain in effect *in perpetuity*.

**IT IS SO ORDERED.**

DATED:  August 30, 2019

Hon. William V. Gallo
United States Magistrate Judge

17-CV-1124-MMA(WVG)